## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-61542-CIV-UNGARO/SIMONTON

IN RE BANKATLANTIC BANCORP, INC.
SECURITIES LITIGATION

_____/

## DEFENDANTS' TRIAL BRIEF

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Eugene E. Stearns
Richard B. Jackson
Adam M. Schachter
Cecilia D. Simmons
Gordon M. Mead, Jr.
Andrea N. Nathan
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3200
Facsimile:  (305) 789-3395

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   The Admissibility of Market Analyst Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.   Analyst Reports dated before October 25, 2007 . . . . . . . . . . . . . . . . . . . . . . 1

      B.   Analyst Reports dated after October 25, 2007 . . . . . . . . . . . . . . . . . . . . . . . 3

III.  The Class Representatives Damages Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.   State Boston and Erie County Could Never Prove Reliance and Have Interests
           Adverse to the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.   The Jury Cannot Speculate as to Damages by Adopting a Per-diem
      Award With Different Awards for Multiple Time Periods as There Will
      be No Evidence to Support it and the Court Has Previously
      Rejected this Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.   The Period Between October 19, 2006 and April 26, 2007 . . . . . . . . . . . . . . . 13

      B.   The Period Between April 26, 2007 and October 26, 2007 . . . . . . . . . . . . . . . 14

      C.   A Last Minute Attempt to Afford a Jury the Opportunity to Speculate on a Daily
           Inflation Rate, Unsupported by any Evidence, Contrary to the Evidence Upon
           Which this Case was Prepared and Without Affording Defendants an Opportunity
           to Prepare Would be Grossly Prejudicial . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      D.   Without The Requisite Expert Opinion, A Jury Cannot Reach A Verdict As To
           Daily Inflation Or Multiple Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . 19

      E.   Vivendi Addressed a Claim of Multiple Days of Inflation and the Attempt to
           Resolve Those Issues has Created a Train Wreck no one Would Knowingly
           Pursue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.    The Court Should Decline to Make Any Instruction with Respect to Comments Made by
      Alan Levan During the Earnings Conference Call on July 25, 2007, until the Close of
      Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

SERVICE LIST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

### Cases

*Almonor v. BankAtlantic Bancorp, Inc.*,
  261 F.R.D. 672 (S.D. Fla. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Haliburton Co.*,
  597 F.3d 330 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9

*Arenson v. Broadcom Corporation*,
  No. 02cv301, 2004 WL 3253646 (C.D. Cal. Dec. 6, 2004) . . . . . . . . . . . . . . . . . . . . . . . 9

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brough v. Imperial Sterling Ltd.*,
  297 F.3d 1172 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Grimes v. Fairfield Resorts, Inc.*,
  No. 06-14363, 2007 WL 245128 (11th Cir. Jan. 30, 2007) . . . . . . . . . . . . . . . . . . . . . 12

*In re eSpeed, Inc. Sec. Litig.*,
  232 F.R.D. 95 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re HealthSouth Corp. Sec. Litig.*,
  257 F.R.D. 260 (N.D. Ala. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re MIVA, Inc. Sec. Litig.*,
  No.05cv201, 2009 WL 3821146 (M.D. Fla. Nov. 16, 2009) . . . . . . . . . . . . . . . . . . . 19, 20

*In re Northern Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Vivendi Universal, S.A. Sec. Litig.*
  (Case No. 02cv5571, S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*In re Williams Securities Litig.-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

-ii-

*Kane v. Shearson,*
   916 F.2d 643 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Miller  v. Thane Int'l, Inc.,*
   No. 03cv1031, 2005 WL 5957833(C.D. Cal. Mar. 3, 2005) . . . . . . . . . . . . . . . . . . . . . 18

*Phillips v. Klassen,*
   502 F.2d 362 (D.C. Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pickett v. Iowa Beef Processors,*
   209 F.3d 1276 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Prado-Steinman v, Bush,*
   221 F.3d 1266 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Richardson v. MacArthur,*
   451 F.2d 35 (10th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Richardson v. MacArthur,*
   451 F.2d 35 (10th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Robbins v. Koger Properties, Inc.,*
   116 F.3d 1441 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. A&S Council Oil Co.,*
   947 F.2d 1128 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Brown,*
   299 F.3d 1252 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Garcia,*
   447 F.3d 1327 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Scrima,*
   819 F.2d 996 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Steed,*
   548 F.3d 961 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Valley Drug Co. v. Geneva Pharm., Inc.,*
   350 F.3d 1181 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12

*Waterford Twp. Gen. Empls. Ret. Sys. v. BankUnited Financial Corp.,*
   No. 08cv22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) . . . . . . . . . . . . . . . . . . . . 2

-iii-

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower  ▪  150 West Flagler Street, Suite 2200  ▪  Miami, FL 33130  ▪  (305) 789-3200

**Rules**

Fed. R. Civ. P. 10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Fed. R. Civ. P. 23(c)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Civ. P. 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Civ. P. 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9

Fed. R. Evid. 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Evid. 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Evid. 705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Statutes**

15 U.S.C. § 28(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15 U.S.C. § 78bb(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. § 78u-4(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

## I.     Introduction

The Court's September 13, 2010 Order on Pretrial Conference requires that each party file

a trial brief addressing the following three issues:

       (1)     the admissibility of market analyst reports;

       (2)     Plaintiffs' need to prove actual damages sustained by the two named Plaintiffs; and

       (3)     whether a jury verdict assigning any value of per share inflation other than zero or the value proffered by Plaintiffs' damages expert is sustainable.

DE 484 at 2.

In addition, the Court's requirement for proposed jury instructions before opening statements

has given rise to an issue over when and how the Court should address the jury with respect to the

Court's summary judgment finding that certain statements by Alan Levan were false, if, at the time,

the July date is relevant to any issues in this case.  That remains to be seen.  We address that issue

in Section V.

The issues are addressed herein in the Order they are presented in the Order.  The Court

should be aware, however, that sections III and IV below have far greater importance to where this

case goes from here.

## II.     The Admissibility of Market Analyst Reports

The analysis of the admissibility of analyst reports differs depending on whether those reports

are dated before October 25, 2007 or after October 25, 2007.

