```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
              Case No. 07-61542-Civ-UNGARO
```

IN RE:  BANKATLANTIC BANCORP, ) Miami, Florida
INC. SECURITIES LITIGATION    ) October 13, 2010
                              ) 9:43 a.m.


               VOLUME 3A - A.M. SESSION

           TRANSCRIPT OF TRIAL PROCEEDINGS

         BEFORE THE HONORABLE URSULA UNGARO

            U.S. DISTRICT JUDGE, and a jury


APPEARANCES:

For the Plaintiffs        LABATON SUCHAROW LLP
                          BY:  MARK S. ARISOHN, ESQ.,
                          SERENA W. HALLOWELL, ESQ., and
                          MINDY DOLGOFF, ESQ.
                          140 Broadway - 3rd Floor
                          New York, New York  10005

                          BARROWAY TOPAZ KESSLER MELTZER &
                          CHECK LLP
                          BY:  ANDREW L. ZIVITZ, ESQ.,
                          MARK S. DANEK, ESQ., and
                          MATTHEW MUSTOKOFF, ESQ.
                          280 King of Prussia Road
                          Radnor, Pennsylvania  19087

                          FOWLER WHITE BURNETT
                          BY:  RONALD D. SHINDLER, ESQ.
                          1395  Brickell Avenue - 14th Floor
                          Miami, Florida  33131-3302

(continued)

Reported by:              WILLIAM G. ROMANISHIN, RMR, CRR
(305) 523-5558            Official Court Reporter
                          400 North Miami Avenue
                          Miami, Florida  33128

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1   APPEARANCES (continued):

 2   For the Defendants        STEARNS WEAVER MILLER WEISSLER
                               ALHADEFF & SITTERSON
 3                             BY:  EUGENE E. STEARNS, ESQ.,
                               ADAM M. SCHACHTER, ESQ.,
 4                             GORDON M. MEAD, JR., ESQ.,
                               CECILIA D. SIMMONS, ESQ.,
 5                             RICHARD B. JACKSON, ESQ., and
                               ANDREA N. NATHAN, ESQ.
 6                             150 West Flagler Street - Suite 2200
                               Miami, Florida  33130
 7

 8              (Call to order of the Court)

 9              THE COURT:  Okay.  Good morning.

10              So, can I bring the jury out?  Any reason not to?

11              I heard from my law clerk you wanted to talk about

12   Harvell.  We'll just have to do it later.  Okay?

13              MR. ARISOHN:  Yes, Your Honor.

14              THE COURT:  Okay.  Jury, please.

15              (Jury returns at 9:44 a.m.)

16              THE COURT:  Oh, where is Mr. Mindling?

17              MR. MEAD:  Your Honor, we had him waiting outside.

18              THE COURT:  Okay.  Good morning.  You can have a

19   seat.  We're just waiting for Mr. Mindling to return.

20       JEFFREY MINDLING, PLAINTIFFS' WITNESS, RESUMED

21              THE COURT:  Okay.  You can have a seat,

22   Mr. Mindling.

23              THE WITNESS:  Thanks.

24              THE COURT:  Is there some reason you're carrying

25   the --
```

1          MR. ARISOHN:  I gave it to him, Your Honor.  We had
2     it here and I just wanted to show him that the index is in the
3     front of the book so he can find the exhibits.
4          THE COURT:  Okay.  Fine.  Thank you.
5          You can proceed.
6          MR. ARISOHN:  Thank you, Your Honor.
7                    CONTINUED DIRECT EXAMINATION
8     BY MR. ARISOHN:
9     **Q.   Good morning, Mr. Mindling.**
10    A.   Good morning.
11    **Q.   Are you familiar with the Steeplechase loan, sir?**
12    A.   Yes.
13    **Q.   And is it correct that that was a $27 million loan that**
14    **was approved for the purchase of 1,142 acres that was a sod**
15    **farm in the city of Myakka, Florida?**
16    A.   Yeah.  It was not only to purchase but to develop the land
17    as well.
18    **Q.   And the plan was for the building of what was called**
19    **ranchettes?  You're familiar with that?**
20    A.   Yes.
21    **Q.   And what are ranchettes?**
22    A.   Well, pretty much they're mini-ranches, if you will.
23    They're large five-plus-acre residential lots.
24    **Q.   And this is what was called equestrian themed?**
25    A.   Yes.

MINDLING - Direct (Arisohn)

1  **Q.  What is equestrian themed?**

2  A.  "Equestrian" meaning most of the individuals that would

3  buy into this project would have horses and maybe a small barn

4  on their lot, and then there would be trails throughout the

5  project for them to ride the horses.

6  **Q.  And there was no feasibility study for this project, was**

7  **there?**

8  A.  Not that I'm aware of.

9  **Q.  Did you review the credit risk for this borrower?**

10  A.  It was a loan that went to committee.  I'm not sure if I

11  was there for the original presentation, but I'm familiar with

12  the credit.

13  **Q.  So, if you would return to Plaintiffs' Exhibit 20.  I**

14  **don't think it's in evidence yet, sir.**

15          THE COURT:  When you say "20," do you mean under tab

16  20 or do you mean --

17          MR. ARISOHN:  Well, in my book it's Exhibit 20 and in

18  the witness' book there is a tab index.

19          THE WITNESS:  It is 21.

20          THE COURT:  Okay.  There were objections to this

21  exhibit.

22          MR. STEARNS:  We don't object, Your Honor.

23          THE COURT:  Okay.  It's admitted.  Thanks.

24          (Plaintiffs' Exhibit 20 in evidence)

25          MR. ARISOHN:  Thank you, Your Honor.

MINDLING - Direct (Arisohn)

1    BY MR. ARISOHN:

2    **Q.  Mr. Mindling, if you could turn to page -- I think this**

3    **exhibit is numbered at the bottom.  If you could turn to page**

4    **16.**

5    A.  Yes.

6           MR. ARISOHN:  And if we could blow up the top section

7    so we can see the top part of this exhibit.

8    BY MR. ARISOHN:

9    **Q.  Is this what you referred to yesterday as the Credit**

10   **Facility Summary?**

11   A.  Yes.

12   **Q.  So this would be the front page of the package that was**

13   **presented to Loan Committee at the time this loan was**

14   **originally presented for approval, is that right?**

15   A.  Yes, along with the handwriting of the Secretary of the

16   Committee.

17   **Q.  And when you say that, you mean the handwriting would be**

18   **added by the Secretary of the Committee during the course of**

19   **the presentation or following the presentation?**

20   A.  Yes.

21   **Q.  So that when it was originally presented there would be no**

22   **handwriting on it, and the handwriting gets added during the**

23   **presentation or following the presentation?**

24   A.  Exactly.

25   **Q.  And why don't we use this as an example.**

MINDLING - Direct (Arisohn)

1    **So the boxes at the top, where it says "New,**
2    **renewal," et cetera, the box that's checked there says "new,"**
3    **and that would indicate that this is a presentation of a new**
4    **loan to Committee, is that right?**
5    A.   Yes.
6    **Q.   And if the boxes next to it -- why don't you tell us what**
7    **the boxes that are not checked mean so that when we see those**
8    **later we'll understand those.**
9    A.   Okay.  "New" is obviously a new loan request.  And then
10   "renewal," if it's an existing loan that has matured and it's
11   coming back to be evaluated and to continue, then it would be
12   a renewal.
13          "Modification" would be a situation where we're
14   making some change to the loan.  For instance, we might be
15   adding some more collateral or changing the term of the loan.
16          "Review" is exactly that.  We're just bringing it in
17   for more of an FYI, sort of just a check to see how the credit
18   is doing.
19          "Expression of interest" is sort of preapproval
20   where you go in and just get a feel from Committee members if
21   they would be even members in the concept.  You don't so as
22   much due diligence.  But instead of the loan officer spending
23   a lot of time and effort, they would bring it in as an
24   expression of interest just to get a feel and make sure that
25   that was something the bank would be interested in.

1  Q.  Okay.  And then in the box below that there's various

2  information.  The borrower would be the name of the borrower,

3  and all the other stuff is pretty much self-explanatory.

4          The loan officer in this case was Warren Toole?

5  A.  Yes.

6  Q.  And the date of July 14, 2005, what does that refer to,

7  the date of presentation to the Committee?

8  A.  Not always.  It's generally the date that the actual

9  Credit Facility Summary was prepared.  So sometimes it might

10 be a day or two off.

11 Q.  Where did Warren Toole work?

12 A.  He worked in our Tampa division.

13 Q.  And to whom did he report?

14 A.  He reported to Len Harvell.

15 Q.  And what was Len Harvell's position?

16 A.  He was the North Regional Manager.

17 Q.  And to whom did Len Harvell report?

18 A.  Len reported directly to Marcia Snyder.

19 Q.  The risk rating at the bottom of this box indicates 4.

20 When was that put on and what does that indicate?

21 A.  That indicates that it's good risk, if you will, and

22 that's generally assigned at the time the loan is presented.

23 It can be modified.  But generally the new loans are in the

24 three, four, five range.

25 Q.  And under the name, or next to the name borrower, there

MINDLING - Direct (Arisohn)

1  was something called G&T Land Development, LLC, and that's

2  crossed out.  Do you know what that is about?

3  A.  Yes.  A lot of times when a loan comes in, the final

4  borrowing entity has not been established, and generally our

5  borrowing entities are what we call single asset entity, and

6  that means that the only asset that the borrower will hold is

7  our collateral.

8        It's usually a work in process.  So if in fact that

9  changes between the time that the loan officer meets with the

10 borrower and the presentation, then it's changed on the CFS.

11 Q.  What do you mean by a single asset entity?

12 A.  A single asset entity is an entity or company that only

13 owns one asset, and that asset would be the collateral

14 securing our loan.  And the reason we do that is in the event

15 that the borrower go into bankruptcy, there won't be other

16 assets that will be included in that bankruptcy.  So it allows

17 the bank not to have to go through so much red tape.

18 Q.  So, in this case was G&T Land Development, LLC, the

19 borrower?

20 A.  It was a company that our principal owned.

21       At that time, I believe, when the loan officer

22 presented this loan, the borrowing entity had not been

23 established.

24 Q.  And that's why it says single asset entity to be formed

25 with G&T Land Development, LLC?

MINDLING - Direct (Arisohn)

1   A.   Yes.

2   **Q.   As guarantor?**

3   A.   Yes.

4   **Q.   What does that mean?**

5   A.   That particular company, which is a company owned by our

6   principal, would also guarantee the loan.

7   **Q.   So was it the fact that it was G&T Land Development, LLC,**

8   **that was buying the property?**

9   A.   I believe that's the case.   I think they were the original

10   buyer.

11          THE COURT:   Can I just interrupt you?   And maybe I

12   misunderstood something.   But I thought this was trial Exhibit

13   20.

14          MR. ARISOHN:   It is, Your Honor.

15          THE COURT:   Well, trial Exhibit 20 in the book you

16   gave me and in the electronic format is not this exhibit.

17          MR. ARISOHN:   And are you on page 16 of that

18   exhibit?

19          THE COURT:   Maybe that's the problem.   Just a

20   second.

21          THE WITNESS:   There's a different CFS.

22          THE COURT:   You're right.   That was the problem.

23   Okay.   Fine.   Thanks for the clarification.

24   BY MR. ARISOHN:

25   **Q.   Okay.   Mr. Mindling, so, underneath the box there's a line**

MINDLING - Direct (Arisohn)

1   **that reflects the request.  And would it be the case that this**
2   **is the proposed loan that's being presented to Committee?**
3   A.   Yes.
4   **Q.  And in this case why don't you take us through what that**
5   **means.**
6   A.   As far as --
7   **Q.  What was the request and explain.**
8   A.   The request was for a $27 million acquisition and
9   development loan, and again, the proceeds would be used to
10  purchase the land and to develop the land so it's ready to be
11  built on.
12       So development would include clearing the land,
13  putting in roads, putting in electric, putting the entrance
14  feature in, putting the fence around the project.  So
15  everything as far as the project goes is completed with the
16  exception of actually building on each of the lots.
17  **Q.  And when it says a $20 million share of a land acquisition**
18  **and development loan, what does that mean?**
19  A.   Oftentimes banks will participate a portion of the loan to
20  another bank in order to reduce exposure.
21       So, what we did in this case is out of the
22  $27 million loan, we went to another bank and said would you
23  be interested in taking a piece of this bank.  In this
24  particular case it was Synovus Bank or Columbus Bank and
25  Trust, which is a large bank in Atlanta.  They would take a

1  piece of it but BankAtlantic would still monitor this loan.

2  **Q.  And you said Synovus and Columbus Bank and Trust.  Can you**

3  **explain?**

4  A.  Yes.  Columbus Bank and Trust is a bank owned by Synovus.

5  Synovus is a large holding company.  It has various banks

6  throughout Florida and Georgia.

7  **Q.  And is that Columbus Bank and Trust known as CB&T?**

8  A.  That's correct.

9  **Q.  And did BankAtlantic have any relationship at that time**

10  **with CB&T?**

11  A.  I'm not sure if we had done any other participations or

12  not.  I don't recall.

13  **Q.  Now, after the phrase "$20 million share," there's an**

14  **IAO.  That's "in the amount of"?**

15  A.  Yes.

16  **Q.  Then it says:  The lesser of $27,860,000, inclusive of a**

17  **$2,650,000 interest and tax reserve, 65 percent loan-to-cost**

18  **or 70 percent loan-to-bulk discounted sellout value.**

19  **$7,680,000 of the commitment will be participated.**

20  **So that's the part that's going to be given to or**

21  **participated in by the other bank?**

22  A.  That's correct.

23  **Q.  And at this time was that already agreed with the other**

24  **bank?**

25  A.  I don't recall.

MINDLING - Direct (Arisohn)

410

1    Q.  And who is it at BankAtlantic that would go about getting

2    the other bank to participate in this loan?

3    A.  Generally its loan officer to loan officer, so a loan

4    officer from BankAtlantic.  We had one particular individual

5    that specialized in this.  But the loan officer would contact

6    a loan officer at the other bank and they would get a package

7    and they would underwrite and get comfortable with the loan

8    just as we did.

9    Q.  And is there any magic to the fact that BankAtlantic was

10   keeping a $20 million part of the loan?

11   A.  That was at the time, I believe -- I'm not sure if we had

12   set the $20 million limit at that point or not.  But we

13   eventually set a limit to exposure, and that could have been

14   the case in this.  I don't recall from the time period.

15   Q.  So, when you say "a limit to exposure," whether at this

16   time or some other time, there was a time when BankAtlantic,

17   at least as a matter of policy, was limiting the amount it

18   would lend on any particular specific loan to $20 million?

19   A.  Yes.

20   Q.  And while we're on that topic, was there also a policy

21   regarding the total exposure that BankAtlantic had with any

22   particular single borrower?

23   A.  Yeah.  $40 million.

24   Q.  And can you explain the difference?

25   A.  Yeah.  Total exposure would generally be multiple loans.

 1  So no one loan would be greater than $20 million, and no group

 2  of loans would be greater than $40 million.

 3  **Q.  So, if a particular borrower had four or five different**

 4  **projects, in total the policy was not to lend more than**

 5  **$40 million?**

 6  A.  Right.

 7  **Q.  Okay.  Now, the next paragraph is something that's set**

 8  **out, it's called the purpose, and this would be an explanation**

 9  **to Loan Committee of what the money that was going to be**

10  **borrowed was to be used for, right?**

11  A.  Yes.

12  **Q.  And in this case it talks about the acquisition of the**

13  **1,142 acres and it gives the location and it talks about what**

14  **the development is going to be into 183 five-acre lots, is**

15  **that right?**

16  A.  Yes.

17  **Q.  And it's referenced that there was going to be a purchase**

18  **of those lots by five local builders, is that right?**

19  A.  Yes.

20  **Q.  So the plan was that the borrower, G&T Development, was**

21  **going to do the development of this 1,142 acres and then sell**

22  **developed building lots to five different local builders to**

23  **build houses, right?**

24  A.  Yes, that's correct.

25  **Q.  Or to build ranchettes.**

MINDLING - Direct (Arisohn)

412

1  A.  Yes.

2  **Q.  Then there's reference to an aggregate initial**

3  **nonrefundable deposit of $2 million held in escrow.**

4  **What does that refer to?**

5  A.  I believe what that's referring to is that the builders

6  that were under contract to purchase lots put up a deposit,

7  which would be held by the bank.

8  **Q.  And was that a condition of this loan closing?**

9  A.  I believe so.  I'd have to review.

10 **Q.  I think when we go down below we'll see it, but let's try**

11 **to go in order.**

12 A.  Okay.

13 **Q.  The next paragraph is the rate.**

14 **That means the interest rate that the bank is**

15 **charging?**

16 A.  Yes.

17 **Q.  And a fee.**

18 A.  Yes.

19 **Q.  And what is the fee for?**

20 A.  The fee is for the costs associated with underwriting and

21 processing the loan.

22 **Q.  So that would be .75 percent of the $27 million?**

23 A.  Yes.

24 **Q.  And then under "Terms of Repayment," it specifies that**

25 **interest only payable monthly from an interest reserve.**

1          **Can you explain what that means?**

2   A.   Sure.   Generally part of the costs associated with a loan

3   is the costs to carry the loan while it's being developed.

4   So, in other words, the period of time where you're not

5   getting any money, you're not selling lots because you're

6   trying to get it ready to sell, typically a reserve will be

7   put up and that will be part of the costs to carry the loan

8   until which time you're ready to sell the lots.

9   **Q.   And where is that interest reserve coming from?**

10  A.   It's part of the total cost.   So, when you look at the

11  total cost of a project, that carry would be part of that cost

12  less the borrower's equity, which is an amount of money they

13  put in.

14  **Q.   So is that, in effect, part of the loan?**

15  A.   It is.

16          Most of the time we do it that way so that we can

17  control it.   What we could do, another alternative, would be

18  to not make it part of the loan proceeds and have the borrower

19  as part of their equity pay the interest.   But it makes the

20  bank a little bit more comfortable because we'll be

21  controlling that money and we know it's there.

22  **Q.   So when it's part of the loan proceeds, what actually**

23  **happens is the loan is funded and a piece of that loan is held**

24  **back to pay what's called the interest reserve, is that right?**

25  A.   That's correct.   Yes.

MINDLING - Direct (Arisohn)

1   Q.  So that interest is money that the borrower has actually

2   borrowed from the bank.

3   A.  Yes.

4   Q.  Now we go down to the next line.  You see "Collateral

5   Code."  We spoke yesterday about those collateral codes.

6   That's for purposes of what again?

7   A.  Again, that code goes into the system so we can segregate

8   the various types of loans.

9   Q.  And then the next paragraph talks about "Collateral

10  Description," and that indicates a first mortgage on the land?

11  A.  Yes.

12  Q.  Can you explain what that means?

13  A.  Sure.  It's part -- in order to secure our position on a

14  piece of property, a bank takes what they call a mortgage.

15  I'm sure you're familiar with that.  It's no different than

16  taking a mortgage on your home as an individual.  We're just

17  taking a mortgage.  It's a legal document that's recorded that

18  allows the bank to have what we call a lien on that property

19  until the loan is paid.

20  Q.  And just explain briefly how that serves as protection for

21  the bank.

22  A.  In the event that a borrower defaults, then the bank has

23  the ability to what we call foreclose, and that's a legal

24  process in order to get title to the property.

25  Q.  And if there's a default and the borrower fails to pay

MINDLING - Direct (Arisohn)

415

1  **back the bank the money owed, the bank takes the property and**

2  **tries to sell it?**

3  A.  That's correct.

4  **Q.  And raise the money to pay off the loan, correct?**

5  A.  That's correct.

6  **Q.  Then it talks about assignment of sales contracts with**

7  **Avalon Homes, Esslinger Homes, Cahill Homes, Tivoli Homes,**

8  **Trend Building.**

9         **What does that mean?**

10  A.  I'm not sure where -- can you show me?

11  **Q.  Right after the first mortgage and it says "Assignment of**

12  **the sales contracts."**

13  A.  Trend Building and Development, Inc., is a builder.

14  **Q.  I understand.  But those are the five builders that --**

15  A.  Oh, I'm sorry.  Yes.  Those are the five builders, I

16  believe, that were going to purchase the lots.

17  **Q.  And what does it mean when it says "Assignment of the**

18  **sales contracts"?**

19  A.  Basically in the event that the bank had to step in, we

20  would be able to be the recipient of those contracts.  So, if

21  our borrower defaulted, we would have the contract between the

22  builder and the bank.

23  **Q.  And how does that protect the bank?**

24  A.  The bank would be able to continue to develop and sell the

25  lots and get paid off.

MINDLING - Direct (Arisohn)

1  Q.  Then it talks about assignment of the initial aggregate

2  nonrefundable deposits of $2 million.

3           That's what we spoke about before?

4  A.  Yes.

5  Q.  So these builders were putting deposits down as, in

6  effect, down payments for their future purchase of these lots,

7  is that right?

8  A.  Yes.

9  Q.  And what was supposed to happen to that $2 million?

10  A.  It was supposed to be held in escrow for the benefit of

11  the bank.

12  Q.  Okay.  That was part of the bank's protection?

13  A.  Yes.

14  Q.  Then underneath that we have the guarantors, and the first

15  guarantor that was handwritten in is the G&T Land

16  Development.  That would the single asset entity buying the

17  land?

18  A.  I'm not sure if G&T Land Development is a single asset

19  entity, but it was the entity that bought the land, that's

20  correct.

21  Q.  And the next column over is something that's called

22  ANW/NW.  That refers to "adjusted net worth"?

23  A.  Yes.

24  Q.  And "net worth"?

25  A.  That's correct.

1    Q.   And what does that mean?

2    A.   When the Credit Department reviews a guarantor's financial

3    statement, what we do is we do an analysis to determine what

4    assets of that particular individual would the bank really be

5    able to rely on.  So, we deduct any kind of asset or equity

6    from that net worth to come up with a more conservative, more

7    realistic number.

8    **Q.   And the reason that you do that is to look at what are the**

9    **assets that the bank could go after if the bank had to go**

10   **after the guarantor, is that right?**

11   A.   Either that or the level of liquidity that the individual

12   has in order to support the loan in the event that sales were

13   slow, et cetera.

14   **Q.   So, for example, if on somebody's financial statement**

15   **there was a home that was owned jointly with a spouse, how**

16   **would you count that?**

17   A.   That would be taken out of the adjusted net worth because

18   of the situation in Florida where it's called homestead, that

19   an individual's primary residence is exempt from being

20   involved in foreclosure or bankruptcy type scenario.

21   **Q.   And if you had on somebody's financial statement an asset**

22   **that was jointly -- not a house, but another asset that was**

23   **jointly owned with the spouse and the spouse was not a**

24   **guarantor, would that be something else you would take out?**

25   A.   Yes.  That would be deducted as well.

1  Q.  Why?

2  A.  Because it's a joint asset and our guarantor is just the

3  husband.  It would be difficult to really go after that asset.

4  **Q.  And if an asset on someone's financial statement was a**

5  **wholly owned closely held corporation, would you deduct the**

6  **value of that?**

7  A.  Generally, unless it's owned exclusively by the

8  guarantor.  But if it has multiple owners, yes.

9  **Q.  And why is that?**

10  A.  Because of the fact it does have multiple owners than our

11  part of our loan.

12  **Q.  So next to G&T Land Development there's no entry.  Does**

13  **that mean that the bank did not have any adjusted net worth**

14  **available for that entity?**

15  A.  I don't know the answer to that.

16  **Q.  And underneath G&T Land Development there's a reference to**

17  **Michael A. Tringali.  Who is that?**

18  A.  He's the principal owner of the borrowing entity.

19  **Q.  And he's the promoter basically of this deal, is that**

20  **right?**

21  A.  Yes.

22  **Q.  He was the one that had the relationship with the lending**

23  **officer that resulted in the lending officer presenting this**

24  **loan, correct?**

25  A.  I believe so.

1   Q.  And his adjusted net worth is 275M, and "M" stands for

2   thousand?

3   A.  Yes.  $275,000, yes.

4   Q.  The column to the right of that is a date of PFS/FS, and

5   am I correct, that means the date of the personal financial

6   statement or the financial statement?

7   A.  Yes.

8   Q.  And is there a policy at the bank as to how current or how

9   recent that financial statement has to be?

10  A.  Generally we like to have a statement within 12 months.

11  Q.  So this satisfied that requirement?

12  A.  Yes.

13  Q.  Now, the two other guarantors listed there, La Vista Homes

14  and Sarasota Bay Construction and Development, do you know

15  what those are?

16  A.  I do not.  I am assuming they are related to -- most

17  likely they're related to Tringali.

18  Q.  So, if you were to look at page 29 of that document and

19  you see the reference near the bottom of the page to Sarasota

20  Bay Construction --

21  A.  Yes.

22  Q.  -- it is indeed an entity owed by Mr. Tringali, correct?

23  A.  Yes.

24  Q.  And Sarasota Bay Construction company was a construction

25  company that was owned by Mr. Tringali?

MINDLING - Direct (Arisohn)

420

1    A.   Yes.

2    Q.   And if you would turn the page to the next page, page

3    number 30, there's a note there about assets under the star

4    where it says "Interim statement."  About three paragraphs

5    down:  "Please note, assets and inventory were overstated by

6    $624,000."

7            Do you see that?

8    A.   Yes.

9    Q.   What does that mean?

10   A.   It looks like between the time that the financial

11   statement was issued and the time that we were analyzing it,

12   some lots had been sold.

13   Q.   And then underneath that is a reference to La Vista

14   Homes.  That was the other guarantor?

15   A.   Yes.

16   Q.   La Vista Homes.

17   A.   Yes.

18   Q.   And it says there:  La Vista Homes performs all the

19   construction for Tringali's projects.  It was formed in 2002

20   and is owned 99 percent by Tringali and one percent by his

21   wife.  The entity does not hold real estate.  Tax returns were

22   received for 2003.

23           And this was the information that was available

24   regarding that guarantor, correct?

25   A.   Yes.

MINDLING - Direct (Arisohn)

1   Q.   And if you turn to page 33, sir -- first of all, let's go

2   down to where it says "written by."

3   A.   Yes.

4   Q.   That's one of the credit analysts you spoke about

5   yesterday?

6   A.   Yes.

7   Q.   And these are the people that reviewed the credit and

8   finances of the borrower and the guarantors, right?

9   A.   Yes.

10  Q.   A bank employee, correct?

11  A.   Yes.

12  Q.   Reports to you, correct?

13  A.   No, he does not report to me.

14  Q.   In the summary it talks about the strength, that the

15  collateral is protected with a 70 percent LTV.

16          Can you tell me what that means?

17  A.   Yes, 70 percent loan to value.  As we talked yesterday,

18  loan to value represents the loan amount divided by the value

19  of the property.  So, if a property is worth a hundred dollars

20  and we lend 70, the loan to value would be 70 divided by a

21  loan hundred, or 70 percent.

22  Q.   And that value is based upon what, sir?

23  A.   Based on an appraisal.

24  Q.   And we'll look at the appraisal in a few minutes.

25          Then it talks about weaknesses.  And the weaknesses

MINDLING - Direct (Arisohn)

1  are is that:  The financial statements of G&T Land

2  Development, as well as La Vista Homes and Sarasota Bay,

3  received for 2004 and the interim statement are not audited

4  and of poor quality.  An adjustment was needed to balance

5  assets with liabilities and equity for G&T in 2004.  Also, the

6  balance sheets are overstated due to the lots under contract

7  that are not removed from the lot inventory, thus double-

8  counted.

9          So, that was all information that was available at

10  the time this loan was approved, correct?

11  A.  Yes.

12  Q.  And number 2:  Limited historical financial information

13  was available and provided for analysis.

14          That was available at the time this loan was

15  approved, correct?

16  A.  Yes.

17  Q.  Now, if you would go back to page 16, please.

18          Underneath the section we were just looking at

19  regarding guarantors, there's a handwritten notation that

20  says:  "Verify 15" -- and "MM" means million, right?

21  A.  Yes.

22  Q.  "Verify $15 million in cash in project and confirm that it

23  is not from the seller."

24          Can you explain what that means?

25  A.  Yeah.  One of the closing conditions was for our attorney

1   to verify that the equity, or the skin in the game we talked

2   about yesterday, that was verified that in fact it was put

3   into the project.

4   **Q.  And what is the significance of verifying or confirming**

5   **that this $15 million is not coming from the seller?**

6   A.  Wanted to ensure that it wasn't just what we call puted

7   (sic) value but it was actually cash.

8   **Q.  And how would $15 million be coming from the seller?**

9   A.  I'm not sure.  I think that was miswritten.

10  **Q.  I'm sorry?**

11  A.  I'm not sure what that piece of it "not from the seller,"

12  the context of that.  But the point of that condition was to

13  verify that actually cash was going into the deal.

14  **Q.  Well, what would be the implication to the deal if**

15  **$15 million was in fact coming from the seller instead of from**

16  **the buyer?**

17  A.  From the seller and not the buyer....  Oh, I see where

18  you're going with this.

19          Basically again, the same comment that I just made,

20  we wanted to verify that our borrower was actually putting

21  money into the project, a skin in the game, as opposed to what

22  we call puted equity where it was increase in value that

23  created that $15 million.

24  **Q.  So, let me see if we can give an example.  If this**

25  **borrower was buying this property for approximately**

MINDLING - Direct (Arisohn)

1   **$34 million -- is that about right?**

2   A.   I don't have anything in front of me that would have the

3   cost breakdown, so I couldn't answer that.

4        If you have the total cost, I could walk you through

5   it.

6   **Q.   I think I do.  Let's see.  Turn to page 18, at the bottom,**

7   **budgeted cost, land purchase, $34 million.**

8   A.   Yeah.  I got you.

9   **Q.   Okay.  So, if the borrower were buying this property for**

10  **$34 million, and $15 million of that was coming from the**

11  **seller, right, the borrower would be actually paying**

12  **$34 million less $15 million.  The borrower would be paying --**

13  **let's see if I can do that quickly --**

14  A.   Nineteen two.

15  **Q.   -- $19 million, right?**

16  A.   Yeah, nineteen two, yeah.

17  **Q.   So, if the borrower were paying $19 million and getting a**

18  **$27 million loan, that wouldn't be good for the bank, would**

19  **it?**

20  A.   I think you're doing apples and oranges.  It would mean

21  that the borrower didn't put any cash into the deal.

22  **Q.   And why did this issue come up, if you know, as to the**

23  **equity coming from the borrower and not the seller?**

24  A.   Well, it was a lot of money and we just wanted to make

25  sure that in fact it was cash going in.

MINDLING - Direct (Arisohn)

1   It's really a normal process that we verify cash

2   equity.  It's done with every single loan.

3   **Q.  Okay.  Now, let's go back to page 16.**

4   **And when that kind of thing is handwritten in on the**

5   **Credit Facility Summary, that's a topic that came up for**

6   **discussion at Major Loan Committee, is that right?**

7   A.  Yes.  It's probably an individual Committee member or

8   several Committee members that made that comment and the

9   Secretary wrote it down.

10  **Q.  And that would be a condition of closing the loan,**

11  **correct?**

12  A.  Yes.

13  **Q.  Let's turn to the next page.**

14  **And this is the standard -- oh, wait.  I'm sorry.  Go**

15  **back.  I'm sorry.  I left one thing out.**

16  **Under the guarantors there's a set of boxes that are**

17  **referred to there as "policy exceptions."  Do you see that?**

18  A.  Yes.

19  **Q.  What is that?**

20  A.  These would be the underwriting exceptions that we talked

21  about yesterday.

22  **Q.  So, in the event this loan is being approved in one way or**

23  **another that does not comply with the written BankAtlantic**

24  **loan policy, it would be noted in that place, correct?**

25  A.  Yes.

MINDLING - Direct (Arisohn)

1   Q.   Okay.   Now on the next page.

2          And this is the typical second page of the Credit

3   Facility Summary?

4   A.   Yes.   Sometimes there is additional conditions.   In this

5   particular case it looks like it ended after the first page.

6   Q.   And the basic purpose of this page is the box at the

7   bottom?

8   A.   Yes.

9   Q.   And in that box at the bottom, that indicates who the

10  sponsoring lending officer was, in that case, Warren Toole,

11  and he signed it, and his manager, Len Harvell, signed it, is

12  that right?

13  A.   Yes.

14  Q.   And then in the middle box, that records the vote at the

15  Major Loan Committee, is that correct?

16  A.   Yes.

17  Q.   And generally those votes are recorded by initial, is that

18  correct?

19  A.   Yes.

20  Q.   And here we have approval votes by Alan Levan, Jay

21  McClung, Marcia Snyder and Perry Alexander, is that right?

22  A.   Yes.

23  Q.   And the fact that your initials are not there doesn't mean

24  you declined this vote -- this loan.   It means that you

25  weren't present?

1   A.   Yes, that's correct.

2   Q.   And do you recall why it was that you were not present?

3   A.   I think I was on vacation.

4   Q.   And if a loan is presented to Major Loan Committee and you

5   are not at Major Loan Committee, does that mean you don't

6   review the loan?

7   A.   Typically.  It depends.  It depends on -- I typically try

8   to at least look through the packages.

9   Q.   Even if you don't vote on them.

10  A.   Even if I don't vote on them.

11  Q.   And you do that in your role as Chief Credit Officer of

12  the bank.

13  A.   Yeah, just so I'm aware what's approved.

14  Q.   Now, if you would turn back in this document to page 14.

15  I think we have a better copy of this in another exhibit.

16         So, let me just ask you this.  The beginning of this

17  document, the first page of Plaintiffs' Exhibit 20 -- if you

18  blow up the top of this page just to see what it is -- this is

19  another Credit Facility Summary for the same loan?

20  A.   Yes.

21  Q.   And this is dated January 26, 2006, is that right?

22  A.   Yes.

23  Q.   So this is about six months later?

24  A.   Yes.

25  Q.   And at that time there's obviously a name, different name

MINDLING - Direct (Arisohn)

1   of a borrower named Steeplechase Properties, LLC.

2   A.   That would be your single asset entity.

3   **Q.   So that was the asset entity that was created?**

4   A.   Yes.

5   **Q.   And six months later the request was that the loan be**

6   **increased by $710,000.**

7   A.   Yeah.   The request was to increase $710,000 so they could

8   put the utilities under the ground as opposed to above ground

9   for aesthetic purposes.

10  **Q.   So the box at the top that's checked as "modification,"**

11  **that's what that indicates?**

12  A.   Yes.

13  **Q.   And when this is submitted to Loan Committee, are the same**

14  **documents that were originally submitted submitted again?**

15  A.   Generally, yes, depending on the time frame.

16  **Q.   And if you turn to page 2 of this exhibit, you'll see**

17  **there at the bottom --**

18          MR. ARISOHN:  Do you want some water?

19          JUROR:  I got some.

20          MR. ARISOHN:   Okay.

21  BY MR. ARISOHN:

22  **Q.   You'll see at the bottom the Major Loan Committee vote on**

23  **this increase to $710,000.**

24  A.   Yes.

25  **Q.   And that was approved on January 31, 2006.**

MINDLING - Direct (Arisohn)

429

1  A.  Yes.

2  Q.  And there we see approval initials by Mr. Abdo,

3  Mr. McClung, Ms. Snyder, you --

4  A.  Yes.

5  Q.  -- and Perry Alexander, correct?

6  A.  That's correct.

7  Q.  And there's no initials in the box next to Alan Levan's

8  name.  But on the top of the box there is an indication

9  acknowledged with a line and then the initial, I think that's

10  the initial A.

11         Could you tell us what that means?

12  A.  Yeah.  What that indicates is that Alan was not at

13  Committee.  However, he did acknowledge the approval.

14  Q.  And what does that mean?

15  A.  He was not going to -- didn't have any major objectives to

16  the approval.

17  Q.  I'm sorry.

18  A.  Didn't have any major objectives to the approval.

19  Q.  He didn't have any major objections to the approval.

20  A.  That's correct.

21  Q.  So, when we see on these Credit Facility Summaries

22  acknowledged Mr. Levan's initial A, that's what that means?

23  A.  Yes.

24  Q.  So now I'd like to turn to Plaintiffs' Exhibit 21.

25         MR. ARISOHN:  I'm offering Exhibit 21, Your Honor.

MINDLING - Direct (Arisohn)

430

