## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 07-61542-CIV-UNGARO/SIMONTON

IN RE BANKATLANTIC BANCORP,
INC. SECURITIES LITIGATION

### PLAINTIFFS' MEMORANDUM OF LAW (1) IN OPPOSITION TO DEFENDANTS' MOTON FOR JUDGMENT AS A MATTER OF LAW ON LOAN LOSS RESERVES, AND (2) REGARDING ISSUE PRECLUSION

BARROWAY TOPAZ KESSLER
MELTZER & CHECK LLP
Andrew L. Zivitz, admitted *pro hac vice*
Matthew L. Mustokoff, admitted *pro hac vice*
Mark S. Danek, admitted *pro hac vice*
Michelle M. Newcomer, admitted *pro hac vice*
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Class Counsel for Class Representatives
and the Class*

LABATON SUCHAROW, LLP
Mark S. Arisohn, admitted *pro hac vice*
Serena Hallowell, admitted *pro hac vice*
Mindy S. Dolgoff, admitted *pro hac vice*
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Co-Class Counsel for Class Representatives
and the Class and Lead Counsel for Lead-
Plaintiff State-Boston Retirement System*

FOWLER WHITE BARNETT P.A.
Ronald D. Shindler
Florida Bar No. 781703
Espirito Santo Plaza, 14th Floor
1395 Brickell Avenue
Miami, FL 33131-3302
Telephone: (305) 789-9222
Facsimile: (305) 789-9201
rshindler@fowler-white.com

*Liaison Counsel for Class Representatives and
the Class and for Lead Plaintiff State-Boston
Retirement System*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................... 1

I.  DEFENDANTS' ARGUMENT THAT THE LOAN LOSS RESERVES ADEQUATELY
    FOREWARNED OF THE RISK IN THE LAND LOAN PORTFOLIO IS INCORRECT
    AS A GAAP ACCOUNTING CONCEPT AND AT MOST IS ONE FOR THE JURY –
    IT IS NOT CASE DISPOSITIVE
    ........................................................................................................................ 5

II. THERE WAS NO ISSUE PRECLUSION HERE WITH RESPECT TO THE
    ADEQUACY OF THE RESERVES ................................................................ 17

CONCLUSION........................................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Clay v. Riverwood Int'l Corp.*,
   157 F.3d 1259 (11th Cir.1998) ...................................................................................12

*In re Fannie Mae 2008 Sec. Litig.*,
   2010 WL 3825713 (S.D.N.Y. Sept. 30, 2010)...............................................2, 5, 6, 7

*Helwig v. Vencor*,
   251 F.3d 540 (6th Cir. 2001) .....................................................................................12

*In re Marsh & Mclennan Co., Inc., Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006).........................................................................11

*Oxford Asset Mgmt. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002) .................................................................................10

*SEC v. Phan*,
   500 F.3d 895 (9th Cir. 2007) .....................................................................................10

*United States. v. Rigas*,
   490 F.3d 208 (2d. Cir. 2007)...................................................................................3, 11

*Ziemba v. Cascade Int'l, Inc.*,
   256 F.3d 1194 (11th Cir. 2001) .................................................................................12

## STATUTES

Fed. R. Evid. 703 ...................................................................................................................4

## PRELIMINARY STATEMENT

Last week, the Court expressed what Plaintiffs hope was only a preliminary view that, with Plaintiffs precluded from arguing that BankAtlantic Bancorp's loan loss reserves were not adequate during the Class Period, it may be difficult for Plaintiffs to maintain their claim that Defendants failed to disclose the risk of loss inherent in the land loan portfolio.  As the Court stated, "part of the problem is that part of what [Plaintiffs] say should have been disclosed is that there were more loan losses coming down the pike . . . So, it's very hard to square that with an agreement that the loan loss reserves are adequate."  Trial Transcript ("Tr.") at 3768. But the fact is that while the reserves represent something very specific in terms of GAAP accounting – an amount sufficient to cover probable and estimated credit losses that have ***already been incurred*** at the time the financial statements are issued – they do *not* disclose the risk in the portfolio.  And it is the magnitude of that risk that Defendants did not fully disclose until October 26, 2007, the bombshell revelation of which caused the stock price to drop.

We have gotten off track in this case with the issue of the reserves.  The defense, insofar as it is based on the implications of adequate reserves during the Class Period which is a highly technical accounting and GAAP concept, should have been presented through expert testimony subject to cross-examination and not through defense counsel who seek to derive conclusive findings based on uninformed and incorrect interpretations of these difficult accounting concepts.

***First,*** the accounting for loan loss reserves and risk disclosures related to high-risk loans are two separate and distinct issues.  GAAP requires the accrual of reserves for existing losses that are *already incurred* at the date the financial statements are issued.  In comparison, risk disclosures focus on risk exposure, including those related to loans, that could significantly change the amounts reported in the financial statements.  The risk exposure is thus not reflected

in the reserves.  *See* Statement of Financial Accounting Standards ("FAS") Nos. 5 ¶8, 114 ¶8 (Arisohn Declaration ("Decl"). Exs. A and B).

