**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 07-61542-CIV-UNGARO/SIMONTON

IN RE BANKATLANTIC BANCORP, INC.
SECURITIES LITIGATION
_____/

**DEFENDANTS' MOTION FOR A NEW TRIAL AND SUPPORTING MEMORANDUM**

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Eugene E. Stearns
Richard B. Jackson
Adam M. Schachter
Cecilia D. Simmons
Gordon M. Mead, Jr.
Andrea N. Nathan
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3200
Facsimile:   (305) 789-3395

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     This Court Committed Prejudicial Error by Accepting Plaintiffs' Form
of Verdict That Precluded Jury Resolution of the Factual Predicates
Assumed by Plaintiffs' Damages Expert as Necessary Conditions to
Her Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.    The Operative Pleading and Candace Preston's Expert Report. . . . . . . . . 2

        B.    The Liability Assumptions and Summary Judgment Order
Required Proof of BLB Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        C.    Candace Preston Admitted at Trial That Her Testimony
and Opinion Depended on a Jury Finding That the Facts She
Was Asked to Assume Were True, Were True. . . . . . . . . . . . . . . . . . . . . . 5

        D.    The Failure to Submit Candace Preston's Factual Assumptions to
the Jury At Least Requires a New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    This Court Committed Prejudicial Error In Permitting Plaintiffs To
Attempt To Prove a Causation and Damages Claim Never
Pleaded, Completely Unsupported by Admissible Record Evidence,
and Never Submitted to the Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   This Court Committed Prejudicial Error in Refusing to Give
At Least Five Instructions And In Refusing to Use the Verdict Form
Submitted by the Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    Refusal to Give an Assumptions Instruction and Submit a
Verdict Form Question About Proof of Those Assumptions. . . . . . . . . . . . 9

        B.    Refusal to Give a Collapsing Markets Instruction. . . . . . . . . . . . . . . . . . 10

        C.    Refusal to Give an Instruction about the Need to Disaggregate
Non-Fraud Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        D.    The Erroneous $2.93 Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        E.    Refusal to Give an Instruction About Corrective Disclosures. . . . . . . . . . 16

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

IV.   This Court Committed Prejudicial Error in Instructing the Jury
      That Alan Levan's July 25, 2007 Statements Were False. . . . . . . . . . . . . . . . . 17

      A.   This Court's Prior Rulings Concerning Alan Levan's
           July 25 Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      B.   Alan Levan's July 25 Statements Cannot Serve as a
           Basis for Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           1.   Non-Actionable Statements Protected by the Safe Harbor. . . . . . 19

           2.   Truth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           3.   Scienter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

           4.   Proximate Cause and Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      C.   This Court's Instructions Concerning Alan Levan's
           July 25 Statements Require a New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.    This Court Committed Prejudicial Error by Excluding
      Defendants' Proposed Expert Testimony and Evidence
      Concerning Other Financial Institutions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      A.   Stephen Morrell — Florida Economy. . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      B.   Jack DeWitt — Banking and Bank Regulation. . . . . . . . . . . . . . . . . . . . 26

      C.   Michael Keable  — Economics and Damages. . . . . . . . . . . . . . . . . . . . . 26

      D.   Evidence Concerning Other Financial Institutions. . . . . . . . . . . . . . . . . 27

VI.   This Court Committed Prejudicial Error in Allowing the
      Introduction of Eight Perry Alexander Emails Into Evidence. . . . . . . . . . . . . . 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*Aronowitz v. Health-Chem Corp.*,
   513 F.3d 1229 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bastian v. Petren Resources Corp.*,
   892 F.2d 680 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bateman v. Mnemonics, Inc.*,
   79 F.3d 1532 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

*Bickerstaff v. Vassar College*,
   196 F.3d 435 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic*,
   152 F.3d 588 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brough v. Imperial Sterling Ltd.*,
   297 F.3d 1172 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15

*Burger King v. Mason*,
   710 F.2d 1480 (11th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
   594 F.3d 783 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ehlert v. Singer*,
   245 F.3d 1313 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Griffin v. Matherne*,
   471 F.2d 911 (5th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

*Guidry v. Kem. Mfr. Co.*,
   598 F.2d 402 (5th Cir.), *rehr'g denied with opinion*, 604 F.2d 320 (5th Cir. 197). . . . . . . 7

*Harris v. IVAX Corp.*,
   182 F.3d 799 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*In re Columbia Laboratories, Inc. Securities Litigation*,
   144 F. Supp. 2d 1362 (S.D. Fla. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Republic Services*,
   134 F. Supp. 2d 1355 (S.D. Fla. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Scientific Atlantica, Inc. Sec. Litig.*,
   No. 1:01-CV-1950-RWS, 2010 WL 4793386 (N.D. Ga. Nov. 18, 2010). . . . . . . . . . 13-15

*In re Williams Sec. Litig.-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kuhn v. Ball State University*,
   78 F.3d 330 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12

*Milan Express v. Averitt Express, Inc.*,
   254 F.3d 966 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Milwaukee Branch of the NAACP v. Thompson*, 1
   16 F.3d 1194 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Peat, Inc. v. Vanguard Research, Inc.*,
   378 F.3d 1154 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Prentice v. Zane's Administrator*,
   49 U.S. 470, 484 (1850).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Proctor v. Fluor Enterprises, Inc.*,
   494 F.3d 1337 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*R.B. Co. v. Aetna Ins. Co.*,
   299 F.2d 753 (5th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower  ▪  150 West Flagler Street, Suite 2200  ▪  Miami, FL 33130  ▪  (305) 789-3200

*Rand v. Nat'l Fin. Ins. Co.*,
    304 F.3d 1049 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ray v. Citigroup Global Markets, Inc.*,
    482 F.3d 991 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Robbins v. Koger Props. Inc.*,
    116 F.3d 1441 (11th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*SEC v. Siebel Systems, Inc.*,
    384 F. Supp. 2d 694 (S.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Stewart & Stevenson Servs., Inc. v. Pickard*,
    749 F2d 635 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Theoharous v. Fong*,
    256 F.3d 1219 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Cooper*,
    277 F.2d 857 (5th Cir. 1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## **STATUTES**

15 U.S.C. § 78u-5(i)(l). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15 U.S.C. § 78u-5(c)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower  ▪  150 West Flagler Street, Suite 2200  ▪  Miami, FL 33130  ▪  (305) 789-3200

Defendants BankAtlantic Bancorp, Inc. ("Bancorp"), John E. Abdo, Alan B. Levan, Jarett S. Levan, Valerie C. Toalson, and James A. White respectfully move for a new trial pursuant to Federal Rule of Civil Procedure 59 and submit the following memorandum in support thereof:

## INTRODUCTION

The jury verdict cannot be the basis of entry of any judgments in favor of any Plaintiffs in this case.  The magnitude of prejudicial error in the trial of this case, invited by Plaintiffs, is simply overwhelming.  Defendants are entitled to judgment in their favor as a matter of law, and they incorporate their arguments supporting that motion made at trial as well as the accompanying post-trial written motion and memorandum for such a judgment by reference and in their entirety.  This motion and memorandum seeks, in the alternative, a new trial.[1]

## THE VERDICT MUST BE VACATED AND, AT A MINIMUM, A NEW TRIAL MUST BE HELD

**I.      This Court Committed Prejudicial Error by Accepting Plaintiffs' Form of Verdict That Precluded Jury Resolution of the Factual Predicates Assumed by Plaintiffs' Damages Expert as Necessary Conditions to Her Testimony**

An essential element of a securities fraud case is damages.  Here, Plaintiffs purported to establish damages through the testimony of Candace Preston who was given, by Plaintiffs' counsel, certain factual assumptions upon which the entirety of her testimony was predicated.  There was no dispute at trial that Preston's testimony was worthless if the jury did not find all of those factual

---

[1]Federal Rule of Civil Procedure 50(c)(1) also provides that if the Court grants a renewed motion as a matter of law, it should also conditionally rule on whether a new trial is necessary if that determination is ultimately reversed.  Defendants therefore respectfully request that in addition to granting their motion for judgment as a matter of law, this Court should also conditionally grant a new trial on the issue of liability and damages based on all of the other errors identified in these motion papers.  If the Eleventh Circuit were somehow to deem judgment as a matter of law in favor of the Defendants to be inappropriate, a new trial would then still be required.  At an absolute minimum, however, a new trial is required consistent with the standards set forth in Federal Rule of Civil Procedure 59.  Rule 59(a)(1) permits a federal court to grant "a new trial on all or some of the issues" as to any party "for any reason for which a new trial has heretofore been granted in an action at law in federal court."

Stearns Weaver Miller Weissler Alhadeff & Sitterson, p.a.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

assumptions to be true.  Nor does the controlling case law differ from that conclusion. Absent the establishment of its predicate factual assumptions, the entire expert testimony must be discarded.

## A.    The Operative Pleading and Candace Preston's Expert Report

The First Amended Consolidated Complaint, which is the operative pleading after the Court properly denied Plaintiffs' pre-trial motion for leave to amend, repeatedly describes a scheme-to-defraud case and a fraud-on-the-market theory.  *E.g.*, D.E. 80 ¶¶ 1, 13, 221, 234, 238-42.[2]  The Court's summary of the alleged scheme consumed few words.  Plaintiffs alleged that BankAtlantic made bad land acquisition and development loans through careless underwriting, which Defendants allegedly concealed through public statements to the effect that loan underwriting had been "conservative." D.E. 70 at 5; D.E. 94 at 3-4. When the loans started to go bad, Defendants identified only one class of loans that had problems causing concern, while concealing identical problems with other land acquisition and development loans. D.E. 70 at 7.

