# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 07-61542-CIV-UNGARO/SIMONTON

IN RE BANKATLANTIC BANCORP,
INC. SECURITIES LITIGATION

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION FOR A NEW TRIAL AND SUPPORTING MEMORANDUM

LABATON SUCHAROW, LLP
Mark S. Arisohn, admitted *pro hac vice*
Mindy S. Dolgoff, admitted *pro hac vice*
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Co-Class Counsel for Class Representatives
and the Class and Lead Counsel for Lead-
Plaintiff State-Boston Retirement System*

FOWLER WHITE BARNETT P.A.
Ronald D. Shindler
Florida Bar No. 781703
Espirito Santo Plaza, 14th Floor
1395 Brickell Avenue
Miami, FL 33131-3302
Telephone: (305) 789-9222
Facsimile: (305) 789-9201
rshindler@fowler-white.com

*Liaison Counsel for Class Representatives and
the Class and for Lead Plaintiff State-Boston
Retirement System*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK LLP
Andrew L. Zivitz, admitted *pro hac vice*
Matthew L. Mustokoff, admitted *pro hac vice*
Mark S. Danek, admitted *pro hac vice*
Michelle M. Newcomer, admitted *pro hac vice*
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Class Counsel for Class Representatives
and the Class*

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ................................................................................................ iii

ARGUMENT ...................................................................................................................... 1

I.     THE JURY WAS NOT REQUIRED TO MAKE A SPECIAL FINDING
REGARDING THE FACTUAL ASSUMPTIONS UNDERLYING THE
OPINION OF PLAINTIFFS' DAMAGES EXPERT AND IN ANY EVENT
PLAINTIFFS PUT FORTH SUFFICIENT EVIDENCE ESTABLISHING
THOSE ASSUMPTIONS ..................................................................................... 1

II.    PLAINTIFFS' DAMAGES CLAIM WAS BASED ON THE PLEADINGS,
SUPPORTED BY SUFFICIENT EVIDENCE AND PROPERLY SUBMITTED
TO THE JURY ................................................................................................... 5

III.   THERE WAS NO ERROR IN THE JURY INSTRUCTIONS OR VERDICT
FORM THAT REQUIRES A NEW TRIAL .......................................................... 6

       A.     Instruction and Verdict Form Question Regarding  Assumptions Utilized
           by Plaintiffs' Damages Expert .................................................................. 6

       B.     Collapsing Markets Instruction.................................................................. 7

       C.     Need to Disaggregate Instruction............................................................... 8

       D.     The $2.93 Instruction ................................................................................ 9

       E.     Instruction about Corrective Disclosures .................................................. 10

IV.   THE COURT DID NOT ERR IN INSTRUCTING THE JURY THAT ALAN
LEVAN'S JULY 25, 2007 STATEMENTS WERE FALSE ........................................ 11

       A.     The Issue of the Objective Falsity of Alan Levan's July 25, 2007
           Statements Was Fairly Decided at the Summary Judgment Phase of this
           Litigation.................................................................................................. 11

       B.     Alan Levan's July 25 Statements Are a Proper Basis For Section 10(b)
           Liability................................................................................................... 11

             1.     Safe Harbor ................................................................................. 11

             2.     Falsity......................................................................................... 13

             3.     Scienter ...................................................................................... 14

             4.     Proximate Cause and Damages.................................................... 15

       C.     The Court's Jury Instruction Concerning Alan Levan's July 25 Statements
           Does Not Require A New Trial .................................................................. 16

V.    THE EXCLUSION OF DEFENDANTS' EXPERTS AND EVIDENCE
CONCERNING OTHER FINANCIAL INSTITUTIONS WAS NOT
PREJUDICIAL ERROR AND DOES NOT WARRANT A NEW TRIAL..................... 18

       A.     Stephen Morrell ....................................................................................... 19

B.     Jack DeWitt...................................................................................................... 19

C.     Michael Keable ................................................................................................ 20

D.     Evidence Concerning Other Financial Institutions ............................................... 21

VI.    THE INTRODUCTION OF PERRY ALEXANDER EMAILS INTO EVIDENCE
       WAS NOT PREJUDICIAL ERROR ............................................................................... 22

CONCLUSION ............................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

### CASES

*In re 21st Century Holding Co. Sec. Litig.*,
No. 07-61057-cv, 2008 WL 5749572 (S.D. Fla. Nov. 7, 2008) ........................................12, 13

*Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*,
849 F.2d 1336 (11th Cir.1987)..................................................................................................6, 8

*Adams v. Sewell*,
946 F.2d 757 (11th Cir.1991)........................................................................................................6

*Alexander v. Fulton Cnty. Ga.*,
207 F.3d 1303 (11th Cir. 2000)...................................................................................................18

*Austin-Westshore Constr. Co. Inc., v. Federated Dep't Stores, Inc.*,
934 F.2d 1217 (11th Cir.1991).................................................................................................1, 2

*Bastian v. Petren Res. Corp.*,
892 F.2d 680 (7th Cir. 1990).........................................................................................................8

*Burger King Corp. v. Mason*,
710 F.2d 1480 (11th Cir. 1983).....................................................................................................1

*Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*,
819 F.2d 1519 (9th Cir. 1987).....................................................................................................16

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ............................................................................................................. 19, 20

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
No. 04 cv 2561, 2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ...................................................12

*Griffin v. Matherne*,
471 F.2d 911 (5th Cir. 1973).........................................................................................................1

*Gross v. Medaphis Corp.*,
977 F. Supp. 1463 (N.D. Ga. 1997) (citation omitted) ..............................................................12

*Guidry v. Ke. Mfg. Co.*,
598 F.2d 402 (5th Cir. 1979).........................................................................................................1

*Harris v. Ivax*,
182 F.3d 799 (11th Cir. 1999)...............................................................................................11, 12

*Haygood v. Auto-Owners Ins. Co.*,
995 F.2d 1512 (11th Cir. 1993)..............................................................................................18, 20

*Hewitt v. B.F. Goodrich Co.*,
732 F.2d 1554 (11th Cir. 1984)...................................................................................................18

*Hibiscus Assocs. Ltd. v. Board of Trustees of the Policemen and Firemen
Ret. Sys. of the City of Detroit*
50 F. 3d 908 (11th Cir. 1995)................................................................................................20, 21

*Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*,
   471 F.2d 894 (5th Cir. 1973)...................................................................................3

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)....................................................................................8

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*,
   267 F.3d 1183 (11th Cir. 2001)...................................................................5, 6, 18

*In re Marsh & McLennan Co., Inc., Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)...................................................................15

*Mason v. Ford Motor Co., Inc.*,
   307 F.3d 1271 (11th Cir. 2002)...............................................................................2

*Mee Indus. v. Dow Chem. Co.*,
   608 F.3d 1202 (11th Cir. 2010).............................................................................14

*Milan Express, Inc. v. Averitt Express, Inc.*,
   254 F.3d 966 (11th Cir. 2001).................................................................................1

*Muro v. Hermanos Auto Wholesalers, Inc.*,
   514 F. Supp. 2d 1343 (S.D. Fla. 2007) .................................................................16

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................................12

*Oxford Asset Mgmt. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002)...............................................................................4

*Palmer v. Board of Regents of the Univ. Sys. of Ga.*,
   208 F.3d 969 (11th Cir. 2000).................................................................................6

*Peat, Inc. v. Vanguard Research Inc.*,
   378 F.3d 1154 (11th Cir.  2004).............................................................................23

*Perry v. State Farm Fire & Cas. Co.*,
   734 F.2d 1441 (11th Cir. 1984).............................................................................18

*Prentice v. Zane's Adm'r*,
   49 U.S. 470 (1850) .................................................................................................1

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996)..........................................................................13

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003).............................................................................20

*R.B. Co. v. Aetna Ins. Co.*,
   299 F.2d 753 (5th Cir. 1962)...................................................................................1

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005).............................................................................19

*Robbins v. Koger Props. Inc.*,
   116 F.3d 1441 (11th Cir. 1997)...............................................................................8

*SEC v. Phan*,
   500 F.3d 895 (9th Cir. 2007) ........................................................................4

*Stewart & Stevenson Servs. Inc. v. Pickard*,
   749 F.2d 635 (11th Cir. 1984) ..................................................................1, 2

*Terrell v. Household Goods Carriers' Bureau*,
   494 F.2d 16 (5th Cir. 1974) ........................................................................7

*United States v. Alfaro-Moncada*,
   607 F.3d 72 (11th Cir. 2010) .....................................................................25

*United States v. Dodds*,
   347 F.3d 893 (11th Cir. 2003) ...................................................................25

*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007) ......................................................................15

*Unites States v. Hill*,
   935 F.2d 196 (11th Cir. 1991) .....................................................................6

*Upton v. McKerrow, Jr.*,
   887 F. Supp. 1573 (N.D. Ga. 1995) ...........................................................12

*In re ValuJet, Inc. Sec. Litig.*,
   984 F. Supp. 1472 (N.D. Ga. 1997) ...........................................................12

## STATUTES

15 U.S.C. § 78u-5(i) ............................................................................................11

Fed. R. Civ. P. 49(a) .......................................................................................1, 2

Fed. R. Evid. 403 ...............................................................................................25

Plaintiffs respectfully submit this Opposition to Defendants' Motion for a New Trial and Supporting Memorandum ("MNT").