### A.     Analyst Reports dated before October 25, 2007

Defendants included twenty-nine pre-October 25 analyst reports on their proposed exhibit

list — some of which were cited by Candace Preston. Plaintiffs did not object to any of those

documents on their pre-trial stipulation.  As this Court's Amended Scheduling Order makes clear:

"The failure of a party to object to exhibits listed in the Pretrial Stipulation shall constitute a waiver

of any objections, including objections under Rule 402 and 403 of the Federal Rules of Evidence."
DE 148 at 2.[1]  Because no objection to the documents has been asserted, this should end the inquiry
for the pre-October 25 analyst reports on Defendants' exhibit list.

Defendants will nonetheless address the admissibility of these documents at the Court's
request, in part because the relevant evidentiary principles have implications for the admissibility
of other documents.  Defendants seek to offer pre-October 25 analyst reports, not for the truth of the
matter asserted, but to demonstrate the total mix of information in the market on or prior to that date,
and to demonstrate the immateriality of any supposed misrepresentations and omissions.  The
Supreme Court has explained that "to fulfill the materiality requirement, there must be a substantial
likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor
as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*,
485 U.S. 224, 231-32 (1988); *see also Waterford Twp. Gen. Empls. Ret. Sys. v. BankUnited
Financial Corp.*, No. 08cv22572, 2010 WL 1332574, at *8 (S.D. Fla. Mar. 30, 2010).  Analyst
reports are public documents that are widely disseminated and become part of the mix of information
that inform the market. *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 280 (N.D. Ala. 2009).

In this context, the class period analyst reports are not offered through an expert as a conduit
to put before the jury inadmissible hearsay in violation of Federal Rule of Evidence 403 because
these documents are admissible in their own right.

---

[1] The pre-October 25 analyst reports included on Defendants' Trial Exhibit list are Defendants
Trial Exhibits 154, 155, 156, 157, 160, 212, 213, 214, 215, 216, 268, 269, 270, 271, 272, 273, 276,
277, 278, 279, 281, 295, 330, 331, 332, 333, 334, 336, and 339.  The exhibit lists and the parties'
objections are contained in the joint pre-trial stipulation, which was filed on August 27, 2010.  The
exhibit lists were not redacted in the publicly-filed version, which is DE 464.  The parties are filing
modified exhibit lists today, which contain descriptions of documents, have hyper-links to electronic
copies of the documents, and reflect changes made by both sides since August 27.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

## B.   Analyst Reports dated after October 25, 2007

The Rules of Evidence compel a different outcome with respect to post class period analyst reports if a hearsay objection has been timely asserted. Defendants included seventeen such analyst reports on their exhibit list, and Plaintiffs objected to eight of those reports (any objection to nine of the trial exhibits has been waived).[2] Defendants have lodged hearsay objections to Plaintiffs' post class period reports as well, most notably, the Morningstar Note published several days after the end of the class period that purports, based on indisputably false statements, to assign a cause to the stock price decline.

At the outset, the mix of information in the market after the end of the class period has no independent basis for admissibility. To be admitted, such documents must find another avenue under the Federal Rules of Evidence. Federal Rule of Evidence 703 provides that experts can rely on inadmissible evidence if "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." Fed. R. Evid. 703. The Rule makes clear, however, that this is not a path or conduit for the admission of otherwise inadmissible evidence: "Facts or data that are otherwise inadmissible shall *not* be disclosed to the jury *by the proponent* of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." *Id.* (emphasis added). The Advisory Committee's Note goes on to state that if otherwise inadmissible evidence is disclosed, then the Court "must give a limiting instruction upon request, informing the jury that the underlying information must not be used for substantive purposes." The law in the Eleventh Circuit is

---

[2] The post-October 25 analyst reports included on Defendants' Trial Exhibit list are Defendants Trial Exs. 381, 382, 383, 385, 386, 387, 390, 392, 414, 418, 421, 422, 425, 427, 428, 429 and 436.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

unsurprisingly in accord.[3]  The party offering the expert, then, whether it be Plaintiffs offering

Candace Preston or the Defendants offering their experts, is free to examine the expert about bases

for his or her opinion, provided the bases is of a type reasonably relied upon by experts in that field

and that the probative value of the testimony outweighs its prejudicial effect.  In this regard, it should

be noted that none of the objected to analyst reports post class period relied on by Defendants is

subject to the same gross infirmities as the Morningstar Note.  Indeed, it is simply extraordinary, that

in arguing that Preston should be allowed to publish this Note to the jury, Plaintiffs make no effort

whatsoever to defend the facts upon which the Note relies.  Instead, without addressing the balancing

test compelled by Rule 703, they argue only that their expert relied on it.  While that is certainly grist

for cross examination – her entire theory of fraud caused damage is predicated on a falsehood  – that

does not establish the right on direct examination for introduction of this hearsay.  Allowing a

proponent of the expert testimony to introduce this Note as evidence, without a showing of its factual

validity, would make a mockery of Rule 703.[4]

-----

[3] *See, e.g., United States v. Steed*, 548 F.3d 961, 975-76 & n. 12 (11th Cir. 2008) (affirming admission of expert testimony describing, among other things, "government literature," as a basis for expert opinion); *United States v. Garcia*, 447 F.3d 1327, 1336 (11th Cir. 2006) ("a district court enjoys the discretion to permit an expert witness to 'disclose [] to the jury' '[f]acts or data that are otherwise inadmissible' if 'the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect'") (brackets in original); *United States v. Brown*, 299 F.3d 1252, 1258 (11th Cir. 2002) (expert witness testimony exception to hearsay rule is "based upon the reasoning 'that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion'"); *United States v. Scrima*, 819 F.2d 996 (11th Cir. 1987) (Rule 703 "is not an open door to all inadmissible evidence disguised as expert opinion" and any hearsay used as a basis for testimony "must be the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject").