```
 1              THE WITNESS:  It's under tab 22.

 2              MR. STEARNS:  No objection, Your Honor.

 3              THE COURT:  21 is under tab 22.

 4              THE WITNESS:  Yes.

 5              THE COURT:  No objection.  Okay.  So 21 is admitted.

 6              (Plaintiffs' Exhibit 21 in evidence)

 7    BY MR. ARISOHN:

 8    Q.  Now, I think you said yesterday that after Major Loan

 9    Committee votes to approve a loan, after that happens the bank

10    receives the initial appraisal on the property, is that right?

11    A.  Yes.

12    Q.  And then, if that appraisal is reviewed and is

13    satisfactory, the Major Loan Committee indicates its approval

14    on the appraisal, is that right?

15    A.  Yeah.  After it's gone through a third party review, this

16    particular document that you're showing here is presented to

17    Major Loan for approval.

18    Q.  So, let's slow that down a little bit.

19    A.  Okay.

20    Q.  So there's initial appraisal.

21    A.  Yes.

22    Q.  And then that appraisal in turn is reviewed by another

23    appraiser.

24    A.  Correct.

25    Q.  And that's called a review appraiser.
```

1    A.   Correct.

2    **Q.   And once that review appraiser reviews the initial**

3    **appraisal, that review appraisal comes to the bank and Major**

4    **Loan Committee, and Major Loan Committee reviews that and**

5    **indicates its approval, correct?**

6    A.   Yeah.

7         You used the term "review appraisal."  It's a review

8    report.  It's not really an appraisal, just for clarification

9    purposes.  But, yes, that process is correct that you

10   outlined.

11   **Q.   I'm sorry.  I didn't understand that.  Could you explain**

12   **that?**

13   A.   You said a "review appraisal."  It's not a new appraisal.

14   It's a review of the existing appraisal, so it's just a

15   report.  It's not a whole new appraisal.

16   **Q.   So the review appraisal is a review of the existing**

17   **appraisal.**

18   A.   Exactly.

19   **Q.   It's not a whole new appraisal.**

20   A.   Exactly.

21   **Q.   Okay.  Thanks for that clarification.**

22        **And at the top of this document, Plaintiffs' Exhibit**

23   **21, this indicates that this is coming from somebody named**

24   **Carolyn Holman and it's dated July 22, 2005, is that right?**

25   A.   Yes.

MINDLING - Direct (Arisohn)

432

1   Q.   So this is just a few days after Major Loan Committee

2   initially approved the loan on July 14th, is that right?

3   A.   Yes.

4   Q.   And who is Carolyn Holman?

5   A.   She's one of our consultants that we utilize to review

6   appraisals.

7   Q.   And this looks like on the right, with the handwriting,

8   was committed to Major Loan Committee on July 28, 2005.

9   A.   Yes.

10  Q.   And there is a column for approval and declined.  And we

11  have all of those approval initials.  And could you tell us

12  whose initials those are?

13  A.   Yes.  Perry Alexander, Marcia Snyder, Alan Levan, myself,

14  and Jay McClung.

15  Q.   And that means that they reviewed this appraisal review

16  and basically agreed at this point to fund the loan, right?

17  A.   Yes.

18  Q.   Let's turn to -- let's first turn to page 4 and there's a

19  paragraph there that talks about the as is land value.

20  A.   Yes.

21  Q.   And in the typical case, Mr. Mindling, an appraiser, in

22  order to determine the value of property, generally looks at

23  what's called comparable sales, is that not right?

24  A.   Yes.

25  Q.   And what does that mean?

MINDLING - Direct (Arisohn)

1  A.  That means the appraiser will look at other sales that

2  have taken place and, based on that information, utilize that

3  to come up with a value for the property that they're

4  appraising.

5  **Q.  And by "comparable sales," that means a buyer and a seller**

6  **who came to terms at arm's length to a price for a piece of**

7  **property that in one way or another was similar to the piece**

8  **of property under consideration, correct?**

9  A.  Yes.

10  **Q.  And that is a measure of value because?**

11  A.  It represents what's happening in the market at that

12  particular time.

13  **Q.  Now, in this particular case, the as is land value is**

14  **estimated based on two land sales, two current contracts**

15  **including the subject.**

16      **What does that mean?**

17  A.  Oftentimes the appraisal will also take into account the

18  actual subject's land contract.

19  **Q.  So, in part, the appraisal in this case was based upon the**

20  **value of this particular contract itself, right?**

21  A.  Yeah.  The thought process there is that the contract

22  would represent, again, what's going on in the market.

23  **Q.  And in addition to that, the appraisal was based upon one**

24  **verbal offer.  Do you see that?  One verbal offer.**

25  A.  Oh, yes, yes.

MINDLING - Direct (Arisohn)

1   Q.   That's not a comparable sale, right?

2   A.   No.

3   Q.   And a current listing, that's not a comparable sale, is

4   it?

5   A.   No.

6   Q.   That would be what somebody is asking for for a piece of

7   property, correct?

8   A.   Yes.

9   Q.   And in your view, as a credit man, that's not really a

10  good marker of what the value of a piece of property is, is

11  it?

12  A.   I'm not an appraiser, and the appraiser has to follow

13  FIRREA guidelines.  So I'm not an expert on appraisal, so I

14  won't comment on that.

15  Q.   Now, if you go back to page 3, under sales history, it

16  says:  Subject is under contract to G&T Land Development for

17  $34,200,000.  Let's stop there.

18       "Subject" means the piece of property at issue,

19  correct?

20  A.   That's correct.

21  Q.   So the piece of property at issue is under contract,

22  meaning G&T Land Development has a contract to buy this

23  property for $34,200,000.

24  A.   That's correct.

25  Q.   And then in the next sentence it says:  The contract is

MINDLING - Direct (Arisohn)

1  dated March 28, 2005.  Is that right?

2  A.  Yes.

3  Q.  So G&T Land Development had a contract to buy this

4  property for $34 million that was entered into on March 28,

5  2005, and the Major Loan Committee is considering this loan in

6  July, is that right?

7  A.  Yes.

8  Q.  Then the next sentence says:  This represents a flip of

9  the property.

10           And what is a flip?

11  A.  Generally a person will purchase a property and then sell

12  it immediately.  That was particularly property in this period

13  of time because valuations were moving so quickly that people

14  were making money by just buying a property and then selling

15  it.

16  Q.  And what does that do to the value of the property?

17  A.  It increases the value.

18  Q.  And it says that it represents a flip of the property,

19  meaning the contract to G&T represents a flip, is that right,

20  from Capital Force, Inc., who has the property under contract

21  from the current owner, the Eddy Corporation, at an

22  undisclosed price.  Do you see that?

23  A.  Yes.

24  Q.  So, if I'm reading that correctly, that means the current

25  owner, Eddy Corporation, who at the time this loan is

MINDLING - Direct (Arisohn)

1  considered owns the property, is that right?

2  A.   Yeah.   It says from the current owner, the Eddy

3  Corporation, yes.

4  Q.   So the Eddy Corporation entered into a contract to sell

5  the property to a company called Capital Force at an

6  undisclosed price, and Capital Force took that contract and

7  flipped it to your borrower, is that right?

8  A.   Ah, let's see here.   Yes, I believe that's correct.

9  Q.   And the flip was for $34 million.   But you had and the

10  bank had no idea how much Capital Force had agreed to buy the

11  property from the Eddy Corporation for.

12  A.   I believe it wasn't public at that time.   That's why it

13  was undisclosed.

14  Q.   So the bank, when it approved this loan of $27 million,

15  had no idea how much was boosted up in price by this flip.

16  Isn't that true?

17  A.   The only thing that we were going by is the appraiser and

18  their value of the value of the property.   That's correct.

19  Q.   And part of that appraisal for the value of that property

20  was based upon this $34 million price, isn't that true?

21  A.   The land piece, yes.

22  Q.   Sorry?

23  A.   It was one of the pieces, yes.

24  Q.   And after all of this information in this review appraisal

25  was reviewed by Major Loan Committee, the $27 million loan was

MINDLING - Direct (Arisohn)

1  approved, correct?

2  A.  Yes.

3  Q.  Now, in July of 2005, when this loan was approved, that

4  was in and around the time that BankAtlantic had made a

5  decision to exit the condo lending business.  Isn't that true?

6  A.  I believe sometime in 2005, if my memory serves me.

7  Q.  And instead of lending money into the condo lending --

8  into the condo development business, BankAtlantic made a

9  business decision to lend money into the land development

10 business, isn't that right?

11 A.  We were always lending money in residential land.  Maybe

12 more emphasis is a better way to put it was placed on

13 residential land development.

14 Q.  Wasn't it the case that a decision was made at

15 BankAtlantic to focus on these land loans because at that

16 time, particularly in the northern part of Florida, there was

17 a lot of land?

18 A.  It was definitely strategy that we were pursuing.

19 Q.  And that strategy included all kinds of land loans,

20 builder land bank loans and non-builder land bank loans,

21 correct?

22 A.  Yes.

23 Q.  And yet, at this time, you and the bank were aware that

24 because there was a lot of land available for sale in Florida

25 in November, say, of 2006, that was a red flag for the bank,

MINDLING - Direct (Arisohn)

1   **was it not?**

2   A.   I don't -- I would say that's probably a little before we

3   realized that there was a deterioration in the market.   At

4   that point, I think, late 2006, I think, is when we started

5   hearing things that, gosh, this market's really heated up; at

6   some point it's got to deflate.   It wasn't until 2007 did we

7   actually start having concern.

8   **Q.   If you would turn back to one of the exhibits we looked at**

9   **yesterday, Plaintiffs' Exhibit 1, which was your board**

10  **presentation in November of 2006, page 16.**

11  A.   Yes.

12  **Q.   And at the top you have a list of something you call red**

13  **flags.**

14  A.   What page are you on?

15  **Q.   We're on page 16, and in your slide you have something**

16  **called red flags at the top of the page.   I think it's up on**

17  **the screen.**

18  A.   Yes.

19  **Q.   And a red flag is a warning, right?**

20  A.   I'll have to review this.   You might be taking that out of

21  context.

22  **Q.   Okay.   Review it.**

23  A.   Give me a second.

24       Okay.

25  **Q.   So a red flag is a -- I don't know what word you want to**

MINDLING - Direct (Arisohn)

1   **use -- but it's a warning, right?**

2   A.   Right.   The red flags in this particular case, I was

3   referring to the condo markets mostly.

4   **Q.  Well, where you talk about land inventory, that was not**

5   **condo markets, right?**

6   A.   I was talking about -- again, you're broadbrushing this.

7   There was specific secondary locations that we were starting

8   to talk about.

9            But at this point, again, we were just seeing the

10  beginning of the issues and we were just hearing about it from

11  our economist.   So it wasn't really until 2007 that we

12  actually saw results from this downturn.

13  **Q.  And in the bottom part of this page, those are your notes**

14  **to yourself?**

15  A.   Yes.

16  **Q.  In the third line of the bottom, you talk about the high**

17  **level of land inventory and carrying costs associated with**

18  **excessive land inventory many builders are currently**

19  **experiencing.**

20            **What did that mean?**

21  A.   There was a lot of land out there and that....

22  **Q.  And if there was a lot of land out there and a lot of**

23  **inventory that builders were currently experiencing, what was**

24  **the impact or potential impact of that on the bank?**

25  A.   Well, if sales would slow, which they ended up doing in

1  2007, then they would be stuck with this inventory or unable

2  to sell it.

3  **Q.  Now, one of the closing conditions that you referred to on**

4  **the Steeplechase loan was that the builders, these builders,**

5  **put their $2 million worth of deposits into an escrow account**

6  **at BankAtlantic, is that right?**

7  A.  That was the requirement, yes.

8  **Q.  And in fact, as it turned out, that did not happen, did**

9  **it?**

10  A.  That is correct.

11  **Q.  And the loan was funded even though that did not happen.**

12  **Isn't that true?**

13  A.  I don't know how much you know about Steeplechase, because

14  this was a fraudulent loan and the deposits were taken.

15  However, the deposits were not held at BankAtlantic -- all of

16  them were not held at BankAtlantic.  They were held at some of

17  the attorneys' office and through their accounts of the

18  borrower.

19  **Q.  And that was not discovered by BankAtlantic, correct?**

20  A.  It wasn't discovered, from my standpoint, until obviously

21  we started experiencing issues.

22  **Q.  So, moving forward into 2007 --**

23          **We can take that down.  Thanks.**

24          **You were aware in the first quarter of 2007, were you**

25  **not, that BankAtlantic had a series of land loans that were**

1  not being paid off as originally contemplated?

2  A.  Yeah.  A lot of renewals were coming up.  Typically on a

3  land loan we put it on a short string, and at that point, if

4  it doesn't go on either through sales or construction, then

5  the loan would need to be renewed.

6  Q.  So, a lot of these projects were coming in for extensions

7  of their maturity dates, right?

8  A.  That's correct.

9  Q.  And that certainly was not just builder land bank loans,

10  right?

11  A.  I don't recall the mix, but it would probably be a variety

12  of the loans.  Probably many of them were builder land bank

13  loans, but I'm sure there was a mix.

14  Q.  You were on the Major Loan Committee during that first

15  quarter of 2007.

16  A.  Yes.

17  Q.  And you would have approved all of those extensions,

18  correct?

19  A.  Yes.

20  Q.  You don't recall rejecting any extension.

21  A.  I don't recall from the top of my head, no.

22         MR. ARISOHN:  I'm going to offer at this time, Your

23  Honor, Plaintiffs' Exhibit 138.

24         THE COURT:  Tab 24, right?

25         THE WITNESS:  Yeah.

 1              THE COURT:  Okay.  There were no objections to this

 2    exhibit, I believe.

 3              MR. STEARNS:  That's correct, Your Honor.

 4              THE COURT:  So it's admitted.

 5              (Plaintiffs' Exhibit 138 in evidence)

 6              MR. ARISOHN:  Put it up, please.

 7    BY MR. ARISOHN:

 8    **Q.  This is an e-mail you received on March 14, 2007?**

 9    A.  Yes.

10    **Q.  And it was written by Alan Levan to you and the other**

11    **members of the Major Loan Committee?**

12    A.  Yes.

13    **Q.  And the subject of this was land loans, correct?**

14    A.  Yes.

15    **Q.  And he says that:  There seems to be a parade of land**

16    **loans coming in for extension recently.**

17              **Was that your perception at that time as well?**

18    A.  "Parade," I'm not sure I would call it a parade.  But

19    there was, you know, probably a handful.

20    **Q.  By "handful" you mean --**

21    A.  Five, six, yeah.

22    **Q.  Five or six.**

23              In his next sentence he says -- this is March 14th of

24    2007 -- it's pretty obvious the music has stopped.

25              Was that your perception as well?

1  A.  At the time, in late first quarter, yes, we started

2  becoming aware that sales were definitely slowing and we had

3  some concern.

4  **Q.  And at the bottom of the e-mail, Mr. Levan states, under**

5  **paragraph 8:  I believe we are in for a long sustained problem**

6  **in this sector.**

7          **Was that your perception as well?**

8  A.  Yeah.  I think, again, we're starting to see issues, have

9  a lot of land loans, and the whole point of this memo was that

10  we need to be proactive and deal with this on a proactive

11  basis and not wait until things continue to deteriorate.

12  **Q.  Our next exhibit is Plaintiffs' Exhibit 340.**

13          THE COURT:  It's under tab 25.

14          THE WITNESS:  25.  Thanks.

15          THE COURT:  There were no objections to this either,

16  right?

17          MR. STEARNS:  That is correct, Your Honor.

18          THE COURT:  So it's admitted.

19          (Plaintiffs' Exhibit 340 in evidence)

20          MR. ARISOHN:  Thank you, Your Honor.

21  BY MR. ARISOHN:

22  **Q.  340, Mr. Mindling, are the minutes from the Major Loan**

23  **Committee dated January 2, 2007, is that right?**

24  A.  Yes.

25  **Q.  And it indicates that you were present?**

MINDLING - Direct (Arisohn)

444

1   A.   Yes.

2   Q.   It indicates that Mr. Abdo was present but Mr. Levan was

3   not present, is that right?

4   A.   Yes.

5   Q.   And if you would turn to the second page of this exhibit,

6   this is a loan regarding a borrower named Brae Burn Estates,

7   is that right?

8   A.   Yes.

9   Q.   And paragraph 2 talks about modifying a six-month

10  extension option.

11  A.   Yes.

12  Q.   So, is this an example of a loan that's being extended --

13  maturity date is being extended by Major Loan Committee?

14  A.   Yes.

15  Q.   And you know that Brae Burn Estates was not a BLB loan,

16  correct?

17  A.   Right.   It was an acquisition, develop and construction.

18  We were actually funding the homes as well.

19  Q.   And the next exhibit is 341.

20          MR. STEARNS:  No objection, Your Honor.

21          THE COURT:  Okay.  Fine.  It's admitted.

22          (Plaintiffs' Exhibit 341 in evidence)

23  BY MR. ARISOHN:

24  Q.   341 are the minutes from the Major Loan Committee dated

25  January 9, 2007.  You're present.  Mr. Levan is not present,

MINDLING - Direct (Arisohn)

445

1   correct?

2   A.  Give me a second.  I'm still finding it.  Let's see.

3          I'm sorry.  Will you ask your question again,

4   please?

5   Q.  January 9, 2007, you are present at that meeting?

6   A.  Yes.

7   Q.  Mr. Levan is not present at that meeting?

8   A.  That is correct.

9   Q.  And if you were to turn to page 2, Home Devco, Tivoli

10  Isles -- Tivoli Lakes, that's another land loan?

11  A.  It's another acquisition, development, construction where

12  we were actually building the homes.

13  Q.  And this was not a builder land bank loan, correct?

14  A.  No.

15  Q.  I'm correct.  It is correct it is not a builder land bank

16  loan.

17  A.  It is not a builder land bank loan.

18  Q.  And if you look at the purpose of this presentation in

19  paragraph 2, a six-month extension of the loan is being asked

20  for, correct?

21  A.  Yes.

22  Q.  And if you turn to the signature page on the Credit

23  Facility Summary, which is two pages later, you see that that

24  was approved, right?

25  A.  Yes.

MINDLING - Direct (Arisohn)

1   Q.  I'm sorry.  If you go back to the prior exhibit, 340, the

2   third page of that exhibit has the signature block, that

3   extension for Brae Burn was also approved, correct?

4   A.  Yes, that's correct.

5   Q.  If you go to the next exhibit, which is Plaintiffs'

6   Exhibit 217.

7   A.  Tab 27.

8           MR. STEARNS:  No objection, Your Honor.

9           THE COURT:  I'm sorry.  What's the number?

10          MR. ARISOHN:  217.

11          THE COURT:  217.  It's admitted.

12          (Plaintiffs' Exhibit 217 in evidence).

13          THE WITNESS:  Tab 27.

14  BY MR. ARISOHN:

15  Q.  This is the Major Loan Committee meeting for January 23,

16  2007?

17  A.  Yes.

18  Q.  And you were present?

19  A.  Yes.

20  Q.  And Alan Levan was absent?

21  A.  Yes.

22  Q.  And if you turn to the second page of this exhibit, this

23  relates to Brae Burn.  Is this another extension for Brae

24  Burn?

25  A.  It might have been the same one.  I believe it was the

MINDLING - Direct (Arisohn)

1   same one.  Perhaps -- let me just look here.  There was only

2   one loan to Brae Burn, so it's got to be the same loan.

3   **Q.  Would this be a further extension?**

4   A.  No.  Let me just....

5   **Q.  If you're not sure, that's okay.  We'll move on.**

6   A.  I'm not sure.  But it would be the same loan.

7   **Q.  Okay.  Let's go to page 15.**

8   A.  Page 15 of the minutes.  Is that what you're -- yeah.

9   Okay.

10  **Q.  Taipan VI.**

11  A.  Yes.

12  **Q.  That's another loan to the land loan portfolio?**

13  A.  This was a loan to build townhomes.

14  **Q.  So not a BLB loan, correct?**

15  A.  No.

16  **Q.  And this was in Major Loan Committee for an extension of**

17  **the maturity date, correct?**

18  A.  No.  This wasn't to extend the maturity.  This was to

19  reduce the A&D commitment.

20  **Q.  If you look at the end of the third line, sir, under B,**

21  **I'll highlight that.  Third line down, starting with B.**

22  A.  Okay.  Yes.  You're correct.  That's correct.

23  **Q.  Third line down.**

24  A.  Yes.  I see.  Not only we reduced the A&D, but, yes, we

25  extended the maturity.

MINDLING - Direct (Arisohn)

1   Q.   And the extension of the maturity was --

2   A.   Looks like eight months, yeah.

3   Q.   From November to July, right?

4   A.   Yes, that's correct.

5   Q.   And Taipan VI was not a BLB.

6   A.   Correct.

7   Q.   And that request for extension, if you go two pages

8   further, you'll see was approved, correct?

9   A.   Yes.  Mr. Abdo voted no, but it had majority approval.

10  Q.   And the next exhibit is 342.

11          MR. STEARNS:  No objection, Your Honor.

12          THE COURT:  I'm sorry.  342?

13          MR. ARISOHN:  342, Your Honor.

14          THE COURT:  It's admitted.

15          (Plaintiffs' Exhibit 342 in evidence)

16  BY MR. ARISOHN:

17  Q.   This was the Major Loan Committee for January 25, 2007,

18  right, Mr. Mindling?

19  A.   Yes.

20  Q.   You're present?

21  A.   Yes.

22  Q.   Mr. Levan is absent?

23  A.   That is correct.

24  Q.   And if you turn to the page 5 of the minutes, Medalist

25  Village Homes, this was what they all an A&D loan, acquisition

MINDLING - Direct (Arisohn)

1  **and development loan?**

2  A.  Yeah.  I think this also had -- let me just refresh my

3  memory.  I think there's a construction component to this as

4  well.

5          Yes, sir.  It was again a scenario where we did

6  acquisition, we developed the land, and we also funded houses

7  on that development.

8  **Q.  And this is request to extend the maturity date from**

9  **August to February of 2010, right, August '07 to 2010, so, a**

10 **two-and-a-half-year extension, is that right?**

11 A.  I believe that's correct.  Let me just verify, make sure

12 it wasn't....

13         That seems strange that was, uh....

14         That's what the minutes say.  I don't -- I can't tell

15 by the CFOs.

16 **Q.  And am I reading it correctly on page 5 of the minutes**

17 **that the total loan exposure on this loan was $54 million and**

18 **that BankAtlantic's exposure was $36 million?**

19 A.  No, that's not correct.  The total committed amount was

20 $55 million.  BankAtlantic's exposure was $40 million.

21 **Q.  And this was a loan that was being presented by Marcia**

22 **Snyder?**

23 A.  Yes.

24         You know what?  I'm sorry.  I'm looking at the wrong

25 CFOs.  Seems like these are out of order.

MINDLING - Direct (Arisohn)

1  **Q.  Page 5.**

2  A.  Just a second.

3  **Q.  Page 6.**

4  A.  I misspoke.  I was looking at the loan prior to.

5          The bank -- the total commitment to the borrower was

6  $54 million.  We participated a portion of that out.  So

7  BankAtlantic's portion was $36 million.

8  **Q.  The single loan, right?**

9  A.  That's the total relationship.  That's not this loan.

10 **Q.  Okay.**

11 A.  This loan was, I believe, $5.5 million.

12 **Q.  And a request for extension was approved, right?**

13 A.  Yes.

14 **Q.  And I think we have just a few more exhibits.**

15          **343.**

16         THE COURT:  Any objection?  No.

17         MR. STEARNS:  No.

18         THE COURT:  It's admitted.

19         (Plaintiffs' Exhibit 343 in evidence)

20         MR. ARISOHN:  Thank you, Your Honor.

21 BY MR. ARISOHN:

22 **Q.  Exhibit 343 are the minutes from the Major Loan Committee**

23 **February 20, 2007.**

24          **You're present and Alan Levan is not present,**

25 **correct?**

MINDLING - Direct (Arisohn)

451

```
 1  A.  That's correct.