The fact that loan loss reserves is a GAAP recordation of current impairments – *not* a means of risk disclosure – is reflected in recent case law.  *See In re Fannie Mae 2008 Sec. Litig.*, 2010 WL 3825713, at *20 (S.D.N.Y. Sept. 30, 2010) ("GAAP makes clear … that reserves are required only for *current* impairments or liabilities as of the date of the financial statements at issue which meet the above-mentioned conditions.") (emphasis in original).   In other words, GAAP requires the bank to accrue for losses in its loan portfolio which impacts the bank's financial statements, but it is not a conduit for risk disclosure.  Defendants' misleading arguments regarding reserves have resulted in these two concepts getting mistakenly conflated by the Court.[1]  Thus, while Defendants disclosed their loan loss reserves on a quarterly basis and Plaintiffs may be precluded from arguing that those reserves were not adequate, the reserves did not, and under GAAP do not, disclose the true extent of risk of loss in the portfolio.  To the extent there is a dispute as to what is disclosed by "adequate" reserves, it is a dispute for the fact finder, not dispositive of Plaintiffs' case.

**Second**, Bancorp's disclosure of its quarterly loan loss reserves does not in any way absolve Defendants of failing to disclose the full truth regarding the deterioration of the BLB and non-BLB loans.  If Defendants truly believed that disclosure of the loan loss reserves adequately disclosed the risk of losses "coming down the pike," then why did Bancorp ultimately disclose its $90 million pipeline of classified assets on October 25, 2007?  Toalson testified that "we were

---

[1] The Court remarked during the trial that "[w]hat the evidence is is that the OTS took no issue with the loan loss reserves.  Now, what that exactly means I do not know, because I'm not a banker.  So, again, every time we get to this issue, I have to stop and say what exactly does that mean."  Tr. at 3060.  This memorandum is designed to assist the Court in better understanding the limited import of adequate loan loss reserves in the larger context of Bancorp's false and misleading public disclosures during the Class Period.

trying to really be, I mean, as transparent as we possibly could be given everything happening in this environment . . . we were trying to be forthright." Tr. at 1951. This begs the question: if Defendants always believed that the loan loss reserves adequately disclosed the risk of loss inherent in the land loan portfolio, then why did they opt ultimately to be "transparent" and "forthright" and disclose the magnitude of their classified loans on October 25, 2007 *in addition to* the $48.9 million loan loss provision taken in the third quarter? The answer is plain: while on the one hand the $48.9 million provision reflected losses that had occurred in the third quarter (a GAAP/earnings concept), on the other hand the classified assets were disclosed (finally) to give investors a blunt indication of the risk exposure going forward.[2] And while GAAP requires the disclosure of adequate loan loss reserves, compliance with "GAAP neither establishes nor shields guilt in a securities fraud case." *United States. v. Rigas*, 490 F.3d 208 (2d. Cir. 2007).

The fact is that other banks did disclose their classified assets to make transparent to investors the "*great snapshot of risk*" that Chief Credit Officer Mindling talked about. Tr. at 330.[3] This bank did not. What is telling is that in 2009, the Financial Accounting Standards Board ("FASB") addressed the issue that disclosure of loan loss reserves is far from adequate in terms of delivering transparency about asset risk to the market. And while Defendants have endeavored to convince this Court that this promulgation is evidence of the fact that they were not required to disclose BankAtlantic's classified assets, what this promulgation really shows is

---

[2] As one analyst reported on the day of the stock price decline, "17% [of the problem loans] are classified suggesting the possibility of migration into nonaccruals in the coming quarters." PX 632 at 2.

[3] Mindling was asked: "And what is the purpose, in your view, of the Loan Watch List?" He answered as follows: "It's a great snapshot of really the high-level risk inherent in the portfolio. So it gives the reader a real good idea as to what the issues are in the various -- really it's nonhomogenous portfolios." Tr. at 330. Of course, the "readers" of the Loan Watch List prior to October 26, 2007 were all internal to the bank.

the regulators' acknowledgment that loan loss reserves disclosure is not the equivalent of full risk disclosure. There is ample evidence in this trial record for the jury to make the same determination.

*Third*, with respect to loss causation and damages, the record of analyst reports in this case establishes that what caused the stock price to decline on October 26, 2007 was an unanticipated – indeed previously concealed – surge in non-accruals and classified assets. PX 632 ("While we suspected there could be more stress, a provision of this magnitude is, in our view, a surprise."). Indeed, one analyst refused to believe management's comment that the huge earnings hit in the third quarter 2007 was due to "market specific challenges" ("we do not believe this is the case") and pointed to the bank's deficient underwriting practices. PX 638. And while Plaintiffs adhered to this Court's order on the Morningstar Report, lest we forget that the Morningstar analyst reported on the next trading day after the price decline that "with the revelation of nearly 4 times as much in questionable loans" as previously disclosed, "faith in management's underwriting, risk-management ability and *forthrightness* has eroded . . . given its *unwillingness to be forthright* about the *risk* in the bank's loan book." (10/29/07 Morningstar Report). This report was not entered into the record as the Court deemed it prejudicial under Fed. R. Evid. 703, but it is one of the "more than a hundred" reports Preston relied upon to opine on the cause for the price decline. Tr. at 2599; *see also* Preston Report (PX 726) at ¶¶ 115-116 (discussing her reliance on Morningstar report).