The Court's summary of Plaintiffs' case was virtually identical to the factual assumptions given by Plaintiffs to their damages expert, Candace Preston, proof of which was made, by Plaintiffs, a necessary condition of her entire opinion and testimony.  Plaintiffs' Ex. 726.  Paragraph 10 of Preston's report sets forth her factual assumptions as follows:

>    10.    Counsel for Plaintiffs has asked me to make the following assumptions, based on the facts and claims which Counsel for Plaintiffs intend to prove a trial in this matter.
>
>    a.    At least from the beginning of, and throughout the Class Period, Defendants knew or recklessly disregarded the true state of the land loan portion of BankAtlantic's commercial real estate ("CRE") portfolio.
>
>    b.    At least from the beginning of, and throughout the Class Period, Defendants were aware of, misrepresented and failed to disclose the credit quality of their borrowers and the quality of the loans in the land loan portion of the CRE portfolio.

---

[2]References to "Defendants' Ex. __" and "Plaintiffs' Ex. __" are to proposed or admitted trial exhibits; references to "DXID __" are references to Defendants' Exhibits marked for identification and used with witnesses; references to "Tr. __" are to the trial transcript; references to "D.E. __" are to documents filed and docketed with the Court; references to "Mead Aff. Ex. __" are to the accompanying Affidavit of Gordon M. Mead, Jr. Submitted in Support of Defendants' Motion for a New Trial and dated December 17, 2010.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

     c.      During the Class Period Defendants provided the public with false and/or misleading information or omitted material information necessary to make other statements not misleading concerning the quality of the assets in the land loan portion of the company's CRE portfolio, the "conservative" nature of its underwriting, and the collateral supporting the loans.

     d.      By November 29, 2006 Defendants should have disclosed that, contrary to their assertions that they were unaware of any upcoming credit quality trends or problems and that they were comfortable with their borrowers, they were seeing an increase in problem loans and had identified at least the $27.1 million Nature Walk loan and the $12.6 million Priority D (Entrada) lands as problem loans and downgraded them to level 10.[3]

     e.      By April 26, 2007, Defendants should have disclosed that:

          i.      contrary to their assertions that their land bank portfolio presented risks not present in the other segments of the CRE portfolio, the problem and potential problem loans were, in actuality, distributed throughout the land loan portion of the CRE portfolio;

          ii.      the number and dollar value of the land loan portion of the CRE problem loans on the loan watch list ("LWL") and the potential problem loans as of April 26, 2007;[4] and

          iii.     the trends and concerns expressed by management as of that date, representative samples of which are detailed below.

Plaintiffs' Ex. 726 ¶ 10 (not admitted but Paragraph 10 published to the jury).

---

[3]The Court struck this factual assumption and the opinion which followed it in the Omnibus Order addressing Candace Preston's testimony and summary judgment. D.E. 411 at 34-35.

[4]It was undisputed at trial that, at the time of the April 26, 2007 conference call, BankAtlantic had loans with a principal amount of approximately $42 million listed on the internal watch list, $21 million of which were publicly reported as non-accruing loans. It was also undisputed that the remaining $21 million of watch list loans were builder land bank loans and that, not only did the company disclose concerns regarding those loans and indicate that they were being carefully watched, the company's disclosure went further, disclosing that similarly structured loans in the amount of $130 to $140 million posed similar concerns and were also being watched. Thus, even were the failure to disclose watch list actionable — it is not — this assumption failed as well because it was indisputably untrue.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

**B.      The Liability Assumptions and Summary Judgment Order Required Proof of BLB Fraud**

Those assumptions were modified with the approval of the Court when, over Defendants' objections, it ruled on summary judgment as follows:

> In her report, Preston assumes that at the beginning of and throughout the class period, Bancorp misrepresented the quality of the assets in the land loan portion of BankAtlantic's CRE portfolio....
>
> In her affidavit, Preston explains that her opinion does not purport to focus only on the non-BLB land loans, but instead the entire land loan portfolio: "Defendants claim that the allegations are somehow limited to [LAD] and [LADC] loans — at the exclusion of the BLB loans.  I am advised by Counsel that this is incorrect."  Accordingly, the Defendants' arguments regarding the failure to disaggregate the BLB loan information do not go to the reliability of Preston's opinion because Preston is explicitly offering an opinion on the residual decline attributable to information regarding the entire land loan portfolio, including the BLB loans.

D.E. 411 at 20, 33 (footnotes and citations omitted).

This Court also made plain in the summary judgment order that Plaintiffs would be required to prove BLB fraud, as one of Preston's assumptions.  In a footnote regarding BLB fraud in the summary judgment order, this Court indicated as follows:

> [T]he Court will revisit this issue should it become apparent that Plaintiffs have put forth insufficient evidence to support a fraud claim relating to the BLB loans which extends past the April 2007 disclosures.

D.E. 411 at 33 n. 26.[5]

---

[5]Plaintiffs prior to trial then filed a proposed verdict form with some 20-plus supposed misrepresentations or omissions, abandoning the case they had previously pleaded. D.E. 465.  As this Court initially explained when Plaintiffs' counsel tried to argue that they had previously articulated a case about some 20-plus separate misstatements:

> But that isn't what you've pled.  That is not the claim that's been plead in the case, as I recall.  My recollection is you've pled a fraud on the market case.  So, we're not going to turn the case into a specific misrepresentation case.  That's not what's been pled here.

Oct. 5, 2010 Hearing Tr. 29. It is unclear when and why the Court decided to permit Plaintiffs to try a liability case about some 20-plus omissions and misrepresentations that bore no relationship to Preston's damages analysis or opinion.  There was no motion for amendment or leave to amend, and, as explained below, Defendants objected vigorously to Plaintiffs' counsel's refusal to question Candace Preston about Paragraph 10 and ultimately defense counsel obtained the testimony confirming that Paragraph 10 contained her critical factual assumptions that needed to be proven.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

**C.      Candace Preston Admitted at Trial That Her Testimony and Opinion Depended on a Jury Finding That the Facts She Was Asked to Assume Were True, Were True**

At trial, Preston admitted that Paragraph 10 of her expert report set forth the factual findings essential to her testimony and that, if the jury did not find those facts to have been established, her testimony was entitled to no weight:

> Q.      And if those opinions [in Paragraph 10] are not true, then your opinion on damages, I think you would agree, isn't of much moment?
>
> A.      Correct.  If there is no liability, then there are no damages....
>
> Q.      So if the jury finds those allegations [in Paragraph 10(a-c)] are not proved, this would effectively render your opinion for the October 06 to April period meaningless; fair enough?
>
> A.      Correct.  If the jury finds no liability, there will be no damage.
>
> Q.      If the jury finds these specific facts which you used to assume to render your opinion, correct?
>
> A.      Yes, sir.  If the jury finds the assumptions that I have made here, there is no liability related to those, then there would be no damage.

Tr. 2668-69.

Further, reflecting the Court's Omnibus Order, Candace Preston confirmed that absent proof of BLB fraud, her opinion was worthless:

> Q.      Is it your belief that you were asked to assume that the company from April '07 through October '07 did not adequately warn the market of the risk in its builder land bank portfolio?
>
> A.      That's correct.
>
> Q.      So in other words, if the jury finds that the company did adequately warn of the risk of the builder land bank portfolio, then your opinion as to the damages in October is wrong, correct?
>
> A.      The jury would not find liability, so they would not find damages.

Tr. 2691.

She repeated:

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Q.      So we are perfectly clear, if the jury finds no fraud with the BLB portfolio from April to October, then your entire opinion dies?

A.      I[f] the jury finds no fraud related to the assumptions that I have made regarding the land loan portfolio, including the disclosure of the other risks other than those that were disclosed, and including the assumptions regarding the fact that the company didn't follow its own underwriting procedures, then they will find no liability, and then there will be no damages.

Tr. 2713.

## D.      The Failure to Submit Candace Preston's Factual Assumptions to the Jury At Least Requires a New Trial

Defendants submitted to the Court a proposed verdict form that would have had the jury determine the factual assumptions Plaintiffs' damages expert testified were essential to her opinion. D.E. 593-2 at 2, 10.  Plaintiffs opposed submission of a verdict form that would have the jury decide any of those issues and instead submitted a verdict form that omitted Preston's factual assumptions. D.E. 598; D.E. 599. The Court sided with Plaintiffs and refused to submit to the jury a form of verdict that would have the jury determine if the factual assumptions accepted by Preston as true, were true.  D.E. 665.

Defendants were entitled to a jury determination of these factual assumptions.  The failure to provide the jury with such a form of verdict was highly prejudicial error.  The jury did not answer the factual questions upon which Preston's testimony depended as a matter of fact and law.  Thus, there is no basis for any award of damages based on this error.

Rule 49(a) itself, in effect since the late 1930s and since only modified by technical and stylistic amendments, provides that a special verdict must be with respect to "*each* issue of fact" (emphasis added). In evaluating the jury's responses to a special verdict, the court should refer to the entire case — pleadings, evidence, argument, jury instructions — and not just to the jury's answers themselves.  *Griffin v. Matherne*, 471 F.2d 911, 916 (5th Cir. 1973).