## ARGUMENT

**I.**   **THE JURY WAS NOT REQUIRED TO MAKE A SPECIAL FINDING REGARDING THE FACTUAL ASSUMPTIONS UNDERLYING THE OPINION OF PLAINTIFFS' DAMAGES EXPERT AND IN ANY EVENT PLAINTIFFS PUT FORTH SUFFICIENT EVIDENCE ESTABLISHING THOSE ASSUMPTIONS**

Defendants argue that they are entitled to a new trial because the jury did not expressly find that the factual assumptions underlying Plaintiffs' damages expert Candace Preston's opinion were established. This argument has no merit.

*First*, there is no controlling precedent requiring a new trial because the jury did not independently find by way of a special interrogatory that each and every one of Preston's assumptions were substantiated by the evidence. None of the cases cited by Defendants (MNT at 6-7) hold that a jury must, as a prerequisite to awarding damages, make a written finding that each factual assumption accepted by the plaintiff's damages expert was proven.[1]  Moreover, most of these cases are inapposite as they concern *special verdicts* under Fed. R. Civ. P. 49(a), *not* general verdicts under Fed. R. Civ. P. 49(b) such as the one utilized in this case.[2]  As the Eleventh Circuit explained in *Austin-Westshore Constr. Co., Inc., v. Federated Dep't Stores, Inc.*, 934 F.2d 1217 (11th Cir. 1991):

> A special verdict is one in which the jury finds all the facts and then refers the case to the court for a decision on those facts. It is rendered in lieu of a general verdict and contains findings on all material issues in the case. Special interrogatories, on the

---

[1] *See Griffin v. Matherne*, 471 F.2d 911, 916 (5th Cir. 1973); *Stewart & Stevenson Servs., Inc. v. Pickard*, 749 F.2d 635, 643-44 (11th Cir. 1984); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1489 (11th Cir. 1983); *Milan Express, Inc. v. Averitt Express, Inc.*, 254 F.3d 966, 982-83 (11th Cir. 2001); *Guidry v. Ke. Mfg. Co.*, 598 F.2d 402, 405-06 (5th Cir. 1979); *Prentice v. Zane's Adm'r*, 49 U.S. 470, 484 (1850); *R.B. Co. v. Aetna Ins. Co.*, 299 F.2d 753 (5th Cir. 1962).

[2] While it is not entirely clear from the decision whether *Burger King*, 710 F.2d 1480, involved a special verdict form, the case is distinguishable nonetheless. In *Burger King*, the court remanded part of the case for a new trial for a determination of facts regarding particular franchise agreements that the jury did not answer despite being presented with the question. *See id*. at 1489 (finding that the verdict form "does not resolve the disposition of over half of the franchises. As the district court observed, it is not clear what the jury found, if anything, with respect to the omitted franchises. The trial court properly declined to supply facts submitted [to] the jury []…*but left unanswered*.") (emphasis added). *Burger King* is thus inapposite, as there is no claim here that the jury neglected to answer certain inquiries on the verdict form.

1

other hand, are propounded as to the selected issues of fact, and answers to them always, or at least normally, given in connection with, not in substitution of, a general verdict.

*Id.* at 1221-22.[3]

Here, the jury answered written questions on selected issues of fact and rendered a general verdict in connection with those answers pursuant to Rule 49(b)(1) – just as Defendants requested.[4]  Pursuant to Defendants' request, the Court charged the jury that they were to apply the law to the facts and reach a general verdict.  Jury Instructions, DE 635 at 1 ("I will now explain to you the ***rules of law that you [the jury] must follow and apply*** in deciding this case.") (emphasis added).  Accordingly, the Rule 49(a) special verdict cases cited by Defendants are inapposite.[5]

---

[3] *See also Mason v. Ford Motor Co., Inc.*, 307 F.3d 1271, 1274 (11th Cir. 2002) ("A general verdict is a 'verdict by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions; it is a verdict by which the jury pronounces generally on all or any of the issues, either in favor of the plaintiff or in favor of the defendant.  In contrast, a *Rule 49(a)* special verdict is a verdict by which 'the jury finds the facts particularly, and then submits to the court the questions of law arising on them.'  With a special verdict, the jury's sole function is to determine the facts; the jury needs no instruction on the law because the court applies the law to the facts as found by the jury. And, the *Rule 49(b)* verdict providing for a general verdict coupled with answers to written interrogatories, is a hybrid of the general and special verdicts.") (citations omitted).

[4] Specifically, Defendants' proposed verdict form and jury instructions requested that the jury answer "Special Interrogator[ies]" and render a general verdict; they did *not* request that the jury only answer individual fact questions and then submit those findings to the Court for the application of law.  *See, e.g.*, DE 465-1 at 112, 114; DE 593-2 at 2, 10; *see also* DE 593-1 at 22 (Jointly Proposed Instruction No. 2 - "Members of the Jury: I will now explain to you the *rules of law that you [the jury] must follow and apply* in deciding this case."); i*d.* at 23 (Jointly Proposed Instruction No. 3 – "In deciding the case *you [the jury] must follow and apply all of the law as I [the Court] explain it to you*, whether you agree with that law or not....").

[5] It also bears mentioning that Defendants cite no cases that stand for the proposition that it was mandatory for the Court to submit to the jury a Rule 49(a) special verdict.  Indeed, it is entirely within the trial court's discretion to decide which verdict form will be submitted to the jury.  *See, e.g.*, Rule 49(a) & (b) (The court "***may require*** the jury to return only a special verdict" or the court "***may submit*** to the jury forms for a general verdict, together with written questions on one or more issues of fact that the jury must decide"); *Austin*, 934 F.2d at 1222 (holding that Rule 49 permits the court to decide which verdict form to submit to the jury); *Stewart*, 749 F.2d at 643 ("*Rule 49(a)* allows special verdicts in the discretion of the trial court.  The trial court also has discretion over the nature and scope of the issues submitted to the jury.").

Even though the Court was not required to submit a special interrogatory regarding Preston's assumptions to the jury, the jury clearly had the opportunity to consider and reject the assumptions.   Preston's assumptions (found at paragraph 10 of her report, PX726) were published to the jury during her testimony.   Trial Transcript ("Tr.") 2668-69.   Defendants vigorously cross-examined her about the assumptions and the significance if Plaintiffs failed to prove them.[6]   Moreover, the instructions given by the Court were absolutely clear that unless the jury first found liability the issue of damages was not to be reached (DE 635 at 23) and specified that it was up to the jury to decide whether it would rely on the expert's opinion.   *Id.* at 6.   Given these instructions, it is implicit in the jury verdict awarding damages based on Preston's testimony that the jurors found that the factual assumptions she relied on were proven.   *See, e.g.*, *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 903 (5th Cir. 1973) ("The jury obviously believed to some extent the assumptions of Dr. Dietz since the jury in its answer to the fifth special interrogatory awarded Gilliland $67,000 in damages.").

*Second*, the record abounds with evidence establishing Preston's assumptions.[7, 8]

---

[6] Preston testified that "[i]f the jury finds no liability, there would be no damage."  Tr. 2669. Moreover, Preston never testified, as Defendants suggest, that each and every one of the assumptions in her report must be met or else there can be *no* damages.  Rather, Preston simply testified that "[i]f the jury finds the assumptions that I have made here, *there is no liability related to those*, then there would be no damage."  *Id*. (emphasis added).  And there is no dispute that the jury found liability related to the subject matter of those assumptions.