[4] The Morningstar Note, published after the close of the class period purports to provide a reason for the decline in the stock price which is based on assertions of fact that are simply wrong.  The market had been expressly told about the size of the entire land acquisition and development portfolio (over $500 million) and had been told that, other than the unique characteristics that made the BLB loans more risky, were underwritten in the same way, using the same kinds of collateral.

-4-

Of course, Federal Rule of Evidence 705 governs the cross-examination of experts and provides that "[t]he expert may in any event be required to disclose the underlying facts or data on cross-examination." Fed. R. Evid. 705.   As the Fourth Circuit has explained: "Rule 703 creates a shield by which a party may enjoy the benefit of inadmissible evidence by wrapping it in an expert's opinion; Rule 705 is a cross-examiner's sword, and, within very broad limits, he may wield it as he likes." *United States v. A&S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991).   The party cross-examining the expert thus has wide latitude about questioning the expert in a way that would disclose even inadmissible evidence that is properly viewed as the type of evidence underlying the expert's opinion.   All of the post-October 25 analyst reports included on Defendants' Trial Exhibit list would fall within this category.

### III.   The Class Representatives Damages Claim

Included among the false allegations of so called confidential witnesses, employed to avoid dismissal of this case, were allegations about the substantial damages suffered by the two potential Plaintiffs who, under the Reform Act, purported to be entitled to direct the case and use their counsel because of their allegedly greater economic interest as compared to other shareholders.   The Court accepted those allegations in designating class representatives and lead counsel as provided by the Reform Act.   The allegations were false.   The statements attributed to the confidential witnesses were false.   The original class period, which opened the door to staggering volumes of discovery, was without a scintilla of even the flimsiest substance.   But that was demonstrated long after Defendants

_____

The market had been expressly told that, if the economy collapsed — as it did — this entire portfolio would suffer substantial losses.   The fact that the overwhelming majority of the losses stemmed from the BLB portfolio simply underscores both the legitimacy of the unique concerns about BLB loans and the accuracy of the warnings.   No expert should be heard to testify about a reasonable reliance on false information to prove a falsehood.

-5-

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

were afforded the opportunity to object to the allegations of adequacy — allegations premised on the same false confidential witness allegations.

Nor were Defendants given the opportunity to know, in a timely fashion, that Plaintiffs had unilaterally altered their class period and damage claims.  Indeed, as Candace Preston began her work as the plaintiffs' damages expert in 2007, she was instructed by class counsel that there were two new class periods, one for the period October 26, 2006 to April 25, 2007, and the other for the period April 26, 2007 through October 26, 2007.  Those new class periods, which abandoned one year of the class that had been certified based on the false allegations falsely attributed to confidential witnesses, were not shared with the Court, opposing counsel nor were they the subject of a motion, court approval or reduced discovery to reflect the new secretly held constraints.  Nor, despite clearly having the obligation to do so, did class counsel reveal how this unilateral change impacted the allegations of common interest and damage claims of the two institutional class representatives.

No motion to bifurcate pursuant to Federal Rule of Civil Procedure 42 has been filed.  Nor have plaintiffs made any motion suggesting a procedure for addressing and resolving the myriad of issues that would arise in the prosecution of individual damage claims for other members of the class, if the resolution of common issues is in whole or in part in their favor.[5]

Although we agree that, on proper motion, courts often separate class claims from the individual claims of representative plaintiffs, no such motion has been filed.[6]  Were it to be filed, we

_____

[5] In a recent order, the Court, *sua sponte*, suggested that a claims administrator would handle such claims.  At the pretrial we pointed out the error in that suggestion as each claim presents individual, adjudicable issues that require resolution.

[6] Plaintiffs suggest that we have misrepresented the *Exxon* case that led to post trial adjudication of claims.  Hardly.  What they do not know about that case and its process would fill far more volumes than available here.  What is clear from that case is that Judge Gold entered individual final judgments once asserted claimants established that they owned the claim asserted.  The amount of damage for each dealership had been established for the entire class of dealers.  The only issue in the

would agree with it, subject to our observation that, with the current status of this case, these plaintiffs could never establish reliance on any fraud – they began dumping their shares shortly after the allegedly false statements were published – and subject to our observation that they are not adequate class representatives as they have no monetary loss proximately caused by a fraud.  Indeed, their interests are adverse to the class they purport to represent, exposing a claim brought by lawyers for lawyers, maintained despite the conflicts now quite apparent.  The implications of this conflict are profound.

A. **State Boston and Erie County Could Never Prove Reliance and Have Interests Adverse to the Class**

While innocent investors may establish damages through a class action on a "fraud on the market" theory, and while a class action is a vehicle to try disputes where the common issues overwhelm the uncommon ones, a resolution of common issues does not remove the uncommon ones.  In this instance, in light of the theory of the case adopted after Plaintiffs were forced to abandon the false allegations attributed to confidential witnesses, it is quite clear that these plaintiffs began selling their shares shortly after April, 2007, when the current theory is that investors were fraudulently persuaded to buy.  Moreover, under the current theory of the case these plaintiffs had no loss.

State Boston purchased most of its Bancorp shares in late 2006 and early 2007, during which time, according to Candace Preston, the alleged inflation was a relatively low $0.37 per share.  State Boston then sold most those shares later in 2007, during which time Preston believes there was a

_____

post trial was ownership, as all other issues of common fact subsumed any individual defenses.  The appellate process followed post verdict judgments for the class representatives based solely on the number of gallons they purchased during the class period.  That appellate process was completed in its entirety before any other final judgments for other class members were entered — many years later.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

much higher artificial inflation of $3.15 per share. *See* Expert Report of Michael A. Keable ¶¶ 28-30, Exs. R and S.   Doing the math, State Boston *benefitted* from the alleged fraud by nearly $600,000 by selling shares before the second class period ended and thus, before "the truth came out."   Erie County's purchases and sales follow the same pattern.   It too benefitted from the fraud it claims occurred.[7]

To rebut this argument, Plaintiffs rely on *Kane v. Shearson*, 916 F.2d 643 (11th Cir. 1990), a decision which has no application to this discussion.  *Kane*, a case which arose under the Florida (not federal) securities statute, involved an attempt by a stock broker to subtract gains on an investment account from fraudulently induced losses in the same account.  His attempt to net the gains against the losses was properly rejected.  This case, however, has nothing to do with advice by an investment advisor who made both honorable and dishonorable decisions.  This issue is one where *the same stock,* allegedly purchased at fraudulent prices, was later sold at much higher fraudulent prices.  In this case, the subsequent sale at the allegedly inflated price establishes the lack of damage.   Indeed, any other conclusion would render the recovery punitive as opposed to compensatory.