 2  Q.  And if you turn to page 13, there's a loan there called

 3  Sunland Development, and the request is for renewing the A&D

 4  loan for an additional six months.

 5  A.  Yes, that's correct.

 6  Q.  With a new maturity of September 18, 2007.

 7  A.  Yes.

 8  Q.  And Sunland Development was not a BLB loan, was it?

 9  A.  No.

10  Q.  And that request for extension was approved, correct?

11  A.  Yes.

12          MR. ARISOHN:  The next exhibit is 344.

13          THE COURT:  Okay.  It's admitted.

14          (Plaintiffs' Exhibit 344 in evidence)

15  BY MR. ARISOHN:

16  Q.  And 344 are the minutes from March 1, 2007, reflecting

17  your presence and Mr. Alan Levan's absence, is that right?

18  A.  Yes.

19  Q.  And the loan that's being considered is OLA Realty?

20  A.  Yes, that's correct.

21  Q.  And that was not a BLB loan, was it?

22  A.  No.

23  Q.  And the loan officer requested a 12-month extension of

24  this loan, correct?

25  A.  Yes.
```

MINDLING - Direct (Arisohn)

452

1    Q.  And that was approved, correct?

2    A.  Yes.

3            MR. ARISOHN:  The next exhibit is 345.

4            THE COURT:  It's admitted.

5            (Plaintiffs' Exhibit 345 in evidence)

6    BY MR. ARISOHN:

7    Q.  And these were the minutes from the Major Loan Committee

8    March 8, 2007, and you're present -- actually there were only

9    four members of the Major Loan Committee present at this one

10   and it looks like Perry Alexander was calling in, is that

11   right?

12   A.  Yes.

13   Q.  And Mr. Alan Levan was not present or calling in, right?

14   A.  Yes, that's correct.

15   Q.  And there was a request on page 2 for the extension of the

16   maturity date on a loan called 46 and 46A from March 20, 2007,

17   to January 19, 2009, correct?

18   A.  Yes.

19   Q.  And if you look at the signature block, that was approved,

20   correct?

21   A.  That's correct.

22           I think, if I can point out too, though, that even

23   though Mr. Abdo and Mr. Levan were not at the meeting, they

24   did sign off on this subsequent to the Committee.

25   Q.  Indicating their approval.

```
 1   A.  Correct.
 2   Q.  And I think finally, Exhibit 122, these are the minutes --
 3           MR. ARISOHN:  I'm sorry.  No objection?
 4           THE COURT:  I'm sorry.  What was the exhibit number?
 5           MR. ARISOHN:  122, Your Honor.
 6           THE COURT:  122.
 7           MR. STEARNS:  No objection, Your Honor.
 8           THE COURT:  Okay.  122 is admitted.
 9           (Plaintiffs' Exhibit 122 in evidence)
10   BY MR. ARISOHN:
11   Q.  These are the minutes from March 13, 2007?
12   A.  Yes, that's correct.
13   Q.  And looks like you're present; Mr. Levan is not present,
14   correct?
15   A.  That's correct.
16   Q.  And we have a loan called McGuire on the second page of
17   the exhibit, McGuire Roberson.
18   A.  Yes.
19   Q.  That was not a BLB loan, was it?
20   A.  No, it was not.
21   Q.  And you're being asked to approve a nine-month extension
22   for that loan, correct?
23   A.  That's correct.
24   Q.  And that was approved, correct?
25   A.  Yes.
```

1    Q.  And on page 5, we see Brae Burn again.  Is this another

2    requested extension or you think that's the same extension?

3    A.  Perhaps -- I'm only speculating because I haven't read

4    this through.  But oftentimes what happens is we approve a

5    loan and they go back to the borrower and the borrower maybe

6    asks for some modifications.  So the loan officer has to come

7    back in.  Without reading through this entirely, I'm guessing

8    that that's what happened.  It's the same loan, though.

9    Q.  Okay.  Now, shortly after Mr. Levan sent that e-mail where

10   he referred to the parade of land loans -- that was in March

11   of 2007 -- there came a time when a Land Loan Committee was

12   formed at BankAtlantic.  Is that true?

13   A.  Yes.

14   Q.  And that was shortly after that March 14th e-mail?

15   A.  You know what?  I think it was around the same time, yes.

16   I can't be certain of the exact date, but I know it was in

17   first quarter.

18   Q.  And what was the purpose of forming this Land Loan

19   Committee?

20   A.  During the first quarter we started to realize that in

21   particular land loans were -- could potentially be an issue.

22   So we formed a special committee to meet twice monthly to

23   monitor these loans, in particular, builder land loans, but we

24   also incorporated other land loans as well under this

25   committee.

MINDLING - Direct (Arisohn)

1  Q.  And am I correct that you were Chairman of that committee?

2  A.  Yes.

3  Q.  And who else was on the committee?

4  A.  Jack Abdo, Jay McClung.  At the time Marcia Snyder was

5  attending.  Alan attended on and off.  I believe that's --

6  besides the loan officers presenting updated information.

7  They weren't actually part of the committee, though.

8  Q.  The purpose of the committee was to closely monitor all of

9  the land loans.  Is that true?

10  A.  Yes.

11  Q.  Not just BLB land loans but all of the land loans.

12  A.  Correct.

13  Q.  And you actually had regularly scheduled Monday afternoon

14  meetings.  Is that not right?

15  A.  No.  That's a different meeting.  I had -- there were

16  Fridays -- every other Friday we met.

17  Q.  So the Land Loan Committee met every other Friday?

18  A.  Yes.

19  Q.  But regularly scheduled?

20  A.  Regularly scheduled, that's correct.

21  Q.  And what was the Monday at 4:00 p.m. meeting?

22  A.  That's a meeting I meet with -- and I don't even think at

23  the time that we were doing this -- and I continue to do it --

24  I meet with Alan Levan, Jarett and our CFO to discuss loan

25  quality and capital.

MINDLING - Direct (Arisohn)

1   **Q.   And do you recall that within a week of Mr. Levan's March**

2   **14th parade of land loans e-mail, there was a Major Loan**

3   **Committee meeting where the issues in that e-mail were**

4   **discussed?**

5   A.   Uh, I vaguely remember.  But, yes, I do remember us having

6   a meeting.  I don't think it was a Major Loan meeting.  I

7   think it was probably the same individuals, but it happened

8   probably right after Major Loan.  But I don't recall

9   specifically.

10          MR. ARISOHN:  Okay.  Can we take a look at

11   Plaintiffs' Exhibit 124.

12          MR. STEARNS:  No objection, Your Honor.

13          Are we going to take a morning recess?

14          THE COURT:  Yeah.  I was just about to in the next

15   few minutes.  But we can go ahead and do that.

16          Okay.  Let's take ten minutes.  If you'll step into

17   the jury room, please don't discuss the case while you're in

18   there.

19          (Jury retires at 11:09 a.m.)

20          (Brief recess)

21          (Resumed at 11:21 a.m.)

22          THE COURT:  So, can we bring the jury out?  Are we

23   ready?

24          MR. ARISOHN:  Yes, Your Honor.

25          MR. STEARNS:  Yes, Your Honor.

MINDLING - Direct (Arisohn)

```
 1              THE COURT:  Okay.  How are we doing?

 2              MR. ARISOHN:  Exhaustingly but getting there.

 3              THE COURT:  That's what trials are all about, right?

 4    It's a matter of stamina.  It's an endurance test.

 5              MR. ARISOHN:  Slugging right through.

 6              THE COURT:  Okay.  Well, so, how much longer do you

 7    think you have on direct?

 8              MR. ARISOHN:  I'd say less than a half hour, Your

 9    Honor.

10              THE COURT:  Bad timing.  Okay.  Well, we'll start the

11    cross before lunch.  I want to break for lunch at 12:30.

12    We'll take an hour and 15 minutes.  Then we'll come back.  So

13    you'll just start.

14              Okay.  Jury, please.

15              (Jury returns at 11:22 a.m.)

16              THE COURT:  Okay.  You can have a seat.

17              Okay.  If you're having trouble with the screen, just

18    move in front of one that's working.  One of the jurors

19    reported to us that the screen was out of focus.  So that's

20    how we're going to handle that for the moment at least.

21              Okay.  So you can continue.

22              MR. ARISOHN:  Thank you, Your Honor.  I think I've

23    introduced Exhibit 124.

24              THE COURT:  Yes, you did.  It was admitted.

25              (Plaintiffs' Exhibit 124 in evidence)
```

```
 1              MR. ARISOHN:  Thank you, Your Honor.
 2   BY MR. ARISOHN:
 3   Q.  I want to focus you, Mr. Mindling, on the e-mail that
 4   starts the bottom of the first page from Marcia Snyder, at the
 5   bottom, the very bottom.
 6   A.  Okay.  Before my e-mail.
 7   Q.  Yes.
 8   A.  Okay.
 9   Q.  So Marcia Snyder sends an e-mail on March 20th, six days
10   before the e-mail we looked at before about the parade of land
11   loans --
12   A.  Yes.
13   Q.  -- and it's addressed to various people.
14              Let me just ask you, for example, who is Amy
15   Engelberg?
16   A.  She is a loan officer -- or was a loan officer.
17   Q.  And who is Christopher Hynes?
18   A.  He was a loan officer.
19   Q.  If we go to the next page.  Let's see.  We see Len
20   Harvell's name there at the top.
21   A.  Yes.
22   Q.  And some of the names we've already heard in this case.
23              Michael Blevins, he was another loan officer?
24   A.  Yes.
25   Q.  And underneath him there's Perry Alexander.
```

MINDLING - Direct (Arisohn)

459