At bottom, what this case is about is full and frank disclosure, not loan loss reserves. When Defendant Alan Levan told investors on July 25, 2007 that while the bank had $135 million in BLB loans, "we don't for one moment think that that's the kind of risk that we're taking in that portfolio" (DX 8 at 28), this was a grossly misleading statement, given that the

June 30, 2007 Loan Watch List contained $103 million of BLB loans risk-graded substandard

and special mention at the time.  PX 356.  It cannot seriously be argued that such an omission or

Levan's demonstrably false statement of *historical and present fact* that "the [non-BLB]

portfolio has always performed extremely well" (DX 8 at 20) is absolved by Bancorp's

disclosure of a $4.9 million loan loss provision in the second quarter.  Indeed, it is ludicrous that

adequate reserves can insulate such falsehoods when at the time BankAtlantic had $203 million

in classified land loan assets – a magnitude so severe that the Office of Thrift Supervision

("OTS") deemed it a "regulatory concern."  PX 9 at 3, 11.

Finally, Plaintiffs respectfully submit that, based on a further review of Defendants'

summary judgment motion and the Court's August 18, 2010 Omnibus Order, judgment was

granted as to Plaintiffs' claims arising from Bancorp's alleged misstatements and omissions

regarding its reserves.  Accordingly, there is no issue preclusion created by the Court's ruling on

Plaintiffs' earlier Section 10(b) claim regarding inadequate loan loss reserves.

I.    **DEFENDANTS' ARGUMENT THAT THE LOAN LOSS RESERVES ADEQUATELY FOREWARNED OF THE RISK IN THE LAND LOAN PORTFOLIO IS INCORRECT AS A GAAP ACCOUNTING CONCEPT AND AT MOST IS ONE FOR THE JURY – IT IS NOT CASE DISPOSITIVE**

A.    **Loan Loss Reserves Do Not Disclose Existing Risk Exposure**

Loan loss reserves is a GAAP concept based on losses incurred to date and not the risk to

a portfolio going forward.  This accounting concept was recently addressed by Judge Crotty in *In*

*re Fannie Mae 2008 Sec. Litig.*, 2010 WL 3825713, at *20 (S.D.N.Y. Sept. 30, 2010).  As the

court stated, "GAAP makes clear … that reserves are required only for *current* impairments or

liabilities as of the date of the financial statements at issue which meet the above-mentioned

conditions" (emphasis in original).[4]  The *Fannie Mae* plaintiffs had brought a Section 10(b)

claim based on inadequate loan loss reserves, arguing that because the "probability of Fannie's

credit losses had substantially increased due to its heightened exposure to high risk mortgages

and the sharp downturn of the housing market," Fannie was required to increase its reserves.  *Id.*

at *19.  The court dismissed the claim on the grounds that reserves that reflect existing loss do

not reflect existing risk exposure:

> Plaintiffs again mainly support [their] argument with the internal 2007 Home Price
> Forecasting Report indicating a 50% market decline over three to five years.  This
> report, as alleged, would seem to indicate the existence of probable future events

---

[4] GAAP requires an entity to accrue loan loss reserves sufficient to cover probable and estimated credit losses that ***have already been incurred at the time financial statements are issued***.  FAS 5 dictates that an entity must accrue loan loss reserves when it is probable that a loss *has been* incurred as of the date of the financial statements and that loss can be reasonably estimated.  FAS 5 ¶8 (Arisohn Decl. Ex. A).  Similarly, pursuant to FAS 114, a loan is impaired when it is probable that the bank will not be able to collect from the borrower all amounts under the contractual terms of the loans.  *See* FAS 114 ¶8 (Arisohn Decl. Ex. B).  Further, Staff Accounting Bulletin 102, *Selected Loan Loss Allowance Methodology and Documentation Issues*, issued by the SEC, states that loan loss reserves are to be accrued at the date of the financial statements when the loss is probable and estimable.  The focus of GAAP is to ensure accrual of loan losses incurred at the date of the financial statements, *and not the risk of loan losses*.  In short, GAAP prohibits providing for the risk of future losses in loan loss reserves.  *See* FAS 5 ¶70 (Arisohn Decl. Ex. A).

In contrast, the disclosure rules under GAAP require disclosure of risks that are not yet recorded in a company's financial statements.  As noted in SOP 94-6, *Disclosure of Certain Significant Risks and Uncertainties* (Arisohn Decl. Ex. C), such disclosures are designed to help users of financial statements assess risk.  SOP 94-6.01.  Specifically, disclosures focus financial statement users on the risk exposure that could significantly change the "amount reported in the financial statements in the near term."  SOP 94-6.02.  Notably, the focus of disclosures is not what is recorded in the financial statements, but how disclosed risks and uncertainties would change the reported financial statements:

> Whether an estimate meets the criteria for disclosure under this SOP does not depend on the amount that has been reported in the financial statements, but rather on the materiality of the effect that using a different estimate would have had on the financial statements. Simply because an estimate resulted in the recognition of a small financial statement amount, or no amount, does not mean that disclosure is not required under this SOP.

SOP 94-6.17.

confirming the fact of loss.  GAAP makes clear, however, that reserves are required only for *current* impairments or liabilities as of the date of the financial statements at issue which meet the above-mentioned conditions.  The losses forecasted in the report were not *current* impairments or liabilities as of the date of issuance of Fannie's financials for those years.

*Id.* at *20 (emphasis in original in part, added in part).[5]  Despite dismissing the reserves claim, the *Fannie Mae* court did *not* dismiss plaintiffs' other Section 10(b) claim that Fannie misrepresented to the market that it had adequate controls in place to monitor risk to subprime mortgages, *id.* at *13-15, suggesting that compliance with GAAP, and specifically, having adequate loan loss reserves, does not insulate a company or its officers from making misrepresentations or omissions related to the underlying assets.