The Eleventh Circuit has explained that where a court presents a jury with a special verdict, its discretion is limited "by the rule that the trial court '*must* submit all material issues raised by the pleadings and the evidence.'"  *Stewart & Stevenson Servs., Inc. v. Pickard*, 749 F.2d 635, 643 (11th Cir. 1984) (citations omitted; emphasis in original).  Put differently, "trial judges are not empowered to fill in facts omitted from the answer to a special interrogatory." *Burger King v. Mason*, 710 F.2d 1480, 1489 (11th Cir. 1983); *see also Milan Express v. Averitt Express, Inc.*, 254 F.3d 966, 982-83

(11th Cir. 2001).  Eleventh Circuit precedent similarly rules that district court judges are not empowered to fill in facts omitted from the answer to a special interrogatory and warns that "unless carefully aimed the questions [can] *miss the target completely*."  *Guidry v. Kem. Mfg. Co.*, 598 F.2d 402, 406 (5th Cir.) (emphasis added), *rehr'g denied with opinion*, 604 F.2d 320 (5th Cir. 1979). This is, of course, in part based on venerable Supreme Court precedent explaining that "[a] verdict which finds but part of the issue and says nothing as to the rest is insufficient, because the jury have not tried the whole issue" and "*[i]n all special verdicts, the judges will not adjudge upon any matter of fact, but that which the jury declare to be true by their own finding*."  *Prentice v. Zane's Administrator*, 49 U.S. 470, 484 (1850) (emphasis added).  The Plaintiffs here refused to even try Candace Preston's liability assumptions, much less permit their submission to the jury, which was reversible error requiring, at the very least, a new trial.[6]

It should be noted that, although we argue in the alternative for a new trial because of this error, the only meaningful result is judgment for Defendants on all claims for the failure of Plaintiffs to prove or seek factual determinations essential to their damage claims, having voluntarily abandoned claims based on the very factual assumptions upon which the entire argument for damage was based.

## II.    This Court Committed Prejudicial Error In Permitting Plaintiffs To Attempt To Prove a Causation and Damages Claim Never Pleaded, Completely Unsupported by Admissible Record Evidence, and Never Submitted to the Jury

The Eleventh Circuit has explained that, if a district court declines to enter judgment as a matter of law on a damages issue, it has properly ordered a new trial where the damages were "against the overwhelming weight of the evidence" because the evidence was "insufficient to support a causal connection" or there was no "yardstick" provided to the jury that could be used to determine damages with "reasonable certainty."  *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1242-43 (11th Cir. 2008).  Juries cannot engage in impermissible speculation and conjecture in reaching a

---

[6]Any attempt to twist the jury's answers to the erroneous verdict form to provide answers that were not given by the jury must be rejected. Binding Eleventh Circuit precedent also explains that attempting to reconcile apparently inconsistent verdicts by adopting a reading that does not "represent a logical and probable decision on the actual relevant issues" "would *displace the jury* by undertaking to make the reconciliation suggested."  *R.B. Co. v. Aetna Ins. Co.*, 299 F.2d 753, 760 (5th Cir. 1962) (emphasis added).  In this case, the objectionable and objected to form of verdict guaranteed inconsistent verdicts that, once deliberation began, could not be rectified.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

damages award.  *See, e.g.*, *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1178 (11th Cir. 2002).  In the unlikely event that this Court does not enter judgment as a matter of law on the loss causation and damages questions in favor of Defendants, a new trial would be required.

As set forth in the accompanying memorandum in support of Defendants' motions for judgment as a matter of law, the other errors with respect to Candace Preston's damages testimony and utter failure to present any competent evidence of causation and damages require entering judgment in Defendants' favor.  This is particularly true given that Preston gave almost no weight to the effect of Bancorp's explicit, escalating, and voluminous disclosures about its exposure to the Florida real estate market and the state of that market.[7]  Preston's testimony obviously never should have been admitted in the first place, as shown by Defendants' Motion to Exclude the Proposed Expert Testimony of Candace L. Preston and Supporting Memorandum of Law dated June 18, 2010 and Defendants' Reply Memorandum in Support of Motion to Exclude the Proposed Expert Testimony of Candace L. Preston dated July 23, 2010, which are incorporated by reference.  And in the unlikely event that this Court or the Eleventh Circuit determines, for example, that Preston's testimony was inadmissible but that Plaintiffs are entitled to another bite at the apple for some other reason, a new trial would then obviously be required.

**III.     This Court Committed Prejudicial Error in Refusing to Give At Least Five Instructions And In Refusing to Use the Verdict Form Submitted by the Defendants**

An erroneous instruction requires a new trial if the reviewing court is "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations."  *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1543 (11th Cir. 1996).   The legal sufficiency of the jury charge is reviewed *de novo* and reversal is required if the charge contains incorrect legal statements about "fraud law" or if it is "confusing and erroneous."  *Rand v. Nat'l Fin. Ins. Co.*, 304 F.3d 1049, 1051-52 (11th Cir. 2002).  The Eleventh Circuit has ruled that a new trial was required where the district court refused to give an instruction and such a refusal left an issue "far from clear" even if "not technically incorrect" because it failed to define essential terms and failed to instruct the jury on the

---

[7]For the warnings, *see, e.g.*, Defendants' Ex. 1 at 21-23; Defendants' Ex. 47 at 7, 15; Defendants' Ex. 49 at 6; Defendants' Ex. 50 at 7, 22; Defendants' Ex. 3 at 16-18, 39; Defendants' Ex. 4; Defendants' Ex. 5 at 4, 8, 17-18, 27-28, 31; Defendants' Ex. 6 at 18-19; Defendants' Ex. 7 at 1, 3; Defendants' Ex. 8 at 4-6, 11, 15-16, 26-31; Defendants' Ex. 9 at 22.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

legal consequences of its findings. *Bateman*, 79 F.3d at 1546. Measured with reference to these governing legal standards, the failure to give at least five of the Defendants' proposed instructions and submit their proposed verdict form was legal error requiring a new trial.

**A.     Refusal to Give an Assumptions Instruction and Submit a Verdict Form Question About Proof of Those Assumptions**

As explained, there was a fundamental mismatch between the liability case and the damages case and Defendants therefore requested the following instruction titled "Expert Opinion Based Upon Assumptions":

> If an expert witness bases her opinion on facts that she assumed would be proven at trial, those facts must actually be proven at trial. If each assumed fact is not proven by a preponderance of the evidence, then you should disregard that expert's opinion.

D.E. 623. The Court summarily refused to give this proposed instruction, Tr. 3917, which was error requiring a new trial.

Defendants also requested a form of verdict under which Plaintiffs would have been obligated to prove the factual assumptions set forth in Paragraph 10 of Candace Preston's expert report. D.E. 593-2 at 2, 10. The Court instead provided a verdict form that did not require proof of Candace Preston's underlying factual assumptions. D.E. 665. This ruling on the verdict form eviscerated Plaintiffs' burden of proof on these issues and stripped defense counsel of the argument that there had been a fundamental failure of proof on Plaintiffs' part.

As explained at greater length in the accompanying motion for judgment as a matter of law, the notion that an expert's factual assumptions must be proven in order for the opinion to have any merit is black-letter law. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *United States v. Cooper*, 277 F.2d 857, 861 (5th Cir. 1960). Defendants were certainly entitled to an instruction and a verdict form consistent with this law.

The failure to give such an instruction and verdict form was confusing and erroneous and invited the jury to reach a verdict based on the intellectual equivalent of flipping a coin. Two sets of factual assumptions were floating around for Candace Preston's damages testimony — those that were pleaded and included in her expert report and those that were offered verbally and over objection during her direct testimony. *Compare* Plaintiffs' Ex. 726 ¶ 10 *with* Tr. 2532-35, 2567, 2573, 2577. It is impossible to know which set of factual assumptions the jury held her to, and the requested instruction on her assumptions and an appropriate verdict form would have made it

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

possible for defense counsel to attempt to keep Plaintiffs' counsel honest during closing arguments, and to attempt to ensure that a legally permissible outcome was reached. That was the least the Court should have done, given Plaintiffs' last-minute and ever-shifting theories of what constituted the actionable misrepresentations and omissions, which they were denied formal leave to amend and add but decided to try anyway.

**B.      Refusal to Give a Collapsing Markets Instruction**

The Court, over Defendants' vigorous objection, adopted the materialization of the risk theory from the Second Circuit's decision in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). Then, however, the Court refused to give the Defendants' requested instruction that fully and accurately reflected that case. D.E. 627; Tr. 3925.

Defendants' proposed instruction would have included the following language intended to reflect the materialization of the risk concept:

> To prove that the misrepresentation or omission was the proximate cause of damage, Plaintiffs must prove that the economic harm suffered occurred as a result of the alleged misrepresentations or omission. If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and loss ultimately suffered is in that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.
>
> However, if the connection between the misrepresentation or omission and the loss is only remotely related to the loss suffered, or if Plaintiffs fail to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie.
>
> In addition, *if the loss coincides with a a market-wide phenomenon causing comparable losses to other investors, the prospect that the Plaintiffs' loss was caused by the alleged fraud decreases. Plaintiffs must prove that [their] loss was caused by the alleged fraud as opposed to intervening events.*

D.E. 627 at 2 (emphasis added).