[7] Evidence supporting assumption at Preston Report ¶ 10(a) ("At least from the beginning of, and throughout the Class Period, Defendants knew or recklessly disregarded the true state of the [land loan portfolio].") (*see, e.g.*, PX667, PX155, PX53, PX154, PX87, PX242, PX286, PX194, DX159, PX133, PX251, PX100, PX444, PX7, PX511, PX138, PX124, PX141, PX139, PX3058, PX1182, PX942, PX9, PX841, PX174, PX454, PX516, PX178, PX236, PX3); Evidence supporting assumption at Preston Report ¶ 10(b) ("At least from the beginning of, and throughout the Class Period, Defendants were aware of, misrepresented and failed to disclose the credit quality of their borrowers and the quality of the loans in the [land loan portfolio].") (*see, e.g.*, PX210, PX190, PX77, PX194, PX80, PX81, PX135, PX251, PX229, PX444, PX181, PX511, PX451, PX364, PX365, PX1182, PX294, PX200, PX841, PX201, PX830); Evidence supporting assumption at Preston Report ¶ 10(c) ("During the Class Period Defendants, provided the public with false and/or misleading information or omitted material information necessary to make other statements not misleading concerning the [asset quality of the loans in the land loan portfolio], the 'conservative' nature of its underwriting, and the collateral supporting the loans.") (*see, e.g.*, PX1156, PX21, DX652, PX225, PX188, PX186, DX655, PX210, PX921, PX190, PX194, DX159, PX135, PX679, PX446, PX181, PX511, PX200, PX841, PX196, DX330, DX331, PX204, PX1167); and evidence supporting assumption at Preston Report ¶ 10(e) ("By
*(continued...)*

3

Defendants place much emphasis on footnote 26 in the Court's August 18, 2010 Omnibus Order (DE 411) concerning Preston's assumptions of fraud regarding BankAtlantic's builder land bank ("BLB") loans beyond April 26, 2007.  *See* MNT at 4.  In this footnote, the Court, in denying Defendants' *Daubert* motion, addressed Defendants' challenge to Preston's methodology that she did not disaggregate the losses related to BLB loans from the October 26, 2007 decline in Bancorp's stock price.  The Court ruled that the admissibility of Preston's opinion that the residual price decline on October 26, 2007 was caused by negative information about the entire land loan portfolio (including the BLB *and* non-BLB segments) – an opinion which does not distinguish the portion of the decline caused by BLB-related news from the portion caused by non-BLB-related news – was contingent upon whether there was sufficient evidence to support Preston's factual assumption that Defendants continued to misrepresent the true risk and quality of the BLB loans after April 26, 2007.  DE 411 at 33 n.26.  During the trial, the Court found that the record evidence substantiated this assumption:

> Now, so [Defendants'] argument is [Preston] should have disaggregated the BLB fraud.  **Well, that argument only works if there's no BLB fraud after April 26th. ….** **And I'll rule now that there is evidence in the record from which the jury could**

*(…continued)*
April 26, 2007, Defendants should have disclosed that: (i) contrary to their assertions that their land bank portfolio presented risks not present in the other segments of the CRE portfolio, the problem and potential problem loans were, in actuality, distributed throughout the [entire land loan portfolio], (ii) the number and dollar value of the [problem land loans] on the Loan Watch Lists ("LWL") and the potential problem loans as of April 26, 2007, and (iii) the trends and concerns expressed by management as of that date.") (*see*, *e.g.*, PX350, PX351, PX711, PX356, PX357, PX727, PX728, PX967, PX138, PX124, PX43, PX141, PX139, PX365, PX3058, PX1182, PX119, PX1184, PX294, PX942, PX215, PX200, PX9, PX841, PX18, PX174, PX454, PX830, PX723, PX516, PX178,  PX236, PX3).

[8]   Defendants contend (MNT at 3 n.4) that at the time of the April 26, 2007 conference call Bancorp had properly disclosed its loans on the Company's internal Loan Watch List.  This is contrary to the evidence.  The Loan Watch List dated March 31, 2007 contained $21 million in BLB loans (PX350), but Bancorp's first quarter 2007 public disclosures did not identify this amount of loans as having been placed on the Loan Watch List.  Moreover, to the extent Defendants argued at trial that Bancorp's description in its public filings of "loans in the amount of $130 to $140 million" deemed its omission of Loan Watch List loans as immaterial (MNT at 3 n.4), that was a question for the jury to determine, not a basis for a new trial.  *See Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002) ("The trier of fact usually decides the issue of materiality."); *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) ("Determining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'") (internal citation omitted).

*conclude that there was post-April 26th BLB fraud.*   And I have many reasons for saying that, but at the most basic level the problem is that … the April 26th disclosure is more or less something like this:  We have a segment of our land loan portfolio which we're calling BLB loans that amount to $140 million to $160 million and it is exposed to risk of loss because of what's going on in the Florida real estate market. ... The Plaintiffs' complaint is, however, that the BLB portfolio was exposed to greater risk than the risk posed by the Florida real estate market because of the credit quality of the portfolio and that that was not disclosed to the public and that that risk materialized in October.  So that is the Plaintiffs' contention.  And I believe *there is evidence in the record,* looking at it in the light most favorable to the nonmoving party, from which the jury could reach that conclusion.

Tr. 3044-45.[9]

## II.   PLAINTIFFS' DAMAGES CLAIM WAS BASED ON THE PLEADINGS, SUPPORTED BY SUFFICIENT EVIDENCE AND PROPERLY SUBMITTED TO THE JURY

Citing to their accompanying memorandum in support of their Motion for Judgment as a Matter of Law, Defendants next contend that they are entitled to a new trial because of Plaintiffs' "utter failure to present any competent evidence of causation and damages."  MNT at 7-8.  As set forth in Plaintiffs' accompanying Opposition to Defendants' Motion for Judgment as a Matter of Law (at Part II), the evidence of causation and damages – presented by Plaintiffs' expert Candace Preston whose testimony was unrebutted by any damages expert for Defendants – was more than ample to sustain the jury's verdict.  *Lipphardt  v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1189 (11th Cir. 2001) (reversing grant of post-verdict motion for new trial

---

[9] Defendants contend that the verdict form proposed by Plaintiffs, which delineated 20-plus alleged false and misleading statements and omissions, represented an "abandon[ment of] the case [Plaintiffs] had previously pled."  MNT at 4 n.5.  This misstates the facts.  As set forth in the First Amended Consolidated Complaint ("FACC"), Plaintiffs alleged, *inter alia*, that Defendants issued roughly 25 false and misleading statements and omissions concerning the quality of BankAtlantic's land loan portfolio and the nature of its underwriting practices in the course of 11 SEC filings, press releases and conference calls between October 19, 2006 and August 9, 2007.   DE 80 ¶¶ 169-210.   Included in these alleged misrepresentations were Defendant A. Levan's statements during the April 26, 2007 and July 25, 2007 conference calls regarding the scope of BankAtlantic's concerns about the land loan portfolio and the characteristics of the portfolio. *Id.* ¶¶ 192-199, 205-06.  Plaintiffs further pled that "Defendants' false and misleading statements had the intended effect and caused BankAtlantic common stock to trade at artificially inflated levels throughout the Class Period…"  *Id.* ¶ 235.  Moreover, to the extent Plaintiffs alleged a handful of additional misrepresentations and omissions in the Proposed Second Amended Consolidated Complaint that were not included in the FACC, this Court ruled in the context of denying Plaintiffs' Motion for Leave to Amend that "Defendants have been put on notice of these additional misstatements and omissions."  DE 242 at 8.

where the verdict "did not result in a miscarriage of justice and was not against the great weight of the evidence").  Indeed, given that there was no expert testimony from Defendants to rebut Preston's testimony, it is hard to see how the jury's damages award went against the "great weight of the evidence" so as to warrant a new trial.  *See id.* ("Because it is critical that a judge does not merely substitute his judgment for that of the jury, 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence.'") (citation omitted).   In addition, as discussed above, Plaintiffs' damages claim was based on the alleged misstatements and omissions contained in the FACC or otherwise made known to Defendants prior to the close of discovery when Plaintiffs sought to amend the FACC.  *See* note 9 *supra.*

## III.   THERE WAS NO ERROR IN THE JURY INSTRUCTIONS OR VERDICT FORM THAT REQUIRES A NEW TRIAL

The Defendants seek a new trial on the ground that the Court failed to instruct the jury as to five specific matters and did not utilize the verdict form they proposed.  The law, however, permits a new trial for failure to give an instruction only "if the failure to give the instruction resulted in prejudicial harm to the requesting party."  *Palmer v. Board of Regents of the Univ. Sys. of Ga.*, 208 F.3d 969, 973 (11th Cir. 2000).  Thus, a defendant may obtain a new trial "only if the requested instruction is correct, is not adequately covered by the charge given, and deals with a point so important that failure to give the instruction seriously impaired the defendant's ability to present an effective defense."  *Adams v. Sewell*, 946 F.2d 757, 767 (11th Cir. 1991) (*quoting United States v. Hill*, 935 F.2d 196, 200 (11th Cir. 1991)).  Further, while a party is entitled to have the jury instructed on its theory of the case if the evidence supports that theory, "the court is not required to give instructions in the exact language that a party's lawyer desires."  *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1349 (11th Cir. 1987).  These well established principles require the Court to deny Defendants' motion for a new trial.