The Securities Exchange Act, as amended by the Reform Act, places the burden on a plaintiff "of proving' that the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover." 15 U.S.C. § 78u-4(b)(4).   The Supreme Court has similarly emphasized the common law

---

[7] Defendants' damages expert offered this opinion as part of his expert report, based on records of stock transactions that State-Boston and Erie County submitted to the Court as part of their briefing on the Lead Plaintiff motions. *See* Expert Report of Michael A. Keable ¶¶ 28-30, Exs. R and S.   Adjusting the numbers to reflect Candace Preston's current opinion of $.37 per share and then $3.15 per share changes the size but not the direction of the effect — both State Boston and Erie County are still beneficiaries of the fraud that Plaintiffs allege.  Charts depicting Plaintiffs' financial benefit from their Bancorp stock transaction are attached as Composite Exhibit A.

roots of a claim under Section 10b-5, making clear that losses are limited to those "actually cause[d]" by the fraud. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

Indeed, it is a fundamental tenet of tort law that a plaintiff can recover only if he was harmed by a defendant's wrongdoing.   As courts have made clear in the securities litigation context (even pre-*Dura*), the first step in evaluating the recovery of any particular investor should be to determine whether that investor was a net winner or net loser from the fraud.  Stated simply, purchases at inflated prices generate inflation losses, while sales at inflated prices generate inflation gains. Accordingly, where an investor's inflation gains exceed inflation losses, there are no damages. *See Arenson v. Broadcom Corporation*, No. 02cv301, 2004 WL 3253646 (C.D. Cal. Dec. 6, 2004). As the Court further explained:

> The authority is clear: where a plaintiff engages in multiple purchases and sales during the period in which the stock is inflated, the proper damages methodology is to take all the inflation losses resulting from all purchases at the inflated price and reduce the amount by all the inflation gains resulting from sales at the inflated price.

2004 WL 3253646, at *2.

Circuit court decisions prior to *Dura* also support this conclusion.  The Fifth Circuit, in an opinion that is binding precedent in this Circuit, affirmed the dismissal of a lead plaintiff's individual Section 10b-5 claim where the individual plaintiffs "had already made a profit of approximately $20,000." *Wolf v. Frank*, 477 F.2d 467, 478-79 (5th Cir. 1973). ("Rule 10b-5 only provides for recovery of actual damages, and not for loss of speculative profits . . . plaintiffs are unable to show that they suffered any damages compensable under Rule 10b-5").  Other appellate courts have followed suit. *See, e.g., Blackie v. Barrack*, 524 F.2d 891, 908-11 (9th Cir. 1975) ("If the stock is resold at an inflated price, the purchaser-seller's damages, limited by s 28(a) of the Act, 15 U.S.C. s 78bb(a) to 'actual damages,' must be diminished by the inflation he recovers from is purchaser.");

-9-

*Richardson v. MacArthur*, 451 F.2d 35, 43-44 (10th Cir. 1971) ("In determining the amount of damages, it is a well recognized rule that the complaining party is entitled to be made whole. That is, he is entitled to be compensated only to the extent that he receives less than he was entitled to under the agreement. He cannot, however, recover in excess of that to which he was entitled in making whole"); *see also In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005) (offsetting gains and losses is a "better measurement of the true damages sustained by the plaintiffs").

The only circumstance where the Class Representatives would have a damage claim would be if a jury found in favor of Plaintiffs for the first portion of the class period — from October 2006 to April 2007 — but against Plaintiffs for the second portion of the class period. Thus, the interest of Class Representatives — and their attorneys — is antithetical to that of the class as a whole.

In agreeing that the damage claims of class representatives can be adjudicated post-trial in an adversary proceeding under the Seventh Amendment, we must also note that this circumstance has left this case in a posture where there is no adequate representation of the class by a class representatives. The "adequacy of representation" analysis encompasses two separate inquiries: "(1) whether any substantial conflicts of interest exist between the representative and the class; and (2) whether the representative will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). As the Court made clear in its order denying class certification in the related ERISA action, a class representatives' having benefitted from the alleged fraud creates a fundamental conflict between the representative and those members of the class who did not so benefit, thereby rendering the party that has benefitted an inadequate class representatives. *See Almonor v. BankAtlantic Bancorp, Inc.*, 261 F.R.D. 672 (S.D. Fla. 2009). Moreover, the Class Representatives' selling shows that, contrary to what Plaintiffs must prove at

-10-

trial, these particular class members were not at all misled by the supposedly misleading statements made during April and July 2007. Indeed, something in the total mix of information convinced these Plaintiffs to sell and sell. Quoting the Eleventh Circuit's *Valley Drug* opinion, this Court noted:

> A fundamental conflict of interest exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class. In such a situation, the named representative cannot vigorously prosecute the interests of the class through qualified counsel because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members.

*Almonor*, 261 F.R.D. at 676. This Court went on to note that "[a]n antagonistic interest does not need to *actually* exist between the representative and the class in order for class certification to be inappropriate; a *potential* antagonistic interest is enough." *Id.* (citations omitted).