```
 1   A.   Yes.
 2   Q.   And he was not only a loan officer but he was a member of
 3   Major Loan Committee?
 4   A.   That's correct.
 5   Q.   And then this e-mail is copied to you, correct?
 6   A.   Yes.
 7   Q.   And the subject is land loans.
 8   A.   Correct.
 9   Q.   And it reads:  The MLC -- and that's Major Loan Committee,
10   right?
11   A.   Yes.
12   Q.   "The MLC members spent a great deal of time today" --
13   which would be March 20th -- "discussing our residential loan
14   exposure, which is currently in excess of 300" -- and that
15   would be $300 million, correct?
16   A.   Yes.
17   Q.   "This includes those loans that are presold to builders."
18            Those would be the BLB loans, right?
19   A.   Yes.  Later to be evolved to the BLB.  "Presold" was not
20   really correct terminology.  But, yes.
21   Q.   But those is how she was referring to BLB.
22   A.   Yeah.  Exactly.  Exactly.
23   Q.   Then she says:  "As well as land loans without a presale
24   but being held for future sale."
25   A.   Uh-huh.
```

MINDLING - Direct (Arisohn)

1  Q.  So there she's referring to all land loans.

2  A.  Pretty much, yes.

3  Q.  And she then says:  "Obviously, there is a significant

4  concern about these loans given the current state of the

5  market," is that right?

6  A.  Yes.

7  Q.  And that was all discussed at the Major Loan Committee, or

8  at least the Major Loan Committee members that day discussed

9  it.

10  A.  Yes.

11  Q.  Including you.

12  A.  Yes.

13  Q.  And do you remember who else was in that discussion?

14  A.  I don't.  I don't remember.

15  Q.  And then she says:  "We will be reviewing each of these

16  loans to determine what action, if any, may be necessary to

17  protect the bank."

18       So, is she saying -- is it your understanding, or was

19  the discussion, that every single land loan would be reviewed?

20  A.  I believe so, but I'm not certain.  At some point every

21  land loan was reviewed.  So at this point in time I believe

22  that was the case, but I'm not positive.

23  Q.  And then if you go to the next paragraph she says that

24  Jeff Mindling, you --

25  A.  Yes.

MINDLING - Direct (Arisohn)

1  Q.  -- you're preparing a template to be completed by the

2  officer with all the above as well as a comment section for

3  any specific information that needs to be considered.

4        So, is it the case that you were preparing a format

5  for every loan officer to fill in regarding various details of

6  every land loan that was existing at the bank at that time,

7  correct?

8  A.  Yes.

9  Q.  And if you now go up to the responsive e-mail that you

10  send, right there, you send a responsive e-mail on Friday,

11  March 23rd, looks like to the same -- maybe this was just a

12  reply to all of these people.

13  A.  It was clarification, yes.

14  Q.  And what you're doing there is you're giving some more

15  information about what the lending officer should look at,

16  right?

17  A.  Yeah.  At this point in time we started what we call

18  scrubbing the system to make sure that the collateral codes

19  were correct, and this sort of evolved over time.  But that's

20  what I'm trying to accomplish here by getting this

21  information, looking at it and making sure that it's in the

22  correct category.

23  Q.  And do you recall that as a result of the review of the

24  land loans in this period of time it was determined that many

25  of the land loans had depleted interest reserves?

1   A.   I think that, many of the loans -- I'm not sure I recall

2   many -- but, yes, there were situations where they were having

3   to pay out of pocket, yes.  When I say "pay out of pocket,"

4   instead of using the reserve, they're actually using their own

5   money to pay the interest.

6   **Q.   And the bank considered that to be an increased risk, did**

7   **it not?**

8   A.   Yes and no, depending on the particular scenario.

9   **Q.   You would agree that a depleted interest reserve would be**

10  **a matter of concern for the bank, would it not?**

11  A.   In certain situations, yes, depending on the strength of

12  the borrower and, again, the situation, are they having sales,

13  are they not having sales.  The positive is that they're

14  paying more into their project when they pay out of pocket

15  because they've already utilized the loan proceeds.

16          MR. ARISOHN:  Your Honor, I have a prior statement

17  I'd like to read to the witness.

18          THE COURT:  Okay.

19  BY MR. ARISOHN:

20  **Q.   Do you recall testifying in your deposition in this case**

21  **back in December of 2009, one of your depositions in this**

22  **case?**

23  A.   One of the many, yeah.

24          MR. STEARNS:  Just a second.  What page and line?

25          THE COURT:  Well, I was waiting for him to get an

MINDLING - Direct (Arisohn)

 1  answer to that question and then hoping that he would give us

 2  a page and line.

 3          MR. ARISOHN:  That's the next.

 4          THE COURT:  Okay.  So what's the --

 5  BY MR. ARISOHN:

 6  **Q.  And I'm going to ask you if you answered these questions**

 7  **with these answers at page 125, lines 8 through 24.**

 8          THE COURT:  Okay.  Just give the defense a chance to

 9  look at it.  Okay, Mr. Arisohn?

10          MR. STEARNS:  No objection to reading it, Your Honor,

11  if that's the question.

12          THE COURT:  Okay.  Fine.

13  BY MR. ARISOHN:

14  **Q.  You were asked the following, Mr. Mindling.**

15          **"Question:  Sir, I want to call your the attention to**

16  **the second page of this document and under the paragraph**

17  **headed 'Sources of Repayment' it says:  Land acquisition**

18  **development, construction and/or land banking loans often have**

19  **interest reserves associated with them.  Slowed absorption and**

20  **altered takedowns coupled with a period of rising interest**

21  **rates have negatively impacted the reserves.**

22          **"What did you mean by that?  What did you understand**

23  **that to mean?**

24          **And your answer was:  "When we establish an interest**

25  **reserve, we assume a certain interest rate for a certain**

MINDLING - Direct (Arisohn)

1  period of time.  His concern was that as rates increase, that

2  there might not be sufficient reserves to carry the loan

3  through maturity.

4          "Question:  And is that situation creating risk for

5  the bank?

6          "Answer:  Um, it would be a concern, yes."

7          Do you remember being asked those questions --

8  A.  Yes.

9  Q.  -- and giving those answers?

10  A.  Yes.

11  Q.  Now, we spent some time -- you can take that down,

12  thanks -- we spent some time yesterday talking about the loan

13  review function at the bank and that the loan review is a

14  separate department headed by Henry Barnes, right?

15  A.  At the time, yes.

16  Q.  And do you recall that in the years 2006 and 2007 that his

17  department reviewed the land loan portfolio?

18  A.  Part of commercial real estate review would include land

19  loans, yes.

20  Q.  And he was engaged in a review of the land loan portfolio

21  in early 2007, is that correct?

22  A.  You keep saying "land loan portfolio."  He didn't

23  specifically review the -- that's part of his commercial real

24  estate review, and I don't have anything in front of me, but

25  that sounds right as far as when he began his review.

MINDLING - Direct (Arisohn)

1  Q.  And in the course of that review, from time to time, he

2  would report back to you with some issues that he noticed,

3  correct?

4  A.  Yeah.  If there was something that needed heightened --

5  that was heightened concern, yes, he would bring it to my the

6  attention.

7         MR. ARISOHN:  At this time, Your Honor, I'd like to

8  offer Plaintiffs' Exhibit 7.

9         MR. STEARNS:  No objection, Your Honor.

10        THE COURT:  Okay.  7 is admitted.

11        (Plaintiffs' Exhibit 7 in evidence)

12 BY MR. ARISOHN:

13 Q.  And 7 is an e-mail from Henry Barnes -- that's the head of

14 Loan Review -- to various people, Ms. Snyder, Jay McClung and

15 to you, correct?

16 A.  Yes.

17 Q.  Dated January 22, 2007.

18        And he's saying there, the top paragraph that:  "The

19 review of commercial real estate portfolio is indicating that

20 certain loans and issues will require better documentation,

21 monitoring" -- at the top, right, under Marcia, Jay and

22 Jeff --

23 A.  Yes.

24 Q.  -- "will require better documentation, monitoring and

25 reporting."

MINDLING - Direct (Arisohn)

466

1          And then in the next paragraph he says:  "Certain of
2     these are summarized below."
3          If we could just blow out that paragraph, please,
4     where "certain of these are summarized below."
5          "It is likely when a combination of slowed sales,
6     depleted or soon to be completed interest reserve,
7     undocumented secondary sources of repayment and limited
8     prospect for market improvement can be attributed to the same
9     loan we can reasonably expect a loan risk rating of special
10    mention to substandard resulting from regulatory examination,
11    more than likely the latter, because I would not anticipate
12    they will go light on the grades regarding land and
13    residential housing loans."
14         You agreed with that assessment of Mr. Barnes, didn't
15    you?
16    A.  Yes.  Yes.
17    Q.  And then he specifically points out some things he found
18    with four separate loans.  This is January 22, 2007.
19         If we could highlight the Augustine Island
20    paragraph.
21         So he describes what the project was and then he says
22    that the last sale -- or he says:  "Construction," rather,
23    "unless out of pocket is at a standstill, last sale that
24    purchased was dated 1/06" -- meaning a year ago, right?
25    A.  Yes.

MINDLING - Direct (Arisohn)

1  Q.  -- "for a unit in a building not yet under construction;

2  and that last sale that he just referred to is not a qualified

3  sale in that only a five percent deposit was obtained.  It was

4  not documented if the deposit was escrowed.  Interest reserve

5  is depleted.  Undocumented secondary sources of repayment,

6  although debt service has been from external sources for an

7  extended period."

8         And these were problems that Mr. Barnes in his loan

9  review was pointing out to you and others in January of 2007

10 regarding Augustine Island, correct?

11 A.  Yes.

12 Q.  And the next one was -- by the way, Augustine Island was

13 not a BLB loan, was it?

14 A.  That's correct.

15 Q.  Aquaplex Ventures, this was for it says 173 high-rise

16 condo units.  So was this an exception to the bank going out

17 of the condo business?

18 A.  Yes.  This was a -- it wasn't just condos.  It was kind of

19 a marina theme slip, wet slips, dry storage.  I believe -- I

20 don't recall if we -- we didn't actually do the condo

21 construction.  I think we had the building pads for those, if

22 I remember correctly.

23 Q.  The second sentence starts:  "Market has softened and

24 marketing of residential component has been deferred to second

25 quarter of '07.  Interest reserve depleted.  Undocumented

1   sources to service debt.  BankAtlantic vacated condo lending;

2   softened market could restrict third party takeout sources."

3           So these were problems that he was noting with

4   respect to the Aquaplex loan in January of 2007, correct?

5   A.  Yeah, or potential problems, yes.

6   Q.  And Aquaplex was not a BLB loan, was it?

7   A.  No.

8   Q.  And then he refers to two more loans in this e-mail,

9   Taipan VI, which is one of the loans we saw was extended at

10  Major Loan Committee, and another one called Centerline Homes,

11  and neither of those loans is a BLB loan, is it?

12  A.  That's correct.

13  Q.  Now, Mr. Barnes completed his loan review in April 27,

14  2007.  Are you aware of that?

15  A.  Yeah.  I'm actually looking at the next exhibit.

16          MR. ARISOHN:  The next exhibit, Your Honor, is 390.

17          THE COURT:  Any objection?

18          MR. STEARNS:  No, Your Honor.

19          THE COURT:  Okay.  It's admitted.

20          (Plaintiffs' Exhibit 390 in evidence)

21  BY MR. ARISOHN:

22  Q.  And 390 is Mr. Barnes' report on his loan review, is that

23  correct?

24  A.  Yes, that's correct.

25  Q.  And let's go to the -- it's addressed to Marcia Snyder.

1   **And why is it addressed to Marcia Snyder, if you know?**

2   A.   In this particular case I believe she has the opportunity

3   to respond before the final report goes and is distributed.

4   I'm not sure if that was the scenario here.  But after the

5   report is completed, it's distributed to a number of people,

6   including the Audit Committee.  So this particular case might

7   have been just before that.  I'm not sure, though.

8   **Q.   She's the head of the Commercial Real Estate Department.**

9   A.   Yes, that's correct, and she has the opportunity to

10  respond.

11  **Q.   Okay.  And if you go to the last page --**

12  A.   The last page.  Is that what you said?

13  **Q.   No.  I'm sorry.  Not the last page.  The last page of the**

14  **report, which is the third page of this exhibit, you'll see**

15  **that this report is cc'd at the bottom --**

16  A.   Yes.

17  **Q.   -- to the Credit Policy Committee, Alan Levan and Jarett**

18  **Levan, is that right?**

19  A.   Yes, that's correct.

20  **Q.   What is the Credit Policy Committee?**

21  A.   What is it?  Is that what you asked me?

22  **Q.   Or what was it at that time?**

23  A.   It's a committee made up of various people that monitor

24  and make recommendations and approve changes in our policy and

25  also reviews any kind of policy issue that we're experiencing

MINDLING - Direct (Arisohn)

470

1  at the time.

2  **Q.  Are you on it?**

3  A.  Yes.  I'm Chair.

4  **Q.  Who else is on it?**

5  A.  At the time?

6  **Q.  Yes.**

7  A.  Because it's changed.

8  Jay McClung.  I believe Marcia Snyder was on the

9  committee.  Henry Barnes, I believe, was on the committee.

10 **Q.  Okay.  Back to the first page of the exhibit, please.**

11 **At the very top there is Mr. Barnes' rating --**

12 A.  Yes.

13 **Q.  -- as a result of his review, at the very top of the box,**

14 **rating, needs improvement.**

15 **Were you in agreement with that rating?**

16 A.  Yes.

17 **Q.  Had you ever seen any rating needs improvement on any loan**

18 **review before?**

19 A.  This was probably the first time I can remember.

20 **Q.  And our last exhibit is Plaintiffs' Exhibit 8.**

21 MR. STEARNS:  No objection, Your Honor.

22 THE COURT:  It's admitted.

23 (Plaintiffs' Exhibit 8 in evidence)

24 BY MR. ARISOHN:

25 **Q.  Are you familiar with this document, Mr. Mindling?**

MINDLING - Direct (Arisohn)

1  A.   Yes.   I've seen it before.

2  Q.   And is it correct that this document consists of four

3  pages?

4  A.   Yes, that's correct.

5  Q.   And if we can go to the second page, just tell us what

6  this.

7         Is this a document that you prepared, by the way?

8  A.   It's a document that's prepared by an individual that

9  reports to me.

10 Q.   So, at least is it correct that the last three pages of

11 this exhibit were prepared by people who report to you?

12 A.   Yeah, that's a correct statement.

13 Q.   And the cover page of that exhibit was prepared by who?

14 A.   I don't know.

15 Q.   But not you?

16 A.   It wasn't me, no.

17 Q.   It wasn't anybody who works for you?

18 A.   Not that I'm aware of.

19 Q.   So, we'll just look at the last three pages.

20        This page that we're on here that's entitled Presold

21 Residential Land Loans as of September 30, 2007, this would be

22 listing all of the what came to be known as BLB loans?

23 A.   That's correct.

24 Q.   And here you see the ones that are graded 11 and 10 and

25 all the other grades as well?

MINDLING - Direct (Arisohn)

1  A.  Yes.

2  Q.  And if I could just call your attention to, for example,

3  the Johns Lake Pointe loan.

4  A.  Yes.

5  Q.  And that's risk graded 10?

6  A.  Yes.

7  Q.  And then to the right of that it talks about it being

8  classified.  And remember yesterday we were --

9  A.  Yeah.  The term -- I think there's some confusion.  Again,

10  this is a -- just to add a little insight on that particular

11  issue, you know, 2007 was a whole new world for us.  We'd been

12  12 years of no losses.  So I think some people were confused,

13  to be honest with you.

14          Again, a classified loan is something that's

15  substandard or worst criticized as something that's special

16  mentioned.  So it should have said criticized.

17  Q.  But at least whoever wrote this report believed a 10 was

18  classified.

19  A.  Yeah.  Correct.

20          For correct regulatory terminology, that's incorrect,

21  so....

22  Q.  Are you aware of the fact that in October of 2007

23  BankAtlantic reported its nonaccrual and classified loans?

24  A.  Nonaccruals are reported, yes.

25  Q.  But are you aware of the fact that in October of 2007 they

MINDLING - Direct (Arisohn)

1  reported the nonaccrual and classified loans?

2  A.  I'm not for certain, no.

3  Q.  By the way, on page 2, the next page of this exhibit that

4  was prepared under your direction or supervision --

5  A.  Yes.

6          MR. ARISOHN:  If we can turn to that next page.

7  BY MR. ARISOHN:

8  Q.  These are entitled Residential Land Loans Excluding

9  Presold.  So these would be among the non-BLB loans, right?

10 A.  Yes.  This would just be either residential acquisition or

11 residential acquisition and development.

12 Q.  And here you also have certain of the loans that are risk

13 graded 10 identified as classified.

14 A.  Right.  That would be actually overreporting, if you will,

15 'cause they're not classified at this point.

16 Q.  Okay.  And then on the next page, this is another category

17 that's called Residential Acquisition Development and

18 Construction Loans, and those would also not be BLB -- these

19 would be non-BLB loans, right?

20 A.  Yes.  These are loans that actually have construction

21 component to them.

22 Q.  And sometimes you refer to that as the vertical piece?

23 A.  Yes.

24 Q.  The part that goes up the building?

25 A.  That's correct.

MINDLING - Direct (Arisohn)

1  **Q.  And here again, you have certain of those loans risk**

2  **graded 10 as being classified, correct?**

3  A.  Yes.

4          MR. ARISOHN:  Okay.  Your Honor, no further

5  questions.

6          THE COURT:  Okay.  Ready to cross, Mr. Stearns?

7          So maybe I should explain to the jury that in

8  addition to cross-examination you're also calling Mr. Mindling

9  in your own case.

10          Is that your intention?  That is your intention,

11  right?

12          MR. STEARNS:  It is at the moment, Your Honor.  I'm

13  going to start with the cross-examination and at some point,

14  depending on time, I may venture into other areas.

15          THE COURT:  Okay.  So you'll let me know?

16          MR. STEARNS:  You will see it when it happens, Your

17  Honor.

18          THE COURT:  Okay.  Fine.

19          MR. STEARNS:  Do we have a book for the witness with

20  the exhibits?

21          Give me one minute, Your Honor.

22          THE COURT:  Okay.  Not a problem.

23          Do you want a short recess to get organized?

24          MR. STEARNS:  It might be useful.

25          No?

MINDLING - Cross (Stearns)

475

1        MR. MEAD:  I think we're ready.

2        MR. STEARNS:  We're ready.  One second, Your Honor.

3 It's just giving him exhibits so we're not wasting a lot of

4 time doing it.

5        THE COURT:  Fine.

6        MR. MEAD:  We have the first two, Your Honor.

7        THE COURT:  Do I need to shift to the defendants'

8 electronic exhibit list now, or are you going to be

9 sticking -- since this is cross, I assume you're sticking with

10 the plaintiffs' exhibits?

11        MR. STEARNS:  That was the old days, Your Honor.  You

12 and I are -- we can now go both ways, so we have offer

13 exhibits in our case.

14        THE COURT:  Yeah.  Well, true.  I haven't ventured

15 into the defendants' electronic version of the exhibit list.

16        MR. STEARNS:  I am referring initially to Plaintiffs'

17 Exhibit 156.

18        THE COURT:  Okay.  Actually I just did it.

19        MR. STEARNS:  151.  I'm sorry.

20        THE COURT:  Okay.  Fine.

21        These are for me?

22        MR. MEAD:  That was for Mr. Mindling.  I'm sorry.

23        THE COURT:  Oh, that was for Mr. Mindling.  Okay.

24        THE WITNESS:  Thank you.

25                   CROSS-EXAMINATION

MINDLING - Cross (Stearns)

 1 | BY MR. STEARNS:

 2 | **Q.  Mr. Mindling --**

 3 | A.  Yes.

 4 | **Q.  -- good morning.**

 5 | A.  Good morning.

 6 | **Q.  If we can, I want to start here with the BankAtlantic**

 7 | **commercial real estate and commercial loan policy which you**

 8 | **started with yesterday.  Do you see that, sir?**

 9 | A.  Yes.

10 | **Q.  And I'm going to draw your attention to page 6 of that**

11 | **document and I'm going to ask you some specific questions**

12 | **about it.**

13 | **Do you see that in front of you?**

14 | A.  Yes.

15 | **Q.  Specifically it talks about -- would you tell the jury**

16 | **what this is?**

17 | A.  Sure.  This is a list of what we consider or potentially

18 | can be considered unsafe and unsound lending scenarios.

19 | **Q.  I want to draw your attention specifically to this line**

20 | **that says, "An outline of potential unsafe and unsound**

21 | **practices is included below," where it says, "Deviation from**

22 | **stated lending policies without adequate evaluation and**

23 | **approval."**

24 | **What does that mean?**

25 | A.  As I mentioned earlier or yesterday, if we're going to

 1  deviate from something that's in policy, there needs to be

 2  mitigating circumstances or a proper approval to do that.

 3  **Q.  Okay.  Let me draw your attention to the next, further**

 4  **down where it says, "Lack of borrower's equity in projects**

 5  **financed."**

 6       **Is that a bad thing?**

 7  A.  We like to have skin in the game.

 8  **Q.  Okay.  That takes me to Steeplechase.  Was Steeplechase a**

 9  **loan that was ultimately underwritten correctly?**

10  A.  It was underwritten correctly, but there was fraud.

11  **Q.  And what does that mean?**

12  A.  Basically, between the borrower's attorney and other

13  individuals, they created false information.  So when we went

14  through our normal process of verifying information, we were

15  given altered information.

16  **Q.  Now, did BankAtlantic feel it had some responsibility for**

17  **failing to catch it?**

18  A.  Yes.

19  **Q.  And what did BankAtlantic do with regard to your**

20  **participant lender who had $7 million in that loan when it was**

21  **discovered that you missed it?**

22  A.  Yeah.  We realized that some of our checks and balances

23  needs some fine-tuning.  So, because we have a good

24  relationship with our participant and we felt responsible,

25  that we bought back that participation so that they wouldn't

MINDLING - Cross (Stearns)

1   have any loss.

2   **Q.  Now, did any other circumstances like that happen during**

3   **this period, '06 and '07?**

4   A.  No.

5   **Q.  Would you consider the Steeplechase loan to be**

6   **representative of other loans that the bank underwrote during**

7   **this period?**

8   A.  No.

9   **Q.  Now, I draw your attention to the bottom where it says:**

10  **"Extensions/renewals of loans to finance projects with no**

11  **realistic sources of repayment."**

12          **Now, what does that mean?**

13  A.  Part of the credit underwriting process is to determine

14  and to ensure that we're going to get paid back.  So, in this

15  situation, if you can't document or it's not a reliable source

16  of repayment, that would be unsafe lending.

17  **Q.  Draw your attention to page 8 of the document, at the**

18  **bottom where it says:  "Exceptions to policy are to be**

19  **approved by the Committee or individual authorized to approve**

20  **the loan.  Exceptions must be defensible and supported by**

21  **documentation that is available in the loan file.  The**

22  **exceptions must be noted in the policy exceptions on the**

23  **CFS."**

24          **Do you see that, sir?**

25  A.  Yes.

Case 0:07-cv-61542-UU   Document 537   Entered on FLSD Docket 10/13/2010   Page 81 of 123

MINDLING - Cross (Stearns)

479

1   **Q.   Is this a prohibition against exceptions?**

2   A.   No.

3   **Q.   What does it mean?**

4   A.   It means that, again, you need to have -- you have to have

5   support to make it an exception.  There obviously needs to be

6   mitigating circumstances or documentation to justify doing

7   anything beyond the normal standards.

8   **Q.   Does every loan fall into a cookie cutter format?**

9   A.   Yesterday we talked about homogenous and nonhomogenous and

10  all these terms.  Homogenous are loans that have similar

11  characteristics.

12         These types of loans, commercial real estate, are

13  nonhomogenous, meaning they can have all kinds of different

14  variables and characteristics.  So you have to look at them on

15  a one-off basis.

16  **Q.   You've been involved in banking for how long,**

17  **Mr. Mindling?**

18  A.   Well, gosh, 25 years.

19  **Q.   And how many of those years have been at BankAtlantic?**

20  A.   18.

21  **Q.   So you were at another institution or institutions before**

22  **that?**

23  A.   Correct.

24  **Q.   Which companies?**

25  A.   SunTrust and prior to that Wachovia.

MINDLING - Cross (Stearns)

1  Q.  How would you contrast the involvement of senior

2  management in the loan process at BankAtlantic as compared to

3  SunTrust?

4          MR. ARISOHN:  Objection, Your Honor.

5          THE COURT:  Sustained.

6  BY MR. STEARNS:

7  Q.  Were the senior officers at BankAtlantic actively involved

8  in the loan review process?

9  A.  No.  BankAtlantic, there's very few people that have

10 individual loan authority.  It's pretty much committee

11 driven.  In other words, to go through a loan like this

12 approved, we have to go through what we call a committee

13 process, and we talked about the officers on the Major Loan

14 Committee.

15 Q.  Was Mr. Abdo involved in reviewing loans?

16 A.  He was involved in the approval process, yes.

17 Q.  Was Mr. Levan involved in approving loans?

18 A.  Yes.

19 Q.  Were they involved even if they weren't physically in a

20 meeting?

21 A.  Yes.

22 Q.  Can you describe how that happened?

23 A.  Yeah.  A lot of times, and particularly with Alan, who

24 couldn't always attend meetings, there was always discussion

25 outside the committee, and generally a loan would have to get

MINDLING - Cross (Stearns)

 1  either formally or informally blessed, if you will, by

 2  Mr. Abdo and/or Mr. Levan.

 3  Q.  All right.  I'm going to draw your attention to page 10 of

 4  the document that's in front of you, which is the Major Loan

 5  Committee discussion, and specifically where it says:  "A

 6  quorum of the Major Loan Committee shall consist of three

 7  members with the Chairman's acknowledgment" -- and Chairman

 8  would be Mr. Alan Levan?

 9  A.  That's correct.

10  Q.  -- "or two members and the Chairman."

11  A.  Correct.

12  Q.  "The Chairman's vote or acknowledgment is required for all

13  Major Loan Committee loan requests with the exception of those

14  loans submitted to Major Loan Committee with total

15  relationship exposure equal to $10 million or less where the

16  members present vote unanimously in favor of the request."

17          You see that, sir?

18  A.  Yes.

19  Q.  So Mr. Levan was personally undertaking to be involved in

20  the loan process.

21  A.  Yes.

22  Q.  And did he in fact do that?

23  A.  Yes.

24  Q.  Now, incidentally, does a bank like BankAtlantic make

25  loans with the expectation of being repaid?

MINDLING - Cross (Stearns)

1   A.   Yes.

2   Q.   Would you make loans if you thought you weren't going to

3   be repaid?

4   A.   No.

5   Q.   What happens when your loan isn't repaid?

6   A.   The bank loses money.

7   Q.   Is there a difference between a bad loan at the outset and

8   a good loan that becomes a bad loan?

9   A.   Yeah, big difference.

10   Q.   What's the difference?

11   A.   The difference is a bad loan at the onset should never

12   have been made because it doesn't meet prudent and safe

13   standards.

14            A loan that is good at the beginning can be affected

15   by many things, particularly in the case that we're talking

16   today, with a downturn in the economy and housing market.

17   Q.   All right.  Now, I want to draw your attention to

18   Plaintiffs' Exhibit -- and I'm not sure which number it is

19   because I have two numbers on it -- 307.

20            MR. MEAD:  It would be the lower right-hand number.

21            MR. STEARNS:  The lower right-hand number is 307.

22            THE COURT:  307 hasn't been admitted.  So perhaps

23   it's the other number.

24            MR. MEAD:  Your Honor, I believe it is 307.  At times

25   we reference their exhibit numbers because they go first and

 1  we're trying to anticipate --

 2          THE COURT:  Okay.  But I don't have 307 as having

 3  been admitted.

 4          MR. STEARNS:  Then I would offer it, Your Honor.

 5          THE COURT:  Any objection?  It's your exhibit,

 6  right?

 7          MR. ARISOHN:  No, Your Honor.

 8          THE COURT:  Okay.  Fine.  It's admitted.  But I

 9  admitted it as Plaintiffs' 307.

10          MR. STEARNS:  Plaintiffs' 307, yes, Your Honor.  It

11  is Plaintiffs' 307.  But it was not an objected to document.

12  Therefore, I think it would come in.

13  BY MR. STEARNS:

14  **Q.  While it's being looked for, Mr. Mindling, let me see if I**

15  **can't just put it up on the screen for you.  We can probably**

16  **do it easier that way.**

17          **This is an e-mail -- didn't do that very well.  Let**

18  **me try again.**

19          **And the date of this, I believe, is September 21,**

20  **2006.**

21          **Do you see that, sir?**

22  A.  Yes.

23  **Q.  And it says:  "This will confirm the Chairman's request**

24  **that an early warning system be established.  This information**

25  **should be provided on any loan/relationship that are not on**

MINDLING - Cross (Stearns)

1  **loan watch list and have not been reported previously evidence**
2  **change similar to the listing below.  Please submit a detailed**
3  **Chairman's review memorandum to Michele Apple in credit**
4  **administration within 15 days of becoming aware of any of the**
5  **following information on any loan relationship where the**
6  **aggregate commitment exceeds $1 million."**

7          **Do you see that, sir?**

8          THE COURT:  We have an exhibit foul-up, which
9  everyone behind you is concurring in.

10         MR. ARISOHN:  We don't know what exhibit this is,
11 Your Honor.

12         MR. MEAD:  Correct.  Mr. Stearns --

13         THE COURT:  It's not 307 for sure.

14         MR. MEAD:  Correct, Your Honor.  It's Plaintiffs'
15 Exhibit 287.  Mr. Stearns read the deposition number.

16         MR. STEARNS:  287.  So I'll offer 287.

17         THE COURT:  Let me go back.

18         So, let me pause for a minute.  So this is
19 Plaintiff's 287.  The plaintiff did not offer it.  But now
20 you're offering it as a defense exhibit.

21         Is it acceptable to the plaintiffs, though, that I
22 mark it in as a plaintiffs' exhibit or do you want it numbered
23 somehow as a defense exhibit?

24         MR. STEARNS:  Plaintiffs' exhibit is fine with me,
25 Your Honor.

```
 1            MR. ARISOHN:  I have no objection to it being a
 2   Plaintiffs' Exhibit.
 3            THE COURT:  Fine.  So Plaintiffs' 287 is admitted.
 4            (Plaintiffs' Exhibit 287 in evidence)
 5            MR. STEARNS:  Forgive me for the numbering issue.
 6   BY MR. STEARNS:
 7   Q.  Now, Mr. Mindling, just looking at what's on the page,
 8   these are the conditions which would cause the Chairman's
 9   watch list to be invoked?
10   A.  Yes.
11   Q.  And let's just go through this.
12            A change of a Chief Executive Officer or a Chief
13   Financial Officer.
14   A.  Yes.
15   Q.  If the borrower had a going concern qualification.
16   A.  Yes.
17   Q.  If there was a known change in loan grading by
18   BankAtlantic or any other banks.
19            What does that mean?
20   A.  If it was a situation where something was deteriorating or
21   it's a loan that we are participating in that's deteriorating
22   and the loan grade reflected that, that would be something
23   that it would.
24   Q.  And if you go through the rest of the list, 1 through 14,
25   you see things that the Chairman, Mr. Levan, wanted to cause
```

1  **information to be triggered to put a loan on a list for him**

2  **even if it wasn't on a watch list.**

3  A.   That's correct.

4  **Q.   Now, did you know why Mr. Levan wanted to see loans before**

5  **they might have migrated downward to the watch list?**

6  A.   Really just to be more proactive in making sure that --

7  ensuring that we're on top of any credit that might be maybe

8  not ready to be classified or criticized but to fully

9  understand the inherent risks that potentially could be in the

10 portfolio.

11 **Q.   Now, were you aware that there came a time when the Office**

12 **of Thrift Supervision did an examination of BankAtlantic**

13 **regarding its loans during the year '06?**

14 A.   Yes.

15 **Q.   '05 and 06.**

16          MR. MEAD:   Defendants' Exhibit 2.

17          THE COURT:   Are we offering Plaintiffs' Exhibit 2,

18 Defendants' Exhibit 2?

19          MR. STEARNS:   This is Defendants' Exhibit 2 which

20 we're offering into evidence.

21          THE COURT:   Okay.   Wait a second.   Let me shift to

22 the Defendants'.

23          That didn't work.   Wait a second.   Oh, there is the

24 Defendants' Exhibit 2.

25          Is there any objection?   Are you maintaining your

MINDLING - Cross (Stearns)

487

1   objection or not?

2           MR. ARISOHN:  Yes, Your Honor.

3           THE COURT:  Excuse me?

4           MR. ARISOHN:  Yes, Your Honor.

5           THE COURT:  You are maintaining your objection?

6           MR. ARISOHN:  This is --

7           THE COURT:  The OTS report of examination.

8           MR. STEARNS:  Yes.

9           THE COURT:  It's overruled.

10          MR. ARISOHN:  I'm sorry, Your Honor.  No objection.

11          THE COURT:  Okay.  It's admitted then.  Oh, but I

12  guess we didn't work things out on your exhibit list.  So let

13  me keep a separate list here.

14          Okay.  So, Defendants' 2 is admitted.

15          (Defendants' Exhibit 2 in evidence)

16  BY MR. STEARNS:

17  **Q.  Now, let me draw your attention to this document which I'm**

18  **going to put on the screen in front of you, Mr. Mindling.  You**

19  **don't have it in front of you, but I'll show you the screen**

20  **version.**

21  A.  Okay.

22  **Q.  This is dated November 30, 2005.**

23  A.  Yes.

24  **Q.  Let me just draw your attention to the date that it was**

25  **completed.  And perhaps you can tell the jury the difference**

MINDLING - Cross (Stearns)

488

1  between the date of the exam and the date it's completed.

2  A.  Right.  Once an exam is completed, there's usually a time

3  period where they have to write up the report, et cetera.  So,

4  the time period in which they're examining would be the

5  completion date.  But oftentimes we don't get it till after

6  it's been completed because they're still preparing the report

7  and finalizing it.

8  Q.  What is the Office of Thrift Supervision?

9  A.  It's a regulatory governmental -- federal governmental

10 regulatory organization that's responsible for examining and

11 ensuring that the bank or thrifts, savings and loans, maintain

12 safe and sound banking practices.

13 Q.  Do they send examiners in to your bank?

14 A.  Yes, many.

15 Q.  When you say "many," how many?

16 A.  Gosh, there could be as many as 30 or 40.

17 Q.  Do you provide facilities for them?

18 A.  Yes.

19 Q.  Do they have free access to everything?

20 A.  Yes.

21 Q.  And do they enjoy that access?

22 A.  Oh, yes.

23 Q.  And how long does that process take?

24 A.  Oh, gosh, it takes months.

25 Q.  And is this report the output of that process?

MINDLING - Cross (Stearns)

1  A.  Yes.

2  Q.  And do they give you a draft report before you see the

3  final report?

4  A.  Yes.

5  Q.  Now, let's just go over some comments in this report.

6      I'm going to draw your attention to page 3 where it

7  says "Asset quality ratios and trends are strong."

8      You see that, sir?

9  A.  Yes.

10 Q.  Then it goes on to say "Classified assets totaled

11 $30 million."

12      Do you see that?

13 A.  Yes.

14 Q.  Now, you went through -- what was your loss experience on

15 the credit side for the several years before this examination

16 report was entered?

17 A.  Almost nothing.

18 Q.  Does that mean you had no problems during that period?

19 A.  No.  But we just didn't have any losses.  Very little

20 problems, though.

21 Q.  Well, you had $30 million of classified assets.  Why

22 didn't those $30 million of classified assets turn into

23 $30 million in losses?

24 A.  Not every reclassified loan -- actually many classified

25 loans don't turn into losses.  Many times we work them out.

1  So it doesn't necessarily mean it's a loss.

2  **Q.  Mr. Mindling, when the bank has an issue with a borrower,**

3  **a borrower has problems of any kind, was it the policy of**

4  **BankAtlantic to work with their borrowers to try to solve**

5  **problems?**

6  A.  Yes.

7  **Q.  Is it what you would expect in the banking business that**

8  **bankers would do?**

9  A.  Absolutely.

10 **Q.  And when you had classified assets during this earlier**

11 **period that didn't turn into losses --**

12 A.  Yes.

13 **Q.  -- how was that accomplished?**

14 A.  Well, you know, you work -- you meet with your borrower

15 and you come up with a solution that's beneficial to both you

16 and your borrower.  You know, it's in the best interest of the

17 bank to work with their borrowers.  Neither one -- the

18 borrower doesn't want to lose their property and the bank

19 doesn't really want the property.  They want it to work out.

20 **Q.  Now, it goes on to say "The allowance for loan and lease**

21 **losses was considered adequate, loans were prudently**

22 **underwritten and properly classified, and the internal loan**

23 **review function was satisfactory."**

24         **Do you see that, sir?**

25 A.  Yes.

MINDLING - Cross (Stearns)

1   Q.  What does that mean?

2   A.  Basically, what they're saying is that we identified risk

3   and we reserved for that risk properly.  Our underwriting

4   process was prudent, which means good, and we had adequate

5   collateral, and that we properly classified our loans --

6   that's the grades that we talked about -- and that the kind of

7   checks and balances, the loan review process, was working

8   appropriately.

9   Q.  All right.  Turning to page 8 of the document, let me draw

10  your the attention to the bottom of the page, where it says:

11  "Asset quality ratios and trends continued to improve due to

12  a decline in classified assets and delinquent loans."

13          Do you see that, sir?

14  A.  Yes.

15  Q.  So, again, you had classified assets and delinquent loans

16  even though you had no losses.

17  A.  That's correct.

18  Q.  "The credit quality of the loan portfolio is strong.

19  Classified assets remain historically low in relation to

20  capital, and the allowance for loan and lease losses was

21  satisfactory."

22          Do you see that?

23  A.  Yes.

24  Q.  And it goes on to say:  "Overall, management has been

25  effectively identifying, monitoring and controlling loan

MINDLING - Cross (Stearns)

492

1   portfolio risk."

2           Did you agree with that assessment?

3   A.   Yes.

4   Q.   Turning to page 9 where it says:  "Management continues to

5   closely monitor land, construction and commercial real estate

6   loans."

7           Do you see that?

8   A.   Yes.

9   Q.   "And established prudent limits based on the various

10  collateral types."

11          Did you agree with that assessment?

12  A.   Yes.

13  Q.   "The largest concentrations within these portfolios are

14  multifamily, residential land development and retail

15  properties.  The real estate portfolio is diversified and

16  there are no concentrations that give cause for supervisory

17  concern at this time."

18          Do you see that?

19  A.   Yes.

20  Q.   Why would you want to diversify your portfolio?

21  A.   Well, you don't want to put all your eggs in one basket.

22  So, for instance, one section, such as shopping centers, what

23  we call retail, were to decline, you don't want to have all of

24  your assets in that particular group.  So, if you spread the

25  risk out, you're less likely to have as much loss.

MINDLING - Cross (Stearns)

1  Q.   Is there something called a risk-reward ratio?

2  A.   Yes.

3  Q.   Would you explain to the jury what is the risk-reward

4  ratio?

5  A.   Well, it really takes, you know, the saying, "The more

6  risk you take, the bigger reward you have."  So, on a risky

7  loan, which some banks take riskier loans, they can get higher

8  pricing, so the reward would be more earnings, but the offset

9  would be require risk.

10         So you try to balance that, because there's always

11  risk.  So you try to take a level of risk that's acceptable

12  and a reward that is beneficial to the stockholders of the

13  bank.

14  Q.   Now, the examiners noted also, it appears -- I draw your

15  attention to this reference on page 10 -- that "Management

16  continues to express concern about real estate speculators in

17  the South Florida condominium market and virtually ceased

18  lending in this area."

19  A.   Yes.

20  Q.   Would you tell us about that?  What concern existed and

21  why did BankAtlantic cease lending in that market?

22  A.   Well, our Chairman and Vice Chairman are, first of all,

23  very attuned to real estate, and particularly in South

24  Florida, so we have that luxury of having their knowledge; and

25  based upon that knowledge, we started having discussion in our

MINDLING - Cross (Stearns)

1  Loan Committee regarding concerns that were surrounding in

2  particular the condominium market.  And based on that input

3  from those two individuals, it was a decision that we would

4  get away from that type of lending because, again, the

5  risk-reward, if you will, was not appropriate for the bank.

6  **Q.  Now, it goes on to say:  "At December 31, 2005, the**

7  **internal limit on loans to one borrower was approximately half**

8  **the institution's legal lending limit."**

9       **What does that reference?**

10 A.  The regulators, the OTS that we were referring to, have a

11 stipulation that you can only lend -- I shouldn't say "only

12 lend," but based upon the capital of the bank, you can lend to

13 one particular borrower a certain amount of money.

14      It was BankAtlantic's decision to only lend to one

15 borrower or one particular person -- it could be multiple

16 projects -- half of what the regulators would allow us to do.

17 **Q.  Why would you restrict your lending authority to half of**

18 **that which the Government allowed you to do?**

19 A.  Well, the main reason is obviously for risk.  We wanted to

20 mitigate risk, and obviously, again, the same thing with

21 having too much in one particular product type.  If you have

22 too much with one borrower and that borrower defaults, then

23 you have, you know, a pretty significant problem as opposed to

24 if you only limit it to a certain amount of dollars, you're

25 limiting your exposure or risk.

1  Q.  Now, I draw your attention to the bottom of the page, if I

2  may, where it talks about loan sampling, it indicates that --

3  you've used this word earlier -- nonhomogenous assets

4  totalling $1.9 billion.

5          What's a nonhomogeneous asset?

6  A.  That would be, again, a scenario where a loan has

7  different -- or a category of loans has a lot of different

8  characteristics.  So, when you're assessing risk, you can't

9  lump them together like, for instance, on a consumer loan.

10  But on nonhomogeneous loans you have to really look at that

11  risk characteristic loan by loan.

12  Q.  "Now, it would indicate that that $1.9 billion was 33

13  percent of total assets as of that year end as compared to 40

14  percent at the prior examination."

15          What does that mean?

16  A.  We were at the time, from the prior period, it looks like,

17  we were doing more homogeneous loans as opposed to

18  nonhomogeneous loans.

19  Q.  It says:  "The large decline in the ratio was caused by

20  growth in residential loans and investments and, to a lesser

21  extent, a decrease of six percent in the balance of

22  nonhomogeneous assets."

23          You see that?

24  A.  Yes.

25  Q.  And it goes on to say:  "As discussed earlier, this change

MINDLING - Cross (Stearns)

1   was mostly by design."

2   A.   Yes.

3   Q.   And it goes on to say:  "A review of these assets

4   revealed" -- I'm going to emphasize this -- "prudent

5   underwriting, adequate monitoring, and satisfactory

6   classification procedures."

7          Do you see that, sir?

8   A.   Yes.

9   Q.   Did you share that view?

10  A.   Yes.

11  Q.   Now, prudent underwriting, is it -- well, strike that.

12          What happens to prudent underwriting when the economy

13  goes south?

14  A.   Well, you try to underwrite a loan so that, obviously,

15  you're doing safe and sound lending.  In the event that

16  there's a decline in the economy, obviously, it's going to

17  affect your borrower.  So you can't always anticipate what can

18  happen in the future.  You do the best you can and try to give

19  yourself cushion.  Depending on the severity of the downturn,

20  it can either effect it a little or it can affect it a lot.

21  Q.   Now, you were asked yesterday about some loans that were

22  approved that indicated that the loan-to-cost ratio was 97

23  percent in one instance and a hundred percent in another

24  instance.

25  A.   Right.

MINDLING - Cross (Stearns)

1  **Q.  And I think you indicated you wanted to explain, but you**

2  **didn't.**

3  A.  Yeah.

4  **Q.  Can you tell us what is it you wanted to say yesterday**

5  **about those loans?**

6  A.  There's a couple different scenarios.  It's a little

7  deceiving.

8         For instance, if a borrower -- one example is if a

9  borrower buys a property, and they bought it five years ago,

10  let's say, and they bought it for a hundred dollars, the cost

11  to them was a hundred dollars.

12         Well, they come to us five years later and say I want

13  to refinance this loan, this land, and I also want to develop

14  it.  So the cost is that original hundred dollars, but now

15  it's worth a thousand dollars.  So, we know that our value is

16  there, but when they originally bought the loan, or bought the

17  land, it had a much lower cost.  So that's going to inflate

18  the loan-to-cost ratio.

19  **Q.  Were there also instances where the bank took back other**

20  **forms of collateral?**

21  A.  Sure.

22  **Q.  Can you give us examples of those?**

23  A.  Yeah.  I mean, a lot of times we'll take, in addition to

24  the subject property, we'll take maybe a shopping center that

25  the borrower has that doesn't have any mortgage on it as

MINDLING - Cross (Stearns)