The principle that reserves are not a reflection of what is believed to be the risk exposure in the portfolio is supported by the evidence adduced at the trial in this case.  When specifically asked about the difference between future risk and what has already come to pass, Chief Financial Officer Valerie Toalson testified that the loan loss reserves were based exclusively on the bank's losses already incurred, *not* the risk in the portfolio going forward:

> Q. In the course of your work on public disclosure, is there a difference between what you are observing at the current moment and what you worry about might happen in the future?
>
> A. Yes.
>
> Q. How do you address those kinds of concerns, the difference between what is happening as you see it as distinguished from what might happen in the future?
>
> A. That's something that probably, you know, takes a lot of our judgment and discussion at any given point in time. ***The financial statements at, say, a quarter end at June 30th or whatever, have to reflect the financial statements as of that date.***

---

[5] Harvey Goldschmid, General Counsel of the SEC, testified before Congress on the issue of financial reporting for loan loss allowances:  "Let us not forget that a loan loss allowance is not cash or capital. Rather, it is management's best judgment of the amount of loan losses ***that have already been incurred by a bank***."  June 16, 1999 Testimony before House of Representatives, Subcommittee on Financial Institutions and Consumer Credit, Committee on Banking and Financial Services, http://commdocs.house.gov/committees/bank/hba57680_0f.htm.  (emphasis added).

> ***And any reserves at that date have to reflect losses that are inherent in, say, the loans as of that date. We can't say oh, but we think we are going to have based on future events all these other losses.  It has to be based on factors as of that certain date***. So that's inherent in our judgment factors that are used to put forth those financial statements.

Tr. at 1900-01 (emphasis added).

BankAtlantic's Controller David Friedman similarly testified that the reserves are not a

function of capturing risk exposure known at the time:

> Q. What are the quantitative reserves?
> A. The quantitative reserves are for groups of loans with like characteristics and they're calculated by taking ***historical loss experience*** over a period of time times the loan balances that are outstanding, you know, less the impaired loans that have been evaluated individually . . . .
> Q. What is a qualitative reserve?
> A. A qualitative reserve adjusts your ***historical loss factors*** to the ***current economic environment….***
>
> Q. And if we look at the second sentence: "Management's analysis should reflect a prudent, conservative, but not excessive ALLL that falls within an acceptable range of estimated credit losses."  Do you see that? …. What does this sentence mean?
>
> A. This sentence means the regulators want you to, let's say, have strong conservative reserves.
>
> Q. What does the language "but not excessive" mean?
>
> A. "Not excessive" means that the reserves are supported.  ***You don't have a lot of unallocated, unsupported reserves that could be construed as you putting future projections in your determination of the allowance for loan loss.  It should be on past events and current economic conditions***.

Tr. at 2930-31, 2934 (emphasis added).[6]

---

[6] This testimony accords with Defense counsel's statements during his opening (Tr. at 220-221):

> Now, how do you establish loan loss reserves? You would be surprised to learn, you are going to learn it in this case, why didn't the bank set aside rainy day money. How come we have this problem? How come they haven't been setting aside money all these years for this problem? The answer is the government doesn't let them. Simple as that. Unless you have losses or a history of losses, you can't just arbitrarily create reserves. And why is that? Because if you create reserves arbitrarily, you are reducing your income and, therefore, reducing your tax liability . . . . Qualitative reserve meaning, okay, ***we have enough losses now***, we can begin to see this is really going south, we need to start building up these qualitative reserves.  (emphasis added)

In light of this testimony from Toalson and Friedman, Defendants cannot possibly argue that the loan loss reserves fully disclosed the magnitude of risk of loss.  At a minimum, it creates an issue for the fact-finder; it is not a basis for a judgment as a matter of law.

What is more, ***Defendants themselves acknowledged*** that loan loss reserves is a GAAP/accounting concept based on losses already incurred – *not* a means of disclosing the true extent of risk:

> Impairment also has a defined meaning under the accounting rules.  The Financial Accounting Standards Board's codification makes plain that a loan is impaired when 'it is probable that the creditor will be unable to collect all the contractual interest and payments as scheduled in the loan agreement,' that 'the concept in GAAP is that impairment of receivables shall be recognized when, based on all available information, it is probable that a loss ***has been incurred based on past events and conditions existing at the date of the financial statements***,' and that '***[i]t is inappropriate to consider possible or expected future trends that may lead to additional losses.***'

D.E. 297 (Defendants' Motion to Exclude Certain Proposed Expert Testimony of Charles D. Umberger), at 6 (citing FASB Codification §310-10-35, at 1; Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio, at 7) ("Losses should not be recognized before it is probable that they ***have been incurred***, even though it may be probable based on past experience that losses will be incurred in the future.") (Arisohn Decl., Ex. D) (emphasis added).  Again, the reserves are not intended to convey the risk exposure of the portfolio, simply losses incurred to date.