The principal defect in the Court's instruction was that it failed to define the zone of foreseeable risk consistently and in a way that made clear that Defendants' argument was that the collapsing Florida real estate market severed the causal link. D.E. 635 at 23-24. Defendants' instruction was supported not only by *Lentell* itself , but also by other published appellate authority on loss causation and damages in the securities context.

-10-

In one of the seminal opinions interpreting the securities statutes in light of their common law roots and before the passage of the Reform Act, Judge Posner explained as follows:

> Indeed what securities lawyers call "loss causation" is the standard common law fraud rule (on which *see Prosser and Keeton on the Law of Torts* § 110, at p. 767 (5th ed. 1984)), merely borrowed for use in federal securities fraud cases. It is more fundamental still; it is an instance of the common law's universal requirement that the tort plaintiff prove causation. No hurt, no tort....
>
> If the plaintiffs would have lost their investment regardless of the fraud, any award of damages to them would be a windfall....
>
> "Loss causation" is an exotic name — perhaps an unhappy one — for the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains. Like a stock-market crash, the collapse of oil prices in the early 1980s reverberated throughout the economy. Since the United States is a net importer of oil, the reverberations were for the most part good ones. But there were some losers. *No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation. Defrauders are a bad lot and should be punished, but Rule 10b-5 does not make them insurers against national economic calamities. If the defendants' oil and gas ventures failed not because of the personal shortcomings that the defendants concealed but because of industry-wide phenomena that destroyed all or most such ventures, then the plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages.*

*Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683-85 (7th Cir. 1990) (emphasis added; citations omitted).

Judge Posner's point that cases in collapsing markets are different and require a different form of proof is further supported by subsequent Seventh and Second Circuit decisions.  In *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007), Judge Wood was able to "dispense quickly with the materialization of the risk idea" because the "defendants introduced expert evidence that [the defendant company] lost its value because of market forces, and the plaintiffs have offered nothing to rebut that theory — no expert testimony suggesting that the collapse was caused by the lack of the fraudulently promised contracts and financing, no evidence that companies similar to [the defendant company] that had firm contracts survived."  And the Second Circuit's decision in *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161 (2d Cir. 2005), also

-11-

echoed the Seventh Circuit's reasoning about a plaintiffs' burden in the context of a collapsing market and cited *Robbins v. Koger* in the course of its discussion:

> Loss causation is a fact-based inquiry and the degree of difficulty in pleading will be affected by circumstances, but our precedents establish certain parameters. It is not enough to allege that a defendant's misrepresentations and omissions induced a "purchase-time value disparity" between the price paid for a security and its "true 'investment quality.'" *Emergent Capital*, 343 F.3d at 198 (clarifying *Suez Equity*, 250 F.3d at 97-99). Such an allegation — which is "nothing more than a paraphrased allegation of transaction causation" — explains why a particular investment was made, but does not speak to the relationship between the fraud and the loss of the investment. *Emergent Capital*, 343 F.3d at 198; *see also Robbins v. Koger Props. Inc.*, 116 F.3d 1441 (11th Cir.1997). "[I]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation ... is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital*, 343 F.3d at 197. However, "*when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,*" *and a plaintiff's claim fails when "it has not adequately ple[ ]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.*" *First Nationwide Bank*, 27 F.3d at 772.

*Lentell*, 396 F.3d at 174-75 (emphasis added).

This Court's refusal to give a clear instruction consistent with Defendants' theory of the case that explained the standard for loss causation and damages cut the legs out from under the Defendants' central defense, namely that the collapsing Florida real estate market — rather than any sort of fraud — caused the enormous losses in the third quarter of 2007. Indeed, the Defendants' testimony and proof that collapsing Florida real estate values caused the losses reported on October 25, 2007, and that this was a market-wide phenomenon that devastated other Florida institutions as well as homebuilders was undisputed and indisputable. *E.g.,* Plaintiffs' Ex. 19; Tr. 2161-62; DXID 242; DXID 250; DXID 255; DXID 257; DXID 261; DXID 262; DXID 263. At minimum, a new trial is required.

**C.     Refusal to Give an Instruction about the Need to Disaggregate Non-Fraud Factors**

Defendants initially proposed an instruction that would have made pellucidly clear to the jury that it needed to disaggregate non-fraud factors from any supposed loss, which, according to Defendants, would have included the losses caused by the BLB segment of the loan portfolio. D.E. 593-1 at 11-12. In the course of briefing and arguing the jury instructions, Defendants also requested the following additional language:

> Defendants contend that the stock price declines that occurred were not caused as a result of any alleged misrepresentations or omissions but were, instead, caused by deteriorating

> conditions in the Florida real estate market about which investors were forewarned.  Any award of damages must subtract from the price declines the losses caused by such factors, and Plaintiffs carry the burden of proof to eliminate from their damage claim losses caused by non-fraud factors.

D.E. 628.  This Court refused to give this instruction in sum or substance, Tr. 3925-26, which requires a new trial.

The United States Supreme Court and the Eleventh Circuit have made plain that plaintiffs in securities fraud actions bear the burden of isolating and dispatching the non-fraud factors related to the losses about which they complain.  Plaintiffs must prove "loss causation" or "a causal connection between the material misrepresentation and the loss" in part because a "tangle of factors" can affect stock price, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005).  Plaintiffs must show more than merely that the alleged misrepresentation "'touches upon' a later economic loss" because "[t]o 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires."  *Id.*(emphasis in original).  And in *Robbins v. Koger*, 116 F.3d 1441, 1447 & n.5 (11th Cir. 1997), the Eleventh Circuit explained that "a plaintiff will be allowed to recover only damages actually caused by the misrepresentations" and that "in determining recoverable damages" non-fraud "contributing forces must be isolated and removed."

And about a month ago, the United States District Court for the Northern District of Georgia weighed in and articulated why the Plaintiffs bear the burden of separating out the non-fraud causes of loss as follows:

> Having reviewed the jurisprudence of neighboring circuits, the Court finds persuasive the position of the Second Circuit that in order to defeat summary judgment, *plaintiffs in a securities fraud case must present evidence disaggregating the fraud and non-fraud-related causes of the plaintiff's loss*. This rule accords with recent decisions of this court utilizing the Second Circuit's disaggregation approach at the pleading stage. *See Waterford Township General Employees Retirement System, Individually and on Behalf of All Others Similarly Situated v. Suntrust Banks, Inc.*, No. 1:09-CV-617-TWT, 2010 WL 3368922, at * 4 (N.D.Ga. Aug.19, 2010) (finding that plaintiffs failed to apportion the loss among the multiple factors that ultimately destroyed plaintiffs' investment); *In re HomeBanc Corp. Sec. Litig.*, 706 F.Supp.2d 1336, 1361-62 (N.D.Ga.2010) (finding insufficient a complaint that failed to make any allegations distinguishing losses caused by defendant's alleged misrepresentations from those caused by industry-wide factors).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

This approach is also consistent with the *Robbins* rule as modified by *Dura*. Merely showing that multiple forces act upon an object is insufficient to show that a particular force was any more substantial than the others. Plaintiffs must provide the fact-finder with a basis for evaluating the relative effects of competing causes of a loss, thereby determining which factors were substantial and which were relatively minor or inconsequential. Accordingly, *where several competing factors may have resulted in a decline in the plaintiff's loss, the plaintiff must provide sufficient evidence to apportion the loss between fraud-related and non-fraud-related causes. Such an analysis requires the plaintiff's expert to disentangle the effects of the alleged fraud from both industry-wide information and company-specific information unrelated to such fraud. See Vivendi*, 605 F.Supp.2d at 591.

*In re Scientific Atlanta, Inc. Sec. Litig.*, No. 1:01-CV-1950-RWS, 2010 WL 4793386, at *32-33 (N.D. Ga. Nov. 18, 2010) (emphasis added; footnotes omitted). The court further emphasized that without such testimony, "the record evidence provides no method by which a jury can determine how much, if any, of Plaintiffs' loss is attributable to Defendants' failure to disclose." *Id.* at *36.

Defendants were entitled to an unambiguous instruction that Plaintiffs had the burden to disaggregate the decline in Florida real estate values, which was not given. The failure to so instruct the jury when, in fact, absent the provisions for BLB loans and the qualitative reserve in the third quarter of 2007 the company would have reported a profit, Tr. 558-59, 3014-16; DXID 8; DX ID 9, was enormously prejudicial and warrants a new trial. Defendants were entitled to an instruction that would support their argument that the Plaintiffs' failure to disaggregate these non-fraud related causes of losses was fatal to their claims. It certainly should have been.

**D.    The Erroneous $2.93 Instruction**

Over Defendants' objection, the Court also proposed an instruction that the Plaintiffs were seeking $2.93 per share in damages for the period from April 2007 to October 2007, which was $0.22 per share *less* than the completely absurd $3.15 per share in damages that Candace Preston had testified should be recoverable. Mead Aff. Ex. 1 at 23; Tr. 3978.

The Court obtained the $2.93 number by subtracting the change in the NASDAQ bank index on October 26, 2007 (it actually went up by $0.22 that day) from the damages' expert's number of $3.15. In making this adjustment for Plaintiffs' counsel, this Court relieved the damages expert of the burden of using *any index whatsoever* and simply instructed the jury that it was permissible for Plaintiffs to attempt to charge Defendants with the full and absolute decline in Bancorp's stock price

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

decline on October 26, 2007, without reference to any standard.[8]  Defendants are unaware of any law condoning such an adjustment when made by a damages expert at trial, much less by a court on behalf of a damages expert and a lawyer.