### A.   Instruction and Verdict Form Question Regarding Assumptions Utilized by Plaintiffs' Damages Expert

Under Defendants' view of the case, the jury should have been instructed specifically that it had to find Plaintiffs proved each of the assumptions Candace Preston utilized in arriving at

her opinion and that the verdict form should have asked the jury for specific findings as to whether those assumptions were established by the evidence.[10]

For the reasons set forth above in Point I and in Plaintiffs' Opposition to Defendants' Motion for Judgment as a Matter of Law, Point I, Defendants were not entitled to the instruction requested as to the assumptions relied on by Candace Preston.  Nor were Defendants entitled to have the jury deliberations structured around those assumptions.  Defendants cited nothing to support their requested instruction or verdict form at trial and cite no relevant authority now.  Defendants' construction of their proposed verdict form based on the factual assumptions utilized by Plaintiffs' damages expert reflects a basic misconception properly rejected by the Court.  To be sure, the assumptions utilized by the expert had to be adequately based in the record. *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 24 (5th Cir. 1974).  But that does not translate into a requirement that a jury must vote up or down on every fact assumption forming the basis of an expert's opinion.

Here, the assumptions utilized by Preston were general statements of fact supporting liability for securities fraud under Section 10(b).  Those assumptions were published to the jury during Preston's testimony (Tr. 2668 – 69) and subject to cross-examination.  Moreover, the Court instructed that unless the jury first found liability the issue of damages was not to be reached (DE 635 at 23) and specified that the jury could accept or reject the expert's opinion (DE 635 at 6).

### B.    Collapsing Markets Instruction

Defendants fault the Court for not giving what they now call "a collapsing market" instruction, asserting that their proposed instruction, entitled "Corrective Disclosure and Materialization of Concealed Risk" submitted on November 8, 2010 (DE 627 at 1 - 2), embodies the principle on which the jury should have been instructed.  According to Defendants, the defect

---

[10] Defendants requested an instruction to the effect that facts assumed by Plaintiffs' expert had to be proven at trial and that if any assumed fact was not proven by a preponderance of the evidence, then the jury should disregard the expert's opinion. DE 623 at 2.  This request, filed by Defendants on November 7, 2010, was not supported by a single citation.  Defendants' complaint that the requested instruction was "summarily refused" (MNT at 9) is belied by the extensive colloquy regarding the issue had the day before. Tr. 3809 – 19.  Defendants' proposed verdict form incorporated a string recitation of the factual assumptions provided to the expert in two sub-parts of a convoluted and unintelligibly drafted special interrogatory. DE 593-2 at 2, 10.

in the Court's instruction that rejected the formulation they proposed was the failure to make clear "that Defendants' argument was that the collapsing Florida real estate market severed the causal link" between the alleged fraud and the damages. MNT at 10.

On the contrary, the Court plainly instructed the jury on the defense theory about the deteriorating Florida real estate market.  First, the instruction on damages required the jury to determine that the Plaintiffs were damaged by the revelation of the truth. DE 635 at 19. ("Plaintiffs must prove by a preponderance of the evidence … that the truth regarding the false statements or omissions was at some time revealed to the market, and that the Plaintiffs were damaged as a result").  Second, the Court specifically instructed the jury about the significance of the Florida real estate market as follows:

> Defendants contend that the Plaintiffs' losses were solely due to deteriorating conditions in the Florida real estate market, about which investors were forewarned. Defendants do not have the burden of proving this contention by a preponderance of the evidence; rather, it is Plaintiffs' burden, as stated above, to prove that the corrective disclosures and/or materialization of concealed risks, and not other factors, were significant contributing causes of their damages.

DE 635 at 22 – 23.  This instruction properly put the issue to the jury and embodied the loss causation principles supported by *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 -75 (2d Cir. 2005); *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683-85 (7th Cir. 1990); and *Robbins v. Koger Props. Inc.*, 116 F.3d 1441 (11th Cir. 1997).  An instruction in the exact language requested by Defendants was not required.  *Ad-Vantage Tel. Directory Consultants, Inc.*, 849 F.2d at 1349.

### C.    Need to Disaggregate Instruction

Defendants erroneously claim that the Court's refusal to give the "sum and substance" (MNT at 13) of their requested instruction on disaggregation (DE 628) necessitates a new trial. [11] As with the argument relating to the "collapsing markets instruction," the essence of the requested instruction on disaggregation was given.  Thus, at the conclusion of the Court's

---

[11] The requested instruction, submitted on November 8, 2010, was:

> Defendants contend that the stock price declines that occurred were not caused as a result of any alleged misrepresentations or omissions but were, instead, caused by deteriorating conditions in the Florida real estate market about which investors were forewarned. Any award of damages must subtract from the price declines the losses caused by such factors, and Plaintiffs carry the burden of proof to eliminate from their damage claim losses caused by non-fraud factors.

instruction on damages, the jury was specifically told the following with respect to disaggregation:

> There may be factors other than the alleged fraudulent statements and/or omissions that affected Bancorp's stock price on any given day.  For example, *market or industry conditions or bad news disclosed by Bancorp that was unrelated to the alleged fraud could have affected Bancorp's stock price.*  Defendants are not liable for any share price decline resulting from those other non-fraud related events.  Plaintiffs bear the burden of disaggregating (or separating out) any share price declines that were caused by non-fraud related events or establishing that the entire share price decline was caused by the alleged fraud.  Plaintiffs claim that the alleged fraud caused damages in the amount of 37 cents per share on April 26, 2007.  Plaintiffs also claim that the alleged fraud caused damages in the amount of $2.93 per share on October 26, 2007.  Defendants claim that Plaintiffs have failed to separate out price declines caused by market conditions, the conditions of the real estate market, and  other conditions not related to the alleged fraud.

DE 635 at 23 – 24 (emphasis added).  Thus, in clear language, the jury was told about Plaintiffs' burden to disaggregate or separate out share price declines caused by non-fraud related events and also about the competing contentions of the parties.  The verdict, in which the jury awarded $0.00 for the first part of the Class Period and $2.41 for the second part of the Class Period, leaves no doubt that the jury understood and applied this instruction and the law it embodied by deducting from the damages a sum it concluded was caused by non-fraud related events, namely the deteriorating economy.

### D.       The $2.93 Instruction

Claiming that the Court's instruction that Plaintiffs' were seeking $2.93 per share in damages turned the causation and damages inquiry "into a farce" (MNT at 15), the Defendants seek a new trial because the instruction supposedly undermined Defendants' challenge to Plaintiffs' damages expert's use of the NASDAQ Bank Stocks Index in calculating damages.

Defendants' entire premise here is wrong.  Neither the instruction nor the $2.93 has anything whatsoever to do with the NASDAQ Bank Stocks Index.  On October 26, 2007, Bancorp's share price declined from $7.65 to $4.72, a total drop of $2.93.  Ms. Preston's damages opinion was that the amount of inflation due to the fraud in the second part of the Class Period was $3.15.  However, since the PSLRA limits recovery to the amount of the actual stock price drop, in this case, $2.93, Plaintiffs were prohibited by law from a recovery of more than $2.93.  The issue was discussed with the parties at length and it was resolved that Plaintiffs

would not claim damages of more than the legal maximum of $2.93 per share. Tr. 3753 – 57. The Court simply instructed the jury that was the amount being claimed by Plaintiffs.

If Defendants saw this issue as an opportunity to further attack Preston, they were free to do so in summation. But the issue has nothing to do with the NASDAQ Banks Stock Index and the instruction telling the jury the amount of Plaintiffs' damages claim is a non issue.

### E.    Instruction about Corrective Disclosures

Claiming another "massively prejudicial" error (MNT at 16), Defendants accuse the Court of failing to advise the jury that if information sufficient to dispel the fraud was disclosed prior to the supposed revelation of the truth, Plaintiff would not satisfy its burden of showing loss causation.

Defendants neglect to point out that the very concept was in fact dealt with in the Court's instructions on the element of materiality. The jury was instructed as follows:

> You should also consider whether the information that was the subject of the misrepresentation or omission was already in the public domain and the market was aware of the truth of the matter. If you find that the market was aware of the information that was misrepresented or omitted, then you should find that the misrepresentation or omission was not material. So, if analysts or investors were aware of a fact, from whatever source, then the Defendants cannot be liable for misrepresenting or omitting disclosure of that fact.

DE 635 at 13. Defendants' contention that the jury was not instructed about the effect of the truth on the market is plainly wrong. [12]

_____

[12] Defendants extend their tortured argument about corrective disclosures with the claim that a properly instructed jury would have cut-off damages caused by the fraudulent April 26 and July 26 conference call statements because they found that the Form 10-Qs filed thereafter did not fraudulently misrepresent the relative risk of the BLB loans. MNT at 16 – 17. The argument is fallacious. Plaintiffs' contention about the 10-Qs (Statements 11 and 18) was that the representation about relative risk amounted to a fraudulent omission about the true risk of both the BLB and non-BLB portfolios. The finding that these statements did not amount to a violation of Section 10(b) in no way can be said to "correct" the false and misleading statements made in the two conference calls (Statements 7, 10, 13, 14, 15, 16, and 17).