Here, like in *Almonor*, under one of the possible trial outcomes, the Class Representatives "benefitted from the same conduct that harmed other members of the class, [and thus they] cannot prosecute the interests of the class." *Almonor*, 261 F.R.D. at 676. Here, as well, Defendants conduct "arguably conferred a net benefit on Plaintiff because they allowed Plaintiff to receive more than [they] would have if the stock had not been artificially inflated." *Id.* at 676. "Meanwhile the class members who did not divest their interests in Bancorp stock during the class period during the period of artificial inflation arguably suffered a harm" as a result of Defendants' alleged misconduct . . . In this way, the class collapses into distinct groups of winners and losers, as there is a fundamental conflict between those who were harmed and those who were benefitted" by the alleged misconduct. *Id.* at 676-77.[8]

_____

[8] Federal Rule of Civil Procedure 23(c)(1)(C) states that an order certifying a class can be altered or amended before final judgment. *See also Prado-Steinman v. Bush*, 221 F.3d 1266, 1273 (11th Cir. 2000).

-11-

Put another way, the Class Representatives' economic interests and objectives differ in a significant way from the economic interests and objectives of class members they purport to represent. *See Almonor* 261 F.R.D. at 676-77; *Valley Drug*, 350 F.3d at 1190; *see also Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (holding that "a class cannot be certified when it . . . consists of members who benefit from the same acts alleged to be harmful to other members of the class"); *Grimes v. Fairfield Resorts, Inc.*, No. 06-14363, 2007 WL 245128, *3 (11th Cir. Jan. 30, 2007) (noting that it is not only economic conflicts of interest that will defeat certification, but that the conflicts inquiry must focus on whether the same conduct harmed some class members and benefitted others); *Phillips v. Klassen*, 502 F.2d 362, 367 (D.C. Cir. 1974) (stating that the foundation of maintaining a class action is undermined when the complained of activity confers harms or benefits, depending on the circumstances of the individual).

## IV.   The Jury Cannot Speculate as to Damages by Adopting a Per-diem Award With Different Awards for Multiple Time Periods as There Will be No Evidence to Support it and the Court Has Previously Rejected this Argument

This argument, which first appeared at the pretrial conference, is an attempted end-run around the Court's Omnibus Order which carefully defined the scope and subject of Candace Preston's testimony.

As the Court knows, Plaintiffs' damage evidence consists of an expert witness, Candace Preston, whose testimony is that there was *level*, fraud-induced inflation for two six months periods ($0.37 per share between October 2006 and April 2007, and $3.15 per share for the period beginning in April 2007 and running until October 2007). The Court has already established the bar Plaintiffs must cross to proceed to a jury on either claim.

### A.   The Period Between October 19, 2006 and April 26, 2007

In its Omnibus Order of August 18, 2010, the Court observed:

-12-

She [Preston] assumes the information regarding the BLB loans which caused the residual decline on April 26, 2007 was misrepresented as of April 26, 2007, and she assumes the information regarding the broader land loan portfolio was misrepresented as of April 26, 2007.

*       *       *

The Court will allow Preston's opinion with respect to the $3.15 inflation beginning on April 26, 2007 because Plaintiffs submit sufficient evidence to create a genuine issue of material fact as to whether Defendants misrepresented the credit quality and performance of the land bank portfolio as of April 26, 2007 and this evidence supports Preston's underlying assumption. However, Plaintiffs have not submitted similar evidence in support of Preston's assumption that Defendants misrepresented the credit quality and performance of the entire BLB loan portfolio *as of October 19, 2006*, and the Court is not convinced that Plaintiffs will be able to do so at trial. Even if Plaintiff could demonstrate some level of inflation *as of October 19, 2006*, the Court is not convinced they could demonstrate a full amount of inflation equal to the April 26, 2007 residual decline existed *as of October 19, 2006* and consistently thereafter until the announcement.] Thus, only to the extent Plaintiffs ultimately put forth sufficient evidence to support this assumption at trial, will the Court allow Preston to opine that the level of inflation from October 19, 2006 through April 26, 2007 was $0.37. The Court will not allow this opinion if Plaintiffs fail to do so.

DE 411 at 35-36. The Court further added:

To be sure, Plaintiffs must put forth sufficient evidence to support a finding that the information was misrepresented as of the exact dates Preston assumes it was — October 19, 2006. *Evidence of some misrepresentation at a later date will not suffice because the Court will not allow Preston to change her opinion at trial.*

DE 411 at n. 30 (emphasis added).

Thus, the Court has already addressed and resolved this attempted modification of Plaintiffs' damage theory. With respect to the first damage claim, Plaintiffs must show that on October 19, 2006, misrepresentations or omissions were made that proximately caused the claimed loss in April 2007. Any alleged false statements made before October 19, 2006, were rejected in this Court's summary judgment against claims during that period. Any bad news in the April 2007 earnings release unrelated to an alleged fraud on October 19, 2006 were required to have been disaggregated by Preston from the claim of damages. This case, as it sits on the eve of trial, is one where a jury

-13-

will not be allowed to speculate as to some other damage period. While it is conceivable, given the nature of the price/earnings analysis Preston performed for this damage claim period, that a jury could subtract elements of alleged damage on her earnings per share analysis (she assigned a $0.03 per share adjustment to the disclosure of the substantial risks from BLB loans and $0.07 per share adjustment to the loan losses taken that quarter), the Court's order and Preston's opinion, prevents any speculative award over other time periods and precludes anything but a constant inflation rate dated back to October 19, 2006.

To use the Court's words — "to be sure" — we are quite certain that Plaintiffs will be unable to establish that the revelations Preston claimed for the April 26, 2007 earnings release originated on October 19, 2006. They did not, as Plaintiffs will be unable to prove the assumptions given to Preston for this period as they are simply not true.

## B.       The Period Between April 26, 2007 and October 26, 2007

The analysis of the second damage period is different because Preston abandons, for obvious self-serving reasons, the price/earnings analysis used for her calculation of damages for the April 2007 damage claim, discussed above. Instead, notwithstanding that almost all of the bad news tangled into the October earnings release related to fully disclosed risks, and further notwithstanding the apparent simplicity of the same price/earnings analysis she urged for April, Preston opines that the entire company specific price decline is attributable to the facts she was asked to assume. Here, however, the facts she was asked to assume, that formed the basis of her published opinion, stand in contrast to the facts this Court has required her to assume if her testimony is to be allowed (the Court's order allowed her to modify the assumptions she relied upon, based on an offhand comment in a third affidavit she submitted to avoid striking her testimony). We note the differences as they

-14-

outline the dilemma Plaintiffs now face – proving the fraud belatedly alleged to avoid losing Preston as a witness.