```
 1  additional collateral to give us security and make up for and
 2  mitigate that lack of cost.
 3  Q.  I'm going to show you Plaintiffs' Exhibit 16.
 4          MR. STEARNS:  Is that in evidence?
 5          MR. MEAD:  It is not.
 6          MR. STEARNS:  I would offer Plaintiffs' Exhibit 16.
 7          THE COURT:  Okay.  Wait a second.  Let me just see
 8  what that is.
 9          Any objection?
10          MR. ARISOHN:  Let's see what it is, Your Honor.
11          No, Your Honor.
12          THE COURT:  Okay.  It's admitted as Plaintiffs'
13  Exhibit 16.
14          (Plaintiffs' Exhibit 16 in evidence)
15  BY MR. STEARNS:
16  Q.  And let's just let me see if I can highlight this for the
17  witness so he can see it, because I'll just work off the
18  screen.
19          It appears to be -- I did a bad job of that --
20  qualitative adjustments for the third quarter of 2006.
21          Do you see that, sir?
22  A.  Yes.
23  Q.  Would you tell the jury what is this?
24  A.  This is part of our reserve analysis that we do on a
25  quarterly basis.  There's a lot of components, but this is one
```

MINDLING - Cross (Stearns)

1  of the components that we go through to determine if we have

2  adequate reserves for the loss that we anticipate, inherent

3  risks that we have in the portfolio.

4  **Q.  All right.  So, let's just put ourselves in time.**

5  **The third quarter of '06, how do we break a year in**

6  **quarters?  What are the four periods?**

7  A.  You have the first quarter ends March 31st; the second

8  quarter ends June 30th; third quarter, September 30th; and

9  then your final quarter or year end is 12-31, December.

10  **Q.  So this would be the third quarter of '06, and that would**

11  **take you through September 30th of '06?**

12  A.  Yes.

13  **Q.  When you draw your qualitative adjustments, it appears, it**

14  **has a title called "Delinquency Levels and Trends."**

15  **Do you see that?**

16  A.  Yes.

17  **Q.  It says:  The portfolio reflected no delinquencies 31 days**

18  **or more at quarter end.**

19  A.  That's correct.

20  **Q.  Is that what was happening then at the end of the third**

21  **quarter?**

22  A.  Yes.

23  **Q.  The next item says:  "Problem loans and nonaccrual**

24  **levels/trends."  It says:  "There are no nonperforming loans**

25  **in this portfolio.  The largest classified loan,**

1    $17.4 million, paid in full during the quarter.  The remaining

2    cited loan in the portfolio has a current balance of

3    $5.8 million."

4            Do you see that?

5    A.  Yes.

6    Q.  Now, if it was a nonaccrual loan, that would have been

7    reported on the company's financial statements.

8    A.  That's correct.

9    Q.  For the public to see.

10   A.  Yes.

11   Q.  Now, with respect to a loan that was classified and paid

12   in full, does that happen from time to time?

13   A.  Yes.

14   Q.  How does that happen?

15   A.  A number of things can happen.  They can go to another

16   lender and the lender will provide them with what we call a

17   takeout loan.  They'll pay us off and they'll get a new loan.

18   They can uses other sources.  If they have another property,

19   they might sell that proceeds to pay us off.  So it's numerous

20   things that can happen.

21   Q.  Now, as we go down the page, I'm going to draw your

22   attention to economic and business conditions where it says

23   "While the FMOC."

24           Would you tell the jury what that is?

25   A.  FOMC (sic)?

MINDLING - Cross (Stearns)

501

1    Q.   Yes.

2    A.   I don't remember off the top of my head.

3    Q.   FOM -- that's a federal --

4    A.   Yeah, federal, yeah.

5    Q.   That's an agency.

6    A.   Yes.

7    Q.   "While the FMOC did not alter rates during the third

8    quarter, the housing market remains in a slowdown."

9    A.   Yes.

10   Q.   "Much of the portfolio is exposed."

11   A.   Yes.

12   Q.   "National and regional builders continue to retract."

13   A.   Yes.

14   Q.   "Many markets, especially the condominium market, reflect

15   excess inventory.  As inventories increase, prices will

16   decrease.  Builders, local, regional and national, are takeout

17   sources on numerous of BankAtlantic's commitments."

18           Do you see that, sir?

19   A.   Yes.

20   Q.   Was that a flag that you were starting to worry about?

21   A.   Yes.

22   Q.   Now, incidentally, was this kind of information also

23   always available to the marketplace about what was happening

24   to mortgage rates and builders and the market generally?

25           MR. ARISOHN:  Objection, Your Honor.

MINDLING - Cross (Stearns)

 1              THE COURT:  Sustained.

 2   BY MR. STEARNS:

 3   **Q.  I'm going to draw your attention to Plaintiffs' Exhibit**

 4   **960.**

 5              MR. STEARNS:  I'll offer it if it's not been

 6   offered.

 7              MR. MEAD:  It is in evidence.

 8              MR. STEARNS:  It's in evidence, Your Honor.

 9              THE COURT:  It's in.

10   BY MR. STEARNS:

11   **Q.  And I again will blow this up for you.**

12          **This appears -- I'm sorry, I did it again.**

13          **This appears to be something called loan watch list.**

14          **Do you see that, sir?**

15   A.  Yes.

16   **Q.  As of October 31st, '06.**

17   A.  Yes.

18   **Q.  Now, when your watch list -- tell the jury again what a**

19   **watch list is.**

20   A.  A watch list lists all loans that we have that are

21   criticized.  That would be anything 10, anything 11, which is

22   special mention substandard, and then anything that's not

23   accruing interest.

24   **Q.  Now, on the watch list it appears -- when you say, by the**

25   **way, you have a date on the watch list, is that the date the**

MINDLING - Cross (Stearns)

503

1  watch list is printed or is that some other date?

2  A.  That's for the period.

3  Q.  So when you do a watch list, how long from the time of the

4  period does it take to actually produce the list itself?

5  A.  Generally 15, 20 days.

6  Q.  So, if you look at a date like October 31st, you would

7  expect that document would have been created 15 days later

8  than that.

9  A.  Yes.

10  Q.  So this would have been sometime in November.

11  A.  That's correct.

12  Q.  Now, if you look at this document, can you tell us how

13  many loans are on watch list as of October 31st of '06?

14  A.  I can't see the whole document right now.

15  Q.  Let's see if I can draw your attention.

16  A.  For commercial real estate there was one.

17  Q.  And what loan was that?

18  A.  That was the Steeplechase loan.

19  Q.  So, other than Steeplechase, did you have any loans on

20  watch list in October of '06?

21  A.  No.

22  Q.  I'm talking about the commercial real estate loans.

23  A.  Right.

24  Q.  Now, I'm going to draw your attention to Plaintiffs'

25  Exhibit 888, which is not evidence and I would offer it.

MINDLING - Cross (Stearns)

504

```
 1              THE COURT:  I'm sorry.  That was Plaintiffs' 888?
 2              MR. STEARNS:  It is, Your Honor.
 3              THE COURT:  There were no objections.  So I take it
 4  you agree, Mr. Arisohn, to the admission of this document?
 5              MR. ARISOHN:  Let's take a look at it, Your Honor.
 6              THE COURT:  Yeah.
 7              MR. ARISOHN:  No objection, Your Honor.
 8              THE COURT:  Okay.  It's admitted.
 9              (Plaintiffs' Exhibit 888 in evidence)
10  BY MR. STEARNS:
11  Q.  All right.  That didn't help much.  Let me try again.
12  A.  I can see it.  That's fine.
13  Q.  Can you see it?
14  A.  Yeah.  I'm familiar with this document.
15  Q.  Would you tell the jury what this document is?
16  A.  Yeah.  Part of the financial process, if you will, on a
17  quarterly basis the bank requests that certain individuals
18  certify in this case that anything in their area has not
19  materially affected, or any process or procedure hasn't
20  materially affected or would affect the financial statements
21  of the bank.
22  Q.  Now, let's just go through what it says.  It says:
23          "The undersigned certifies as follows:  As
24  BankAtlantic's Chief Credit Officer, to the best of my
25  knowledge, the information contained in the company's Form
```

MINDLING - Cross (Stearns)

1  10-Q for the current period related to credit operations does

2  not contain any untrue statement of material fact nor omit to

3  state a material fact necessary to make the information

4  related to loan losses, credit administration, underwriting

5  and collections not misleading, and it fairly presents the

6  company's financial condition.

7         "Additionally, to the best of my knowledge, there

8  have been no significant changes in the design or operating

9  effectiveness of internal controls or other factors that could

10 significantly affect internal controls which could adversely

11 affect the company's ability to record, process, summarize and

12 report financial information."

13        You see that?

14 A.  Yes.

15 Q.  And this is a document, I believe, this particular one you

16 signed in November of '06.

17 A.  That's correct.

18 Q.  Now, you know at some level some officers are required to

19 file a similar document by Sarbanes-Oxley?

20 A.  Yes.

21 Q.  Did BankAtlantic extend that signing policy down

22 throughout the organization to many officers?

23 A.  Yes.

24 Q.  And why was that done?

25 A.  You know, really, because, you know, it's our culture that

MINDLING - Cross (Stearns)

506

1  people need to be accountable, and I think Alan in particular

2  wanted to ensure that everyone was aware of that and that

3  there was no tolerance for anything that would misrepresent

4  our actual financial situation.

5  **Q.  Good news or bad news?**

6  A.  Either or, yeah.

7  **Q.  Now, Mr. Mindling, were many officers required to sign**

8  **similar documents every quarter?**

9  A.  Yes.

10  **Q.  And were there instances where officers noted exceptions?**

11  A.  Yes.

12  **Q.  And what happened when officers noted exceptions?**

13  A.  It was accelerated to either the CFO or the Chairman.

14  **Q.  And what would then happen?**

15  A.  They would look into it and ensure that if there was an

16  issue, that it was dealt with.

17  **Q.  Okay.  Now, your role in the bank with respect to**

18  **reporting credit both in terms of credit approvals but also**

19  **loan loss reserves was what?  What level of responsibility did**

20  **you have?**

21  A.  One of my responsibilities was to ensure, and I signed off

22  on, that the bank has adequate reserves to cover any risk

23  that's inherent in the portfolio.

24          THE COURT:  Would this be a good breaking point?

25          MR. STEARNS:  It is, Your Honor.

MINDLING - Cross (Stearns)

507

 1          THE COURT:  Okay.  So, we're going to go ahead and
 2   take the lunch recess.  It's more or less 12:30.  So, what
 3   we're going to do is we're going to come back at a quarter to
 4   2:00.

 5          Please remember not to discuss the case among
 6   yourselves, not to allow anyone to say anything to you or in
 7   your presence about the case.  Please do everything you can to
 8   avoid anyone associated with the case.  Please leave your
 9   notebooks in the jury room or you can leave them just there in
10   the jury box.  And please continue to observe all of my
11   instructions on use of the Internet and social networking
12   sites.  Have a nice lunch and we'll see you at quarter to
13   2:00.

14          (Jury retires at 12:27 p.m.)

15          THE COURT:  I understand you gave a new electronic
16   version of your exhibit list to my clerks this morning.  So,
17   we'll get that up and running.  I just wasn't expecting
18   defense exhibits at this stage.

19          Anything we need -- you can step outside,
20   Mr. Mindling.

21          MR. STEARNS:  I have two points.  If I can ask
22   Mr. Mindling to be excused so I can raise one issue.

23          (Witness temporarily excused)

24          MR. STEARNS:  Also, can we have access to the
25   courtroom at lunch to work with our papers, if that's not a

1    problem?

2            THE COURT:  Yes.

3            MR. STEARNS:  Then I'll just get a quick lunch and

4    come back.

5            An issue came up about accountants because of one of

6    your orders initially.  The motion was made that there was no

7    advice of counsel defense, which there is not in this case.

8            Loan loss reserves are routinely examined by

9    accountants, and we have offered those documents.  There's

10   been no hearsay objection.  But they've been objected to.  I

11   don't know why.

12           But this witness, Mr. Mindling, worked every quarter

13   with the accounting firm, Price Waterhouse, to go through how

14   they justified their reserves, and those documents exist back

15   and forth as they negotiated loan loss reserves.

16           THE COURT:  And are those particular defense

17   exhibits?

18           MR. STEARNS:  They are, Your Honor.  And I wanted to

19   offer them with this witness, because each quarter there would

20   be a negotiation where typically --

21           THE COURT:  Can you just identify what the exhibits

22   are by number so we can find out whether the plaintiff is

23   going to maintain the objection?

24           MR. MEAD:  The first one is Defendants' Exhibit 188.

25   Do you not have defendants' exhibits?

```
 1              THE COURT:  So it's not like a group, like 188
 2   through 207?
 3              MR. STEARNS:  We put them in chronological order as
 4   they came up.  But they're all basically the same.  There's
 5   just a negotiating session where they negotiate --
 6              MR. MEAD:  The next one is Defendants' Exhibit 263.
 7              THE COURT:  Well, so, Mr. Arisohn, do you know what
 8   the documents are that he's talking about?
 9              MR. ARISOHN:  Well, I vaguely do, Your Honor.  These
10   are PWC documents that we objected to.
11              You know, the motion we made is based upon the fact
12   that there was no PWC representative ever disclosed by the
13   defendants as having any information with knowledge that was
14   relevant to this case.  If that were the case, we would have
15   deposed PWC people about these documents.
16              THE COURT:  Whether they're offered by PWC or not, I
17   assume these are business records of BankAtlantic.
18              MR. STEARNS:  They are, Your Honor.
19              MR. MEAD:  No, Your Honor.  They're business records
20   of PWC.
21              MR. ARISOHN:  I'm not objecting to them on hearsay
22   ground, Your Honor.
23              THE COURT:  Well, aren't they maintained at
24   BankAtlantic?  Just because they're from PWC doesn't --
25              MR. STEARNS:  Actually, Mr. Mead corrected me.  These
```

```
 1   are documents that correspond with similar documents at
 2   BankAtlantic where they negotiated their reserves.
 3            THE COURT:  Okay.  Well, I haven't seen the
 4   documents.  So maybe what you need to do is you need to give
 5   my clerk the numbers so I can look at the exhibits over
 6   lunch.
 7            MR. MEAD:  Mr. Arisohn subpoenaed these documents.
 8   That's how we got them.
 9            THE COURT:  Okay.  Well, that means nothing to me.
10   But thank you for that piece of information.
11            But could you give the list of the exhibits to my
12   clerk and I'll take a look at them over lunch.  But these are
13   not documents maintained by BankAtlantic.
14            MR. STEARNS:  There was no hearsay objection made.
15            THE COURT:  It's all what, relevance?
16            MR. ARISOHN:  Relevance.
17            THE COURT:  Authenticity it looks like.
18            MR. ARISOHN:  And I have no idea where they're coming
19   from.  There's not even a Bates stamp.
20            THE COURT:  Relevance and undue prejudice.
21            MR. STEARNS:  They were subpoenaed.  We got them
22   through the subpoena process.  They just happen to correspond
23   with our internal records of the meetings that occurred
24   simultaneously.
25            THE COURT:  Okay.  Well, I have no idea what's
```

```
 1   contained in the documents.  So would you give my --
 2           MR. STEARNS:  We'll give you a set, if we may.
 3           THE COURT:  Okay.  Excellent.  Okay.
 4           And I take it you can go into something else with him
 5   if I don't have a chance to --
 6           MR. STEARNS:  Yes, Your Honor.  I just wanted to
 7   bring it up.
 8           THE COURT:  Okay.  Fine.
 9           (Recessed at 12:31 p.m.)
10           (Lunch recess)
11                        I N D E X
```

```
12   WITNESSES                                              PAGE
13   JEFFREY MINDLING, PLAINTIFFS' WITNESS, RESUMED........... 400
14   CONTINUED DIRECT EXAMINATION BY MR. ARISOHN.............. 401
15   CROSS-EXAMINATION BY MR. STEARNS........................ 475
16   EXHIBITS
17   Plaintiffs' Exhibit 20 in evidence...................... 402
18   Plaintiffs' Exhibit 21 in evidence...................... 430
19   Plaintiffs' Exhibit 138 in evidence...................... 442
20   Plaintiffs' Exhibit 340 in evidence...................... 443
21   Plaintiffs' Exhibit 341 in evidence...................... 444
22   Plaintiffs' Exhibit 217 in evidence...................... 446
23   Plaintiffs' Exhibit 342 in evidence...................... 448
24   Plaintiffs' Exhibit 343 in evidence...................... 450
```