Defendants' characterization of the loan loss reserves – both in trial testimony and in briefing – is significant.  The exercise of the reserves is to determine what probable loss (meaning will end up being charged-off) exists in the portfolio as of the end of the quarter.   In other words, the allowance for loan and lease losses ("ALLL") process is one where the calculation of loss is a documentable and auditable process.  Since previous loss experience is a

significant component of this exercise, a bank such as BankAtlantic, with negligible losses in recent years, would not be expected to have a very sizable ALLL – which it did not – until the third quarter 2007. Thus, the ALLL exercise is not the same exercise as an evaluation of the *risk* in the portfolio based on current information. For example, even if the loss reserves were adequate under GAAP, they do not protect against false statements on the *quality* or *risk exposure* of loans for the following reason. A high quality loan may have a 95% chance of being repaid, and a low quality loan may only have a 55% chance of being repaid. The former one may have a passing risk grade of 4 and the latter one may have a failing grade of 11. This may make a huge difference to investors, but may not have any effect on loss reserves because such reserves only need to cover losses that have been incurred or are probable and estimable as of quarter-end. In other words, unless a watch list loan can be said to have a current loss it will have no effect on the amount of reserves.

The materiality of an adequate ALLL during the Class Period and the extent to which it discloses the risk exposure in the portfolio is, at best, a jury issue, but not one warranting judgment as a matter of law. *See Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002) ("The trier of fact usually decides the issue of materiality."); *SEC v. Phan*, 500 F.3d 895 (9th Cir. 2007) ("Determining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'") (internal citation omitted). Regardless of adequate reserves, the jury could certainly find on this trial record that Defendants did not disclose until October 25, 2007 the known risk in the entire land loan portfolio.

     **B.**     **Disclosure of Adequate Loan Loss Reserves Does Not Insulate Defendants From Misrepresentations or Omissions Regarding the Current Known Risk of the Portfolio**

Bancorp's disclosure of its quarterly loan loss provisions does not absolve Defendants of failing to disclose the full truth regarding the deterioration of the BLB and non-BLB loans.  As discussed above, if Defendants really believed that disclosure of the loan loss reserves adequately disclosed the risk of exposure on the portfolio, then there was no reason for them to also disclose the pipeline of $90 million in classified assets on October 25, 2007.  This information was disclosed *in addition to* the $48.9 million loan loss provision taken in the third quarter.  The reason for this is plain:  these two metrics disclosed two distinct types of information:  the classified assets reflected the currently known risk of further non-accruals, whereas the loan loss provision reflected the losses, actual and probable, incurred as of the quarter end.

The courts have held that misrepresentations and omissions under the securities laws can exist without violations of GAAP.  *See In re Marsh & Mclennan Co., Inc., Sec. Litig.,* 501 F. Supp. 2d 452 (S.D.N.Y. 2006) (court sustained securities fraud claims based on false statements regarding contingent commissions even though "Plaintiffs fail[ed] to sufficiently plead a violation of GAAP or the existence of accounting fraud" in connection with income derived from those contingent commissions).  As stated by the Second Circuit in *United States. v. Rigas*, 490 F.3d 208 (2d. Cir. 2007):

> It has been the long-held view in this Circuit that GAAP neither establishes nor shields guilt in a securities fraud case …. Making GAAP compliance determinative of securities fraud charges would require jurors to 'accept the accountants' evaluation whether a given fact was material to overall fair presentation' …. Instead, ***compliance with GAAP is relevant only as evidence of whether a defendant acted in good faith …. Even if Defendants complied with GAAP, a jury could have found, as the jury did here, that Defendants intentionally misled investors.***

*Id.* at 220 (emphasis added).

If Defendants claim the loan loss reserves were adequate for the purpose of disclosing the true risk of the portfolio, they are really saying that the losses in the third quarter had been

sufficiently forewarned.  But if that is the case, then there is no apparent reason why the market was shocked on October 26, 2007 and the stock price plummeted by 38%.  Thus, because of the severity of the stock price reaction, to the extent Defendants claim that the reserves served as an adequate disclosure of the risk, that is a question for the jury—not a basis for directed verdict.

When the Defendants chose to speak to the market about matters beyond the loan loss reserves, *i.e.*, the state of the land loan portfolio and BankAtlantic's underwriting practices, they were required to speak the whole truth about those matters.  The securities laws require that once a party chooses to speak, he or she has a duty to be both accurate and complete and cannot issue half-truths.[7]  Thus, when Defendants made representations and omissions concerning the state of the land loan portfolio and the purported conservative nature of BankAtlantic's underwriting – matters well beyond the loan loss reserves – they had a duty to "provide complete and non-misleading information."  *Helwig v. Vencor*, 251 F.3d 540, 561 (6th Cir. 2001).

For example, when Alan Levan stated on April 26, 2007 that "the portfolios that are borrowers that are buying land for their own development – those are proceeding in the normal course" (DX 5), he had an obligation to disclose that a horde of multi-million-dollar non-BLB loans including Augustine Island, Water's Edge, Frostproof, Brae Burn, Serenby, Waverly, and Whitehall were all not "proceeding in the normal course."  DX15, Ex. A.  Whether or not the loan loss reserves were adequate does not shield Levan's misrepresentations to investors.  Likewise, when Levan stated on July 25, 2007 that "the [non-BLB] portfolio has performed extremely well, continues to perform extremely well," the overwhelming evidence introduced at trial – including the June and July loan watch lists (PX 356, 357), the OTS report (PX 9), which

---

[7] *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001) ("This Court has recognized that a duty to disclose arises . . . '[w]here a defendant's duty to speak would render the defendant's own prior speech misleading or deceptive . . . .'"); *Clay v. Riverwood Int'l Corp.*, 157 F.3d 1259, 1268 (11th Cir.1998) (same).

reflected the "regulatory concern" of $203 million in criticized land loan assets on its loan watch list, and Amy Engelberg's emails demonstrating that the loan watch list contained more than $200 million in criticized loans that she referred to as "ticking time bombs" (PX 454) – shows that the non-BLB portfolio was demonstrably not "performing extremely well."  It strains credulity that Levan's misstatements are somehow immunized by Bancorp's increase in loan loss reserves in the second quarter by a mere $4.9 million – adequate or inadequate.[8]  At best, it is an argument that touches upon scienter and materiality reserved for the jury.