At the very least, the $2.93 was based on speculation and conjecture, making it an unsupportable basis for a jury verdict.  *See, e.g., Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1178 (11th Cir. 2002); *In re Williams Sec. Litig. - WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009) (rejecting expert's testimony because he failed to disaggregate, granting summary judgment and finding case could not proceed to jury because opinions on loss causation "would be no less speculative and unreliable if reached by jurors than when reached by Dr. Nye"); *In re Scientific Atlanta, Inc. Sec. Litig.*, No. 1:01-CV-1950-RWS, 2010 WL 4793386, at *32-33 (N.D. Ga. Nov. 18, 2010).

And, as was explained during trial, if the expert used the wrong index, then the expert used the wrong index, and the proper remedy was exclusion of her testimony, not attempting a back-of-the-envelope fix for her during the charge conference.  Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment.[9]  The bottom line effect of the Court's intervention was to eliminate any purported control for economic conditions or banking conditions, much less the Florida-specific conditions that Candace Preston never even purported to control for in any meaningful way.  The Court's $2.93 adjustment turned the entire causation and damages inquiry for the April 2007 to October 2007 period into a farce, and it is hardly surprising that measured by reference to the standards the Court had supplied, a jury could conclude that the Plaintiffs had satisfied their burden of showing some lesser amount of damages for the second period.  The Court's actions plainly warrant a new trial.

---

[8]Of course, Preston's testimony with respect to the NASDAQ index should have been disallowed altogether as it, indisputably, failed to take into consideration the collapsing real estate market in the State of Florida.  The defects in failing to subtract from the price decline the impact of the collapsing Florida real estate market does not go to weight of the evidence but its entire competence.

[9]*Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998); *Milwaukee Branch of the NAACP v. Thompson*, 116 F.3d 1194, 1198 (7th Cir. 1997); *Kuhn v. Ball State University*, 78 F.3d 330, 332-33 (7th Cir. 1996); *see Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999) (excluding regression analysis because it failed to account for certain "variables that are too significant not to be accounted for").

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

E.     **Refusal to Give an Instruction About Corrective Disclosures**

The Defendants also requested the following instruction entitled "Corrective Disclosure and Length of Inflation" that included the following language

> If you find by a preponderance of the evidence that an alleged misrepresentation or omission artificially inflated the price of BankAtlantic Bancorp stock, you will also have to determine the length of time during which the inflation existed.  To make this determination, you must decide the date on which information curing or correcting the alleged misrepresentation or omission was publicly announced or otherwise effectively disseminated to the market. Dissemination of the allegedly withheld or misrepresented information through a public announcement, a press release, or a press report will correct the previous misrepresentation or omission and terminate the period during which purchasers can seek to hold Defendants liable under the securities laws for the misrepresentation or omission.  At that point, subsequent purchasers are charged with knowledge of the true state of affairs and the stock's market price is presumed to reflect its true value.

D.E. 593-1 at 14.  The Court, however, declined to give such a charge and instead gave the lopsided instruction that there was a duty to correct prior statements that had become misleading, D.E. 635 at 13-14, without giving any instruction on the effect that a corrective disclosure would have on a prior statement alleged to be misleading.

The Defendants' proposed instruction was amply supported by precedent.  The United States Supreme Court has ruled that a private plaintiff cannot, as a matter of law, show loss causation and damages by alleging the stock was inflated at the time of purchase but must instead show that some securities fraud caused the plaintiff to pay an inflated price for the security.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 338 (2005).  A plaintiff could not conceivably make such a showing if information sufficient to dispel the fraud was disclosed by the company prior to the supposed revelation.  And as this Court explained in its order regarding summary judgment, "the public discussion of information that is already available to the market cannot constitute" a "revelation" that causes a stock price to decline for the purpose of measuring the damages caused by an alleged securities fraud violation.  D.E. 411 at 54 (collecting cases).

On the facts of this case, this instructional error was massively prejudicial because the jury found liability based on statements on April 26 and July 25 conference calls that were, at worst for Defendants, subsequently undone by statements in Form 10-Qs that the jury found could not support a claim for securities fraud.  D.E. 665.  The jury therefore found statements about the greater risk faced by BLB loans made on the conference calls to conceivably support a basis for liability but that

-16-

the subsequent statements in the Form 10-Qs that the non-BLB loans were of "relatively lower risk" to be non-actionable.  D.E. 665.  Under a proper instruction, as requested by the Defendants, the jury then would have found that the subsequent statements in the Form 10-Qs cut off any liability created by the conference calls and, in light of Candace Preston's incompetent loss causation and damages testimony, would have found no fraudulently caused damages at all.  The refusal to give the Defendants' proposed instruction was therefore decisively prejudicial error requiring a new trial.

**IV.    This Court Committed Prejudicial Error in Instructing the Jury That Alan Levan's July 25, 2007 Statements Were False**

**A.    This Court's Prior Rulings Concerning Alan Levan's July 25 Statements**

As this Court is well aware, on July 25, 2007, Alan Levan made the following statements in response to an analyst question during an investor conference call:

> Al Savastano:    Basically what I'm trying to — ask you is the $135 million in the land loans that you guys are concerned about, are there other portfolios (unintelligible) focus you on the construction portfolio *that you feel there might be some risk down the road as well.*
>
> Alan Levan:    *There are no asset classes that we are concerned about in the portfolio as an asset class.*  You know we've reported all of the delinquencies we have, which actually I don't think are any other than the ones that we've you know, that we've just reported to you.
>
> So the portfolio has always performed extremely well, continues to perform extremely well.  And that's not to say that, you know, from time to time there aren't some issues as there always have, even though we've never taken losses in that — we've not taken — I won't say ever taken any losses, because that's probably never going to be a correct statement, but that portfolio has performed extremely well.
>
> The one category that we just are focused on is this land loan builder portfolio because, you know, just from one day to the next, the entire homebuilding industry, you know, went into a state of flux and turmoil and is impacting that particular class.  *But to our knowledge and in — just in thinking through, there are no particular asset classes that we're concerned about other than that one class.*

Defendants' Ex. 8 at 22-23 (emphasis added).

This Court entered a partial summary judgment finding that this answer, which the Court subdivided into four separate statements, was false.  D.E. 411 at 56-62.  Defendants believed and

continue to believe that this ruling was clearly erroneous and highly prejudicial for all of the reasons expressed at trial and in prior memoranda including the Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment dated June 22, 2010 and Defendants' Motion for Reconsideration of Order Granting Plaintiffs' Motion for Partial Summary Judgment dated September 1, 2010 (D.E. 471), all of which are incorporated by reference.

Prior to trial, Plaintiffs sought a preliminary instruction from the Court that it had found those July 25 statements to be false so that they could reference the Court's finding during opening statements, and this Court properly refused to do so. Tr. 123-26. As explained further below, however, the Court then committed highly prejudicial error by ultimately instructing the jury, based on its summary judgment ruling, that the July 25 statements were false.

**B.    Alan Levan's July 25 Statements Cannot Serve as a Basis for Liability**

It is a travesty under the securities laws and the Reform Act, to engage in a process of cherry picking a few words from sentences, ignore what else was said in the surrounding sentences, paragraphs and pages, and ignore the words published in the company's 10-Q shortly thereafter to conclude, on the papers and without hearing evidence, falsity. The evidence at trial confirmed that, even if it was appropriate to conduct such a microscopic analysis of a few words plucked from a larger universe of words and without context, beyond a shadow of a doubt, Alan Levan's July 25 statements were non-actionable statements protected by the safe harbor, were true when made, were made without the necessary scienter, and could not in any way serve as the proximate cause for any damages. Moreover, Plaintiffs' own expert acknowledged that nothing said or done in July caused the stock price to be inflated. Tr. 2629.

Given that Plaintiffs did not meet their burden on any of these elements, and the fact that the words were determined not to have moved the market by none other than Plaintiffs' own expert, the instruction on falsity was hopelessly prejudicial without any countervailing benefit: it is indefensible and solely provides a reason to overturn the verdict. The notion that the jury could hear the Court's conclusion and then independently determine the issues of scienter and materiality is absurd. Any reasonable juror would conclude that the Court must have thought the words material simply to pick them out for such a factual determination.

Stearns Weaver Miller Weissler Alhadeff & Sitterson, p.a.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

1.        **Non-Actionable Statements Protected by the Safe Harbor**

The Reform Act defines forward-looking statements protected by the safe harbor to include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss)" or "other financial items," "a statement of future economic performance," and *"any statement of the assumptions underlying or relating to" any forward-looking statement*. 15 U.S.C. § 78u-5(i)(l) (emphasis added).  In determining whether a statement is protected, the Court must read the statements in the context of the entire document.  *Harris v. IVAX Corp.*, 182 F.3d 799, 805 (11th Cir. 1999); *In re Columbia Laboratories, Inc. Securities Litigation*, 144 F. Supp. 2d 1362, 1368 (S.D. Fla. 2001).  A material and misleading omission can fall within the safe harbor.  *Ehlert v. Singer*, 245 F.3d 1313, 1317 (11th Cir. 2001); *Columbia Laboratories,* 144 F. Supp. 2d at 1371.  Statements that include both forward-looking and factual factors must be treated as forward-looking.  *Harris*, 182 F.3d at 806; *Columbia Laboratories,* 144 F. Supp. 2d at 1368; *In re Republic Services*, 134 F. Supp. 2d 1355, 1363 (S.D. Fla. 2001).  "[A] statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance." *Harris*, 182 F.3d at 805.