## IV.   THE COURT DID NOT ERR IN INSTRUCTING THE JURY THAT ALAN LEVAN'S JULY 25, 2007 STATEMENTS WERE FALSE

### A.   The Issue of the Objective Falsity of Alan Levan's July 25, 2007 Statements Was Fairly Decided at the Summary Judgment Phase of this Litigation

As this Court has noted, the issue of whether Alan Levan's July 25, 2007 conference call statements were false was "litigated fair and square" on summary judgment. Tr. 123.  Defendants were afforded – and maximized – every opportunity to be heard on the issue.  Indeed, Defendants' opposition to Plaintiffs' narrowly focused partial summary judgment motion consisted of a 15-page brief, a 56-paragraph statement of material facts and an affidavit attaching over 60 exhibits.   DE 329; DE 330; DE 331.  In conjunction with its Order deeming Levan's July 25 statements to be false, the Court issued a detailed opinion that identifed the record evidence establishing the objective falsity of the statements and noting the deficiencies of Defendants' arguments to the contrary.  DE 411 at 57-61.  In response to a 20-page motion for reconsideration (DE 471), the Court again considered and rejected Defendants' arguments and issued a second detailed opinion on the issue.  DE 478.

### B.   Alan Levan's July 25 Statements Are a Proper Basis For Section 10(b) Liability

Defendants claim prejudicial error in the Court's instruction to the jury regarding the falsity of the July 25 statements because (i) the statements were non-actionable under the PSLRA safe harbor for forward-looking statements, and (ii) having heard the instruction, the jury could not possibly have fairly determined the issues of materiality, scienter and loss causation with respect to these statements.  Putting aside the fact that the instruction was proper in all respects (*see* Point IV.C *infra*), the July 25 statements are not protected by the PSLRA safe harbor, as previously found by this Court (Tr. 3915; 4022), and there was sufficient evidence presented at trial for the jury to find that Alan Levan and Bancorp violated Section 10(b) with respect to the July 25 statements.

#### 1.   Safe Harbor

The July 25 statements were not forward-looking and, in any event, were not accompanied by meaningful cautionary language and were made with actual knowledge of their falsity, such that the safe harbor does not apply.  *See* 15 U.S.C. § 78u-5(i)(l) (defining forward-looking statements as earnings forecasts, revenue projections or statements of future plans for operations); *Harris v. Ivax*, 182 F.3d 799, 805 (11th Cir. 1999) (forward-looking statements are

ones whose truth "is discernible only after it is made"); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1479 (N.D. Ga. 1997).  For example, statements that the portfolio "**has always performed** extremely well, **continues to perform** extremely well" and "there are no other asset classes that **we are concerned** about in the portfolio," (DX8 at 20-21), speak to the past and then-existing performance of the non-BLB portfolio and Defendants' *then-held* concerns for the same. *Harris*, 182 F.3d at 806 (statements such as "customer re-orders remain depressed" and "prices have continued to decline" are not forward-looking); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements "that the inventory situation was in good shape or under control" are not forward-looking); *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga. 1997) (the safe harbor "does not insulate defendants from private securities liability based on statements that *misrepresent historical/hard or current facts*") (emphasis added) (citation omitted).

Defendants' attempts to cast the July 25 statements as forward-looking because (1) the analyst question to which these statements responded addressed "risk down the road," and (2) the statements were not verifiable or falsifiable when made because only time would tell which asset classes were most exposed, are misplaced.  MNT at 19.  As the Court found, the evidence submitted on summary judgment established there was no genuine issue of material fact that these statements were objectively false when made – *i.e.*, they could not have been forward-looking.  *See* DE 411 at 58-59; DE 478 at 3, 7.  Indeed, any doubt that Levan was referring to his *then-existing* concern for only the BLB portfolio in responding to the analyst's question is extinguished by his later representation on the call:  "I'm just telling you **to date** … we do not have a concern about the balance of the [non-BLB] portfolio."[13]   DX8 at 32 (emphasis added).

_____

[13] Even if the statements can be deemed forward-looking (which they cannot) the generic warnings that "actual results, performance or achievements could differ materially from those contemplated" and about potential risks relating to the Florida real estate market are not sufficiently meaningful to render Alan Levan's lies about *then-occurring* events immaterial.  *See Harris*, 182 F.3d at 805; *Davidco Investors, LLC v. Anchor Glass Container Corp.*, No. 04 cv 2561, 2006 WL 547989, at *12-13 (M.D. Fla. Mar. 6, 2006) (safe harbor did not apply because statements were not forward-looking and risk disclosures were "boilerplate"); *Upton v. McKerrow, Jr.*, 887 F. Supp. 1573, 1579 (N.D. Ga. 1995) (cautionary language must *directly* address the nature and scope of the misstatement).  Furthermore, no warnings of possible credit quality problems would have been sufficient, as the credit quality of the bank's land loan portfolio had already deteriorated by the time of the misstatements.  *See In re 21st Century Holding Co. Sec. Litig.*, No. 07-61057-cv, 2008 WL 5749572, at *13 (S.D. Fla. Nov. 7, 2008) ("Cautionary language can never be 'meaningful' if it warns of risks that have already *(continued…)*

2.      **Falsity**

Putting aside this Court's Omnibus Order (DE 411 at 57-61), there was sufficient evidence at trial establishing that the July 25 statements were false at the time they were made and that, contrary to Alan Levan's public representations, the non-BLB segment of the land loan portfolio was *not* "performing extremely well" and there in fact *was* concern within Bancorp regarding these loans.   *See, e.g.*, PX356, 357 (June and July 2007 loan watch lists containing $165 and $204 million, respectively, in land loans, including $62 and $98 million, respectively, in non-BLB loans); PX138 (Levan noting a "parade" of non-BLB loans seeking extended maturities in first quarter 2007); PX124 (Marcia Snyder email discussing MLC's concerns in March 2007 with both BLB and non-BLB land loans:  "The MLC members spent a great deal of time today discussing our residential land exposure, which is currently in excess of $300MM [and] … includes those loans that are presold to builders [BLB] *as well as* land loans without a presale but being held for future sale [non-BLB].  Obviously, there is significant concern about these loans given the current state of the market." (emphasis added)); Tr. 964 (playing McClung deposition testimony at 212 that he was "concerned" with the entire land loan portfolio in April 2007); PX9 at 11, 13 (report establishing that Office of Thrift Supervision viewed the magnitude of watch list loans as a "regulatory concern" as of June 30, 2007); PX200, 215; Tr. 2357, 2361 (manager of "special" assets testifying that in May 2007, BankAtlantic had $86 million in land loans, including non-BLB loans, "that either should be on non-accrual or will be soon" and that this was just the "tip o the iceberg").

Moreover, Defendants' argument that Alan Levan's description of the non-BLB land loans as "performing extremely well" was true is one that the jury was entitled to – and did – reject.  Specifically, Defendants argue that Levan's use of the word "performing" was consistent with the OTS definition of a performing loan as an accruing loan and thus in describing the non-BLB segment, he was telling the truth.  But whether Levan told the truth is an issue of credibility for the jury.  Defendants assert that "[e]*very witness* who spoke to the issue also testified that non-performing means non-accrual," but cite just one page of trial testimony in support of this

---

(*…continued*)

materialized."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

strident assertion.   MNT at 21 (citing testimony of David Friedman (Tr. 2908)) (emphasis added).   The jury was apparently not swayed by this testimony, but that is no basis for a new trial.   Indeed, the district court "'must disregard all evidence favoring the moving party that the jury is not required to believe,'" *i.e.*, evidence that comes from biased witnesses, even if "uncontradicted and unimpeached." *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211, 1216 (11th Cir. 2010) (citation omitted) (upholding the trial court's denial of judgment as a matter of law where there was sufficient evidence in the record raising "material issues of fact which were properly left for the jury to decide").   In addition, Defendants cite to no trial evidence establishing that Levan's concerns as of July 25, 2007 were limited to the BLB loans.   By contrast, Plaintiffs presented unrefuted evidence (*see* above paragraph) of widespread concerns regarding the non-BLB loans within the Company by the time of the July 25 conference call and the fact that the non-BLB loans were no longer "perform[ing] extremely well."[14]  DX8 at 20.[15]

   **3.   Scienter**

   The evidence of scienter with respect to the July 25 statements was overwhelming.   In claiming they are entitled to a new trial because of a failure of proof as to scienter, Defendants completely overlook that every misstatement on July 25, 2007 was found by the jury to have been made with actual knowledge of falsity.   Verdict Form, DE 665 at 33-41.   The Loan Watch Lists, the internal emails and the stipulated facts established Levan's actual knowledge that the non-BLB loans were not performing extremely well and that there was concern about these

---

[14] Also without merit is Defendants' contention that the analyst's report following the July 25 earnings call stating that "*we believe it is possible* that other areas of the commercial real estate portfolio will be impacted in the near future given the market for Florida real estate," synthesizes how the market understood the mix of available information and establishes that, in considering the total mix of information, the July 25 statements were true.   MNT at 20 (quoting DX330 (emphasis added)).   Indeed, the same analyst noted in his report that **"BankAtlantic indicated the other portfolios [non-BLB] currently are not having issues"** (DX330 (emphasis added)), demonstrating that the market was not made aware of the true state of the deteriorating non-BLB loan segment at the time of the July 25 earnings call.   *See also* DX331 at 1, 3 (analyst report stating "Non-Land Bank Portfolio is Showing No Weakness" and issuing a "buy" recommendation).