In her Report, Preston states the assumptions upon which her conclusions are based with respect to his damage claim as follows:

*By April 26, 2007*, Defendants should have disclosed that:

    i.    contrary to their assertions, that their land bank [BLB] portfolio presented risks not present in the other segments of the CRE portfolio, the problems and potential problem loans were, in actuality, distributed throughout the land loan portion of the CRE portfolio;[9]

    ii.    The number and dollar value of the land loan portion of the CRE problem loans on the loan watch list ("LWL") and the potential problem loans *as of April 26, 2007*;[10] and

    iii.    the trends and concerns expressed by management *as of that date*, representative samples of which are detailed [in the pages that followed].[11] (emphasis added)

In her deposition, emphasizing her assertion that the alleged fraud for this period began on April 26, 2007 and ended with the October 25, 2007 earnings release, and that nothing in the interim period was said or omitted that would have added to or subtracted from the level, per diem inflation

---

[9] This assumption is demonstrably false.  The BLB loans did have greater risk, as the October 2007 earnings release starkly established.  The Company plainly disclosed that other than those unique characteristics, the non-BLB loans were underwritten in the same fashion and were exposed if the market fell and land values deflated, *see* Defendants' Trial Ex. 5 at 5, 25 — which, of course, is what happened.

[10] This assumption is also demonstrably false.  In fact, the Company's public disclosures not only included every commercial real estate loan on watch list, but by disclosing the greater risk of BLB loans, most of which were then not on any watch list, the Company disclosed far more in April than Plaintiffs allege should have been disclosed.

[11] Not surprisingly, this assumption is false as well. As the Company observed market downturns internally, its next regularly scheduled public filings reflected the trends it was observing which, over the period, became increasingly dire.

-15-

of $3.15 per share, Preston testified that, had the Company disclosed what she was asked to assume above, the price on April 26, 2007 would have immediately declined by $3.15 per share and on each and every day thereafter, would have been lower by that same amount than it actually was. *See* Preston Deposition Transcr. at 169-70.

Although she performed an event study following the July 2007 earnings release which found a Company specific price *increase* relative to the market, she was quick to assert that the statements made or not made in July 2007 did not cause the stock price increase: "it was my opinion that the increase in the stock was not driven by the issues in this matter."[12] Preston Deposition Transcr. at 125-26.

Most importantly, the alleged false statements of July 2007, which emphasized problems with the "asset class" of BLB loans "as an asset class" is directly at odds with Plaintiffs' new theory which Preston adopted and the Court narrowly permitted, that the fraud must include the BLB loans or her damage opinion for this period will be rejected.

Thus, assuming the Court applies the same methodological analysis to both time periods, and limits Preston to the opinion she has given, any alleged fraud or omission between April and October would be wholly irrelevant to this case:

> To be sure, Plaintiffs must put forth sufficient evidence to support a finding that the information was misrepresented as of the exact dates Preston assumes it was — [April 26, 2007].[13] Evidence of some misrepresentation at a later date will not suffice because the Court will not allow Preston to change her opinion at trial.

DE 411 at n. 30.

---

[12] Although her opinion of no effect in July was expressed specifically, the same view is inherently part of her opinion with respect to every other day during the period. That is, implicitly, the consequence of her "level inflation" opinion.

[13] The date in the Court's order for the first period was October 19, 2006. The rationale for the former applies for the same reasons to the latter.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

In our motion to strike Preston's testimony we, *inter alia*, pointed out the absurdity of her conclusion that 100% of the stock price decline was attributable to an alleged fraud, when the lion's share of the bad news consisted of matters that are not part of this case — including the fact that the Company had correctly concluded that the "class of loans" about which it was concerned "as a class" were the builder land bank loans.  That is because these were the loans that caused most of the loss on an earnings per share basis and thus, in a price/earnings analysis, would have accounted for non-fraud losses.[14]  In response, Preston filed another affidavit in which she fundamentally altered the assumptions upon which her original opinion was given.  Her new position is that the alleged fraud included misrepresentations back to April 26, 2007 about the BLB loans as well: "Defendants claim that the allegations are somehow limited to [LAD] and [LADC] loans — at the exclusion of the BLB loans.  I am advised by counsel that this is incorrect."[15]

Accepting this new position, the Court denied the motion to strike this opinion but noted that it will "revisit this issue should it become apparent that Plaintiffs have put forth insufficient evidence to support a fraud claim *relating to the BLB loans* which extends past the April 2007 disclosures." DE 411 at n. 26.

---

[14] In addition to the BLB loan losses and reserves, an additional loss was taken on Steeplechase — a loan that even Preston concluded had been fully disclosed in January 2007 — and there were other substantial losses unconnected from any claim of fraud.  Preston's sweeping of those into a single 100% basket is frivolous and unprincipled overreaching of a degree that should make an advocate blush.

[15] Plaintiffs elsewhere had described Candace Preston's opinion as consistent with her expert reports, her deposition, and their theory of the case.  In their opposition to Defendants' motion for summary judgment, Plaintiffs stated: Candace Preston "further concludes that the *entire stock decline* following the October 25, 2007 disclosure was caused by both the disclosure and materialization of the previously concealed problems with the *Non-BLB land loan segments*." Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment at 21 (emphasis added; citing Candace Preston's expert report dated April 16, 2010); *see also id.* at 25 ("it is possible (as Ms. Preston opines) for the shocking news about the non-BLB loans to have caused the entire stock decline on October 26 and 29").

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

Thus, no room has been left for a jury to speculate about a shorter time period than that offered by Plaintiffs nor may the jury speculate about some other causal link for part of the company specific price decline. Plaintiffs and Candace Preston chose to go for broke with a patently frivolous claim for damages, leaving them with no way to meet their burden of proof. It cannot be fixed with speculation. No tools will be given to the jury to allow it to disaggregate the non-fraud causes of a loss because Plaintiffs have failed to provide them. They seem to forget the burden of proof is theirs. Finally, when it becomes apparent that the event study used by Preston to remove the price declines attributable to the Florida market used an improper control group, no means exist to speculate about how some appropriate control group might have established real company specific price declines in any event.