```
25   (continued)
```

```
 1  (continued)                                              PAGE

 2  Plaintiffs' Exhibit 344 in evidence...................... 451

 3  Plaintiffs' Exhibit 345 in evidence...................... 452

 4  Plaintiffs' Exhibit 122 in evidence...................... 453

 5  Plaintiffs' Exhibit 124 in evidence...................... 457

 6  Plaintiffs' Exhibit 7 in evidence........................ 465

 7  Plaintiffs' Exhibit 390 in evidence...................... 468

 8  Plaintiffs' Exhibit 8 in evidence........................ 470

 9  Plaintiffs' Exhibit 287 in evidence...................... 485

10  Plaintiffs' Exhibit 16 in evidence....................... 498

11  Plaintiffs' Exhibit 888 in evidence...................... 504

12  Defendants' Exhibit 2 in evidence........................ 487

13       *     *     *     *     *     *     *     *     *

14                    C E R T I F I C A T E

15

16       I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18

19  October 13, 2010                    /s/ William G. Romanishin

20

21

22

23

24

25
```

## A

**Abdo** 429:2 444:2 448:9 452:23 455:4 480:15 481:2
**ability** 414:23 505:11
**able** 415:20,24 417:5
**above-entitled** 512:17
**absence** 451:17
**absent** 446:20 448:22
**Absolutely** 490:9
**absorption** 463:19
**accelerated** 506:13
**acceptable** 484:21 493:11
**access** 488:19,21 507:24
**accomplish** 461:20
**accomplished** 490:13
**account** 433:17 440:5
**accountable** 506:1
**accountants** 508:5,9
**accounting** 508:13
**accounts** 440:17
**accruing** 502:23
**acknowledge** 429:13
**acknowledged** 429:9,22
**acknowledgement** 481:7,12
**acquisition** 408:8,17 411:12 444:17 445:11 448:25 449:6 463:17 473:10 473:11,17
**acres** 401:14 411:13,21
**action** 460:16
**actively** 480:7
**actual** 405:8 433:18 506:4
**ADAM** 400:3
**add** 472:10
**added** 413:18,22
**adding** 404:15
**addition** 433:23 474:8 497:23
**additional** 426:4 451:4 498:1
**Additionally** 505:7
**addressed** 458:13 468:25 469:1
**adequate** 476:22 490:21 491:4 496:5 499:2 506:22
**adjusted** 416:22 417:17 418:13 419:1
**adjustment** 422:4
**adjustments** 498:20 499:13
**administration** 484:4 505:4
**admission** 504:4
**admitted** 402:23 430:5 442:4 443:18 444:21 446:11 448:14 450:18 451:13 452:4 453:8 457:24 465:10 468:19 470:22 482:22 483:3,8,9 485:3 487:11,14 498:12 504:8
**adversely** 505:10
**advice** 508:7
**aesthetic** 428:9
**affect** 496:17,20 504:20 505:10,11
**afternoon** 455:13
**agency** 501:5
**aggregate** 412:2 416:1 484:6
**ago** 466:24 497:9
**agree** 462:9 492:2,11 504:4
**agreed** 409:23 432:16 436:10 466:14
**agreement** 470:15
**Ah** 436:8
**ahead** 456:15 507:1
**Alan** 426:20 429:7,12 432:13 442:10 446:20 450:24 451:17 452:13 455:5 455:24 469:17 480:23 481:8 506:1
**Alexander** 426:21 429:15 432:13 452:10 458:25
**ALHADEFF** 400:2
**allow** 494:16 507:6
**allowance** 490:20 491:20
**allowed** 494:18
**allows** 406:16 414:18
**alter** 501:7
**altered** 420:23 477:15
**alternative** 413:17
**amount** 409:14 410:17 413:12 421:18 449:19 494:13,24
**Amy** 458:14
**analysis** 417:3 422:13 498:24
**analysts** 421:4
**analyzing** 420:11
**ANDREA** 400:5
**ANDREW** 399:16
**and/or** 463:18 481:2

**answer** 418:15 424:3 463:1,24 464:6
**answered** 463:6
**answers** 463:7 464:9
**anticipate** 466:11 483:1 496:17 499:2
**ANW/NW** 416:22
**anybody** 471:17
**APPEARANCES** 399:11 400:1
**appears** 493:14 498:19 499:13 502:12 502:13,24
**Apple** 484:3
**apples** 424:20
**appraisal** 421:23,24 430:10,12,14,20,22 431:3,3,7,8,13,13,14,15,16,17,19 432:15 433:17,19,23 434:13 436:19 436:24
**appraisals** 432:6
**appraiser** 430:23,25 431:2 432:21 433:1 434:12,12 436:17
**appraising** 433:4
**appropriate** 494:5
**appropriately** 491:8
**approval** 403:14 426:20 429:2,13,16,18 429:19 430:13,17 431:5 432:10,11 448:9 452:25 476:23 477:2 480:16
**approvals** 506:18
**approve** 430:9 453:21 454:4 469:24 478:19
**approved** 401:14 422:10,15 425:22 427:13 428:25 432:2 436:14 437:1,3 441:17 445:24 446:3 448:8 450:12 451:10 452:1,19 453:24 478:19 480:12 496:22
**approving** 480:17
**approximately** 423:25 494:7
**April** 468:13
**Aquaplex** 467:15 468:4,6
**area** 493:18 504:18
**areas** 474:14
**Arisohn** 399:12 400:13 401:1,6,8 402:17 402:25 403:1,6,8 407:14,17,24 428:18,20,21 429:25 430:7 441:22 442:6,7 443:20,21 444:23 446:10,14 448:13,16 450:20,21 451:12,15 452:3 452:6 453:3,5,10 456:10,24 457:2,5,8 457:22 458:1,2 462:16,19 463:3,5,9 463:13 465:7,12 468:16,21 470:24 473:6,7 474:4 480:4 483:7 484:10 485:1 487:2,4,6,10 488:7,13,16 505:4 504:4,5,7 509:7,9,21 510:7,16,18 511:14
**arm's** 433:6
**asked** 416:19 453:21 463:14 464:7 469:21 496:21
**asking** 434:6
**asks** 454:6
**assessing** 495:8
**assessment** 466:14 492:2,11
**asset** 406:5,6,11,12,13,13,24 416:16,18 417:5,21,22 418:2,3,4 428:2,3 489:7 491:1 496:5
**assets** 406:16 417:4,9 420:3,5 422:5 489:10,21,22 490:10 491:12,15,19 492:24 495:3,13,22 496:3
**assigned** 405:22
**assignment** 415:6,11,17 416:1
**associated** 412:20 413:2 439:17 463:19 507:8
**assume** 463:25 475:9 509:17
**assuming** 419:16
**Atlanta** 408:25
**attend** 480:24
**attended** 455:5
**attending** 455:5
**attention** 463:15 465:6 472:2 476:10,19 477:3 478:9,17 481:3 482:17 487:17 487:24 489:6 491:10 493:15 495:1 500:22 502:3 503:15,24
**attorney** 422:25 477:12
**attorneys** 440:17
**attributed** 466:8
**attuned** 493:23
**Audit** 469:6
**audited** 422:3
**August** 439:9,9
**Augustine** 466:19 467:10,12
**Authenticity** 510:17

**authority** 480:10 494:17
**authorized** 478:19
**available** 418:14 420:23 422:9,13,14 437:24 478:21 501:23
**Avalon** 415:7
**Avenue** 399:20,24
**avoid** 507:8
**aware** 402:8 427:13 437:23 440:24 443:2 468:14 471:18 472:22,25 484:4 486:11 506:2
**A&D** 447:19,24 448:25 451:3
**a.m** 399:4,6 400:15 456:19,21 457:15

## B

**B** 400:5 447:20,21
**back** 404:11 413:24 415:1 422:17 425:3 425:15 427:14 434:15 438:8 446:1 454:5,7 457:12 462:21 465:2 470:10 477:25 478:14 484:17 497:19 507:3 508:4,14
**bad** 457:10 477:6 482:7,8,11 498:19 506:5
**balance** 422:4,6 493:10 495:21 500:2
**balances** 477:22 491:7
**BANCORP** 399:3
**bank** 404:25 406:17 408:20,22,23,24,24 408:25 409:2,4,4,7,21,24 410:2,6 412:7,14 413:20 414:2,14,18,21,22 415:1,1,19,22,23,24 416:11 417:4,9,9 418:13 419:8 421:10 424:18 427:12 430:9 431:3 436:10,14 437:20,20,23 437:25 439:20 440:22 445:13,15,17 450:5 460:17 461:6 462:6,10 464:5 464:13 467:16 478:6 481:24 482:6 488:11,13 490:2,17,18 493:13 494:5 494:12 497:19 504:17,21 506:17,22
**BankAtlantic** 399:3 409:1,9 410:1,4,9 410:16,21 425:23 437:3,8,15 440:6 440:15,16,19,25 454:12 468:1 472:23 476:6 477:16,19 479:19 480:2,7,9 481:24 485:18 486:12 490:4 493:21 505:21 509:17,24 510:2,13
**BankAtlantic's** 449:18,20 450:7 494:14 501:17 504:24
**bankers** 490:8
**banking** 463:18 479:16 488:12 490:7
**bankruptcy** 406:15,16 417:20
**banks** 408:19 409:5 485:18 493:7
**bank's** 416:12
**barn** 402:3
**Barnes** 464:14 465:13 466:14 467:8 468:13,22 470:9,11
**BARROWAY** 399:15
**based** 421:22,23 433:2,14,19,23 436:20 492:9 493:25 494:2,12 509:11
**basic** 426:6
**basically** 415:19 418:19 423:19 432:16 477:12 491:2 509:4
**basis** 443:11 479:15 498:25 504:17
**basket** 492:21
**Bates** 510:19
**Bay** 419:14,20,24 422:2
**becoming** 443:2 484:4
**began** 464:25
**beginning** 427:16 439:10 482:14
**believe** 406:21 407:9 410:11 412:5,9 415:16 418:25 436:8,12 437:6 442:2 443:5 446:25 449:11 450:11 455:5 460:20,21 461:19 469:2 470:8,9 482:24 483:19 505:15
**believed** 472:17
**beneficial** 490:15 493:12
**benefit** 416:10
**best** 490:16 496:18 504:24 505:7
**better** 427:15 437:12 465:20,24
**beyond** 479:7
**big** 482:9
**bigger** 493:6
**billion** 495:4,12
**bit** 413:20 430:18
**BLB** 444:15 447:14 448:5 451:8,21 453:19 455:11 459:18,19,21 467:13 468:6,11 471:22 473:18
**blessed** 481:1
**Blevins** 458:23
**block** 446:2 452:19

**blow** 403:6 427:18 466:3 502:11
**board** 438:9
**book** 401:3 402:17,18 407:15 474:19
**boosted** 436:15
**borrowed** 411:10 414:2
**borrower** 402:9 405:2,2,25 406:6,10,15 406:19 410:22 411:3,20 413:18 414:1 414:22,25 415:21 421:8 423:20,25 424:9,11,12,17,21,23 428:1 436:7 440:18 444:6 450:5 454:5,5 462:12 485:15 490:2,3,14,16,18 494:7,13,15 494:22,22 496:17 497:8,9,25
**borrowers** 490:4,17
**borrower's** 413:12 477:4,12
**borrowing** 406:4,5,22 418:18
**bottom** 403:3 405:19 419:19 424:6 426:7,9 428:17,22 439:13,16 443:4 458:4,5,5 469:15 478:9,18 491:10 495:1
**bought** 416:19 477:25 497:9,10,16,16
**box** 404:2 405:1,19 407:25 426:6,9,14 428:10 429:7,8 470:13 507:10
**boxes** 404:1,6,7 425:16
**Brae** 444:6,15 446:3,23,23 447:2 454:1
**break** 457:11 499:5
**breakdown** 424:3
**breaking** 506:24
**Brickell** 399:20
**Brief** 456:20
**briefly** 414:20
**bring** 400:10 404:23 456:22 465:5 511:7
**bringing** 430:16
**broadbrushing** 439:6
**Broadway** 399:14
**budgeted** 424:7
**build** 411:23,25 447:13
**builder** 415:13,22 437:20 441:9,12 445:13,15,17 454:23
**builders** 411:18,22 412:5 415:14,15 416:5 439:18,23 440:4,4 459:17 501:12,16,24
**building** 401:18 408:16 411:22 415:8,13 445:12 467:1,21 473:24
**built** 408:11
**Burn** 444:6,15 446:3,23,24 447:2 454:1
**BURNETT** 399:19
**business** 437:5,8,9,10 467:17 490:7 500:22 509:17,19
**buy** 402:3 434:22 435:3 436:10
**buyer** 407:10 423:16,17 433:5
**buying** 407:8 416:16 423:25 424:9 435:14
**buys** 497:9

## C

**C** 512:14,14
**Cahill** 415:7
**call** 400:8 406:5 414:14,18,23 423:6,22 438:12 442:18 461:17 463:15 472:2 480:12 492:23 500:16
**called** 401:18,24 406:1 411:8 413:24 416:21 417:18 430:25 432:23 436:5 438:16 451:2 452:16 453:16 468:10 473:17 493:1 499:14 502:13
**calling** 452:10,13 474:8
**capital** 435:20 436:5,6,10 455:25 491:20 494:12
**Carolyn** 431:24 432:4
**carry** 413:3,7,11 464:2
**carrying** 400:24 499:17
**case** 399:2 405:4 406:18 407:9 408:1,4 408:21,24 410:14 411:12 426:5,10 432:21 433:13,19 437:14 439:2 456:17 458:22 460:22 461:4 462:20 462:22 469:2,6 474:9 475:13 482:15 504:18 507:5,7,8 508:7 509:14,14
**cash** 422:22 423:7,13 424:21,25 425:1
**catch** 477:17
**category** 461:22 473:16 495:7
**cause** 473:15 485:8,25 492:16
**caused** 495:19
**CB&T** 409:7,10
**cc'd** 469:15
**cease** 493:21
**ceased** 493:17
**CECILIA** 400:4

center 497:24
Centerline 468:10
centers 492:22
certain 454:16 460:20 462:11 463:25,25
    465:20 466:1,4 473:2,12 474:1
    494:13,24 504:17
certainly 441:9
certifies 504:23
certify 504:18 512:16
cetera 404:2 417:13 488:3
CFO 455:24 506:13
CFOs 449:15,25
CFS 406:10 407:21 478:23
Chair 470:3
Chairman 455:1 481:7,10 485:25
    493:22,22 506:13
Chairman's 481:7,12 483:23 484:3
    485:8
chance 463:8 511:5
change 404:14 484:2 485:12,17 495:25
changed 406:10 470:7
changes 406:9 469:24 505:8
changing 404:15
characteristic 495:11
characteristics 479:11,14 495:8
charging 412:15
check 399:16 404:17
checked 404:2,7 428:10
checks 477:22 491:7
Chief 427:11 485:12,12 504:24
Christopher 458:17
chronological 509:3
circumstances 477:2 478:2 479:6
cited 500:2
city 401:15
clarification 407:23 431:8,21 461:13
classification 496:6
classified 472:8,14,18,23 473:1,13,15
    474:2 486:8 489:10,21,22,24 490:10
    490:22 491:5,12,15,19 499:25 500:11
clearing 408:12
clerk 400:11 510:5,12
clerks 507:16
closely 418:5 455:8 492:5
closing 412:8 422:25 425:10 440:3
code 414:5,7
codes 414:5 461:18
collateral 404:15 406:7,13 414:4,5,9
    421:15 461:18 491:5 492:10 497:20
    498:1
collections 505:5
Columbus 408:24 409:2,4,7
column 416:21 419:4 432:10
combination 466:5
come 417:6 424:22 433:3 454:6 457:12
    483:12 490:15 497:12 507:3 508:4
comes 406:3 431:3
comfortable 410:7 413:20
coming 404:11 413:9 423:5,8,15 424:10
    424:23 431:23 441:2,6 442:16 510:18
comment 423:19 425:8 434:14 461:2
comments 489:5
commercial 464:18,23 465:19 469:8
    476:7,7 479:12 492:5 503:16,22
commitment 409:19 447:19 450:5 484:6
commitments 501:17
committed 432:8 449:19
committee 402:10 403:13,16,18 404:4
    404:20 405:7 408:2 411:9 425:6,7,8
    426:15 427:4,5 428:13,22 429:13
    430:9,13 431:4,4 432:1,8 435:5
    436:25 441:14 442:11 443:23 444:13
    444:24 446:15 447:16 448:17 450:22
    452:7,9,24 454:11,19,22,25 455:1,3,7
    455:8,17 456:3 459:3,9 460:7,8
    468:10 469:6,17,20,23 470:9,9
    478:19 480:10,12,14,25 481:5,6,13,14
    494:1
companies 479:24
company 406:12,20 407:5,5 409:15
    419:24,25 436:5
company's 500:7 504:25 505:6,11
comparable 412:23 433:5 434:1,3
compared 480:2 495:13
completed 408:15 461:1 466:6 468:13
    469:5 487:25 488:1,2,6

completion 488:5
425:23
component 449:3 467:24 473:21
components 498:25 499:1
concentrations 492:13,16
concept 404:21
concern 438:7 443:3 460:4 462:10 464:1
    464:6 465:5 485:15 492:17 493:16,20
concerns 494:1
concurring 484:9
condition 412:8 423:12 425:10 505:6
conditions 422:25 426:4 440:3 485:8
    500:22
condo 437:5,7,8 439:3,5 467:16,17,20
    468:1
condominium 493:17 494:2 501:14
condos 467:18
confirm 422:22 483:23
confirming 423:4
confused 472:12
conservative 417:6
consider 476:17 478:5
consideration 433:8
considered 436:1 451:19 461:3 462:6
    476:18 490:21
considering 435:5
consist 481:16
consists 471:2
construction 419:14,20,24,24 420:19
    441:4 444:17 445:11 449:3 463:18
    466:22 467:1,21 473:18,20 492:5
consultants 432:5
consumer 495:9
contact 410:5
contain 505:2
contained 504:25 511:1
contemplated 441:1
context 423:12 438:21
continue 404:11 415:24 443:11 455:23
    457:21 501:12 507:10
continued 399:22 400:1 401:7 491:11
    511:14,25 512:1
continues 492:4 493:16
contract 412:6 415:21 422:6 433:18,20
    433:21 434:16,21,22,25 435:3,19,20
    436:4,6
contracts 415:6,12,18,20 433:14
contrast 480:1
control 413:17
controlling 413:21 491:25
controls 505:9,10
cookie 479:8
copied 459:5
copy 427:15
corporation 418:5 435:21,25 436:3,4,11
correct 401:13 409:8,22 411:24 413:25
    415:3,4,5 416:20,25 418:24 419:5,22
    420:24 421:10,12 422:10,15 425:11
    425:24 426:15,18 427:1 429:5,6,20
    430:24 431:1,5,9 433:8 434:7,19,20
    441:8,18 442:3,13 443:17 444:16
    445:1,8,13,15,15,20 446:3,4 447:14
    447:17,22,24 448:4,6,8,23 449:11,19
    450:25 451:1,5,10,20,24 452:1,14,17
    452:20,21 453:1,12,14,15,22,23,24
    455:1,12,20 459:4,5,8,15,20 461:7,19
    461:22 464:21 465:3,15 467:10,14
    468:4,12,23,24 469:9,19 471:2,4,10
    471:12,23 472:19,20 473:25 474:2
    479:23 481:9,11 484:12,14 486:3
    491:17 499:19 500:8 503:11 505:17
    512:16
corrected 509:25
correctly 435:24 449:16 467:22 477:9
    477:10
correspond 510:1,22
cost 413:10,11,11 424:3,4,7 497:10,14
    497:17 498:2
costs 412:20 413:2,3,7 439:17
counsel 508:7
count 417:16
counted 422:8
couple 497:6
coupled 463:20

course 403:18 465:1
Court 399:1,23 400:8,9,14,16,18,21,24
    401:4 402:15,20,23 407:11,15,19,22
    430:3,5 441:24 442:1,4 443:13,15,18
    444:21 446:9,11 448:12,14 450:16,18
    451:13 452:4 453:4,6,8 456:14,22
    457:1,3,6,10,16,24 458:25 463:4,8
    463:12 465:10 468:17,19 470:22
    474:6,15,18,22 475:5,7,14,18,20,23
    480:5 482:22 483:2,5,8 484:8,13,17
    485:3 486:17,21 487:3,5,7,9,11 498:7
    498:12 502:1,9 504:1,3,6,8 506:24
    507:1,15 508:2,16,21 509:1,7,16,23
    510:3,9,15,17,20,25 511:3,8
courtroom 507:25
cover 471:13 506:22
created 423:23 428:3 477:13 503:7
creating 464:4
credit 402:9,12 403:9 404:17 405:9
    417:2 421:4,7 425:9 426:2 427:11,19
    429:21 434:9 445:22 469:17,20
    478:13 484:3 486:7 489:15 491:18
    504:24 505:1,4 506:18,18
criticized 472:15,16 486:8 502:21
cross 457:11 474:6 475:9
crossed 406:2
cross-examination 474:8,13 475:25
    511:15
CRR 399:23
culture 505:25
current 419:8 433:14 434:3 435:21,24
    436:2 460:4 500:2 505:1
currently 439:18,23 459:14
cushion 496:19
cutter 479:8

D

D 399:20 400:4 511:11
DANEK 399:17
date 405:6,7,8 419:4,5 444:13 447:17
    449:8 452:16 454:16 483:19 487:24
    488:1,1,5 502:25,25 503:1,6
dated 427:21 431:24 435:1 443:23
    444:24 465:17 466:24 487:22
dates 441:7
day 405:10 460:8
days 432:1 458:9 475:11 484:4 499:17
    503:5,7
deal 418:19 423:13,14 424:21 443:10
    459:12
dealt 506:16
debt 467:6 468:1
deceiving 497:7
decision 437:5,9,14 494:3,14
decline 491:12 492:23 495:19 496:16
declined 426:24 432:10
decrease 495:21 501:16
deduct 417:5 418:5
deducted 417:25
default 414:25
defaulted 415:21
defaults 414:22 494:22
defendants 400:2 475:7,15 486:16,18,19
    486:22,24 487:14,15 508:24,25 509:6
    509:13 512:12
defense 463:8 484:20,23 507:18 508:7
    508:14
defensible 478:20
deferred 467:24
definitely 437:18 443:2
deflate 438:6
delinquencies 499:17
Delinquency 499:14
delinquent 491:12,15
department 417:2 464:14,17 469:8
depending 425:15 462:8,11 474:14
    496:19
depends 427:7,7
depleted 462:15 462:9 466:6 467:5,25
deposed 509:15
deposit 412:3,6 467:3,4
deposition 462:20 484:15
depositions 462:21
deposits 416:2,5 440:5,14,15
describe 480:22

describes 466:21
Description 414:10
design 496:1 505:8
detailed 484:2
details 461:5
deteriorate 443:11
deteriorating 485:20,21
deterioration 438:3
determine 417:3 432:22 460:16 478:13
    499:1
determined 461:24
Devco 445:9
develop 401:16 408:10 415:24 444:17
    497:13
developed 411:22 413:3 449:6
development 406:1,18,25 407:7 408:9
    408:12,18 411:14,20,21 415:13
    416:16,18 418:12,16 419:14 422:2
    434:16,22 435:3 437:8,9,13 445:11
    449:1,7 451:3,8 463:18 473:11,17
    492:14
deviate 477:1
Deviation 476:21
difference 410:24 482:7,9,10,11 487:25
different 407:21 411:3,22 414:15
    427:25 455:15 479:13 495:7,7 497:6
difficult 418:3
diligence 404:22
direct 401:7 457:7 511:14
direction 473:4
directly 405:18
disclosed 509:12
discounted 409:18
discovered 440:19,20 477:21
discuss 455:24 456:17 507:5
discussed 456:4 460:7,8 495:25
discussing 459:13
discussion 425:6 460:13,19 480:24
    481:5 493:25
distributed 469:3,5
DISTRICT 399:1,1,9
diversified 492:15
diversify 492:20
divided 421:18,20
division 405:12
document 414:17 419:18 427:14,17
    430:16 431:22 463:16 470:25 471:2,7
    471:8 476:11 478:15,17 481:4 483:11
    487:17 491:19 503:7,12,14 504:4,14
    504:15 505:15,19
documentation 465:20,24 478:21 479:6
documented 467:4
documents 428:14 506:8 508:9,14 509:8
    509:10,15 510:1,1,4,7,13 511:1
doing 404:18 424:20 439:25 455:23
    457:1 461:14 475:4 479:6 495:17
    496:15
DOLGOFF 399:13
dollars 421:19 494:24 497:10,11,14,15
double 422:7
downturn 439:12 482:16 496:19
downward 486:5
draft 489:2
draw 476:10,19 477:3 478:9,17 481:3
    482:17 487:17,24 489:6 491:9 493:14
    495:1 499:13 500:21 502:3 503:15,24
driven 480:11
dry 467:19
due 404:22 422:6 491:11

E

E 400:3 511:11 512:14,14
earlier 476:25 490:10 495:3,25
early 464:21 483:24
earnings 493:8
easier 483:16
economic 500:22
economist 439:11
economy 482:16 496:12,16
Eddy 435:21,25 436:2,4,11
effect 413:14 416:6 496:20
effectively 491:25
effectiveness 505:9
effort 404:23
eggs 492:21
eight 448:2

**either** 417:11 441:4 443:15 473:10
  481:1 496:20 506:6,13
**electric** 408:13
**electronic** 407:16 475:8,15 507:15
**emphasis** 437:12
**emphasize** 496:4
**employee** 421:10
**ended** 426:5 439:25
**ends** 499:7,8
**endurance** 457:4
**engaged** 464:20
**Engelberg** 458:15
**enjoy** 488:21
**ensure** 423:6 478:14 506:2,15,21
**ensuring** 486:7 488:11
**entered** 435:4 436:4 489:16
**entirely** 454:7
**entities** 406:5
**entitled** 471:20 473:8
**entity** 406:4,5,11,12,12,22,24 416:16,19
  416:19 418:14,18 419:22 420:21
  428:2,3
**entrance** 408:13
**entry** 418:12
**equal** 481:15
**equestrian** 401:24 402:1,2
**equity** 413:12,19 417:5 422:5 423:1,22
  424:23 425:2 477:4
**escrow** 412:3 416:10 440:5
**escrowed** 467:4
**especially** 501:14
**ESQ** 399:12,13,13,16,17,17,20 400:3,3,4
  400:4,5,5
**Esslinger** 415:7
**establish** 463:24
**established** 406:4,23 483:24 492:9
**estate** 420:21 464:18,24 465:19 469:8
  476:7 479:12 492:5,15 493:16,23
  503:16,22
**Estates** 444:6,15
**estimated** 433:14
**et** 404:2 417:13 488:3
**EUGENE** 400:3
**evaluated** 404:11
**evaluation** 476:22
**event** 406:14 414:22 415:19 417:12
  425:22 496:15
**eventually** 410:13
**evidence** 402:14,24 430:6 442:5 443:19
  444:22 446:12 448:15 450:19 451:14
  452:5 453:9 457:25 465:11 468:20
  470:23 484:1 485:4 486:20 487:15
  498:4,14 502:7,8 503:25 504:9
  511:7,18,19,20,21,22,23,24 512:2,3
  512:4,5,6,7,8,9,10,11,12
**evolved** 459:19 461:19
**exact** 454:16
**exactly** 403:24 404:16 431:18,20 459:22
  459:22
**exam** 488:1,2
**examination** 401:7 466:10 486:12 487:7
  489:15 495:14 511:14
**examined** 508:8
**examiners** 488:13 493:14
**examining** 488:4,10
**example** 403:25 417:14 423:24 444:12
  458:14 472:2 497:8
**examples** 497:22
**exceeds** 484:6
**Excellent** 511:3
**exception** 408:16 467:16 479:5 481:13
**exceptions** 425:17,20 478:18,20,22,22
  479:1 506:10,12
**excess** 459:14 501:15
**excessive** 439:18
**Excluding** 473:8
**exclusively** 418:7
**Excuse** 487:3
**excused** 507:22,23
**Executive** 485:12
**exempt** 417:19
**Exhaustingly** 457:2
**exhibit** 402:13,17,21,24 403:7 407:12
  407:15,16,18 427:15,17 428:16
  429:24,25 430:6 431:22 438:9 441:23
  442:2,5 443:12,12,19 444:5,19,22

**F**
**F** 512:14
**facilities** 488:17
**Facility** 403:10 405:9 425:5 426:3
  427:19 429:21 445:23
**fact** 406:8 407:7 410:9 418:10 423:2,15
  424:25 426:23 440:8 472:22,25
  481:22 505:2,3 509:11
**factors** 505:9
**failing** 477:17
**fails** 414:25
**fairly** 505:5
**fall** 479:8
**false** 477:13
**familiar** 401:11,19 402:11 414:15
  470:25 504:14
**far** 408:6,15 464:25
**farm** 401:15
**favor** 481:16
**feasibility** 402:6
**feature** 408:14
**February** 449:9 450:23
**federal** 438:9 501:3,4
**fee** 412:17,19,20
**feel** 404:20,24 477:16
**felt** 477:24
**fence** 408:14
**file** 478:21 505:19
**fill** 461:5
**final** 406:3 469:3 489:3 499:9
**finalizing** 488:7
**finally** 453:2
**finance** 478:10
**financed** 477:5
**finances** 421:8
**financial** 417:2,14,21 418:4 419:5,6,9
  420:10 422:1,12 485:13 500:7 504:16
  504:20 505:6,12 506:4
**find** 401:3 508:22

**finding** 445:2
**fine** 401:4 407:23 444:21 463:12 474:18
  475:5,20 483:8 484:24 485:3 504:12
  511:8
**fine-tuning** 477:23
**firm** 508:13
**FIRREA** 434:13
**first** 414:10 415:11 416:14 421:1 426:5
  427:17 432:18 440:24 441:14 443:1
  454:17,20 458:4 470:10,19 475:6
  482:25 493:22 499:7 508:24
**five** 405:24 411:3,18,22 415:14,15
  442:21,22 467:3 497:9,12
**five-acre** 411:14
**five-plus-acre** 401:23
**flag** 437:25 438:19,25 501:20
**Flagler** 400:6
**flags** 438:13,16 439:2
**flip** 435:8,10,18,19 436:9,15
**flipped** 436:7
**Floor** 399:14,20
**Florida** 399:1,3,21,24 400:6 401:15
  409:6 417:18 437:16,24 493:17,24
**FMOC** 500:23 501:7
**focus** 437:15 457:19 458:3
**follow** 434:12
**following** 403:19,23 463:14 484:5
**follows** 504:23
**FOM** 501:3
**FOMC** 500:25
**Force** 435:20 436:5,6,10
**foreclose** 414:23
**foreclosure** 417:20
**foregoing** 512:16
**Forgive** 485:6
**Form** 504:25
**formally** 481:1
**format** 407:16 461:4 479:8
**formed** 406:24 420:19 454:12,22
**forming** 454:18
**forms** 497:20
**forth** 508:15
**forward** 440:22
**foul-up** 484:8
**found** 466:17
**four** 405:24 411:3 452:9 466:18 471:2
  499:6