Compelling evidence of the fact that loan loss reserves do not adequately disclose the risk inherent in a portfolio of non-homogenous loans is the Financial Accounting Standards Board's (FASB) recent pronouncement, FASB Accounting Standards Update No. 2010-20 - *Disclosure about the Credit Quality of Financing Receivables and the Allowance for Credit Losses* ("Update 2010-20") (Arisohn Decl. Ex. E).  Through Update 2010-20, FASB will require entities to disclose far more data than reserves to enable "financial statement users" to properly evaluate: "(1) The nature and credit risk inherent in the entity's portfolio of financing receivables; (2) How that risk is analyzed and assessed in arriving at the allowances for credit losses; and (3) The charges and reasons for those changes in the allowance for credit losses."  *Id.* at 1-2.  For bank holding companies, such as Bancorp, Update 2010-20 means that Bancorp must now disclose "Credit Quality Indicators" for all loans in its commercial real estate portfolio by dollar amount

---

[8] Indeed, this is precisely why public companies are required to assess and describe their business and the risks inherent in their business in the Management Discussion and Analysis ("MD & A") section of their SEC filings.  As White testified, the MD & A is "the opportunity for management to go *beyond the numbers, the raw numbers,* and give its insight into the operations of the company so that the reader can understand the business of the company and its activities … the opportunity to … give added insight …."  Tr. at 1572 (emphasis added).  This strongly suggests that a mere disclosure of adequate loan loss reserves is not sufficient to portray the true risk of a loan portfolio and supports the notion that an argument to the contrary is at best a factual argument that should go to the jury.

13

and grade, such as "Pass, Special Mention, and Substandard." *Id*. at 19, 25, 32.  FASB

recognized that the disclosure of Special Mention and Substandard loans by dollar amount is

essential to "help financial statement users assess an entity's credit risk exposure and its

allowance for credit losses." *Id*. at 3.

In addition to FASB, five other federal banking regulatory agencies including the OTS,

the FDIC and the Federal Reserve recognize that the mere disclosure of loan loss reserves does

not adequately disclose the risk inherent in a financial institution's loan portfolio.  For example,

in a September 2009 letter to FASB, the banking regulatory agencies noted that the mere

disclosure of loss reserves was insufficient to apprise a shareholder of the risk inherent in a loan

portfolio and stated, "[w]e support the concept of providing ***enhanced disclosures of qualitative***

***and quantitative information*** about allowances and loan quality that will improve the decision

making abilities of investors as well as other users of financial statements."  September 10, 2009

letter from Office of Comptroller of the Currency et al. to FASB (Arisohn Decl. Ex. F) (DX 443,

not admitted in evidence).  Thus, there is a clear recognition among the banking regulators that

disclosure of loan loss reserves (and their presumed adequacy) does not disclose the credit risk

inherent in an institution's loan portfolio.

In light of these regulatory agencies' view that the disclosure of adequate loan loss

reserves is inadequate for purposes of disclosing the risk exposure to classified assets, it is not

the least bit surprising that no less than 220 financial institutions (117 of which trade on

NASDAQ and 113 of which trade on the New York Stock Exchange or another exchange)

disclosed their substandard and special mention loans during the October 2006 to December

2007 time period.[9]

---

[9] These 220 financial institutions are listed on Exhibit G to the Arisohn Declaration.

**C.    The Commentary of Market Analysts Creates A Genuine Issue of Fact As to What Caused Bancorp's Stock Price to Decline By 38% On October 26, 2007**

The Court made a critical observation during the course of the trial, noting, "Why can these two things not coexist in the same universe:  Bad underwriting and adequate loan loss reserves?"  Tr. at 3063.  Indeed, such an observation is directly in line with what the analyst community was thinking when Bancorp announced the cratering of the land loan portfolio on October 25 and 26, 2007.  An analyst from JP Morgan, commenting on the Company's quarterly results following the October 25 and 26, 2007 press release and conference call, noted the following:

> Management attributed much of the deterioration within the CRE acquisition and development portfolio to market specific challenges and does not believe it is a function of lax underwriting standards.  However, in light of the magnitude of the jump in NPAs [non-performing assets] and size of the reserve charge, ***we do not believe this is the case.***

PX 638 at 2 (emphasis added).  Regarding her reliance on the JP Morgan report in rendering her opinion that the stock price decline was 100% due to the negative announcements regarding the land loan portfolio, Plaintiffs' damages expert Candace Preston testified that

> this is an example of the fact of how important this change was, and this is an example of how the market for the first time is understanding the importance of the underwriting standards and the fact that in this analyst's opinion the bank probably did not adhere to appropriate underwriting standards. …. When I looked at [this report], I said, well, this helped cure – the statement the company made on October 26th did in fact help cure that misrepresentation that I had assumed previously …. So, one of the things that we had assumed was not disclosed prior to this were problems within the underwriting policies and procedures and the company didn't follow them. This is an indication that, although the company didn't reveal that to the market, at least some market participants understood that.