Al Savastano's question was forward-looking and concerned future losses, and so was Alan Levan's response.  When asked to identify any other portfolios where "*you feel there might be some risk down the road as well*," Levan responded by stating that "[t]here are no [other] asset classes that we are concerned about in the portfolio as an asset class" and that "there are no other particular asset classes that we're concerned about other than that one class." Alan Levan's statement about "concerns" over future losses was also quintessentially forward-looking and protected by the safe harbor because it was not verifiable or falsifiable when made: only time would tell which asset classes were most exposed.  And, finally, all of the statements of historical fact concerning performing loans, delinquencies, and the state of the homebuilding portfolio were all assumptions underlying forward-looking statements and therefore also fall within the statutory definition of forward-looking statements.

Liability for these statements is precluded because the statements were accompanied by meaningful cautionary statements (in the conference call itself and the earnings release and Bancorp's incorporated public filings) identifying important factors that "could cause actual results to differ materially from those in the forward-looking statement." *Harris*, 182 F.3d at 803 (citation omitted); *see also Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010); Defendants' Ex. 7 at 9; Defendants' Ex. 8 at 2-3.   Liability simply cannot be

-19-

predicated on these statements, no matter how they are chopped up.

### 2.  Truth

Another problem with predicating liability on Alan Levan's July 25 statements is that they were *true*.[10]   The only "class" of loans that the company was then worried about "as a class" were the builder land bank loans, a worry which, of course, turned out to be correct.  The fact that specific loans within a larger class of loans were being watched has nothing to do with the entire class of such loans.

The analysts' responses to Mr. Levan's statements also preclude an argument that they were misleading.  Indeed, the very person who asked the question and received the purportedly fraudulent answer published a report that very day revealing how he understood the answer.  Al Savastano's July 25 analyst report that stated that "we expect the $135 million of builder land loans to have more hiccups in 2H07," "note the entire land development portfolio is about $540 million," and "believe that it is possible that other areas of the commercial real estate portfolio will be impacted in the near future given the market for Florida real estate."  Defendants' Ex. 330.  This comment synthesizes what the evidence indisputably demonstrated — that the four isolated statements, when considered in the mix of all information, including Bancorp's explicit and escalating warnings,[11] were not misleading.

Moreover, the evidence demonstrated that Alan Levan's description of loans as "performing" was correct.  Bancorp's Form 10-K and the OTS's TFR Instruction Manual, to which the banking

---

[10]"[I]n order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were *misleading* as to a *material* fact" and "[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."  *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis in original).  "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the '*total mix*' of information made available."  *Id.* at 231-32 (emphasis added).  The *Basic* materiality standard means that "[n]it-picking should not become the name of the game," "[t]here is no requirement that a material fact be expressed in certain words or in a certain form of language," and "[f]air accuracy, not perfection is the appropriate standard."  *SEC v. Siebel Systems, Inc.*, 384 F. Supp. 2d 694, 705 (S.D.N.Y. 2005).

[11]*E.g.*, Defendants' Ex. 1 at 21-23; Defendants' Ex. 47 at 7, 15; Defendants' Ex. 49 at 6; Defendants' Ex. 50 at 7, 22; Defendants' Ex. 3 at 16-18, 39; Defendants' Ex. 4; Defendants' Ex. 5 at 4, 8, 17-18, 27-28, 31; Defendants' Ex. 6 at 18-19; Defendants' Ex. 7 at 1, 3; Defendants' Ex. 8 at 4-6, 11, 15-16, 26-31; Defendants' Ex. 9 at 22.

Stearns Weaver Miller Weissler Alhadeff & Sitterson, p.a.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

agencies collectively refer for definitions, all define non-performing as synonymous with non-accrual so that a performing loan is the same thing as an accruing loan. Defendants' Ex. 3 at F16;. Defendants' Ex. 177 at 13 & n.24; Defendants' Ex. 229 at 1936. Every witness who spoke to the issue also testified that non-performing means non-accrual, *e.g.* Trial Tr. 2908, and no one gave any contrary testimony. There is no dispute that the loans were either performing or accurately reported as non-performing and therefore the only reasonable conclusion, supported by the evidence, is that Alan Levan's statements were true when made.

> ### 3.      Scienter

Plaintiffs also failed to satisfy their burden of showing scienter with respect to Alan Levan's statements on the July 25 conference call. Given that the statements fell within the scope of the safe harbor, if they were unaccompanied by meaningful cautionary language (they were), then the Plaintiffs still bore the burden of showing that they were made with actual knowledge that they were false or misleading. 15 U.S.C. § 78u-5(c)(1)(B); *Theoharous v. Fong*, 256 F.3d 1219, 1223 (11th Cir. 2001); *Harris*, 182 F.3d at 803. Even if the statements were not forward-looking (they were), the burden of demonstrating scienter through a showing of severe recklessness is very heavy. The Plaintiffs must show "not merely simple or even inexcusable negligence, but an extreme departure form the standards of ordinary care" "that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008).

Whatever the Court's opinion about the objective falsity of these statements, there was not a shred of evidence that Alan Levan did not believe his statements to be true when made or even made them with severe recklessness. The evidence, for example, was absolutely uncontested that the term performing was a term of art, that it was so used by Alan Levan, and that it was categorically true. There was no basis for a contrary conclusion.

Moreover, the uncontested evidence in the case was that there were no accounting red flags (indeed Plaintiffs here agreed that there was no accounting fraud whatsoever and that reserves were adequate) and that Bancorp purchased millions of dollars worth of its own shares in the weeks following the July announcement. Defendants' Ex. 2 at 8; Defendants' Ex. 3 at F3-F4; Defendants' Ex. 14 at 18; Defendants' Ex. 51 at 34; Defendants' Ex. 52 at F3-F4; Tr. 3216-17. The facts

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

undermining scienter are far stronger here than they were in *Mizarro*, which did not even survive a motion to dismiss.  544 F.3d at 1251-54.[12]

In addition, it was undisputed that shortly after the conference call, the company's 10-Q for the quarter was published which emphatically described the land acquisition and development loans, identified the magnitude of such loans by category, emphasized the considerable risk of the BLB loans, emphasized the horrendous nature of the market and the likely losses that would follow if things did not improve, and described the non-BLB as being of "relatively lower risk."  Defendants' Ex. 9 at 22.

### 4.     Proximate Cause and Damages

The Court's instruction was also clearly erroneous and highly prejudicial because Plaintiffs failed to present any evidence or testimony establishing any sort of causal link between the July 25 statements and damages, making any such award inherently speculative.  Plaintiffs must prove "loss causation" or "a causal connection between the material misrepresentation and the loss" in part because a "tangle of factors" can affect stock price, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005).  These relevant legal standards in the Eleventh Circuit and in the context of collapsing markets are discussed at greater length above, but detail and nuance are not required to dispense with any claim based on the July statements.

As explained more fully in the accompanying memorandum submitted in support of Defendants' motion for judgment as a matter of law, Plaintiffs' damages expert Candace Preston volunteered during her direct testimony that the Bancorp stock price movements in the wake of the July 25 call "had nothing to do with the land loan portfolio or the allegations in this case."  Tr. 2629. She gave testimony fundamentally inconsistent with the idea that her analysis of the October 25, 2007 earnings release and October 26, 2007 stock price movement could in any way disaggregate

---

[12]In granting Plaintiff's motion for partial summary judgment on this issue, the Court relied on Alan Levan's "music has stopped" email. D.E. 411 at 57. But it is undisputed that on the very same July 25 conference call containing these supposedly fraudulent statements, Alan Levan also said: "what we just have in the marketplace is *the music stopped* and that because sales velocity is so slow that many of these builders because of the fact that they — they're slow, they've just, you know, made a decision to go on the sidelines."  Defendants' Ex. 8 at 31 (emphasis added).  It is baffling how the "music has stopped" email could conceivably have supported the summary judgment ruling.

-22-

or pin down the effects of the July 25, 2007 statements or any other specific statements made prior to October.  *E.g.*, Tr. 2709, 2728, 2732-33, 2739.  Alan Levan's statements themselves, which this Court has interpreted as overemphasizing the risks associated with the BLB loans, are also inconsistent with the factual predicate of BLB fraud that this Court found, and Preston admitted, needed to be proven.  In short, Preston's testimony and analysis were utterly incompetent to do what even they did not purport to do: measure any damages proximately caused by Alan Levan's July 25 statements.  Instructing on the falsity of Alan Levan's July 25 statements was therefore completely superfluous because loss causation and damages could not be established as a matter of law, but the instruction was also massively prejudicial and therefore requires a new trial.

**C.     This Court's Instructions Concerning Alan Levan's July 25 Statements Require a New Trial**

The error introduced by the closing instruction that Alan Levan's July 25 statements were false is enormous and was enormously prejudicial.  This Court described that tremendous and unfair prejudice that could be caused by giving a similar preliminary instruction as follows:

- "[T]here are still a lot of issues that surround those statements and I'm concerned that *the jury will close down* on the consideration of those statements if they hear that the Court's already determined that they were false."  Tr. 123 (emphasis added).

- "But what is the overall significance of that ruling?  Except for the fact it gives you a *huge strategic advantage*, other than that, it really has very little significance because of the fact that there are all these attendant issues that remain to be proven."  Tr. 123 (emphasis added).