[15] In addition, Defendants waived this argument regarding the meaning of the word "performing" by not raising it in opposition to Plaintiffs' Motion for Partial Summary Judgment.   DE 478 at 3 (Order on Motion for Reconsideration).

loans. *See* evidence cited in Point IV.B.2 *supra*; DX15 (establishing when non-BLB loans were placed on Loan Watch List).

The adequacy of the loan loss reserves, the absence of accounting red flags and the Company's stock repurchase program – all arguments raised by Defendants and properly rejected by the jury – simply cannot support the motion for a new trial on the issue of scienter. With respect to the reserves, while Generally Accepted Accounting Principles ("GAAP") require the disclosure of adequate loan loss reserves, compliance with "GAAP neither establishes nor shields guilt in a securities fraud case," *United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007), and the courts have held that misrepresentations and omissions under the securities laws can exist without violations of GAAP. *See, e.g., In re Marsh & McLennan Co., Inc., Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006) (court sustained securities fraud claims based on false statements regarding contingent commissions even though "Plaintiffs fail[ed] to sufficiently plead a violation of GAAP or the existence of accounting fraud" in connection with income derived from those contingent commissions); *see also generally* DE 622 (Plaintiffs' Memorandum of Law in Opposition to (1) Defendants' Motion for Judgment as a Matter of Law on Loan Loss Reserves and (2) Regarding Issue Preclusion). With respect to the Company's stock buybacks, Plaintiffs established at trial that none of the Individual Defendants, including Alan Levan, bought any Bancorp shares with their own money for their own investment portfolios during the Class Period, suggesting that none of these Defendants genuinely believed Bancorp to be a "good buy." Plaintiffs also presented evidence that the Company's intention in repurchasing its stock was to inflate the stock price. PX742 (June 14, 2007 e-mail between White and Toalson discussing the public's reaction to news of the buybacks and the effect of the buybacks on earnings per share). By contrast, there was *no* evidence adduced that Bancorp repurchased its shares because Levan or the other Defendants thought that the Company was a "good buy." The jury properly weighed all these facts and arguments to conclude that Levan (and thus Bancorp) "knowingly" made the July 25 statements in violation of Section 10(b).

### 4.    Proximate Cause and Damages

As fully set forth in Plaintiffs' accompanying Opposition to Defendants' Motion for Judgment as a Matter of Law, Point II, and contrary to Defendants' assertion (MNT at 22-23), Plaintiffs presented sufficient evidence at trial demonstrating the requisite causal link between

Levan's July 25 statements and the losses suffered by Bancorp shareholders following the October 25, 2007 Form 8-K and resulting stock price decline.

Defendants' assertion that Preston testified that "Bancorp's stock price movements in the wake of the July 25 call 'had nothing to do with the land loan portfolio or the allegations in this case,'" mischaracterizes Preston's testimony and takes it completely out of context.  MNT at 22 (quoting Tr. 2629).  Preston testified that although Bancorp's stock price increased following the July 25, 2007 call in response to positive news unrelated to the land loan portfolio, Levan's statements regarding the land loan portfolio (which she assumed – and Plaintiffs proved – were false) maintained the inflation in Bancorp's stock price that first entered the stock price on April 26, 2007.  Tr. 2624-29.  Thus, Defendants' contention that Preston failed to establish how the July 25 statements were a proximate cause of damages is belied by the record.

### C.   The Court's Jury Instruction Concerning Alan Levan's July 25 Statements Does Not Require A New Trial

Defendants' claim of undue prejudice is without merit.  First, Defendants cite no appellate precedent for the proposition that a trial court's instruction to the jury regarding a pre-trial factual finding (in the context of summary judgment or otherwise) constitutes prejudicial error warranting a new trial.  This is not surprising, as there is nothing inherently prejudicial about a partial summary judgment ruling, particularly one that has been litigated fully and fairly. *See* Tr. 123 (Court noting that the partial summary judgment motion was "litigated fair and square").  Indeed, such rulings serve the function of streamlining issues for trial. *See, e.g., Muro v. Hermanos Auto Wholesalers, Inc.*, 514 F. Supp. 2d 1343, 1353 (S.D. Fla. 2007) (granting partial summary judgment as to defendants' violations of the Truth in Lending Act, leaving the issue of causation for trial); *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987) ("[G]iven the size and complexity of this case, we cannot condemn the district court's effort to carve out threshold claims and thus streamline further litigation.  In these partial summary judgments, the district court effectively narrowed the issues….").

Far from "enormously prejudici[ng]" Defendants (MNT at 23), this Court took great care to ensure that Defendants suffered no undue prejudice by its partial summary judgment ruling regarding Levan's July 25 statements.  For example, the Court denied Plaintiffs' requests to inform the jury about the Court's ruling at the outset of the trial in the preliminary jury instructions as potentially prejudicial (Tr. 77-78, 123-126) and, instead, deferred until the close of evidence any reference to the ruling.  Tr. 4286-87.  Moreover, when the Court did ultimately

16

relay the instruction following the close of evidence, it did so with emphasis on the narrow nature of the ruling, and, only after having notified the jury of a summary judgment ruling in *Defendants'* favor:

> Prior to trial the Court ruled that BankAtlantic's non-accrual loans, BankAtlantic's allowance for loan loss provision, and Bancorp's financial statements were accurately calculated and reported throughout the class period. ***You must, therefore, accept that BankAtlantic's non-accrual loans, BankAtlantic's allowances for loan loss provisions, and Bancorp's financial statements were accurately calculated and reported throughout the class period in your deliberations.***
>
> ***Prior to trial the Court also made a narrow ruling that four statements made by Alan Levan during a July 25, 2007 conference call were objectively misleading or false.*** However, the Court has not made any determination regarding whether those statements were material – I'm sorry, excuse me – and you must accept the Court's finding that those statements were, in fact, misleading or false in our deliberations. However, the Court has not made any determination regarding whether those statements were material, whether they were made with scienter, or whether they caused Bancorp's share price to decline. ***The Plaintiffs still must prove, and you will need to decide, the remaining elements of their claims with respect to these statements.***

*Id.* (emphasis added). In short, the Court's instruction regarding its pre-trial findings was balanced, narrow and deferred until the absolute latest stage in the trial and does not constitute prejudicial error.

Indeed, Defendants' claim of prejudice is further belied by the fact that notwithstanding the Court's partial summary judgment ruling, *Defendants were permitted to – and did – present* testimony from Alan Levan that his July 25 statements were true. For example, Levan testified that his statement during the July 25 conference call that "there are no asset classes that we are concerned about" was ***"an absolute true statement"*** (Tr. 3602-05) and that what he stated about the land loan portfolio during the conference call "was a ***true statement at the time***, and looking back on it, was ***still a true statement."*** Tr. 3405-07 (emphasis added). In addition, Defendant Valerie Toalson testified that Levan's July 25 statements were ***"true words."*** Tr. 1936-40. And in summation, Defendants' counsel argued to the jury that the July 25 statements found to be false by the Court were in fact true. Tr. 4186-98 (emphasis added). Having been permitted to present evidence and make argument to the jury that purported to nullify the Court's summary judgment ruling, Defendants' cry of undue prejudice rings hollow. And the jury's mixed verdict tellingly undermines Defendants' claim that the summary judgment ruling "was enormously

17

prejudicial" (MNT at 23) to the defense.  *See, e.g., Alexander v. Fulton Cnty. Ga.*, 207 F.3d 1303, 1326 (11th Cir. 2000) (mixed verdict refutes allegation of compelling prejudice).

**V.  THE EXCLUSION OF DEFENDANTS' EXPERTS AND EVIDENCE CONCERNING OTHER FINANCIAL INSTITUTIONS WAS NOT PREJUDICIAL ERROR AND DOES NOT WARRANT A NEW TRIAL**

A new trial will not be granted based on evidentiary rulings unless the movant can show that that an error was committed and that it affected the "substantial rights" of the moving party. *Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1514 (11th Cir. 1993) ("even if [the movant] can show that certain errors were committed, the errors must have affected 'substantial rights' in order to provide the basis for a new trial") (citing Fed. R. Evid. 103(a)); *see also Perry v. State Farm Fire & Cas. Co.*, 734 F.2d 1441, 1446 (11th Cir. 1984) ("error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties"). Indeed, this very high standard is a difficult one to meet.  *See Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d at 1186 (*quoting Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) ("new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence")).  The Defendants have failed to show that any error on an evidentiary ruling was committed, let alone that the error reached the high standard of affecting their "substantial rights" providing a basis for a new trial.