C.     **A Last Minute Attempt to Afford a Jury the Opportunity to Speculate on a Daily Inflation Rate, Unsupported by any Evidence, Contrary to the Evidence Upon Which this Case was Prepared and Without Affording Defendants an Opportunity to Prepare Would be Grossly Prejudicial**

Defendants chose not to offer competing evidence to rebut Plaintiffs' expert testimony on the calculation of damages because the Plaintiffs' damage claim and evidence is so make-weight as to border on the laughable.[16]  We chose not to respond with an alternative theory since the one presented is so plainly unsupportable. The Court's orders precluding new opinions are quite clear. To allow Plaintiffs, on the eve of trial, to fundamentally alter their damage case would not only be contrary to the law, it would be prejudicial to the extreme.

---

[16] *See* DE 411 at 33, n. 25 (citing *Miller v. Thane Int'l, Inc.*, No. 03cv1031, 2005 WL 5957833, at *6 (C.D. Cal. Mar. 3, 2005) (excluding Preston's testimony where she "did not even attempt to factor out the effect of other events which could have accounted for a portion of the decline.").

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

**D.      Without The Requisite Expert Opinion, A Jury Cannot Reach A Verdict As To
Daily Inflation Or Multiple Misrepresentations**

The Securities Exchange Act expressly imposes on plaintiffs the burden of proving that the

defendant's misrepresentations caused the loss for which the plaintiff seeks to recover.  *See* 15

U.S.C. § 78u-4(b)(4).  *Dura* also makes clear that losses are limited those "actually cause[d]" by the

fraud. 544 U.S. at 345.  Given the complex nature of the issues in this case, this requires a principled

analysis of the market and industry conditions which affected the price of Bancorp stock.  Indeed,

Plaintiffs explicitly recognize the need for expert testimony regarding such issues by their proffer

of such testimony as to inflation beginning in October 2006 and April 2007.   The jury is not free to

substitute its own view of inflation per share for either zero or the constant value which Plaintiff has

offered (but will not be able to sustain).  Here there will be absolutely no evidence in the record from

which a jury could rationally determine differing amounts of alleged inflation on a daily basis.  Any

attempt to do so would be impermissible speculation and conjecture. *See Brough v. Imperial Sterling

Ltd.*, 297 F.3d 1172, 1178 (11th Cir. 2002).  Ms. Preston has been there before.

Therefore, absent the necessary expert testimony disaggregating the tangle of factors and

showing daily inflation, it is clear that causation and damages cannot be demonstrated as a matter

of law.  *In re MIVA, Inc. Sec. Litig.*, No.05cv201, 2009 WL 3821146 (M.D. Fla. Nov. 16, 2009)

(granting summary judgment where plaintiffs' expert testimony did not disaggregate factors which

led to supposed inflation in stock price) (citing *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp.

2d 446, 456 (S.D.N.Y. 2000) ("[P]laintiffs must show that the statements they are challenging

inflated [defendant's] share price"); *Archdiocese of Milwaukee Supporting Fund, Inc. v. Haliburton

Co.,* 597 F.3d 330, 341 (5th Cir. 2010) ("showing of loss causation is a "rigorous process" and

requires both expert testimony and analytical research or an event study that demonstrates a linkage

between the *culpable* disclosure and the stock-price movement") (emphasis in original); *In re*

-19-

*Williams Sec. Litig. - WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009) (rejecting expert's testimony because he failed to disaggregate, granting summary judgment and finding that case could not proceed to jury because its opinions on loss causation "would be no less speculative and unreliable if reached by jurors than when reached by Dr. Nye"); *see also Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447, n. 5 (11th Cir. 1997) ("in determining recoverable damages, these contributing forces must be isolated and removed. This is often done, as it was here, with the help of an expert witness").

In *Miva,* the court granted summary judgment for the defendants where the expert did not list the particular misrepresentations in his event study and provided no analysis as to how much inflation may be attributable to each of the allegedly fraudulent statements. 2009 WL 3821146, at *12. As the Court explained:

> Dr. Hakala provided no analysis as to how much inflation may be attributable to either or both of the allegedly fraudulent statements. Dr. Hakala fails to analyze the effect of each particular misrepresentation. To determine economic loss, the Plaintiffs must tie the fraudulent statement to the loss and there is no evidence as to how much, if any, of the inflation in the FindWhat.com's stock was attributable to either statement, nor how much, if any, of the loss was attributable to these statements.

*Id.*

There is (and will be) absolutely no competent evidence in the record as to differing amounts of daily inflation or the amount of such inflation on any given day (other than the start of the two periods of constant inflation). And, for the inflation at the start of those two periods, it is plainly not attributable to any allegedly misleading statement, but to other non-fraud, company specific disclosures on those days. Any assertion by Plaintiff that these misstatements somehow maintained the inflation at the precise level it began is equally unsupported and would be pure conjecture. The notion that by some cosmic coincidence each of these statements exactly offset any other movement

in the stock price by the precise amount necessary to maintain a constant level of inflation is unsupportable in the record, not to mention offending any notion of common sense.

> **E.  Vivendi Addressed a Claim of Multiple Days of Inflation and the Attempt to Resolve Those Issues has Created a Train Wreck no one Would Knowingly Pursue**

*In re Vivendi Universal, S.A. Sec. Litig.* (Case No. 02cv5571, S.D.N.Y.) presents far different circumstances than those here, with a verdict form that case does not provide any sort of model for use in this case.  First, the *Vivendi* plaintiffs did not assert a theory of constant inflation like in this case.  The court, in addressing plaintiffs' damages expert, made that clear:

> Had Dr. Nye simply opined that inflation was constant prior to Vivendi's liquidity risk first beginning to materialize, allegedly on January 7, 2002, defendants' challenge would likely be simpler. *But Dr. Nye opined reasonably that inflation "did not remain constant,"* but increased over time with Vivendi Universal's deteriorating liquidity situation accompanied by public assurances from Defendants to the contrary.