**FOWLER** 399:19
**frame** 428:15
**fraud** 477:10
**fraudulent** 440:14
**free** 488:19
**Friday** 455:16,17 461:10
**Fridays** 455:16
**front** 401:3 403:12 424:2 457:18 464:24
  476:13 481:4 487:18,19
**full** 500:1,12
**fully** 486:8
**function** 464:13 490:23
**fund** 432:16
**funded** 413:23 440:11 449:6
**funding** 444:18
**further** 447:3 448:8 474:4 477:3
**future** 416:6 459:24 496:18
**FYI** 404:17

**G**
**G** 399:23 512:19
**game** 423:1,21 477:7
**generally** 405:8,22,23 406:4 410:3,25
  413:2 418:7 419:10 426:17 428:15
  432:22 435:11 480:25 501:24 503:5
**Georgia** 409:6
**getting** 410:1 413:5 424:17 457:2
  461:20
**give** 423:24 438:23 445:2 463:1,8
  474:21 489:2 492:16 496:18 497:22
  498:1 510:4,11 511:1,2
**given** 409:20 460:4 477:5
**gives** 411:13
**giving** 461:14 464:9 475:3
**go** 404:20 406:15,17 410:1 412:10,11
  414:4 417:9,9 418:3 421:1 422:17
  425:3,14 434:15 441:4 446:1,5 447:7
  448:7 454:5 456:15 458:19 460:23
  461:9 466:12 468:25 469:11 471:5

**goes** 408:15 414:7 469:3 473:24 489:10
  490:20 491:24 494:6 495:25 496:3,13
**going** 409:20 411:9,14,17,21 415:16
  423:13,18 424:25 429:15 433:22
  436:17 441:22 456:13 457:20 463:6
  467:16 474:13 475:8 476:10,11,25
  478:14 481:3 482:2 485:15 487:18
  489:6 496:4,16 497:17 498:3 500:21
  502:3 503:24 507:1,3,3 508:23
**good** 400:9,18 401:9,10 405:21 424:18
  434:10 476:4,5 477:23 482:8,14
  491:4 506:5,24
**GORDON** 400:4
**gosh** 438:5 479:18 488:16,24
**Government** 494:18
**governmental** 488:9,9
**grade** 485:22
**graded** 471:24 472:5 473:13 474:2
**grades** 466:12 471:25 491:6
**grading** 485:17
**great** 459:12
**greater** 411:1,2
**ground** 428:8,8 509:22
**group** 411:1 492:24 509:1
**growth** 495:20
**guarantee** 407:6
**guarantor** 407:2 416:15 417:10,24
  418:2,8 420:14,24
**guarantors** 416:14 419:13 421:8 422:19
  425:16
**guarantor's** 417:2
**guess** 487:12
**guessing** 454:7
**guidelines** 434:13
**G&T** 406:1,18,25 407:7 411:20 416:15
  416:18 418:12,16 422:1,5 434:16,22
  435:3,19

**H**
**half** 457:8 494:7,16,17
**HALLOWELL** 399:13
**handful** 442:19,20
**handle** 457:20
**handwriting** 403:15,17,22,22 432:7
**handwritten** 416:15 422:19 425:4
**happen** 416:9 440:8,11 478:2 496:18
  500:12,14,15,20 506:14 510:22
**happened** 454:8 456:7 480:22 506:12
**happening** 433:11 499:20 501:23
**happens** 413:23 430:9 454:4 474:16
  482:5 496:12
**Harvell** 400:15 405:14,17 426:11
**Harvell's** 405:15 458:20
**head** 441:21 465:13 469:8 501:2
**headed** 463:17 464:14
**heard** 400:11 458:22
**hearing** 438:5 439:10
**hearsay** 508:10 509:21 510:14
**heated** 438:5
**heightened** 465:4,5
**held** 412:3,7 413:23 416:10 418:5
  440:15,16,16 459:24
**help** 504:11
**Henry** 464:14 465:13 470:9
**high** 439:16
**higher** 493:7
**highlight** 447:21 466:19 498:16
**high-rise** 467:15
**historical** 422:12
**historically** 491:19
**history** 434:15
**hold** 406:6 420:21
**holding** 409:5
**Holman** 431:24 432:4
**home** 414:16 417:15 445:9
**homes** 415:7,7,7,7 419:13 420:14,16,18
  422:2 444:18 445:12 448:25 468:10
**homestead** 417:18
**homogeneous** 495:17
**homogenous** 479:9,10
**honest** 472:13
**Honor** 400:13,17 401:1,6 402:22,25
  407:14 429:25 430:2 441:23 442:3

443:17,20 444:20 446:8 448:11,13
450:20 453:5,7 456:12,24,25 457:9
457:22 458:1 462:16 463:10 465:7,9
468:16,18 470:21 474:4,12,17,21
475:2,6,11 480:4 482:24 483:4,7,10
484:11,14,25 487:2,4,10 498:10,11
501:25 502:8 504:2,5,7 506:25
508:18 509:9,18,19,22 511:6
**HONORABLE** 399:8
**hoping** 463:1
**horses** 402:3,5
**hour** 457:8,12
**house** 417:22
**houses** 411:23 449:6
**housing** 466:13 482:16 501:8
**hundred** 421:19,21 496:23 497:10,11,14
**husband** 418:3
**Hynes** 458:17

**I**

**IAO** 409:14
**idea** 436:10,15 510:18,25
**identified** 473:13 491:2
**identify** 508:21
**identifying** 491:25
**immediately** 435:12
**impact** 439:24,24
**impacted** 463:21
**implication** 423:14
**improve** 491:11
**improvement** 466:8 470:14,17
**incidentally** 481:24 501:12
**include** 408:12 464:18
**included** 406:16 437:19 476:21
**includes** 459:17
**including** 433:15 460:11 469:6
**inclusive** 409:16
**incorporated** 454:24
**incorrect** 472:20
**increase** 423:22 428:7,23 464:1 501:15
**increased** 428:6 462:6
**increases** 435:17
**index** 401:2 402:18
**indicate** 404:3 405:20 495:12
**indicated** 496:22 497:1
**indicates** 405:19,21 414:10 426:9
428:11 429:12 430:13 431:5,23
443:25 444:2 495:2
**indicating** 452:25 465:19
**indication** 429:8
**individual** 410:4 414:16 417:4,11 425:7
471:8 478:19 480:10
**individuals** 402:2 456:7 477:13 494:3
504:17
**individual's** 417:19
**inflate** 497:17
**informally** 481:1
**information** 405:2 420:23 422:9,12
433:2 436:24 455:6 461:3,15,21
477:13,14,15 483:24 484:5 486:1
501:22 504:25 505:3,12 509:13
510:10
**inherent** 486:9 499:2 506:23
**initial** 412:2 416:1 426:17 429:9,10,22
430:10,20 431:2
**initially** 432:2 475:16 508:6
**initials** 426:23 429:2,7 432:11,12
**input** 494:2
**insight** 472:10
**instance** 400:14 492:22 495:9 496:23,24
497:8
**instances** 497:19 506:10
**institution** 479:21
**institutions** 479:21
**institution's** 494:8
**instructions** 507:11
**intention** 474:10,10
**interest** 404:19,24 409:17 412:14,25,25
413:9,19,24 414:1 461:25 462:5,9
463:19,20,24,25 466:6 467:4,25
490:16 502:23
**interested** 404:25 408:23
**interim** 420:4 422:3
**internal** 490:22 494:7 505:9,10 510:23
**Internet** 507:11
**interrupt** 407:11

**introduced** 457:23
**inventories** 501:15
**inventory** 420:5 422:7 439:4,17,18,23
440:1 501:15
**investments** 495:20
**invoked** 485:9
**involved** 417:20 479:16 480:7,15,16,17
480:19 481:19
**involvement** 480:1
**Island** 466:19 467:10,12
**Isles** 445:10
**issue** 424:22 434:18,21 454:21 469:25
472:11 485:5 490:2 506:16 507:22
508:5
**issued** 420:11
**issues** 439:10 440:21 443:8 456:3 465:2
465:20
**item** 499:23

**J**

**Jack** 455:4
**JACKSON** 400:5
**January** 427:21 428:25 443:23 444:25
445:5 446:15 448:17 452:17 465:17
466:18 467:9 468:4
**Jarett** 455:24 469:17
**Jay** 426:20 432:14 455:4 465:14,21
470:8
**Jeff** 460:24 465:22
**JEFFREY** 400:20 511:13
**job** 498:19
**Johns** 472:3
**joint** 418:2
**jointly** 417:15,22,23
**JR** 400:4
**JUDGE** 399:9
**July** 405:6 431:24 432:2,8 435:6 437:3
448:3
**June** 499:8
**JUROR** 428:19
**jurors** 457:18
**jury** 399:9 400:10,14,15 456:17,19,22
457:14,15 474:7 476:15 487:25 493:3
498:23 500:24 502:18 504:15 507:9
507:10,14
**justified** 508:14
**justify** 479:6

**K**

**keep** 464:22 487:13
**keeping** 410:10
**KESSLER** 399:15
**kind** 417:5 425:4 467:18 469:25 490:3
491:6 501:22
**kinds** 437:19 479:13
**King** 399:18
**know** 406:2 413:21 418:15 419:14
424:22 438:25 440:13,13 442:19
444:15 449:24 454:15,16 469:1
471:14 472:11 474:15 484:10 486:4
490:14,16 493:9 494:23 497:15
505:18,25,25 508:11 509:7,11
**knowledge** 493:24,25 504:25 505:7
509:13
**known** 409:7 471:22 485:17

**L**

**L** 399:16
**La** 419:13 420:13,16,18 422:2
**LABATON** 399:12
**lack** 477:4 498:2
**Lake** 472:3
**Lakes** 445:10
**land** 401:16 406:1,18,25 407:7 408:10
408:10,12,17 414:10 416:15,17,18,19
418:12,16 422:1 424:7 432:19 433:13
433:14,18 434:16,22 435:3 436:21
437:9,11,13,15,17,19,20,20,24 439:4
439:17,18,21,22 440:25 441:3,9,22
442:13,15 443:9 445:10,13,15,17
447:12 449:6 454:10,11,18,21,23,24
455:9,11,11,17 456:2 458:10 459:7
459:23 460:1,19,21 461:6,24,25
463:17,18 464:17,18,20,22 466:12
471:21 473:8 492:5,14 497:13,17

**large** 401:23 408:25 409:5 495:19
**largest** 492:13 499:25
**late** 438:4 443:1
**law** 400:11
**lease** 490:20 491:20
**leave** 507:8,9
**left** 425:15
**legal** 414:17,23 494:8
**Len** 405:14,15,17,18 426:11 458:19
494:12,12,14
**lend** 410:18 411:4 421:20 437:9 494:11
494:12,12,14
**lender** 477:20 500:16,16
**lending** 418:22,23 426:10 437:5,7,7,11
461:15 468:1 476:18,22 478:16
493:18,21 494:4,8,17 496:15
**length** 433:6
**lesser** 409:16 495:20
**let's** 412:10 421:1 424:6,13 425:3,13
430:18 432:18,18 434:17 436:8 445:2
447:7 456:16 458:19 468:25 485:11
489:5 497:10 498:10,16 499:4 503:15
504:5,22
**Levan** 426:20 432:13 442:10 443:4
444:2,25 445:7 446:20 448:22 450:24
452:13,23 453:13 454:9 455:24
469:17,18 480:17 481:2,8,19 485:25
486:4
**Levan's** 429:7,22 451:17 456:1
**level** 417:11 439:17 493:11 505:18
506:19
**Levels** 499:14
**levels/trends** 499:24
**liabilities** 422:5
**lien** 414:18
**light** 466:12
**limit** 410:12,13,15 494:7,8,24
**limited** 422:12 466:7
**limiting** 410:17 494:25
**limits** 492:9
**line** 407:25 414:4 429:9 439:16 447:20
447:21,23 462:24 463:2 476:19
**lines** 463:7
**liquidity** 417:11
**list** 438:12 475:8,15 476:17 484:1 485:9
485:24 486:1,2,5 487:12,13 502:13
502:18,19,20,24,25 503:1,3,4,13,20
507:16 510:11
**listed** 419:13
**listing** 434:3 471:22 484:2
**lists** 502:20
**LITIGATION** 399:3
**little** 413:20 430:18 438:2 472:10 489:19
496:20 497:6
**LLC** 406:1,18,25 407:7 428:1
**LLP** 399:12,16
**loan** 401:11,13 402:10 403:13,13 404:4
404:9,10,14,15,22 405:4,22 406:3,9
406:14,21,22 407:6 408:2,9,18,19,22
409:1 410:2,3,3,5,6,7,10,18 411:1,9
412:8,21 413:2,3,7,14,18,22,23,23
414:19 415:4 417:2 418:11,24
421:17,18,18,20,21 422:10,14 424:18
425:2,6,10,22,24 426:15,24 427:4,4,5
427:6,19 428:5,13,22 430:8,9,13,17
431:4,4 432:1,2,8,16 435:5,5,25
436:14,25,25 437:3 440:4,11,14
441:3,5,14 442:11 443:22 444:6,12
444:13,15,24 445:10,13,16,17,19
446:15 447:2,2,6,12 449:16,17,19
448:17,25 449:1,17,21 450:4,4,6
450:11,22 451:2,4,8,19,21,23,24
452:7,9,16 453:16,19,22 454:5,6,8,11
454:18 455:6,17,24 456:2,6,8 458:16
458:16,18,23 459:2,3,9,13 460:7,8,19
460:21 461:5,6 462:15 464:2,12,13
464:17,20,22 466:4,6 466:9,9 467:8
467:13 468:4,6,10,11,13,22 470:17
472:3,14 476:7 477:9,20 478:5,20,21
479:8 480:2,8,10,11,13,25 481:4,6,13
481:13,14,20 482:5,7,8,8,11,14 484:1
484:5 485:17,21,22 486:1 489:24
490:20,22 491:7,18,20,25 493:7
494:1 495:2,6,9,11,11 496:14 497:13
497:16 499:25 500:2,6,11,17,17
502:13 503:17,18 505:4 506:19 508:8
508:15

**loans** 405:23 410:25 411:2 414:8 437:15
437:19,20,20 440:25 441:9,11,12,13
442:13,16 443:9 454:10,21,23,23,24
455:9,11,11 456:2 458:11 459:7,17
459:18,23 460:1,4,16 461:24,25
462:1 463:18 464:19 465:20 466:13
466:18 468:8,9,11 471:21,22 472:23
473:1,8,9,12,18,19,20 474:1 478:6,10
479:10,12 480:15,17 481:14,25 482:2
486:4,13 488:11 489:25 490:21 491:5
491:12,15 492:6 493:7 494:7 495:7
495:10,17,18,20 496:21 497:5 499:23
499:24 502:20 503:13,19,22
**loan-to-bulk** 409:18
**loan-to-cost** 409:17 496:22 497:18
**loan/relationship** 483:25
**local** 411:18,22 501:16
**location** 411:13
**locations** 439:7
**long** 443:5 479:16 488:23 503:3
**longer** 457:6
**look** 413:10 417:8 419:18 421:24 427:8
433:1 445:18 447:1,20 452:19 456:10
461:15 463:9 471:19 479:14 495:10
503:6,12 504:5 506:15 510:5,12
**looked** 438:8 458:10 483:14
**looking** 422:18 449:24 450:4 461:4
468:15 485:7
**looks** 420:10 426:5 432:7,22 448:2
452:10 453:13 461:11 495:16 510:17
**lose** 490:18
**loses** 482:6
**loss** 478:1 489:14 490:1 492:25 499:2
506:19 508:8,15
**losses** 472:12 489:19,23,25 490:11,21
491:16,20 505:4
**lot** 402:4 404:23 406:3 422:7 424:24
437:17,24 439:21,22,22 441:2,6
443:9 475:3 480:23 495:7 496:20
497:23 498:25
**lots** 401:23 408:16 411:14,18,22 412:6
413:5,8 415:16,25 416:6 420:12
422:6
**low** 491:19
**lower** 482:20,21 497:17
**LTV** 421:15
**lump** 495:9
**lunch** 457:11 507:2,12,25 508:3
510:6,12 511:10
**luxury** 493:24

**M**

**M** 400:3,4 419:1
**magic** 410:9
**main** 494:19
**maintain** 488:11 508:23
**maintained** 509:23 510:13
**maintaining** 486:25 487:5
**major** 425:6 426:15 427:4,5 428:22
429:15,18,19 430:8,13,17 431:3,4
432:1,8 435:5 436:25 441:14 442:11
443:22 444:13,24 446:15 447:16
448:17 450:22 452:7,9 456:2,6,8
459:3,9 460:7,8 468:10 480:13 481:4
481:6,13,14
**majority** 448:9
**making** 404:14 435:14 461:21 486:6
**man** 434:9
**management** 480:2 491:24 492:4
493:15
**manager** 405:14 426:11
**March** 435:1,4 442:8,23 451:16 452:8
452:16 453:11 454:10,14 456:1 458:9
459:13 461:11 499:7
**Marcia** 405:18 426:21 432:13 449:21
455:4 458:4,9 465:21 468:25 469:1
470:8
**marina** 467:9
**mark** 399:12,17 484:22
**marker** 434:10
**market** 433:11,22 438:3 460:5 466:8
467:23 468:2 482:16 493:17,21 494:2
501:8,14,24
**marketing** 467:24
**marketplace** 501:23
**markets** 439:3,5 501:14

**market's** 438:5
**material** 505:2,3
**materially** 504:19,20
**matter** 410:17 457:4 462:10 512:17
**MATTHEW** 399:17
**matured** 404:10
**maturity** 441:7 444:13 447:17,18,25
448:1 449:8 451:6 452:16 464:3
**McClung** 426:21 429:3 432:14 455:4
465:14 470:8
**McGuire** 453:16,17
**Mead** 400:4,17 475:1,6,22 482:20,24
484:12,14 486:16 498:5 502:7 508:24
509:6,19,25 510:7
**mean** 402:15,16 403:17 404:7 406:11
407:4 408:18 415:9,17 417:1 418:13
420:9 424:20 426:23 427:5 429:14
432:25 433:16 439:20 442:20 463:22
463:23 476:24 477:11 478:12 479:3
485:19 489:18 490:1 491:1 495:15
497:23
**meaning** 402:2 434:22 435:19 466:24
479:13
**means** 406:6 408:5 412:14 413:1 414:12
419:5 421:16 422:20,24 426:24
429:11,22 432:15 433:1,5 434:18
435:24 479:4 491:4 510:9
**measure** 433:10
**Medalist** 448:24
**meet** 454:22 455:22,24 482:12 490:14
**meeting** 445:5,7 446:15 452:23 455:15
455:21,22 456:3,6,6 480:20
**meetings** 455:14 480:24 510:23
**meets** 406:9
**MELTZER** 399:15
**member** 425:7 459:2
**members** 404:20,21 425:8 442:11 452:9
459:12 460:8 481:7,10,16
**memo** 443:9
**memorandum** 484:3
**memory** 437:6 449:3
**mention** 466:10 502:22
**mentioned** 472:16 476:25
**met** 455:16,17
**Miami** 399:3,21,24,24 400:6
**Michael** 418:17 458:23
**Michele** 484:3
**middle** 426:14
**migrated** 486:5
**MILLER** 400:2
**million** 401:13 408:8,17,22 409:13
410:10,12,18,23 411:1,2,5 412:3,22
416:2,9 422:20,22 423:5,8,15,23
424:1,7,10,10,12,12,15,17,18 435:4
436:9,14,20,25 440:5 449:17,18,20,20
450:6,7,11 459:15 477:20 481:15
484:6 489:11,21,22,23 500:1,3
**Mindling** 400:16,19,20,22 401:9 403:2
407:25 432:21 443:22 448:18 458:3
460:24 463:14 470:25 474:8 475:22
475:23 476:2 479:17 483:14 485:7
487:18 490:2 506:7 507:20,22 508:12
511:13
**MINDY** 399:13
**mini-ranches** 401:22
**minute** 474:21 484:18
**minutes** 421:24 443:22 444:24 447:8
448:24 449:14,16 450:22 451:16
452:7 453:2,11 456:15,16 457:12
**misleading** 505:5
**misrepresent** 506:3
**missed** 477:21
**misspoke** 450:4
**misunderstood** 407:12
**miswritten** 423:9
**mitigate** 494:20 498:2
**mitigating** 477:2 479:6
**mix** 441:11,13
**MLC** 459:9,12
**MM** 422:20
**modification** 404:13 428:10
**modifications** 454:6
**modified** 405:23
**modifying** 444:9
**moment** 457:20 474:12
**Monday** 455:13,21

**money** 411:9 413:5,12,21 414:1 415:1,4
423:21 424:24 435:14 437:7,9,11
462:5 482:6 494:13
**monitor** 409:1 454:23 455:8 469:23
492:5
**monitoring** 465:21,24 491:25 496:5
**monthly** 412:25 454:22
**months** 419:10 427:23 428:5 448:2
451:4 488:24
**morning** 400:9,18 401:9,10 456:13
476:4,5 507:16
**mortgage** 414:10,14,16,17 415:11
497:25 501:24
**motion** 508:6 509:11
**move** 447:5 457:18
**moving** 435:13 440:22
**multifamily** 492:14
**multiple** 410:25 418:8,10 494:15
**music** 442:24
**MUSTOKOFF** 399:17
**Myakka** 401:15

**N**

**N** 400:5 511:11
**name** 405:2,25,25 427:25,25 429:8
458:20
**named** 428:1 431:23 444:6
**names** 458:22
**NATHAN** 400:5
**national** 501:12,16
**near** 419:19
**necessarily** 490:1
**necessary** 460:16 505:3
**need** 441:5 443:10 475:7 479:4 506:1
507:19 510:4,4
**needed** 422:4 465:4
**needs** 461:3 470:14,17 477:1,23 479:5
**negatively** 463:21
**negotiate** 509:5
**negotiated** 508:15 510:2
**negotiating** 509:5
**negotiation** 508:20
**neither** 468:11 490:17
**net** 416:22,24 417:6,17 418:13 419:1
**networking** 507:11
**never** 482:11
**new** 399:14,14 404:1,2,3,9,9 405:23
431:13,15,19 451:6 472:11 500:17
507:15
**news** 506:5,5
**nice** 507:12
**nineteen** 424:14,16
**nine-month** 453:21
**nonaccrual** 472:23 473:1 499:23 500:6
**Nonaccruals** 472:24
**nonhomogeneous** 495:5,10,18,22
**nonhomogeneous** 479:9,13 495:3
**nonperforming** 499:24
**nonrefundable** 412:3 416:2
**non-BLB** 473:9,19
**non-builder** 437:20
**normal** 425:1 477:14 479:7
**North** 399:24 405:16
**northern** 437:16
**notation** 422:19
**note** 420:3,5
**notebooks** 507:9
**noted** 425:24 478:22 493:14 506:10,12
**notes** 439:13
**noticed** 465:2
**noting** 468:3
**November** 437:25 438:10 448:3 487:22
503:10 505:16
**number** 417:7 420:3 422:12 446:9 453:4
469:5 482:18,20,21,23 484:15 500:15
508:22
**numbered** 403:3 484:22
**numbering** 485:5
**numbers** 482:19,25 510:5
**numerous** 500:19 501:17

**O**

**object** 402:22
**objected** 483:11 508:10 509:10
**objecting** 509:21
**objection** 430:2,5 444:20 446:8 448:11

**450:16** 453:3,7 456:12 463:10 465:9
468:17 470:21 480:4 483:5 485:1
486:25 487:1,5,10 498:9 501:25
504:7 508:10,23 510:14
**objections** 402:20 429:19 442:1 443:15
504:3
**objectives** 429:15,18
**observe** 507:10
**obtained** 467:3
**obvious** 442:24
**obviously** 404:9 427:25 440:20 460:3
479:5 494:19,20 496:14,16
**occurred** 510:23
**October** 399:3 472:22,25 502:16 503:6
503:13,20 512:19
**offer** 433:24,24 441:22 465:8 475:12
483:4 484:16,19 498:6 502:5 503:25
508:19
**offered** 502:6 508:9 509:16
**offering** 429:25 484:20 486:17,20
**office** 440:17 486:11 488:8
**officer** 404:22 405:4 406:9,21 410:3,3,4
410:5,6 418:23,23 426:10 427:11
451:23 454:6 458:16,16,18,23 459:2
461:2,5,15 485:12,13 504:24
**officers** 455:6 480:7,13 505:18,22 506:7
506:10,12
**Official** 399:23
**offset** 493:8
**oftentimes** 408:19 433:17 454:4 488:5
**oh** 400:16 415:15 423:17 425:14 433:25
475:23 486:23 487:11 488:22,24
**okay** 400:9,12,14,18,21 401:4 402:20,23
404:9 405:1 407:23,25 411:7 412:12
416:12 424:9 425:3 426:1 428:20
442:21 447:5,7,9,22 450:10 451:13
453:8 454:9 456:10,16 457:1,6,10,14
457:16,17,21 458:6,8 462:18 463:4,8
463:9,12 465:10 468:19 469:11
470:10 473:16 474:4,6,15,18,22
475:18,20,23 477:3,8 483:2,8 486:21
487:11,14,21 498:7,12 504:8 506:17
507:11 510:3,9,25 511:3,3,8
**OLA** 451:19
**old** 475:11
**omit** 505:2
**once** 431:2 488:2
**ones** 471:24
**one-off** 479:15
**onset** 482:11
**operating** 505:8
**operations** 505:1
**opportunity** 469:2,9
**opposed** 423:21 428:8 494:23 495:17
**option** 444:10
**oranges** 424:20
**order** 400:8 408:20 412:11 414:13,24
417:12 432:22 449:25 509:3
**orders** 508:6
**organization** 488:10 505:22
**organized** 474:23
**original** 402:11 407:9 497:14
**originally** 403:14,21 428:14 441:1
497:16
**OTS** 487:7 494:10
**outline** 476:20
**outlined** 431:10
**output** 488:25
**outset** 482:7
**outside** 400:17 480:25 507:19
**Overall** 491:24
**overreporting** 473:14
**overruled** 487:9
**owed** 415:1 419:22
**owned** 406:20 407:5 409:4 417:15,23
418:5,7 419:25 420:20
**owner** 418:18 435:21,25 436:2
**owners** 418:8,10
**owns** 406:13 436:1

**P**

**package** 403:12 410:6
**packages** 427:8
**pads** 467:21

**page** 403:2,3,12 407:17 419:18,19 420:2
420:2,2 421:1 422:17 424:6 425:3,13
426:1,2,5,6 427:14,17,18 428:16
432:18 434:15 438:10,14,15,16
439:13 444:5 445:9,22 446:2,22
447:7,8 448:24 449:16 450:1,3 451:2
452:15 453:16 454:1 458:4,19 462:24
463:2,7,16 469:11,12,13,13,14 470:10
471:5,13,20 473:3,3,6,16 477:16
478:17 481:3 485:7 489:6 491:9,10
492:4 493:15 495:1 500:21 511:12
512:1
**pages** 445:23 448:7 471:3,10,19
**paid** 414:19 415:25 441:1 478:14 500:1
500:11
**papers** 507:25
**parade** 442:15,18,18 454:10 456:2
458:10
**paragraph** 411:7 412:13 414:9 432:19
443:5 444:9 445:19 460:23 463:16
465:18 466:1,3,20
**paragraphs** 420:4
**part** 403:7 409:20 410:10 413:2,7,10,11
413:14,18,19,22 414:13 416:12
418:11 433:19 436:19 437:16 439:13
455:7 464:18,23 473:24 478:13
498:24 504:16
**participant** 477:20,24
**participate** 408:19 410:2
**participated** 409:19,21 450:6
**participating** 485:21
**participation** 477:25
**participations** 409:11
**particular** 407:5 408:24 410:4,18,22
411:3 417:4 426:5 430:16 433:12,13
433:20 439:2 454:21,23 462:8 469:2
469:6 472:10 492:24 494:2,13,15,21
505:15 506:1 508:16
**particularly** 413:25 437:16 480:23
482:15 493:23
**party** 430:15 468:2
**pause** 484:18
**pay** 413:19,24 414:25 415:4 462:3,3,5
462:14 500:17,19
**payable** 412:25
**paying** 424:11,12,17 462:14
**payments** 416:6
**Pennsylvania** 399:18
**people** 421:7 435:13 458:13 461:12
465:14 469:5,23 471:11 472:12 480:9
506:1 509:15
**percent** 409:17,18 412:22 420:20,20
421:15,17,21 467:3 495:13,14,21
496:23,23
**perception** 442:17,25 443:7
**performs** 420:18
**period** 410:14 413:4 435:12 461:24
430:20 464:1 467:7 478:3,7 488:3,4
489:18 490:11 495:16 503:2,4 505:1
**periods** 499:6
**Perry** 426:21 429:5 432:13 452:10
458:25
**person** 435:11 494:15
**personal** 419:5
**personally** 481:19
**PFS/FS** 419:4
**phrase** 409:13
**physically** 480:19
**piece** 408:23 409:1 413:23 414:14
423:11 433:6,7 434:6,10,18,21
436:21 472:22 510:10
**pieces** 436:23
**place** 425:24 433:2
**placed** 437:12
**plaintiff** 484:19 508:22
**plaintiffs** 399:12 400:20 402:13,24
427:17 429:24 430:6 431:22 438:9
441:23 442:5 443:12,19 444:22 446:5
446:12 448:15 450:19 451:14 452:5
453:9 456:11 457:25 464:8,11 468:20
470:20,23 475:10,16 482:18 483:9,10
483:11 484:14,21,22,24 485:2,3,4
486:17 498:3,6,12,14 502:3 503:24
504:1,9 511:13,17,18,19,20,21,22,23
511:24 512:2,3,4,5,6,7,8,9,10,11
**Plaintiff's** 484:19

**plan** 401:18 411:20
**please** 400:14 420:5 422:17 442:6 445:4 456:17 457:14 466:3 470:10 484:2 506:24
**pocket** 462:3,3,14 466:23
**point** 410:12 423:12 432:16 438:4,6 439:9 441:3 443:9 452:22 460:20,21 461:17 473:15 474:13 506:24
**Pointe** 472:3
**pointing** 467:9
**points** 466:17 507:21
**policies** 476:22
**policy** 410:17,20 411:4 419:8 425:17,24 469:17,20,24,25 476:7 477:1 478:18 478:22 490:3 505:21
**poor** 422:4
**portfolio** 447:12 464:17,20,22 465:19 486:10 491:18 492:1,15,20 499:3,17 499:25 500:2 501:10 506:23
**portfolios** 492:13
**portion** 408:19 450:6,7
**position** 405:15 414:13
**positive** 460:22 462:13
**potential** 439:24 468:5 476:20
**potentially** 454:21 476:17 486:9
**practices** 476:21 488:12
**preapproval** 404:19
**prejudice** 510:20
**prepared** 405:9 471:7,8,11,13 473:4
**preparing** 461:1,4 488:6
**presale** 459:23
**presence** 451:17 507:7
**present** 426:25 427:2 443:25 444:2,3,25 444:25 445:5,7 446:18 448:20 450:24 450:24 452:8,9,13 453:13,13 481:16
**presentation** 402:11 403:19,19,23,23 404:3 405:7 406:10 438:10 445:18
**presented** 403:13,14,21 405:22 406:22 408:2 427:4 430:16 449:21
**presenting** 418:23 455:6
**presents** 505:5
**presold** 459:17,19 471:20 473:9
**pretty** 401:22 405:3 442:24 460:2 410:10 494:23
**previously** 484:1
**price** 433:6 435:22 436:6,15,20 508:13
**prices** 501:15
**pricing** 493:8
**primary** 417:19
**principal** 406:20 407:6 418:18
**printed** 503:1
**prior** 446:1 450:4 462:16 479:25 495:14 495:16
**proactive** 443:10,10 486:6
**probably** 425:7 438:2 441:11,12 442:19 456:7,8 470:19 483:15
**problem** 407:19,22 443:5 474:22 494:23 499:23 508:1
**problems** 467:8 468:3,5 489:18,20 490:3,5
**procedure** 504:19
**procedures** 496:6
**proceed** 401:5
**proceedings** 399:7 512:17
**proceeds** 408:9 413:18,22 462:15 500:19
**process** 406:8 414:24 425:1 431:9 433:21 477:14 478:13 480:2,8,13,16 481:20 488:23,25 491:4,7 504:16,19 505:11 510:22
**processing** 412:21
**produce** 503:4
**product** 494:21
**prohibition** 479:1
**project** 402:3,5,6 408:14,15 413:11 422:22 423:3,21 462:1,14 466:21
**projects** 411:4 420:19 441:6 477:4 478:10 494:16
**promoter** 418:19
**proper** 477:2
**properly** 490:22 491:3,5
**properties** 428:1 492:15
**property** 407:8 414:14,18,24 415:1 421:19,19 423:25 424:9 430:10 432:22 433:3,7,8 434:7,10,18,21,23 435:4,9,11,12,14,16,18,20 436:1,5,11

436:18,19 490:18,19 497:9,24 500:18