Tr. at 2604-05.  In light of this evidence that the materialization of the concealed risk posed by deficient underwriting caused the stock price decline on October 26, in addition to the substantial

evidence of the deficient underwriting itself,[10] it is far from conclusive that the disclosure of the loan loss reserves taken in the third quarter 2007 was the cause of the price decline.

Preston further testified that the $90 million pipeline of classified assets – disclosed for the first time on October 25, 2007 – was new information that caused the price decline.  Tr. at 2600-01, 2606-09.   Two analyst reports highlighted the revelation of the magnitude of classified assets.  PX 630 at 1 ("Pipeline for NPAs.  Management noted $90mm classified loans in at-risk loan categories within the CRE portfolio."); PX 632 at 2 ("The problem loans almost all come from the commercial residential portfolio . . . 17% are classified suggesting the possibility of migration into nonaccruals in the coming quarters").  Coupled with this evidence that the first-time shock of these classified loans caused the stock price decline is the utter *lack* of quantitative evidence in the trial record that the risk of the land loan portfolio followed the market, as noted by the Court.  Tr. at 3062-63.  There is also no competent expert evidence from the Defendants offering a competing interpretation of the analyst reports to refute Preston's testimony on causation and damages.  In light of this disparity of evidence, it is at best a jury question as to whether the precipitous decline was caused by the fact that the reserves had to be dramatically increased at the end of the third quarter or whether Bancorp was disclosing for the first time the true extent of the risk exposure on the portfolio.[11]

---

[10] *See, e.g.,* PX 1156 at 32 (Dec. 2004 Loan Officer Memo for Hernando Oaks II identifies the borrower's "lack of cash equity" as a weakness); PX 21 at 3 (July 22, 2005 Review appraisal for Steeplechase loan identifies a prior sale between two related parties as a "flip" transaction); DX 652 at 1 (January 12, 2006 – BankAtlantic has a total exposure of $5.6 million to a borrower with an adjusted net worth of $140,000); PX 225 (March 30, 2006 – Alexander notes that MLC never vets the ownership composition or purchase and sale information for a property prior to approving a loan); DX 655 (June 8, 2006 – Appraisal for land that was the subject of the Frostproof Acres, LLC loan identified part of the land as inhabited by a protected species); PX 200 at 1 (June 1, 2007 – Alexander discussing circumstances surrounding a MLC decision to lend over $60 million to a borrower with adjusted net worth of negative $10,000,000).

[11] To the extent Defendants maintain that "the market" caused the price decline, it should be

Indeed, the evidence shows that by June 2007 the land loan portfolio contained $164.6 million in substandard and special mention loans (PX 356) and that by July 2007 the land loan portfolio contained $206 million in substandard and special mention loans (PX 357) – none of which was disclosed at the time.  Nevertheless, on July 25, 2007, Alan Levan told investors that his concerns did not go beyond the BLB asset class and that the rest of the land loan portfolio "has always performed extremely well, [and] continues to perform extremely well."  DX 8 at 20.  After Levan falsely assured the market that the problems were limited to the BLB portfolio (as found by this Court, *see* D.E. 411), market analysts confirmed this.  *See* DX 331 at 3 ("Non-Land Bank Portfolio is Showing No Weakness."  An analyst from SunTrust Robinson Humphrey gave Bancorp a "Buy" rating following Levan's comments and reported that "[a]sset  quality was stable in the quarter."  PX 609.  *Remarkably*, this analyst further reported that "despite stable asset quality, *[Bancorp] increased its loan loss reserve by 1.19%. Id.* (emphasis added).  This is as telling as anything on the issue of the reserves.  ***It shows that a company can disclose adequate loan loss reserves and nonetheless simultaneously lie about the extent of its risk exposure.***

## II.       THERE WAS NO ISSUE PRECLUSION HERE WITH RESPECT TO THE ADEQUACY OF THE RESERVES

---

noted again that Preston, through her Event Study, accounted for the effect of any general market or industry factors on the April and October 2007 stock price declines.  So to the extent Bancorp's stock price declined on these days, any general market or industry volatility was accounted for.  To be sure, Preston testified that while an investor in Bancorp stock would have seen its investment decline by $8.50 per share from October 19, 2006 to October 25, 2007, Plaintiffs are only claiming $0.37 in per share inflation for the first six months of the Class Period and $3.15 in per share inflation for the last six months of the Class Period (capped at $2.93 as a matter of recoverable damage) -- the amounts that represent the residual, or *company-specific*, declines in the stock price on the two days associated with the alleged corrective disclosures and announcements of the materialization of concealed risk.  To the extent Defendants contend that "the market" caused the damages to the Class, again, there is no quantitative or competent expert evidence to support that contention.

As a follow-up to the November 5, 2010 conference call with the Court, Plaintiffs respectfully submit that a further review of the record supports a finding that the Court entered judgment on Plaintiffs' "claim" concerning the adequacy of Bancorp's loan loss reserves and did not specifically adjudicate any of the "issues" underlying that former claim.  On August 18, 2010, the Court entered an Omnibus Order ruling, *inter alia*, that "Defendants are entitled to summary judgment as to the following:  … Plaintiffs' ***claims*** arising from Defendants' alleged misstatements or omissions regarding BankAtlantic's loan loss reserves."  D.E. 411 at 62.  The Court's Omnibus Order (at 45) evidences the Court's understanding that Plaintiffs had decided not to pursue their "claim" at summary judgment – *not* that they were accepting the accuracy of the reserves:

> Defendants' sole argument on this point is that Plaintiffs' concession that the Bank adequately reserved for loan losses in connection with its land loans leads to the necessary conclusion that any statements Defendants made regarding those loans were forward looking.  The Court is unconvinced.  ***The mere fact that Plaintiffs concede they have no claim based on the adequacy of the Bank's loan loss reserves*** does not, in itself, render all the allegedly fraudulent statements made by Defendants forward looking.  (emphasis added).