- "Mr. Arisohn, I know I'm taking away a *big strategic advantage* from you.  But I feel very uncomfortable with this and I'm not going to allow it."  Tr. 125 (emphasis added).

- "[T]he purpose of the summary judgment isn't to get a *strategic advantage* of the kind that you're fighting for.  And *believe me, I understand why you're fighting for it*.  The purpose of the summary judgment is to narrow the issues in the case."  Tr. 126 (emphasis added).

What was true of the preliminary instruction was obviously also true of the closing instruction.

The Court's closing instruction permitted Plaintiffs' counsel to do just what the Court had feared, and Plaintiffs' counsel fully exploited the opportunity by arguing as follows:

- "Now, as you will see, four of the statements made by Alan Levan in the July 2007 conference call *were found by Judge Ungaro prior to trial to be objectively false or*

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

> *misleading, and you will be instructed by the Court that you must find those statements were false or misleading.*" Tr. 4061 (emphasis added).

- "That statement is false and misleading statement number 14. *It's indeed another lie. Judge Ungaro found prior to trial this statement by Mr. Levan also false, issue settled.*" Tr. 4103 (emphasis added).

- "[T]his is another statement by Alan Levan *found to be false by Judge Ungaro, false statement by Alan Levan established.*" Tr. 4104-05 (emphasis added).

Plaintiffs' counsel then also argued that Alan Levan is "the public face of the bank, and his credibility is key to the defense case, because *when you boil it all down, if Alan Levan is not worthy of belief, the defense is not worthy of belief.*" Tr. 4066 (emphasis added). In other words, Plaintiffs' counsel argued that because a federal judge had found Alan Levan to be unworthy of belief, the entire defense was not worthy of belief.

The jury itself also told the Court that the instruction concerning Alan Levan's false statements influenced their verdict. During deliberations, the jury sent a note to the Court that, among other things, asked "Which statements did you find to be false?" Tr. 4322. The Court responded, subject to all of defense counsel's previous objections, "[t]he answer to your second question appears at page 29 of the jury instructions. Please consider that instruction together with all the other instructions I have given you." Tr. 4322. In other words, the Court instructed the jury not only once, but *twice* that Alan Levan's July 25 statements were false. The unfair prejudice was staggering and plainly warrants a new trial.

## V.     This Court Committed Prejudicial Error by Excluding Defendants' Proposed Expert Testimony and Evidence Concerning Other Financial Institutions

The erroneous exclusion of evidence warrants a new trial if it affects the proponent's substantial rights, and the proponent bears the burden of showing that an error "probably had a substantial influence on the jury's verdict." *Proctor v. Fluor Enterprises, Inc.*, 494 F.3d 1337, 1352 (11th Cir. 2007). The erroneous exclusion of evidence that "could potentially convince a reasonable jury" of "a complete defense to liability" affects substantial rights and warrants a new trial. *Id.* at 1355. This Court's exclusion of the proposed expert testimony of at least four different witnesses each independently requires a new trial.

-24-

The exclusion of the Defendants' proposed expert testimony simply cannot be reconciled with the Court's admission of Candace Preston's damages testimony, which the Court found competent. Her "methodology" has been discussed at length above, but it is also worth noting that she conceded, as she had to concede, the following: she is not an expert in Florida real estate, she is not an expert on how banks establish loss reserves, she had no opinion on the timing or adequacy of loan loss reserves, she did not do any economic analysis of whether Florida was affected by a recession in 2007, but that she understood that Florida was impacted severely by a recession. Tr. 2659-62. Indeed, *she admitted that during her three hours of direct testimony on causation and damages, she did not once use the word "recession."* Tr. 2661. Although it is stunning that such "expert" testimony on loss causation and damages was permitted at all, what is truly breathtaking is that the Court excluded all of the competent expert testimony and additional evidence concerning other financial institutions that Defendants would have used to refute Preston's nonsense.

**A.      Stephen Morrell — Florida Economy**

Stephen Morrell has for seventeen years been a Professor of Economics and Finance at Barry University in Miami and submitted an expert report addressing Florida's economic activity during the relevant time period. Mead Aff. Ex. 2. His principal opinions were that Florida was hit first and hardest by the Great Recession and that because economic indicators lag, no one could have described precisely how bad the Florida economy was as events were unfolding in 2006-2008. D.E. 466 at 1-2. The Court ruled that Morrell's opinion was unhelpful or unreliable because it was not tailored to the specific metropolitan areas in which the loans were made and it was simply supported by government statistics, but those rulings were shown to be erroneous by the Defendants' briefing on the subject (D.E. 366-1), which is incorporated by reference.

The exclusion of Morrell's testimony plainly affected the Defendants' substantial rights because Morrell would have explained how the decline in Bancorp's stock price was driven by a depression in the Florida real estate market. As explained above, courts across the country have recognized that plaintiffs face different burdens in collapsing markets cases, and Plaintiffs here would have had an almost impossible time showing that their national bank index with its more than 98 percent of non-Florida banks was at all appropriate if the Defendants had been allowed to present evidence of what actually happened in Florida. It is a cosmic understatement to say that the fate of "Florida's Most Convenient Bank" was affected by the Florida economy, and Defendants should

-25-

have been permitted the opportunity to present this evidence.

**B.     Jack DeWitt — Banking and Bank Regulation**

Jack DeWitt served as a federal and state bank examiner for more than twenty years, examined more than four hundred banks and thrifts in the Southeastern United States, and drafted hundreds of examination reports. Mead Aff. Ex. 3 at 1; Mead Aff. Ex. 4 at 98-99, 286. This Court nonetheless excluded his testimony prior to trial. D.E. 479. DeWitt would have offered the six opinions described in his 43-page expert report, including the opinion that BankAtlantic's underwriting was conservative, that its primary risk was its exposure to the Florida real estate market, that BankAtlantic closely and consistently monitored the status of its loan portfolio, that BankAtlantic established adequate loan loss reserves throughout the relevant period, that BankAtlantic reasonably identified the BLB portion of the portfolio as most exposed to a downturn in the Florida real estate market in the first and second quarters of 2007, and that BankAtlantic acted conservatively in placing loans on non-accrual and taking loan loss reserves in the third quarter of 2007. Mead Aff. Ex. 3 at 2. These opinions addressed the critical issues raised throughout the trial, were admissible, and this Court's ruling was erroneous for all of the reasons set forth in Defendants' Memorandum in Opposition to Plaintiffs' Motion to Exclude Expert Testimony of Jack DeWitt dated July 9, 2010, which is incorporated by reference.

The exclusion of DeWitt's proposed opinions, in a case where underwriting was placed at issue and Defendants were charged with demonstrating an extreme departure from the standards of care, was arguably fatal to Defendants' case. DeWitt, a former bank examiner with more than twenty years' experience, would have testified that BankAtlantic's underwriting practices were conservative and that BankAtlantic's losses were not caused by any fraud but were rather market-driven and reflected a conservative attitude towards recognizing non-accruals and taking reserves. Testimony from this highly-qualified witness was well-reasoned, central to the issues that were ultimately tried, and could well have been the death knell of Plaintiffs' various and ever-shifting fraud theories.

**C.     Michael Keable  — Economics and Damages**

Michael Keable is an economics expert with over twenty years' experience in addressing issues associated with securities markets, damages, corporate finance, and financial statement analysis. He would have opined that market participants understood that Bancorp stock was a risky investment particularly exposed to a downturn in the Florida real estate market, that the economic

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

evidence was inconsistent with a claim of artificial inflation, that Preston's analysis was fundamentally flawed, and that the Class Representatives would have benefitted from any alleged fraud. Mead Aff. Ex. 5 ¶ 12.

The Court ruled that all but a sliver of Keable's proposed opinions were unhelpful or unreliable. D.E. 460. This ruling was erroneous for all of the reasons set forth in the Defendants' Memorandum in Opposition to Plaintiffs' Motion to Exclude the Expert Testimony of Michael A. Keable dated July 9, 2010 (D.E. 367-1), which is incorporated by reference. This exclusion affected the Defendants' substantial rights by eliminating their most direct answer to Candace Preston's damages analysis and exposing them to the argument made in closing that Alan Levan could not provide testimony to rebut her analysis because he was not an independent, third party expert. Tr. 4117. The enormous and unfair prejudice caused is patent, obvious, and warrants a new trial.

**D.      Evidence Concerning Other Financial Institutions**

Defendants sought to offer evidence and testimony showing that very few, if any, of the institutions on Candace Preston's NASDAQ bank index made the sort of disclosure that Plaintiffs claimed should have been made here. D.E. 474; D.E. 506; D.E. 526; Tr. 3634-38. This Court repeatedly and emphatically rejected the introduction of such evidence. Tr. 2898-99, 3634.

Defendants also sought to introduce a joint letter from the banking agencies, described in great detail in David Friedman's expert report, objecting to requiring the disclosure of unimpaired pass, special mention, and substandard loans in SEC filings because such disclosures would reveal confidential supervisory examination-related information. D.E. 474 at 16; Defendants' Ex. 443. The Court, however, ruled that this document was inadmissible because it was irrelevant and because it was inadmissible hearsay. Tr. 3633.[13]

--------------------------------------------------------

[13]In excluding the joint interagency letter from the banking agencies, this Court mentioned relevance and hearsay as possible justifications. Tr. 3633. As for relevance, Plaintiffs' counsel made the failure to disclose unimpaired watch list loans a centerpiece of his argument throughout trial, *e.g.*, Tr. 166, 168, 4062-63, 4068, 4090, and this interagency letter would have plainly demonstrated that David Friedman was correct in concluding that this was confidential examination-related information not appropriate for SEC disclosures.