Defendants have done nothing more in their MNT than describe their proposed experts' opinions and incorporate their previous briefing to the Court.  They have made no attempt to show what error the Court made or how, in any way, the exclusions of the expert testimony affected their "substantial rights."  The failure to make this showing, alone, compels the denial of a new trial on this basis.

Prior to trial, this Court evaluated each of Defendants' three proposed experts and correctly determined that the proposed expert testimony (other than a small portion of the proposed testimony from Michal Keable) was incompetent, improper and inadmissible under the Federal Rules of Evidence.  Despite Defendants' assertions, the Court's decision was not connected to its decision to admit Candace Preston's testimony.  The Orders regarding the three defense experts (DE 466, 460, 479) clearly set forth the reasons for the Court's exclusion of their proposed testimony and Defendants offer no basis post-trial to upset those rulings.  Similarly, the Court's rulings concerning other financial institutions were correct in all respects.

### A.      Stephen Morrell

Defendants offered Stephen Morrell ("Morrell") as a proposed expert on the Florida economy and Plaintiffs moved to exclude Morrell.   This Court ruled that Morrell's opinion would not assist the trier of fact to understand the evidence, would not assist the jury to determine a fact in issue, and that Morrell provided no testimony linking any of his opinions to an issue in this action.   DE 466.   In a well-reasoned opinion, the Court noted that "[t]he comparisons Morrell provides of Florida and U.S. economic measures appear to be nothing more than the parroting of figures takes from other sources."  DE 466 at 5.[16]  For all of these reasons and all of the reasons stated in its Order on Morrell, the Court ruled that Morrell's testimony was inadmissible under Federal Rules of Evidence 401, 402 and 702 and under the standards set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

In their MNT, Defendants do nothing more than make the conclusory statement that the Court erred in excluding him and incorporate their opposition to Plaintiffs' *Daubert* motion by reference.   They do not explain how any of their "substantial rights" were affected by Morrell's exclusion.    This half-hearted attempt to claim that a new trial is required based on this evidentiary exclusion does not come close to meeting the required standard.   This utter lack of a showing requires that the MNT be denied on these grounds.

### B.      Jack DeWitt

Defendants' MNT with respect to Jack DeWitt ("DeWitt") suffers the same infirmities as the motion with respect to Morrell.   DeWitt was offered as an expert on banking and bank regulation and Plaintiffs moved to exclude DeWitt.    In their MNT Defendants do nothing more than they did in the first round of briefing concerning DeWitt, namely tout his extensive experience in banking regulation.   However, as the Court recognized in its Order excluding his

---

[16] During trial, defense counsel's attempt to reargue the exclusion of Morrell was rejected by the Court as "preposterous" (Tr. 3059) because:

> Morrell offered this highly generalized up here macro opinion about Florida real estate and the economic conditions in Florida, and that was all he did,  and that was why he was excluded. It was not an economic analysis that addressed the allegations in this case.  In fact, all he did, as I recall, was  dust off some report he had done for someone else, put a new title on it, and you all proposed to use it. And I said no, and I'm not going to reconsider it.

Tr. 3058.

testimony, an expert's experience alone is not enough for admissibility of the expert's opinion. As the Court wrote, "[e]ven if a witness is qualified as an expert regarding a particular issue, the process used by the witness in forming his expert opinion must be sufficiently reliable under *Daubert* and its progeny" (DE 479 at 5) (*citing Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003).  DeWitt's process was anything but reliable.

Defendants fall short of meeting the exacting standard of showing that the Court erred in excluding DeWitt and that it affected their "substantial rights."  *Haygood*, 995 F.2d at 1514.  As the Court recognized in its DeWitt Order, DeWitt's opinions were wholly inadmissible because he failed to explain how his experience led him to the conclusions he made; failed to describe the methodology he used to reach his conclusions; failed to provide any discernible basis for his conclusions; and simply parroted information provided by other sources and therefore would not assist the trier of fact.  The Court noted that "the reader is simply invited to take DeWitt's word for it, based on his experience."  DE 479 at 8.

Now, once again, Defendants do nothing more than tout DeWitt's extensive experience. That is not enough to show that it was error to exclude his opinion, it is not enough to show that Defendants' "substantial rights" were affected and it is certainly not enough to justify a new trial.

### C.    Michael Keable

Defendants offered Michael Keable ("Keable") as their expert on damages and Plaintiffs moved to exclude Keable.   The Court ruled that all but a small portion of Keable's opinions were unreliable and not helpful to a jury and did not meet the requirements of the Federal Rules of Evidence.  The ruling excluding Keable's testimony was not error justifying a new trial.

Again, Defendants have simply recapped Keable's proposed testimony and incorporate the previous briefing by reference.  This alone does not come close to meeting the standard required for granting a new trial based on an evidentiary ruling.  Defendants do not show that the Court made an error in excluding Keable.  They do not even attempt to show what that alleged error was.  In its well-reasoned opinion, the Court held that Keable's opinion was not helpful to the jury, was not relevant to Plaintiffs' claims, did nothing more than parrot information found in Bancorp's SEC filings, and did not explain the method behind his conclusions. DE 460.  The Court reasoned that "Keable's opinion is not helpful to the jury because it requires no expertise – his conclusions are 'issues of common understanding which jurors are able to comprehend for

themselves.'" *Id.* (quoting *Hibiscus Assocs. Ltd. v. Board of Trustees of the Policemen and Firemen Ret. Sys. of the City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995).

Defendants' blanket assertions notwithstanding, the Court properly excluded Keable's testimony.  Defendants have done nothing to show that the ruling was an error or that it affected any if their "substantial rights."  Accordingly, the exclusion of Keable's testimony does not justify a new trial.

### D.  Evidence Concerning Other Financial Institutions

Defendants continue to press their ill-founded point that the Court should have permitted them to introduce evidence about what other financial institutions disclose about their loans. MNT at 27.  As the Court correctly found, such evidence was simply not relevant to the issue in this case, namely whether the statements that Defendants were making about BankAtlantic's land loan portfolio were shown to be false and misleading by BankAtlantic's internal loan watch lists.[17]  Thus, whether or not other financial institutions disclosed their watch list loans was completely irrelevant.  Moreover, the entire premise of Defendants' point that few if any other financial institutions disclosed their watch list loans was shown to be false.  Thorough research (not the bogus search conducted by Defendants on the word "watch") established that 125 of 527 banks on the NASDAQ Banks Stock Index in fact disclosed their special mention and substandard loans in their SEC filings.  Tr. 2648.  Defendants' point here is further demolished

---

[17] In its October 8, 2010 Order on Motion *in Limine* (DE 527 at 1 - 2), the Court wrote:

> The Court perceives no relevance to the proposed evidence whereby Defendants would compare and contrast Bancorp's disclosure practices and its interpretation of its legal obligations to make particular disclosures with those of other banking institutions. Such comparisons, without more, would not tend to prove or disprove the accuracy of the alleged misstatements or omissions or whether they were made with scienter.

> More specifically, the Court is not persuaded that Plaintiffs contend that Defendants had an independent duty under regulatory laws, rules, or guidance to disclose BankAtlantic's special mention, substandard, or watch list loans; rather, Plaintiffs contend that Defendants misrepresented or omitted to state the true nature of the credit quality and performance of loans in its land loan portfolio, that BankAtlantic and its management were aware of the quality of these loans from internal documents including but not limited to the Loan Watch List and, and that Bancorp could have corrected the misleading impression created by its alleged misrepresentations and omissions by, among other things, disclosing the extent of BankAtlantic's special mention, substandard, and watch list loans. Evidence of what other institutions did to disclose problem loans does not tend to disprove Plaintiffs' contention.

by the fact that they were given an opportunity to cross examine Preston about the disclosures made by these other financial institutions. Tr. 2648 – 49. However, upon their realization that Preston would have testified that nearly 25% of those banks made the specific disclosures that the Defendants had contended no bank makes, Defendants abandoned the entire point.