*Vivendi*, Case No. 02cv5571, Order, DE 929 at 4 (S.D.N.Y. Aug. 18, 2009).  Indeed, *Vivendi* arose out of plaintiffs' contention that there were 11 (although it appears to have been reduced to 9 at trial) separate dates on which the truth or partial truth was disclosed. *See Vivendi*, 634 F. Supp. 2d 352, 356 (S.D.N.Y. 2009) ("In his section entitled "Causation Class Action," Dr. Nye proceeds to explain the causal connection between Vivendi's concealment of liquidity risk and stock declines on eleven days in 2002.").  On each of those dates, Dr. Nye conducted an event study. *Id.* at 357.[17]  Moreover, very much unlike here, plaintiffs in *Vivendi* submitted into evidence an expert analysis of daily rates of inflation showing an increasing amount of inflation as conditions worsened.

---

[17] "Dr. Nye identified eleven days on which there were Vivendi-specific residual declines." *Vivendi*, 634 F. Supp. 2d at 357.  For those dates, he conducted his event study and attempted to disentangle company specific information. *Id.*

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

In any event, the decision in *Vivendi* to permit the jury to arrive at its own conclusions as to the daily rates of inflation was incorrect for all of the reasons articulated herein. And, *Vivendi* perfectly illustrates the train wreck that almost certainly will ensue if the jury here is given the opportunity to speculate and guess a level of daily inflation. For example, in *Vivendi,* the jury's verdict assigned inflation per share of greater than zero on dates *even after* the full truth had been disseminated to the market — an obviously untenable conclusion. On numerous other dates, the jury arbitrarily halved the level of inflation presented by plaintiffs' expert — a finding irreconcilable with any evidence regarding the actual causes of the loss.[18]   The perils are even greater here where there is absolutely no competent evidence that will be presented of inflation on a daily basis.

**V.  The Court Should Decline to Make Any Instruction with Respect to Comments Made by Alan Levan During the Earnings Conference Call on July 25, 2007, until the Close of Evidence.**

The foregoing provides substantial additional grounds for withholding any instruction on statements made by Alan Levan in July 2007. As the case stands, nothing said in July is relevant to any claim. Indeed, based on the Court's direction limiting Preston's testimony, if Mr. Levan falsely elevated concerns about BLB loans –he did not – that would be inconsistent with the new set of facts Preston has been belatedly asked to assume.

While it remains doubtful that anything said in July is relevant to this case, it should go without saying that an instruction to the jury that the Chairman of Bancorp made objectively false statements in a conference call held in July 2007 would prejudice the jury against all of the Defendants. If the factual finding is proved unwarranted based on the evidence as a whole or proved irrelevant as the case proceeds, it will be impossible to "unring the bell." Thus, it would seem

---

[18] For these and numerous other reasons, Defendants moved for entry of judgment pursuant to Rule 50(b), or, in the alternative, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. The motion remains pending.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

necessary to avoid prejudicing the jury with such a finding until and unless it is necessary to a proper resolution of the case. That time would be, at the earliest, at the close of the evidence — which would allow the jury to form impressions about the case without that prejudicial impact.

Moreover, while the Court has already entered its order on the factual finding, and denied our request for reconsideration, the Court has identified other issues for resolution which may make the finding — and its concomitant prejudice — wholly unnecessary. For example, based on the Court's prior orders, substantial jury questions remain with respect to the comments made by Alan Levan during the earnings conference call held on July 25, 2007, as to whether they were material, intended to mislead, or forward-looking (and thus protected by the safe harbor provided to such statements pursuant to the Private Securities Litigation Reform Act). Moreover, given the absence of any competent evidence in the record, it is clear that Plaintiffs cannot establish causation and damages necessary to get to a jury as to the July statements. This is particularly so where Plaintiffs' expert has specifically assigned no value to these statements and Plaintiffs' argument of propping up the price lacks any expert support. If the jury finds in favor of Defendants on any of those three remaining factual issues, then the Court's factual finding is simply irrelevant but for its prejudice (what jury would decide the facts immaterial if told that the Court picked them out for a factual finding of falsity). Told of the prejudicial finding, a jury would effectively be improperly instructed to similarly resolve the three remaining factual issues with respect to these statements.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

s/ Eugene E. Stearns
EUGENE E. STEARNS
Florida Bar No. 149335
estearns@stearnsweaver.com
RICHARD B. JACKSON
Florida Bar No. 898910
rjackson@stearnsweaver.com
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@stearnsweaver.com
CECILIA DURAN SIMMONS
Florida Bar No. 469726
csimmons@stearnsweaver.com
GORDON M. MEAD, JR.
Florida Bar No. 49896
gmead@stearnsweaver.com
ANDREA N. NATHAN
Florida Bar No. 016816
anathan@stearnsweaver.com

*Attorneys for Defendants*

-24-

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2010, I electronically filed the foregoing document with the Clerk of the Court using EM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by EM/ECF or through other approved means.

s/ Adam M. Schachter
ADAM M. SCHACHTER

-25-

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

## SERVICE LIST

*In re BankAtlantic Bancorp, Inc. Securities Litigation*
Case No. 07-61542-CIV-Ungaro/Simonton
United States District Court, Southern District of Florida

Mark Arisohn
marisohn@labaton.com
Serena Hallowell
shallowell@labaton.com
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
Telephone: 212-907-0877
Facsimile:  212-818-0477
*Lead Counsel for Lead Plaintiff State Boston
Retirement System*

Ronald D. Shindler
rshindler@fowler-white.com
Fowler White Burnett P.A.
1395 Brickell Avenue
14th Floor
Miami, FL 33131
Telephone: 305-789-9222
Facsimile: 305-789-9201
*Liaison Counsel for Lead Plaintiff State Boston
Retirement System*

Andrew Zivitz
azivitz@btkmc.com
Barroway Topaz Kessler Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
Facsimile:  610-667-7056
*Attorney for Plaintiff*

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200