**proposed** 408:2
**prospect** 466:8
**protect** 415:23 460:17
**protected** 421:15
**protection** 414:20 416:12
**provide** 488:17 500:16
**provided** 422:13 483:25
**prudent** 482:12 491:4 492:9 496:4,11,12
**prudently** 490:21
**Prussia** 399:18
**public** 436:12 500:9
**purchase** 401:14,16 408:10 411:17 412:6 415:16 416:6 424:7 435:11
**purchased** 466:24
**purpose** 411:8 426:6 445:18 454:18 455:8
**purposes** 414:6 428:9 431:9
**pursuing** 437:18
**put** 405:20 412:6 413:7,13 423:2 424:21 428:8 437:12 440:5 441:3 442:6 483:15 486:1 487:18 492:21 499:4 509:3
**puted** 423:6,22
**putting** 408:13,13,13,14 416:5 423:20
**PWC** 509:10,12,15,16,20,24
**p.m** 455:21 507:14 511:9

## Q

**qualification** 485:15
**qualified** 467:2
**qualitative** 498:20 499:13
**quality** 422:4 455:25 489:7 491:11,18
**quarter** 442:24 444:15 443:1 454:17,20 467:25 498:20 499:5,7,8,8,9,10,18,21 500:1 501:8 506:8 507:3,12 508:12 508:19
**quarterly** 498:25 504:17
**quarters** 499:6
**question** 445:3 463:1,11,15 464:4
**questions** 463:6 464:7 474:5 476:11
**quick** 508:3
**quickly** 424:13 435:13
**quorum** 481:6

## R

**R** 512:14
**Radnor** 399:18
**raise** 415:4 507:22
**ranchettes** 401:19,21 411:25
**range** 405:24
**rate** 412:13,14 463:25
**rates** 463:21 464:1 501:7,24
**rating** 405:19 466:9 470:11,14,15,17
**ratio** 493:1,4 495:19 496:22 497:18
**ratios** 489:7 491:11
**read** 454:3 462:17 484:15
**reading** 435:24 449:16 454:7 463:10
**reads** 459:9
**ready** 408:10 413:6 456:23 474:6 475:1,2 486:8
**real** 420:21 464:18,23 465:19 469:8 476:7 479:12 492:5,15 493:16,23 503:16,22
**realistic** 417:7 478:11
**realize** 454:20
**realized** 438:3 477:22
**really** 417:4 418:3 425:1 431:8 434:9 438:5 439:11 459:20 486:6 490:19 493:5 495:10 505:25
**Realty** 451:19
**reason** 400:10,24 406:14 417:8 494:19
**reasonably** 466:9
**recall** 409:12,25 410:14 427:2 441:11,20 441:21 456:1,8 461:23 462:1,20 464:16 467:20
**received** 420:22 422:3 442:8
**receives** 430:10
**recess** 456:13,20 474:23 507:2 511:10
**Recessed** 511:9
**recipient** 415:20
**reclassified** 489:24
**recommendations** 469:24
**record** 505:11 512:17
**recorded** 414:17 426:17
**records** 426:14 509:17,19 510:23

**red** 406:17 437:25 438:12,16,19,25 439:2
**reduce** 408:20 447:19
**reduced** 447:24
**refer** 405:6 412:4 473:22
**reference** 412:2 418:16 419:19 420:13 482:25 493:15 494:9
**referenced** 411:17
**referred** 403:19 425:17 440:3 454:10 467:2
**referring** 412:5 439:3 459:21 460:1 475:16 494:10
**refers** 416:22 468:8
**refinance** 497:13
**reflect** 501:14
**reflected** 485:22 499:17
**reflecting** 451:16
**reflects** 408:1
**refresh** 449:2
**regard** 477:19
**regarding** 401:20 420:24 422:19 444:6 461:5 466:12 467:10 486:13 494:1
**regional** 405:16 501:12,16
**regularly** 455:13,19,20
**regulators** 494:10,16
**regulatory** 466:10 472:20 488:9,10
**rejecting** 441:20
**related** 419:16,17 505:1,4
**relates** 446:23
**relation** 491:19
**relationship** 409:9 418:22 450:9 477:24 481:15 484:5
**relevance** 510:15,16,20
**relevant** 509:14
**reliable** 478:15
**rely** 417:5
**remain** 491:19
**remaining** 500:1
**remains** 501:8
**remember** 456:5,5 460:13,14 464:7 467:22 470:19 472:8 501:2 507:5
**removed** 422:7
**renewal** 404:2,10,12
**renewals** 441:22
**renewed** 441:5
**renewing** 451:3
**repaid** 481:25 482:3,5
**repayment** 412:24 463:17 466:7 467:5 478:11,16
**reply** 461:12
**report** 405:13,17 421:13 431:8,15 465:2 468:22 469:3,5,14,15 471:11 472:17 487:7 488:3,6,25 489:2,3,5,16 505:12
**reported** 399:23 405:14,18 457:19 472:23,24 473:1 484:1 500:7
**Reporter** 399:23
**reporting** 465:25 506:18
**reports** 421:12 471:9
**represent** 433:22
**representative** 478:6 509:12
**represents** 421:18 433:11 435:8,18,19
**request** 404:9 408:1,7,8 428:5,7 448:7 449:8 450:12 451:3,10 452:15 481:16 483:23
**requested** 451:23 454:2
**requests** 481:13 504:17
**require** 465:20,24 493:9
**required** 481:12 505:18 506:7
**requirement** 419:11 440:7
**reserve** 409:17 412:25 413:6,9,24 462:4 462:9 463:25 466:6 467:4,25 498:24
**reserved** 491:3
**reserves** 461:25 463:19,21 464:2 499:2 506:19,22 508:8,14,15 510:2
**residence** 417:19
**residential** 401:23 437:11,13 459:13 466:13 467:24 471:21 473:8,10,11,17 492:14 495:20
**respect** 468:4 500:11 506:17
**respond** 469:3,10
**responsibilities** 506:21
**responsibility** 477:16 506:19
**responsible** 477:24 488:10
**responsive** 461:9,10
**rest** 485:24
**restrict** 468:2 494:17

**result** 461:23 470:13
**resulted** 418:23
**resulting** 466:10
**results** 439:12
**Resumed** 400:20 456:21 511:13
**retail** 492:14,23
**retires** 456:19 507:14
**retract** 501:12
**return** 400:19 402:13
**returns** 400:15 420:21 457:15
**revealed** 496:4
**review** 402:9 404:16 412:9 427:6 430:15 430:25 431:2,3,7,7,13,14,16,16 432:5 432:15 436:24 438:20,22 461:23 464:13,13,18,20,23,24,25 465:1,14,19 467:9 468:13,22 470:13,18 480:8 484:3 490:23 491:7 496:3
**reviewed** 421:7 430:12,22 432:15 436:25 460:19,21 464:17
**reviewing** 460:15 480:15
**reviews** 417:2 431:2,4 469:25
**reward** 493:6,8,12
**RICHARD** 400:5
**ride** 402:5
**right** 403:14 404:4 407:22 411:6,10,15 411:18,23 413:24 415:11 416:7 417:10 418:20 419:4 421:8 422:20 424:1,11,15 425:6 426:12,21 427:21 430:10,14 431:24 432:2,7,16,23 433:20 434:1 435:1,6,19 436:1,7 437:10 438:19 439:1,2,5 440:6 441:7 441:10,24 443:16,23 444:3,7,17 445:24 448:3,18 449:9,10 450:8,12 451:17 452:11,13 455:14 456:8 457:3 457:5 459:10,18 460:5 461:10,16 464:14,25 465:21 466:24 469:18 472:7 473:9,14,19 474:11 481:3 482:17 483:6 488:2 491:9 496:25 494:4 503:14,23 504:11
**right-hand** 482:20,21
**rising** 463:20
**risk** 402:9 405:19,21 462:6 464:4 466:9 472:5 473:12 474:1 491:2,3 492:1,25 493:6,9,11,11 494:19,20,25 495:8,11 506:22
**riskier** 493:7
**risks** 486:9 499:3
**risky** 493:6
**risk-reward** 493:1,3 494:5
**RMR** 399:23
**Road** 399:18
**roads** 408:13
**Roberson** 453:17
**role** 427:11 506:17
**Romanishin** 399:23 512:19
**RONALD** 399:20
**room** 456:17 507:9
**routinely** 508:8
**running** 507:17

## S

**s** 399:12,17 512:19
**safe** 482:12 488:12 496:15
**sale** 434:1,3 437:24 459:24 466:22,23 467:2,3
**sales** 415:15,18 417:12 432:23 433:1,5 433:14 434:15 439:25 441:4 443:2 462:12,13 466:5
**sampling** 495:2
**Sarasota** 419:14,19,24 422:2
**Sarbanes-Oxley** 505:19
**satisfactory** 433:13 490:23 491:21 496:5
**satisfied** 419:11
**savings** 488:11
**saw** 439:12 468:9
**says** 404:1,2 406:24 408:17 409:16 415:11,17 420:4,18 421:2 422:20 434:16,25 435:8,18 436:2 442:15,23 459:23 460:3,15,23 463:17 466:1,21 466:22 467:15 476:20,21 477:4 478:9 478:18 481:5 483:23 489:7 491:10 492:4 495:19 499:17,23,24 500:22 504:22,22
**scenario** 417:20 449:5 462:8 469:4

495:6
scenarios 476:18 497:6
SCHACHTER 400:3
scheduled 455:13,19,20
screen 438:17 457:17,19 483:15 487:18
   487:19 498:18
scrubbing 461:18
seat 400:19,21 457:16
second 407:20 426:2 438:23 444:5 445:2
   446:22 450:2 453:16 462:24 463:16
   467:23,24 471:5 475:2 486:21,23
   497:7 499:7
secondary 439:7 466:7 467:5
Secretary 403:15,18 425:9
section 403:6 422:18 461:2 492:22
sector 443:6
secure 414:13
securing 406:14
SECURITIES 399:3
security 498:1
see 403:7 404:7,17 412:10 414:4 419:19
   420:7 423:17,24 424:6,13 425:17
   427:18 428:16,22 429:2,21 433:24
   435:22 436:8 443:8 445:2,23 447:24
   448:8 454:1 458:19,19 469:14 471:24
   474:16 476:8,13 478:24 481:17
   483:14,21 484:7 485:25 486:4 489:2
   489:8,12 490:24 491:13,22 492:7,18
   495:23 496:7 498:7,10,16,17,21
   499:15 500:4,9 501:18 502:14 503:14
   503:15 504:12,13 505:13 507:12
seeing 439:9
seen 470:17 471:1 510:3
segregate 414:7
self-explanatory 405:3
sell 411:21 413:6,8 415:2,24 435:11
   436:4 440:2 500:19
seller 422:23 423:5,8,11,15,17 424:11
   424:23 433:5
selling 413:5 435:14
sellout 409:18
send 461:10,10 488:13
sends 458:9
senior 480:1,7
sent 454:9
sentence 434:25 435:8 442:23 467:23
separate 464:14 466:18 487:13
September 461:6 471:21 483:19 499:8
   499:11
SERENA 399:13
series 440:25
serves 414:20 437:6
service 467:6 468:1
session 399:6 509:5
set 410:12,13 411:7 425:16 511:2
severity 496:19
share 408:17 409:13 496:9
sheets 422:6
shift 475:7 486:21
SHINDLER 399:20
shopping 492:22 497:24
short 441:3 474:23
shortly 454:9,14
show 401:2 415:10 487:19 498:3
showing 430:16
sic 423:7 500:25
side 489:15
sign 452:24 506:7
signature 445:22 446:2 452:19
signed 426:11,11 505:16 506:21
significance 423:4
significant 460:3 494:23 505:8
significantly 505:10
signing 505:21
similar 433:17 479:10 484:2 505:19
   506:8 510:1
SIMMONS 400:4
simultaneously 510:24
single 406:5,11,12,24 410:22 416:16,18
   425:2 428:2 450:8 460:19
sir 401:11 402:14 421:1,22 447:20 449:5
   463:15 476:8 478:24 481:17 483:21
   484:7 489:8 490:24 491:13 496:7
   498:21 501:18 502:14
sites 507:12
SITTERSON 400:2

situation 404:13 417:18 462:12 464:4
   478:15 485:20 506:4
situations 462:2,11
six 427:23 428:5 442:21,22 451:4 458:9
   495:21
six-month 444:9 445:19
skin 423:1,21 477:7
slide 438:15
slip 467:19
slips 467:19
slow 417:13 430:18 439:25
slowdown 501:8
slowed 463:19 466:5
slowing 443:2
Slugging 457:5
small 402:3
Snyder 405:18 426:21 429:3 432:13
   449:22 455:4 458:4,9 465:14 468:25
   469:1 470:8
social 507:11
sod 401:14
softened 467:23 468:2
sold 420:12
solution 490:15
solve 490:4
somebody 431:23 434:6
somebody's 417:14,21
someone's 418:4
soon 466:6
sorry 415:15 423:10 425:14,15 429:17
   431:11 436:22 445:3 446:1,9 448:12
   449:24 453:3,4 469:13 475:19,22
   487:10 502:12 504:1
sort 404:17,19 461:19
sound 488:12 496:15
sounds 464:25
source 478:15
sources 463:17 466:7 467:5,6 468:1,2
   478:11 500:18 501:17
south 493:17,23 496:13
SOUTHERN 399:1
special 454:22 466:9 472:15 502:22
specialized 410:5
specific 410:18 439:7 461:3 476:11
specifically 456:9 464:23 466:17 476:15
   476:19 481:5
specifies 412:24
speculating 454:3
speculators 493:16
spending 404:22
spent 459:12 464:11,12
spoke 414:5 416:3 421:4
sponsoring 426:10
spouse 417:15,23,23
spread 492:24
stage 507:18
stamina 457:4
stamp 510:19
standard 425:14
standards 479:7 482:13
standpoint 440:20
stands 419:11
standstill 466:23
star 420:3
start 438:7 457:10,13 474:13 476:6
started 438:4 440:21 443:1 454:20
   461:17 476:8 493:25
starting 439:7 443:8 447:21 501:20
starts 458:4 467:23
state 460:4 505:3
stated 476:22
statement 417:3,14,21 418:4 419:6,6,9
   419:10 420:4,11 422:3 462:16 471:12
   505:2
statements 422:1 500:7 504:20
states 399:1 443:4
Stearns 400:2,3 402:22 430:2 442:3
   443:17 444:20 446:8 448:11 450:17
   453:7 456:12,25 462:24 463:10 465:9
   468:18 470:21 474:6,12,16,19,24
   475:2,11,16,19 476:1 480:6 482:21
   483:4,10,13 484:12,15,16,24 485:5,6
   486:19 487:8,16 498:4,6,15 502:2,5,8
   502:10 504:2,10 506:25 507:21,24
   508:3,18 509:3,18,25 510:14,21
   511:2,6,15

Steeplechase 401:11 428:1 440:4,13
   477:8,8 478:5 503:18,19
step 415:19 456:16 507:19
sticking 457:9
stipulation 494:11
stockholders 493:12
stop 434:17
stopped 442:24
storage 467:19
strange 449:13
strategy 437:18,19
Street 400:6
strength 421:14 462:11
strike 496:11
string 441:3
strong 489:7 491:18
stuck 440:1
study 402:6
stuff 405:3
subject 433:15 434:16,18 442:13 459:7
   497:24
subject's 433:18
submit 484:2
submitted 428:13,14,14 481:14
subpoena 510:22
subpoenaed 510:7,21
subsequent 452:24
substandard 466:10 472:15 502:22
SUCHAROW 399:12
sufficient 464:2
Suite 400:6
Summaries 429:21
summarize 505:11
summarized 466:2,4
summary 403:10 405:9 421:14 425:5
   426:3 427:19 445:23
Sunland 451:3,8
SunTrust 479:25 480:3
supervision 473:4 486:12 488:8
supervisory 492:16
support 417:12 479:5
supported 478:20
supposed 416:9,10
sure 402:10 404:24 409:11 410:11 413:2
   414:13,15 415:10 416:18 423:9,11
   424:25 441:13 442:18 447:5,6 449:11
   461:18,21 462:1 469:4,7 476:17
   482:18 484:13 486:6 497:21
surrounding 494:1
sustained 443:5 480:5 502:1
Synovus 408:24 409:2,4,5
system 414:7 461:18 483:24

T

T 512:14,14
tab 402:15,18 430:1,3 441:24 443:13
   446:7,13
Taipan 447:10 448:5 468:9
take 408:4,25 417:24 433:17 440:23
   456:10,13,16 457:12 464:11 488:23
   493:6,7,11 497:23,24 499:11 503:4
   504:3,5 507:2 510:12 511:4
takedowns 463:20
taken 417:17 433:2 440:14
takeout 468:2 500:17 501:16
takes 414:14 415:1 477:8 488:24 493:5
talk 400:11 439:4,8,16
talked 421:17 423:1 425:20 479:9
   480:13 491:6
talking 439:6 464:12 482:15 503:22
   509:8
talks 411:12,13 414:9 415:6 416:1
   421:14,25 432:19 444:9 472:7 476:15
   495:2
Tampa 405:12
tape 406:17
tax 409:17 420:21
tell 404:6 421:16 429:11 432:11 449:14
   471:5 476:15 487:25 493:20 497:4
   498:23 500:24 502:18 503:12 504:15
template 461:1
temporarily 507:23
ten 456:16
term 404:15 431:7 472:9
terminology 459:20 472:20
terms 412:24 433:6 479:10 506:18

test 457:4
testifying 462:20
thank 401:4,6 402:25 443:20 450:20
   457:22 458:1 475:24 510:10
thanks 402:3 402:23 407:23 431:21
   440:23 443:14 464:12
theme 467:19
themed 401:24 402:1
thing 425:4,15 436:17 477:6 494:20
things 438:5 443:11 466:17 482:15
   485:25 487:12 500:15,20
think 402:14 403:2 407:9 412:10 423:9
   424:6,20 427:3,15 429:9 430:8 438:4
   438:4,16 443:8 449:2,3 450:14
   452:22 453:2 454:2,15 455:22 456:6
   456:7 457:7,22 462:1 467:21 472:9
   472:12 475:1 483:12 497:1 506:1
third 430:15 439:16 446:2 447:20,21,23
   468:2 469:14 498:20 499:5,8,10,20
   501:7
thought 407:12 433:21 482:2
thousand 419:2 497:15
three 405:24 420:4 471:10,19 481:6
Thrift 486:12 488:8
thrifts 488:11
till 488:5
time 403:13 404:23 405:22 406:9,21
   409:9,23 410:11,14,16,16,16 413:4,8
   413:16 420:10,11 422:10,14 427:25
   428:15 433:12 435:13,25 436:12
   437:4,16,23 441:22 442:17 443:1
   454:11,15 455:4,23 459:12 460:21
   461:6,17,19,24 464:1,11,12,15 465:1
   465:1,7 469:22 470:1,5,19 474:14
   475:4 486:11 488:2,4 492:17 495:16
   499:4 500:12,12 503:3
times 406:3 480:23 482:24 489:25
   497:23
timing 457:10
title 414:24 499:14
Tivoli 415:7 445:9,10
today 459:12 482:16
tolerance 506:3
Toole 405:4,11 426:10
top 403:6,7 404:1 427:18 428:10 429:8
   431:22 438:12,16 441:21 458:20
   465:18,21 470:11,13 486:7 501:2
TOPAZ 399:15
topic 410:20 425:5
total 410:21,25 411:4 413:10,11 424:4
   449:17,19 450:5,9 481:14 495:13
totaled 489:10
totalling 495:4
townhomes 447:13
trails 402:4
transcript 399:7 512:16
Trend 415:8,13
trends 489:7 491:11 499:14
trial 399:7 407:12,15
trials 457:3
tries 415:2
triggered 486:1
Tringali 418:17 419:17,22,25 420:20
Tringali's 420:19
trouble 457:17
true 436:16,20 437:5 440:12 454:12
   455:9 475:14
Trust 408:25 409:2,4,7
try 412:10 427:7 483:18 490:4 493:10
   493:11 496:14,18 504:11
trying 413:6 461:20 483:1
turn 403:2,3 420:2 421:1 424:6 425:13
   427:14 428:16 429:24 430:22 432:18
   432:18 438:8 444:5 445:9,22 446:22
   448:24 451:2 473:6 489:22,25 490:11
turned 440:8
Turning 491:9 492:4
twice 454:22
two 405:10 419:13 424:14,16 433:14,14
   445:23 448:7 468:8 475:6 481:10
   482:19 494:3 507:21
two-and-a-half-year 449:10
type 417:20 494:4,21
types 414:8 479:12 492:10
typical 426:3 432:21
typically 413:6 427:7,7 441:2 508:20

**U**

uh 449:13 456:5
Uh-huh 459:25
ultimately 477:9
Um 464:6
unable 440:1
unanimously 481:16
underneath 407:25 416:14 418:16
    420:13 422:18 458:25
undersigned 504:23
understand 404:8 415:14 431:11 463:22
    486:9 507:15
understanding 460:18
undertaking 481:19
underwrite 410:7 496:14
underwriting 412:20 425:20 478:13
    491:3 496:5,11,12 505:4
underwritten 477:9,10 490:22
underwrote 478:6
undisclosed 435:22 436:6,13
undocumented 466:7 467:5,25
undue 510:20
UNGARO 399:8
unit 467:1
UNITED 399:1
units 467:16
unsafe 476:18,20 478:16
unsound 476:18,20
untrue 505:2
updated 455:6
URSULA 399:8
use 403:25 439:1 507:11
useful 474:24
uses 500:18
usually 406:8 488:2
utilities 428:8
utilize 432:5 433:2
utilized 462:15
U.S 399:9

**V**

vacated 468:1
vacation 427:3
vaguely 456:5 509:9
valuations 435:13
value 409:18 418:6 421:17,18,20,22
    423:7,22 432:19,22 433:3,10,13,20
    434:10 435:16,17 436:18,18,19
    497:15
variables 479:14
variety 441:11
various 405:1 409:5 414:8 458:13 461:5
    465:14 469:23 492:9
venture 474:14
ventured 475:14
Ventures 467:15
verbal 433:24,24
verified 423:2
verify 422:20,22 423:1,13,20 425:1
    449:11
verifying 423:4 477:14
version 475:15 487:20 507:16
vertical 473:22
VI 447:10 448:5 468:9
Vice 493:22
view 434:9 496:9
Village 448:25
virtually 493:17
Vista 419:13 420:13,16,18 422:2
VOLUME 399:6
vote 426:14,24 427:9,10 428:22 481:12
    481:16
voted 448:9
votes 426:17,20 430:9

**W**

W 399:13
Wachovia 479:25
wait 425:14 443:11 486:21,23 498:7
waiting 400:17,19 462:25
walk 424:4
want 428:18 438:25 457:11 458:3
    463:15 474:23 476:6,19 482:17
    484:22 490:18,19,19 492:20,21,23
    497:12,13

**wanted** 400:11 401:2 423:6,20 424:24
    485:25 486:4 494:19 497:1,4 506:2
    508:18 511:6
warning 438:19 439:1 483:24
Warren 405:4,11 426:10
wasn't 423:6 436:12 437:14 438:6
    439:11 440:20 447:18 449:12 467:18
    471:16,17 486:2 507:17
wasting 475:3
watch 484:1 485:9 486:2,5 502:13,18,19
    502:20,24,25 503:1,3,13,20
water 428:18
Waterhouse 508:13
way 413:16 425:22 433:7 437:12 467:12
    471:7 473:3 483:16 502:25
ways 475:12
weaknesses 421:25,25
WEAVER 400:2
week 456:1
WEISSLER 400:2
went 402:10 408:22 477:13 489:14
weren't 426:25 455:7 480:19 482:2
West 400:6
wet 467:19
we'll 400:12 404:8 412:10 413:20
    421:24 447:5 457:10,12,12 471:19
    497:23,24 507:12,17 511:2
we're 400:19 404:13,16 410:20 414:16
    438:15 443:8 457:20 469:25 471:20
    475:1,2,3 476:25 478:14 482:15
    483:1 486:7,20 507:1,3,3
we've 458:22
WHITE 399:19
wholly 418:5
wife 420:21
William 399:23 512:19
witness 400:20,23 402:18,19 407:21
    430:1,4 441:25 443:14 446:13 462:17
    474:19 475:24 498:17 507:23 508:12
    508:19 511:13
WITNESSES 511:12
word 438:25 495:3
words 413:4 480:11
work 405:1 406:8 486:23 487:12
    489:25 490:4,14,17,19 498:17 507:25
worked 405:12 508:12
working 457:18 491:7
works 471:17
world 472:11
worry 501:20
worst 472:15
worth 416:22,24 417:6,17 418:13 419:1
    421:19 440:5 497:15
wouldn't 424:18 477:25
write 488:3
written 421:2 425:23 442:10
wrong 449:24
wrote 425:9 472:17

**X**

X 511:11

**Y**

yeah 401:16 410:23,25 422:25 424:8,16
    424:16 427:13 428:7 429:12 430:15
    431:6 433:21 436:2 441:2,25 442:21
    443:8 447:8 448:2 449:2 456:14
    459:22 461:17 462:23 465:4 468:5,15
    471:12 472:9,19 475:14 477:22
    480:23 482:9 497:3,23 501:4,4 504:6
    504:14,16 506:6
year 466:24 486:13 495:13 499:5,9
years 464:16 472:12 479:18,19 489:15
    497:9,12
yesterday 403:9 414:5 421:5,17 423:2
    425:21 430:8 438:9 464:12 472:8
    476:8,25 479:9 496:21 497:4
York 399:14,14

**Z**

ZIVITZ 399:16

**$**

$1 484:6
$1.9 495:4,12

$10 481:15
$15 422:22 423:5,8,15,23 424:10,12
$17.4 500:1
$19 424:15,17
$2 412:3 416:2,9 440:5
$2,650,000 409:17
$20 408:17 409:13 410:10,12,18 411:1
$27 401:13 408:8,22 412:22 424:18
    436:14,25
$27,860,000 409:16
$275,000 419:3
$30 489:11,21,22,23
$300 459:15
$34 424:1,7,10,12 435:4 436:9,20
$34,200,000 434:17,23
$36 449:18 450:7
$40 410:23 411:2,5 449:20
$5.5 450:11
$5.8 500:3
$54 449:17 450:6
$55 449:20
$624,000 420:6
$7 477:20
$7,680,000 409:19
$710,000 428:6,7,23

**0**

05 486:15
06 478:3 486:13,15 499:5,10,11 502:16
    503:13,20 505:16
07 449:9 467:25 478:3
07-61542-Civ-UNGARO 399:2

**1**

1 438:9 451:16 485:24
1,142 401:14 411:13,21
1/06 466:24
10 471:24 472:5,17 473:13 474:2 481:3
    493:15 502:21
10-Q 501:1
10005 399:14
11 471:24 502:21
11:09 456:19
11:21 456:21
11:22 457:15
12 419:10 472:12
12-month 451:23
12-31 499:9
12:27 507:14
12:30 457:11 507:2
12:31 511:9
122 453:2,5,6,8,9 512:4
124 456:11 457:23,25 512:5
125 463:7
13 399:3 451:2 453:11 512:19
138 441:23 442:5 511:19
1395 399:20
14 405:6 427:14 442:8 485:24
14th 399:20 432:2 442:23 454:14 456:2
140 399:14
15 422:20 447:7,8 457:12 484:4 503:5,7
150 400:6
151 475:19
156 475:17
16 403:4 407:17 422:17 425:3 438:10,15
    498:3,6,13,14 512:10
173 467:15
18 424:6 451:6 479:20
183 411:14
188 508:24 509:1
19 452:17
19087 399:18

**2**

2 422:12 428:16 443:23 444:9 445:9,19
    452:15 473:3 486:16,17,18,19,24
    487:14,15 512:12
2:00 507:4,13
20 402:13,15,16,17,24 407:13,15 427:17
    450:23 452:16 503:5 511:17
20th 458:9 459:13
2002 420:19
2003 420:22
2004 422:3,5
2005 405:6 431:24 432:8 435:1,5 437:3

437:6 487:22 494:6
2006 427:21 428:25 437:25 438:4,10
    464:16 483:20 498:20
2007 438:6 439:11 440:1,22,24 441:15
    442:8,24 443:2 444:25 445:5 446:16
    448:17 450:23 451:6,16 452:8,16
    453:11 454:11 461:24,21 465:17
    466:18 467:9 468:4,14 471:21 472:11
    472:22,25
2009 452:17 462:21
2010 399:3 449:9,9 512:19
207 509:2
21 402:19 429:24,25 430:3,5,6 431:23
    483:19 511:18
217 446:6,10,11,12 511:22
22 430:1,3 431:24 465:17 466:18
2200 400:6
23 446:15
23rd 461:11
24 441:24 463:7
25 443:13,14 448:17 479:18
26 427:21
263 509:6
27 446:7,13 468:13
275M 419:1
28 432:8 435:1,4
280 399:18
287 484:15,16,16,19 485:3,4 512:9
29 419:18

**3**

3 434:15 489:6
3A 399:6
3rd 399:14
30 420:3 471:21 487:22 488:16
30th 499:8,8,11
300 459:14
305 399:23
307 482:19,21,22,24 483:2,9,10,11
    484:13
31 428:25 494:6 499:17
31st 499:7 502:16 503:6,13
33 421:1 495:12
33128 399:24
33130 400:6
33131-3302 399:21
340 443:12,19,22 446:1 511:20
341 444:19,22,24 511:21
342 448:10,12,13,15 511:23
343 450:15,19,22 511:24
344 451:12,14,16 512:2
345 452:3,5 512:3
390 468:16,20,22 512:7

**4**

4 405:19 432:18
4:00 455:21
40 488:16 495:13
400 399:24 511:13
401 511:14
402 511:17
430 511:18
442 511:19
443 511:20
444 511:21
446 511:22
448 511:23
450 511:24
451 512:2
452 512:3
453 512:4
457 512:5
46 452:16
46A 452:16
465 512:6
468 512:7
470 512:8
475 511:15
485 512:9
487 512:12
498 512:10

**5**

5 448:24 449:16 450:1 454:1
504 512:11

521

**523-5558** 399:23

---
**6**
---
**6** 450:3 476:10
**65** 409:17

---
**7**
---
**7** 465:8,10,11,13 512:6
**70** 409:18 421:15,17,20,20,21
**75** 412:22

---
**8**
---
**8** 443:5 452:8 463:7 470:20,23 478:17
   491:9 512:8
**888** 503:25 504:1,9 512:11

---
**9**
---
**9** 444:25 445:5 492:4
**9:43** 399:4
**9:44** 400:15
**960** 502:4
**97** 496:22
**99** 420:20