Plaintiffs' intention since April 2010 has always been to voluntarily dismiss their claim concerning loan loss reserves; not to concede the sufficiency of the reserves.  As noted during these proceedings, Plaintiffs initially moved to amend their complaint to include new evidence acquired during discovery and to abandon certain claims including their Section 20A claims and GAAP claims concerning loan loss reserves to streamline the case for trial.  D.E. 208.  While the Court denied the Motion to Amend it recognized Plaintiffs' intention, *inter alia*, to abandon certain *claims* through the filing of the Second Amended Consolidated Complaint.  D.E. 242.

On June 3, 2010, Defendants filed a motion for summary judgment seeking judgment on the "***claim*** of financial statement fraud during the class period":

18

> BankAtlantic accurately calculated its non-accruals throughout the class period, BankAtlantic properly established allowances for loan loss reserves throughout the class period, Bancorp accurately reported the effect of those allowances for loan loss reserves on their financial results, and therefore ***claims*** that Bancorp's financial statements were incorrect or fraudulent cannot be sustained. Defendants are entitled to judgment in their favor on the ***claim*** of financial statement fraud during the class period.

Defendants' Motion for Summary Judgment (D.E. 412 at 2) (emphasis added); *see also*

Defendants' Corrected Mem. of Law in Support of Motion for Summary Judgment (D.E. 261 at

2) ("In proposing yet another amended complaint purportedly based on discovery, Plaintiffs have

abandoned these ***claims***.") (emphasis added).

In light of the foregoing, the record is clear that Defendants sought judgment on the

reserves "claim" – not an adjudication of the individual elements or issues underlying the claim.

That request for relief is mirrored in this Court's Order on the Motion. *See* D.E. 411 at 4

("Defendants are entitled to summary judgment as to the following: … Plaintiffs' ***claims*** arising

from Defendants' alleged misstatements or omissions regarding BankAtlantic's loan loss

reserves.") (emphasis added). In response to Defendants' Motion and as evidenced by their

motion to amend filed two months earlier, Plaintiffs agreed to abandon their loan loss reserve

claim by not contesting Defendants' motion for summary "judgment in their favor on the ***claim***

of financial statement fraud during the class period." D.E. 261 at 2 (emphasis added).

Notwithstanding Plaintiffs' intention to not oppose Defendants' Motion addressed to the reserves

"claim," Plaintiffs inartfully stated that they did not challenge the Motion on the "issues relating

to the accuracy of BA's allowance for loan loss provisions." D.E. 335 at 1 n. 3.

Because (1) Defendants have always understood that Plaintiffs intended to abandon the

loan loss "claim," (2) Defendants' summary judgment motion sought dismissal of the loan loss

"claim," and (3) the Court dismissed the loan loss "claim" in its Omnibus Order without a

determination of the merits underlying each element of the claim, Plaintiffs respectfully submit

that the issues underlying the loan loss claim have never been adjudicated and thus, were not

essential to the Court's determination of Defendants' motion.  As such, Plaintiffs respectfully

submit that they should not be estopped from challenging Defendants' contention that Bancorp's

loan loss reserves were adequate.

<u>**CONCLUSION**</u>

Plaintiffs respectfully request that the Court (1) deny Defendants' motion for judgment as

a matter of law and (2) find that there is no issue preclusion with respect to the adequacy of

Bancorp's loan loss reserves.

Date: November 7, 2010                              Respectfully submitted,

/s/ Mark S. Arisohn
Mark S. Arisohn, admitted *pro hac vice*
Serena Hallowell, admitted *pro hac vice*
Mindy S. Dolgoff, admitted *pro hac vice*
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Co-Class Counsel for Class Representatives
and the Class and Lead Counsel for Lead
Plaintiff State-Boston Retirement System*

Andrew L. Zivitz, admitted *pro hac vice*
Matthew Mustokoff, admitted *pro hac vice*
Mark S. Danek, admitted *pro hac vice*
Michelle M. Newcomer, admitted *pro hac vice*
BARROWAY TOPAZ KESSLER
MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610)667-7056

*Co-Class Counsel for Class Representatives*

*and the Class*

FOWLER WHITE BURNETT P.A.
Ronald D. Shindler,
Florida Bar No. 781703
Espirito Santo Plaza, 14th Floor
1395 Brickell Avenue
Miami, FL 33131-3302
Telephone: (305) 789-9200
Facsimile: (305) 789-9201
rshindler@fowler-white.com

*Liaison Counsel for Class Representatives and the Class and for Lead Plaintiff State-Boston Retirement System*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 7, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Ronald D. Shindler
RONALD D. SHINDLER

## SERVICE LIST

Adam M. Schachter
Eugene E. Stearns
Gordon M. Mead, Jr.
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SITTERSON, P.A.
150 W. Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305)789-3400
Facsimile: (305) 789-3395
aschachter@stearnsweaver.com
estearns@stearnsweaver.com
gmead@sternsweaver.com