As for hearsay, the letter was not offered for the truth of the matter asserted and also fell within the scope of at least two exceptions to the hearsay rules. It was not offered for the truth of the matter asserted because, as an institution regulated by the OTS, the OTS's opinion about what is

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Defendants also sought to, and were forbidden from, introducing evidence of the fate of the few Florida institutions on Candace Preston's bank index.  Tr. 2676. Candace Preston's NASDAQ Bank Stocks Index of 527 different financial institutions includes only thirteen institutions headquartered in Florida.  Defendants' Ex. 283; Tr. 2676, 2683. Defendants included on their trial exhibit list documents showing that many of those banks have failed, no longer exist in their previous form, or were operating under consent decrees with the banking regulators because the depression in the Florida real estate market has so severely impacted their loan portfolios.[14]  These documents confirmed that the Florida market, and Florida-centered institutions, are profoundly different from the national market that Candace Preston examined and were not only admissible as exhibits but also critical cross-examination and impeachment material for Candace Preston.

These rulings were erroneous for all of the reasons articulated at trial and in substantial prior briefing including (1) Defendants' Memorandum in Opposition to Plaintiffs' Omnibus Motion in Limine dated July 8, 2010; (2) Defendants' Opposition to Plaintiffs' Motion to Exclude Expert Opinion Testimony of Alan Levan, Jeffrey Mindling, and David Friedman dated October 1, 2010 (D.E. 506); and (3) Defendants' Opposition to Plaintiffs' Motion in Limine to Preclude Argument Concerning the Timing and Truth of Other Banking Institutions' Disclosures Concerning the Real Estate Downturn dated October 8, 2010 (D.E. 526).  Those arguments and memoranda are hereby incorporated by reference and explain how this evidence was relevant to numerous issues, including whether there were any material misstatements and omissions, whether Defendants acted with the necessary scienter, and whether Defendants caused any recoverable damages.

_____

confidential examination related information has independent significance for BankAtlantic and Bancorp, no matter whether the OTS is correct in that assessment.  It also fell within the scope of the business records and public records exceptions to the hearsay rules.  *See* Fed. R. Evid. 803(6); Fed. R. Evid. 803(8).

[14]Defendants' Ex. 335; Defendants' Ex. 447; Defendants' Ex. 473; Defendants' Ex. 474; Defendants' Ex. 487; Defendants' Ex. 171; Defendants' Ex. 437; Defendants' Ex. 487; Defendants' Ex. 450; Defendants' Ex. 298; Defendants' Ex. 461; Defendants' Ex. 483; Defendants' Ex. 455. Other Florida financial institutions have survived only after receiving federal money. *See, e.g.,* Defendants' Ex. 430; Defendants' Ex. 431; Defendants' Ex. 434; Defendants' Ex. 433. Defendants would have used even more documents in cross-examining and impeaching Candace Preston, many of which were being publicly posted on the Internet as the trial was progressing, about the status of various Florida-headquartered financial institutions.  Mead Aff. Exs. 6-10.

The erroneous exclusion of evidence that bears critically on three different elements of Plaintiffs' claims, any of which would foreclose liability, is precisely the sort of error on which a new trial can and must be predicated. But it goes further than that, because the jury heard evidence that Bancorp failed to disclose watch list loans and arguments that the Defendants' disclosures were therefore misleading without hearing any evidence that other financial institutions made the same balancing determinations in reaching their disclosure decisions. In other words, the jury heard only evidence that Bancorp failed to disclose certain information, without hearing any countervailing evidence about the reasons for such non-disclosure, including the fact that such evidence was confidential examination related information. Doing so was precisely the sort of massively prejudicial error that requires a new trial.

## VI.   This Court Committed Prejudicial Error in Allowing the Introduction of Eight Perry Alexander Emails Into Evidence

The Eleventh Circuit will reverse and order a new trial based on the erroneous admission of evidence if the district court made "a clear error of judgment" or "applied an incorrect legal standard." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004). In determining whether the error was prejudicial enough to require a new trial, courts look to "the number of errors," "the closeness of the factual disputes," "the prejudicial effect of the evidence at issue," "whether counsel intentionally elicited the evidence," "whether counsel focused on the evidence during the trial," and "whether any cautionary or limiting instructions were given." *Id.* at 1162.

This Court admitted over objection eight different email exchanges involving Perry Alexander, which were laced with profanity, slang, gossip, and every other indication of unreliability imaginable. Plaintiffs' Ex. 3; Plaintiffs' Ex. 182; Plaintiffs' Ex. 186; Plaintiffs' Ex. 188; Plaintiffs' Ex. 194; Plaintiffs' Ex. 201; Plaintiffs' Ex. 205; Plaintiffs' Ex. 231; Tr. 1375-79, 1452, 1474. The admission of those emails was erroneous for all of the reasons articulated in Defendants' Motion in Limine to Exclude Certain Emails and Testimony Regarding Such Emails dated June 18, 2010 and Defendants' Reply Memorandum in further Support of Their Motion dated July 23, 2010, both of which are incorporated by reference.[15]

---

[15]The emails read as a whole and in context show that Alexander was often commenting on rumors, guessing about the contents of SEC filings, and speculating about the impact of actual or potential lawsuits, rather than discussing a subject matter within the scope of his employment.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Plaintiffs have not, at any point in time, even attempted to satisfy their burden of tying Alexander's job position to the statements that he made in his emails. They did not and cannot show that Alexander was the lender for, or as market manager supervised the lender for, any of the loans that even they claim are relevant to this dispute. And, although they tout his experience as an MLC member, they have not and cannot show that Alexander was appointed to the MLC prior to the approval of any of the relevant loans or how the MLC monitored the loans (in fact it did so by approving modifications and Alexander did not participate in at least some of those modifications because he did not participate in the original approval of the loans), and they therefore have failed to meet their burden of showing that the emails address a subject matter within the scope of Alexander's agency or employment.

All of the factors identified by the Eleventh Circuit counsel in favor of ordering a new trial in this case: at least eight emails were erroneously admitted; absent those emails, Plaintiffs would have had little other than the Loan Watch Lists that even arguably supported their case; the emails themselves use highly inflammatory and prejudicial language; Plaintiffs' counsel very obviously and intentionally elicited this evidence for its prejudicial effect; Plaintiffs' counsel focused on this evidence extensively during opening and closing arguments, Tr. 161-62, 4063-66, 4113, 4115-16; and the Court never gave any sort of cautionary or limiting instruction concerning the emails. A new trial is plainly required.

## CONCLUSION

For the foregoing reasons, this Court must grant Defendants' motion for a new trial.

---

Alexander had no responsibility for grading loans other than his own loans, setting loan loss reserves, reviewing financial statements, or reviewing SEC filings. Tr. 1460, 1464, 1513-14, 1543-44, 1546-47, 1550-51. As Alexander put it, "I was just blowing hot air," he was chauvinistic, and at times he was covering himself against the risk of possible personal liability if the loans he had approved went bad because of an economic downturn. Tr. 1466, 1521, 1530, 1534-36. And indeed one of Alexander's emails even identified *itself* as "hearsay" and many others were plastered with indicia that they were not trustworthy and spoke to matters beyond the scope of his employment. Plaintiffs' Ex. 228; *see also, e.g.* Plaintiffs' Ex. 186; Plaintiffs' Ex. 189; Plaintiffs' Ex. 231. These emails were plainly inadmissible hearsay that should have also been excluded under Rules 401-403, and the failure to do so was prejudicial error requiring a new trial.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3200
Facsimile:  (305) 789-3395


 s/ Eugene E. Stearns
EUGENE E. STEARNS
Florida Bar No. 149335
estearns@stearnsweaver.com
RICHARD B. JACKSON
Florida Bar No. 898910
rjackson@stearnsweaver.com
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@stearnsweaver.com
CECILIA DURAN SIMMONS
Florida Bar No. 469726
csimmons@stearnsweaver.com
GORDON M. MEAD, JR.
Florida Bar No. 49896
gmead@stearnsweaver.com
ANDREA N. NATHAN
Florida Bar No. 16816
anathan@stearnsweaver.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF or through other approved means.

s/ Gordon M. Mead, Jr.
GORDON M. MEAD, JR.

## SERVICE LIST

*In re BankAtlantic Bancorp, Inc. Securities Litigation*
Case No. 07-61542-CIV-Ungaro/Simonton
United States District Court, Southern District of Florida

Mark Arisohn
marisohn@labaton.com
Serena Hallowell
shallowell@labaton.com
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
Telephone: 212-907-0877
Facsimile:  212-818-0477
*Lead Counsel for Lead Plaintiff State Boston*
*Retirement System*

Ronald D. Shindler
rshindler@fowler-white.com
Fowler White Burnett P.A.
1395 Brickell Avenue
14th Floor
Miami, FL 33131
Telephone: 305-789-9222
Facsimile: 305-789-9201
*Liaison Counsel for Lead Plaintiff State Boston*
*Retirement System*

Andrew Zivitz
azivitz@btkmc.com
Barroway Topaz Kessler Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
Facsimile:  610-667-7056
*Attorney for Plaintiff*