Defendants' further assignment of error (MNT at 27) in the Court's refusal to admit DX 433, a September 10, 2009 letter from the bank regulators to the Financial Accounting Standards Board that objected to a proposal requiring disclosure of special mention and substandard loans, is also without merit. The Court permitted extensive argument from Defendants as to the relevance of the document. Tr. 3632 -33. Aside from the fact that the joint letter was written two years after the close of the Class Period and therefore completely lacks any temporal nexus to any issue in the case, the point of the letter, as explained by Defense counsel to the Court, was to state the regulators' opposition to mandatory disclosure of loans internally rated high risk by banks. But, as noted above, what other banks do or do not disclose was simply not relevant to the issues on trial – whether Defendants misrepresented the risk of BankAtlantic's land loan portfolio and whether that misrepresentation was established by the bank's internal watch lists.

Finally, Defendants argue (MNT at 28) they are entitled to a new trial because they were barred from introducing evidence that other Florida banks on the bank index utilized by Preston had failed, or no longer exist, or were operating under consent decrees. Defendants fail to point out, however, that the Court's ruling barred them from cross examining Preston about bank failures and regulator takeovers between the end of the Class Period and the present (Tr. 2676), clearly an area that had zero probative value. They were permitted to (DE 527 at 3) and did in fact question Preston about the failure of banks listed on the NASDAQ Banks Stock Index during the relevant time period and received an answer that did not suit them – none. Tr. 2676. Furthermore, Defendants were given extreme leeway in adducing evidence that the index utilized by Preston included a small number of Florida banks and they freely argued throughout the trial that such fact undermined Preston's analysis. The jury's rejection of that argument was well grounded in the evidence.

## VI.   THE INTRODUCTION OF PERRY ALEXANDER EMAILS INTO EVIDENCE WAS NOT PREJUDICIAL ERROR

The eight Perry Alexander emails Defendants claim were sufficiently prejudicial to warrant a new trial address issues that were directly relevant to Plaintiffs' allegations and provided the jury with the contemporaneous written words of member of senior management

who had direct access to key probative information.  Admission of these Alexander emails does not justify a new trial.  *See Peat, Inc. v. Vanguard Research Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004) (the district court must have committed a "clear error of judgment" or "applied an incorrect legal standard").  Defendant's have failed to meet the high standard required to obtain the relief they request.

Despite Defendants' constant claims to the contrary, Plaintiffs showed that Alexander, through his employment at BankAtlantic was in the precise position to know the information which he discussed in his emails.  Plaintiffs showed that: (1) between 2005 and 2007 Alexander was a lending market manager leading a team of lenders, (2) he reported directly to Marcia Snyder (Executive Vice President in charge of commercial real estate lending and the land loan portfolio that is at the center of this case) and (3) during the period from at least 2004 through June 2007 he was a member of the Major Loan Committee ("MLC") of the Bank that approved and monitored all of the land loans. Tr. 1390-91.  In that capacity he had close interaction with the other MLC members: defendants Alan Levan, Jarett Levan and Jack Abdo; Marcia Snyder; Jay McClung, the bank's chief risk officer; and Jeff Mindling, the bank's chief credit officer. MLC's role was to approve or reject loan applications in excess of $5 million.

Defendants are dead wrong when they assert that Alexander was not in a position to know the information disclosed in his e-mails.  MLC is the core of BankAtlantic's lending function.  The give and take Perry Alexander participated in and witnessed at MLC as well as the information, presentations and reports he reviewed as an MLC member and used to assess whether to vote to approve or reject a loan provided him with a unique opportunity to acquire a broad range of knowledge regarding BankAtlantic's lending practices and very specific knowledge about many of the loans at issue in this case.

And, contrary to Defendants' contention that Perry Alexander's e-mails contain only gossip, ramblings and irrelevancies,  the eight particular emails Defendants say were erroneously admitted were all relevant and the Court committed no error in admitting these highly probative exhibits into evidence.  Indeed, Defendants do not even attempt to show how any of the emails they say entitle them to a new trial lacks probative value.

In PX3 Alexander states his understanding that the reason for the third quarter losses suffered by Bancorp was the "11 bombs (so far) in our portfolio [that] did not occur overnight." He supports Plaintiffs' theory that the financial incentives given the lenders allowed them to

"stuff[ ] their pockets by cramming shit on the books."  And he confirms that the complaints he made at Major Loan Committee meetings about certain lenders' bad underwriting "appears to have been the problem, but MLC sticks their heads in the sand and pretends there's no pattern and their lying never caused the losses."  This exhibit undermined Defendants' theory that the economy caused the losses not bad underwriting.

PX182 corroborated Plaintiffs' evidence that Marcia Snyder had a huge incentive to push MLC to approve risky loans ("I'm still trying to tolerate Marcia Snyder as my Boss and fellow member of MLC").  This Alexander email also expressed the fact that he was suspicious of the Steeplechase loan at its original approval.  His reference to the MLC members as "a sneaky pack of liars" flies in the face of Defendants' theme that the bank's loan committee provided a safeguard against making risky loans.

In PX186 Alexander refers to his efforts to resist Marcia Snyder's "attempts at intimidation" and provided additional support for Plaintiffs' theory that Snyder aggressively sought approvals for risky and badly underwritten loans.  Additionally, this email speaks about the poor lending practices of one of the lenders who "never answers the question" at MLC.

In PX188 is another email dealing with Snyder getting a loan through MLC by running "interference" for a lender.

PX194 is an email from Alexander in which he refers to a loan that is 100% LTC (loan to cost) and how so many of the deals approved by MLC  "violate[ ] so many bank policies."  He also notes that three votes on the MLC – Alan Levan, McClung and Snyder – are "almost automatic" approvals.  Alexander bemoans the risky lending business engaged in by the bank, and comments: "we never analyze the risks up front, only on the downside when the learning curve is the steepest and most expensive. That's BankAtlantic logic."  Again, the exhibit supported Plaintiffs' claim that the bank engaged in sloppy underwriting and made risky loans.

PX201 deals with the Priority Entrada loan and provided evidence that the bank's borrower had missed a "time trigger" that allowed the builder Lennar to default on its obligation to purchase lots from the borrower.  The exhibit was probative of the BLB risk that Defendants misrepresented.

PX205 also refers to the Priority loan and "Marcia cramming it down" at MLC."  It provides an insider's eye witness report about the workings of MLC.  Alexander is critical of the

fact that Alan Levan and Abdo do not attend MLC meetings allowing Marcia to have freedom to do as she wants.

PX231 relates to the Naturewalk loan and DR Horton's intention not to "take down any lots." This January 2007 email refers to "big loans fraying" and directly relates to the state of the loan portfolio in the first quarter 2007.

Finally, the fact that Alexander uses colorful or even harsh language in describing his experiences on BankAtlantic's MLC in his e-mails does not preclude their admissibility under Fed. R. Evid. 403. Contrary to Defendants' conclusory assertion that the Alexander e-mails are unreliable and excludable because they are "laced with profanity, slang, gossip and every other indication of unreliability" (MNT at 29), exclusion under Rule 403 "is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." *United States v. Alfaro-Moncada*, 607 F.3d 72 (11th Cir. 2010) (*citing United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003)). Wholesale exclusion of the highly probative e-mails is not called for simply because Perry Alexander used profanity and made strong statements about the institutional failures of BankAtlantic's MLC. As the Court commented when Defendants objected to PX186 at trial, "I can't help the way Mr. Alexander expresses his opinions. If he had expressed them more politely, you wouldn't be making this objection." Tr. 1377. Accordingly, the Court committed no error in admitting these eight emails.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for a New Trial in its entirety.

Date:  January 18, 2010

Respectfully submitted,

/s/ Mark S. Arisohn_____

Mark S. Arisohn, admitted *pro hac vice*
Mindy S. Dolgoff, admitted *pro hac vice*
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Co-Class Counsel for Class Representatives and the Class and Lead Counsel for Lead Plaintiff State-Boston Retirement System*

Andrew L. Zivitz, admitted pro hac vice
Matthew L. Mustokoff,
admitted *pro hac vice*
Mark S. Danek, admitted *pro hac vice*
Michelle M. Newcomer,
admitted *pro hac vice*
BARROWAY TOPAZ KESSLER
MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610)667-7056

*Co-Class Counsel for Class Representatives and the Class*

FOWLER WHITE BURNETT P.A.
Ronald D. Shindler,
Florida Bar No. 781703
Espirito Santo Plaza, 14th Floor
1395 Brickell Avenue
Miami, FL 33131-3302
Telephone: (305) 789-9200
Facsimile: (305) 789-9201
rshindler@fowler-white.com

*Liaison Counsel for Class Representatives
and the Class and for Lead Plaintiff State-
Boston Retirement System*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 18, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


/s/ Ronald D. Shindler
RONALD D. SHINDLER

## <u>SERVICE LIST</u>

Adam M. Schachter
Eugene E. Stearns
Gordon M. Mead, Jr.
Stearns Weaver Miller
Weissler Alhadeff & Sitterson, P.A.
150 W. Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305)789-3400
Facsimile: (305) 789-3395
aschachter@stearnsweaver.com
estearns@stearnsweaver.com
gmead@sternsweaver.com