# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 07-61542-CIV-UNGARO

IN RE BANKATLANTIC BANCORP, INC.
SECURITIES LITIGATION
_____/

## DEFENDANTS' MOTION FOR SANCTIONS

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Eugene E. Stearns
Richard B. Jackson
Adam M. Schachter
Cecilia D. Simmons
Gordon M. Mead, Jr.
Andrea N. Nathan
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3200
Facsimile:  (305) 789-3395

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        A.    Appointment of Lead Plaintiff and Lead Counsel  . . . . . . . . . . . . . . . . . . . . 4
        B.    The *JDS Uniphase* and *Star Gas* Securities Litigations . . . . . . . . . . . . . . . . . . . 4
        C.    The Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        D.    The First Amended Consolidated Complaint . . . . . . . . . . . . . . . . . . . . . . . . . 6
        E.    Defendants' Motion to Dismiss the First Amended Consolidated Complaint . . . . 7
        F.    Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        G.    The Secretly Recorded Conversations With Donna Loverin  . . . . . . . . . . . . . . 9
        H.    The Confidential Witnesses' Deposition Testimony . . . . . . . . . . . . . . . . . . . . 11
        I.    The Proposed Second Amended Consolidated Complaint . . . . . . . . . . . . . . . . 12
        J.    Trial and Post-Trial Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.    LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        A.    The Rule 11 Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        B.    Plaintiffs' Counsel Did Not Make A Reasonable Inquiry . . . . . . . . . . . . . . . . . 16
        C.    The Claims Were And Are Objectively Frivolous  . . . . . . . . . . . . . . . . . . . . . . 17
              1.    The Claims Asserted in the First Amended Consolidated Complaint  . . . 17
              2.    Insider Trading Claims against Alan Levan and John Abdo  . . . . . . . . . 17
              3.    Accounting Fraud and Loan Loss Reserves  . . . . . . . . . . . . . . . . . . . . 18
              4.    All Remaining Claims Should Never Have Been Brought  . . . . . . . . . . . 18
              5.    Alan Levan's July 25, 2007 Statements  . . . . . . . . . . . . . . . . . . . . . . . 20
              6.    Plaintiffs' Claim of Partial Disclosure of a Fraud in April 2007  . . . . . . . 20

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

## TABLE OF AUTHORITIES

Page

**Cases**

*Avirgan v. Hull*,
    932 F.2d 1572 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Business Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
    498 U.S. 533 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Campo v. Sears Holding Corp.*,
    371 F. App'x 212, 216 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Garr v. U.S. Healthcare, Inc.*,
    22 F.3d 1274 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hashemi v. Campaigner Publ'ns, Inc.*,
    784 F.2d 1581 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*,
    No. 08cv11278, 2010 WL 1875728 (S.D.N.Y. May 11, 2010) . . . . . . . . . . . . . . . . . . 14

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re JDS Uniphase Sec. Litig.*,
    No. 02cv1486, 2008 WL 460282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 9

*In re Star Gas Sec. Litig.*,
    745 F. Supp. 2d 26 (D. Conn. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15

*Jones v. Int'l Riding Helmets, Ltd.*,
    49 F.3d 692 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ledford v. Peeples*,
    630 F.3d 1345 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mike Ousley Prods., Inc. v. WJBF-TV*,
    952 F.2d 380 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pavelic & LeFlore v. Marvel Entm't Grp.*,
    493 U.S. 120 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

-ii-

*Pelletier v. Zweifel*,
    921 F.2d 1465 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Smith v. Smith*,
    184 F.R.D. 420 (S.D. Fla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Thompson v. Relationserve Media, Inc.*,
    610 F.3d 628, 636 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Worldwide Primates, Inc. v. McGreal*,
    87 F.3d 1252 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 16

*Zaldivar v. City of Los Angeles*,
    780 F.2d 823 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17


**Rules**

Fed. R. Civ. P. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 26(b)(3)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


**Other Authorities**

House Conf. Report No. 104-369,
    1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Nov. 28, 1995) . . . . . . . . . . . . . . . . . . . . 1

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

Pursuant to Federal Rule of Civil Procedure 11 and the Private Securities Litigation Reform Act of 1995, Defendants BankAtlantic Bancorp, Inc. ("Bancorp"), John E. Abdo, Alan B. Levan, Jarett S. Levan, Valerie C. Toalson, and James A. White move for sanctions against the class representatives, State-Boston Retirement System and Erie County Employees Retirement System, and their counsel, Labaton Sucharow LLP and Barroway Topaz Kessler Meltzer & Check, LLP. Due to the egregious misconduct in this action, this Court should order reimbursement of Defendants' legal fees and expenses incurred as a direct result of the sanctionable conduct in this case.[1]

## I.   INTRODUCTION

The Reform Act mandates consideration of whether sanctions are appropriate under Rule 11. There are likely few cases where sanctions are more obviously warranted.

To avoid dismissal of their case and gain access to discovery, Plaintiffs relied on false assertions and attributed them to unidentified former employees. Plaintiffs' counsel engaged in similar misconduct in at least two other cases, in each instance deflecting criticism by blaming their own staff, the memories of the witnesses or the vigorousness of cross examination. In this case, absent the false allegations of confidential witnesses, the suit would have been dismissed, and thus everything that followed was the consequence of their wrongdoing. Indeed, it is quite stunning that lawyers who use the word fraud so frequently to describe the people they sue, would themselves utilize fraud in the hopes of finding it.

This behavior violates Rule 11. It is precisely this sort of conduct in precisely this type of case that led Congress to adopt the Reform Act, through which Congress sought to prevent:

> the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, *and with only faint hope that the discovery process might lead eventually to some plausible cause of action* . . .

House Conf. Report No. 104-369, 1995 WL 709276 (Nov. 28, 1995) (emphasis added). Thus, in order to begin a discovery fishing expedition into corporate records, a securities class action plaintiff must first survive a motion to dismiss, where it can no longer rely on sweeping allegations of fraud, unsupported by specific allegations of fact sufficient to establish an intent to defraud. And, concerned

---

[1] The determination of the necessity of an award of sanctions should be considered separately from the appropriate sanctions to be imposed. Thus, if this motion is granted, we recommend subsequently proceeding under a framework similar to what is set forth in Local Rule 7.3.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

that district court judges had been too lenient in dealing with Rule 11 abuses, Congress compelled district courts, *in each case, with or without motion,* to determine if sanctions were warranted for the assertion of frivolous claims or defenses, and urged the imposition of sanctions to punish wrongful behavior and compensate the victims.

Here, the importance of the false confidential witness allegations cannot be overstated. This Court made it quite clear what was expected to avoid dismissal: sufficient detail to establish that the alleged confidential witnesses were employed by the Company during the relevant time frames and in positions where they would have the means to know the facts attributed to them. Plaintiffs purported to provide that information and the Court accepted it as having been pled in good faith. We now know, however, that virtually all of the material facts attributed to the confidential witnesses are untrue and that Plaintiffs should have known they were untrue at that time.

Once the fraudulent allegations opened the floodgates of discovery, the vast data made available to Plaintiffs proved that the allegations of securities fraud were baseless and that their public utterances trumpeting those claims were scandalous and defamatory. But, knowing the claims they had brought were meritless, Plaintiffs pressed on, abusing the litigation process, slandering the Defendants, and compelling the expenditure of millions of dollars in defense costs.

Even absent the false confidential witness allegations, the claims of fraud should never have been brought. The claims of insider trading, false financial reporting and manipulated loan loss reserves could not have been the product of a responsible pre-suit inquiry. And, after getting undeserved discovery, it became clear that these claims could not be supported — clarity that obligated Plaintiffs to so advise the Court and opposing counsel. They did not do so, revealing it on the eve of the close of discovery in connection with expert reports and a proposed amendment.

The remaining claims that were brought to trial were also frivolous in light of the Company's public disclosures and the detail of the Company's losses made available during discovery. It is simply beyond dispute that Bancorp's loan losses were caused by the collapse of the Florida housing market — the "black swan" event that occurred in Summer 2007 — in precisely the way the Company had warned could happen if the market collapsed.[2] DEX 14 at 3; Tr. 551-57, 996-97,

---

[2] Indeed, Plaintiffs' belated concession that they had no support for the claim that loan loss reserves were inadequate leads to another inescapable conclusion (one also ignored by Plaintiffs): the loss reported in October 2007 from increases in loan loss reserves, by definition, had to have been

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

2162-63, 3422-27.  As had been warned, the builder land bank ("BLB") loans had the greatest risk and, as happened, suffered far and away the greatest loss.  The next largest part of the loss was a general reserve required by the real estate market collapse.  One of the smallest parts of the loss were the remaining land acquisition and development loans the Company had described six months earlier as having a lesser level of risk — which, as it turned out, was true.  Having obtained that discovery under false pretenses, any reasonable inquiry would have established that damages could never be established.  Thus, by claiming that 100% of the October 2007 stock price decline was fraud caused, Plaintiffs violated Rule 11.

While much of Plaintiffs' case ended at summary judgment (*e.g.*, insider trading, accounting fraud, loan loss reserves, first year of the class period), what remained through trial and post-trial should have ended at summary judgment as well.[3]  The absence of any evidence of any damage should have been abundantly clear to Plaintiffs. It was not that the wrong expert advanced the wrong theory.  It was that no expert could establish damage because there was none.

Although Defendants now have a final judgment in their favor, it does little to ameliorate the massive costs, financial and otherwise, caused by claims and allegations of fraud that were themselves a product of fraud.  The damage they caused continues, as does the doubt they falsely created.  During the years these false claims were pending, the banking system as a whole teetered on the verge of collapse as unemployment reached staggering levels and property values plummeted.  Bancorp was compelled to raise equity capital to offset a continuing hemorrhage of loan losses caused by these economic events.  The litigation costs and adverse publicity increased the cost of that capital significantly.  Now, finally, is the time for Plaintiffs to answer for their behavior.

---

"caused by" events after loan loss reserves were established for the second quarter of 2007, and thus, did not happen earlier and could not have been concealed earlier.

[3] In entering judgment for Defendants, this Court reiterated that Alan Levan's four statements in July 2007 were "objectively false and misleading," and that there was sufficient evidence for the jury to have found other statements during those calls to be false. Since this motion is subject to appellate review, we remain consistent in our belief that the Alan Levan's four statements were true when made, properly believed to be true when made and proven true after the "black swan" collapse of the market.  We also reiterate our view that no jury question was presented as to any of the snippets that ended up in the verdict form, as the evidence plainly established that the Company timely identified problems, timely reported economic circumstances as they unfolded and correctly reported on how those circumstances would impact the Company if they worsened.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

## II.     BACKGROUND

### A.     Appointment of Lead Plaintiff and Lead Counsel

On December 28, 2007, State-Boston moved for appointment as Lead Plaintiff.  *See* DE 26. The motion also requested approval of State-Boston's selection of the Labaton Sucharow law firm as Lead Counsel.  *See id.*  On February 5, 2008, the Court granted the motion and approved Labaton Sucharow as Lead Counsel.  *See* DE 45.[4]

### B.     The *JDS Uniphase* and *Star Gas* Securities Litigations

Just two weeks before filing their lead plaintiff motion in this case, certain very serious accusations were being leveled against Labaton Sucharow lawyers in another case in another court. *See In re JDS Uniphase Sec. Litig.*, No. 02cv1486, 2007 WL 4937036, JDSU Defendants' Motion for Sanctions Pursuant to Rule 11 (N.D. Cal. Dec. 14, 2007).  The lawyer in that case was Mark S. Arisohn, the lead lawyer for the class in this case.

In *JDS Uniphase*, "[a]fter Defendants spent nearly six years and tens of millions of dollars defending themselves, a jury confirmed that Lead Plaintiff's entire case lacked merit." *Id.*  However, even after obtaining a complete defense jury verdict, the defendants felt obligated to move for sanctions because "certain violations of Rule 11 were so egregious":

> Another witness testified that he received a payment of $1,200 from Lead Counsel —
> a fact that was not disclosed in the SAC.  Witness after witness provided testimony
> that either contradicted the allegations that Lead Plaintiff attributed to them or
> admitted that they lacked any personal knowledge for those allegations. In many
> instances, the witnesses explained that Lead Plaintiff had gotten the date wrong by
> alleging that an event occurred in 2000 when in fact the witness had said it happened
> in 2001.

*Id.* (citations omitted).

The procedural backdrop of the confidential witness manipulations is familiar: according to the *JDS* defendants, the key allegations in the complaint "were based entirely on the purported statements of confidential witnesses." *See id.*  Thus, "Lead Counsel touted the confidential witnesses

---

[4] Barroway Topaz did not sign the Consolidated Amended Complaint or the First Amended Consolidated Complaint.  The response to the earlier sanctions motion indicated that Barroway investigators participated in interviewing witnesses for purposes of drafting the complaints.  In August 2009, three Barroway attorneys moved for admission as additional counsel on behalf of the Lead Plaintiff.  *See* DE 107, 108, 109.  On October 19, 2009, this Court appointed State Boston and Erie County as co-Class Representatives and Labaton and Barroway as co-Class Counsel.  DE 153.

in opposing the motion to dismiss," and the "Court cited the confidential witnesses in denying Defendants' motion." *See id.* n. 2.

Because there was no contemporaneous evidence of conversations with the confidential witnesses, counsel was able to make assertions without fear of reproach:

> the confidential witnesses were interviewed by investigators and counsel in 2002 and 2003. The available notes from those interviews have been reviewed thoroughly and corroborate most of all the statements in the SAC. The fact that three and four years later witnesses did not recall that they spoke to plaintiffs' representatives, or that they made certain statements or in some cases that they deny having made the statements does not support imposition of sanctions.

*In re JDS Uniphase Sec. Litig.*, No. 02cv1486, 2008 WL 460282, Lead Plaintiff's Opposition to Defendants' Motion for Sanctions Pursuant to Rule 11 (N.D. Cal. Jan. 14, 2008).   In an accompanying Declaration, Arisohn stated that although he made "every effort to locate all materials relating to the investigations underlying" the Complaint, "the documentary record relating to the investigations may be incomplete."   *In re JDS Uniphase Sec. Litig.*, No. 02cv1486, 2008 WL 460283, Declaration of Mark S. Arisohn in Opposition to Motion for Sanctions Pursuant to Rule 11 (N.D. Cal. Jan. 14, 2008).

On March 19, 2008, Judge Wilken denied the motion for sanctions.  *See In re JDS Uniphase Sec. Litig.*, No. 02cv1486, 2008 WL 753758, at *3 (N.D. Cal. Mar. 19, 2008).  Lacking direct evidence to undermine counsel's assertion that the confidential witness allegations were corroborated by attorney notes, the Court found that the question of "whether the statements were made is essentially a credibility question."  *Id.*   This case, by contrast, does not present a credibility question. In any event, Labaton did not wait long before employing these same tactics in other cases.

Indeed, on September 30, 2010, these very same law firms — Labaton (again) and Barroway Topaz — were sanctioned because of numerous, significant Rule 11 violations involving the use of confidential witness allegations that counsel knew or should have known to be false:

> Plaintiffs' lead counsel's violations were substantial, creating a presumption for awarding all fees and costs for the entire litigation as sanctions. The Rule 11 violations were not *de minimis*. The [Complaint] did not suffer from a minor procedural flaw. Nor were the Rule 11 violations limited to one of the many claims for relief.

-5-

*See In re Star Gas Sec. Litig.*, 745 F. Supp. 2d 26, 39 (D. Conn. 2010) (citations omitted).  Although Judge Arterton ordered plaintiffs' counsel to reimburse defendants' legal fees, it appears that the Rule 11 matter was settled quickly and quietly.

### C.     The Amended Complaint

One month after the *JDS* ruling, on April 22, 2008, the Amended Complaint was filed in this case.  *See* DE 51.  It attributed roughly forty substantive allegations to seven confidential witnesses. The Court dismissed the Amended Complaint without prejudice, finding that it failed to plead scienter adequately.  *See* DE 70.

The Court criticized the confidential witness allegations specifically:

> The Complaint relies on seven confidential witnesses. Each of these sources is described as a "former employee with specific and detailed knowledge about the Bank's CRE lending practices and underwriting procedures during the Class Period. *There is no specific information as to the confidential witnesses' positions in the Company, their employment duties, the foundation or basis for their knowledge, or whether they were even employed with the Company during the relevant times in the Complaint.* With the exception of two of the seven confidential witnesses, the Complaint does not even state in what department they worked. Thus, for the majority of the confidential witnesses, it is not even possible to discern their proximity to the offending conduct. In short, the Complaint fails to "unambiguously provide in a cognizable and detailed way the basis of the whistleblower's knowledge." Accordingly, the Court is unable to give any significant weight to the allegations based on statements made by these confidential witnesses.

*Id.* (citations and footnote omitted) (emphasis added).  Thus, having been granted leave to file another amended pleading, Plaintiffs' task was clear.  In order to survive a motion to dismiss — and thereby gain access to discovery — the new pleading would have to include far more detailed and specific allegations from the confidential witnesses.  It is inconceivable that responsible lawyers, burdened by Rule 11, after reading the Court's Order would not carefully verify the legitimacy of the details the Court demanded be part of any new pleading if one was to be filed.

### D.     The First Amended Consolidated Complaint

On January 12, 2009, Plaintiff filed the First Amended Consolidated Complaint ("FACC"). *See* DE 80. The most obvious difference between it and its predecessor was the additional and more detailed confidential witness allegations.  It attributed facts to six so called confidential witnesses: Johnny Irizarry (CW#1), Barbara Halprin (CW#2), Donna Loverin (CW#3), Warren Toole (CW#4), Michael Blevins (CW#5) and Mark Meek (CW#6).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

There are more than forty such allegations in the FACC.  The confidential witnesses, who remained unidentified in the pleading, were alleged to be former employees of BankAtlantic, employed at relevant times, who were privy to the events which unfolded during the class period, such that they have personal knowledge of the events and assertions regarding the lending and underwriting practices that help form the basis of scienter as to the individual Defendants.  *See* First Am. Compl. ¶¶ 58-86, 92, 95, 97-98, 100-106, 119-121.

### E.      Defendants' Motion to Dismiss the First Amended Consolidated Complaint

In moving to dismiss the FACC, Defendants were constrained by the usual presumptions afforded a plaintiff at the motion to dismiss stage.  Although Defendants attacked the confidential witness allegations as they were, there was no means through which to challenge the veracity of those allegations, or to confirm whether the allegations were the product of a fair, meaningful and sufficient investigation. With the benefit of hindsight, it is clear that Plaintiffs' actions turned the entire motion to dismiss exercise into a charade.[5]

The confidential witnesses figured prominently in both Defendants' motion to dismiss and the response. For example, Defendants' motion argued that the FACC failed to plead facts establishing a foundational basis for the confidential witness allegations, citing the broad and vague allegations with respect to CW#1/Irizarry, CW#2/Halprin, CW#3/Loverin and CW#4/Toole.  *See* DE 85 at 6-7. Defendants further argued that the pleading did not allege a sufficient basis of knowledge for certain of the claims.  *See id.*

Plaintiffs, by contrast, paraded their confidential witness allegations as providing the factual basis for denying Defendants' motion to dismiss.  Committing further Rule 11 violations, their response touted the purported facts establishing that these witnesses had a basis for saying what was claimed they said, citing, *inter alia*, the allegations that: CW2/Halprin participated in MLC meetings; CW3/Loverin worked in the Credit Department during the class period; and CW6/Meek was loan officer during the class period. DE 89.  Of course, these were all simply made up.

---

[5] Some courts have taken steps, consistent with the Reform Act's purposes, to address the growing confidential witness problem. The Second Circuit, for example, has affirmed Judge Kaplan's directive that confidential witnesses be deposed at the motion to dismiss stage of a securities class action.  *See Campo v. Sears Holding Corp.*, 371 F. App'x 212, 216 n. 4 (2d Cir. 2010) (affirming dismissal with prejudice of securities class action).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

On May 11, 2009, the Court denied the motion to dismiss, relying almost entirely on the new confidential witness allegations:

> The Amended Complaint cures the most pertinent deficiencies in Plaintiff's earlier complaint — namely, that Plaintiff's earlier allegations rested upon statements from confidential witnesses about whom the Court knew nothing, and that many of the allegations were vague and failed to show what each of the individual defendants knew or should have known during the class period.

DE 94.  The Court was particularly satisfied with the allegations regarding the period of time during which the confidential witnesses were employed at BankAtlantic:

> the Amended Complaint contains sufficient information regarding these confidential witnesses, including their employment duties, whether they were employed during the Class Period and how they obtained direct knowledge of the facts they were reporting . . . *Plaintiff has provided information that assures the Court that the confidential witnesses were employed with the Company at relevant times and were in close proximity to the offending conduct.*

*Id.* (emphasis added).  The Court then expressly cited more than a dozen of the confidential witness allegations for supplying the facts sufficient to withstand a motion to dismiss.  *See id.* (citing FACC ¶¶ 61, 65, 67, 69, 70, 72, 84, 85, 86, 87, 103, 105, 119, 120 and 121).

### F.    Discovery

Disclosure of the fiction did not come easily.  Plaintiffs argued vigorously to both the Magistrate and this Court that they could not be compelled to disclose the confidential witnesses' names or the information that had allegedly been revealed.[6]  Plaintiffs disclosed their identities only after being ordered to do so by this Court.

Following production of the names of these witnesses, but prior to their depositions, Plaintiffs' counsel then undertook to obtain counsel for four of the witnesses (Irizarry, Halprin, Blevins and Meek) *with all of the legal fees and expenses being paid for by Plaintiffs' counsel.*  Only then, it appears, did an actual lawyer for the class actually interview the witnesses.  At that point, the duty of candor to the Court again should have compelled counsel to notify the Court of the discrepancies

---

[6] On July 22, 2009, for example — well before receiving any documents or taking any depositions in this case that would provide some independent evidentiary basis for the claims — Plaintiffs served Initial Disclosures failing to identify a single one of the confidential witnesses as having discoverable information.  The decision not to identify the confidential witnesses was, of course, purely tactical, reflecting a purposeful attempt to keep those individuals forever hidden from the discovery process.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

between what the witnesses actually knew or had the means to know — not the least of which was time and place of employment — and the allegations in the FACC upon which this Court relied in denying the motion to dismiss.  Plaintiffs remained silent.[7]

### G.    The Secretly Recorded Conversations With Donna Loverin

Confidential Witness Donna Loverin (CW#3) presents a unique circumstance because there can be no argument advanced of attorney notes that would suggest a mere mistake as argued in California to avoid sanction.  That is because *Plaintiffs' investigator secretly recorded her phone conversations with Loverin.*  We know this, not because counsel volunteered the information, but because Loverin's counsel made a request pursuant to Fed. R. Civ. P. 26(b)(3)(C) for her witness statements.  In response, on the eve of her deposition, Plaintiffs produced a copy of what purports to be a transcript of the conversations between an investigator for the Plaintiffs and Loverin.[8]

Unlike the circumstance confronted by Judge Wilken in *JDS Uniphase*, the transcript in this case, on its face, expressly contradicts that which is attributed to Loverin in the FACC.  One such example is glaring.  Paragraph 101 of the FACC alleges (with emphasis and quotes in the original):

> CW3 added that, with respect to the unusually large amount of loan defaults that were disclosed at the end of the Class Period, *"there's no way these loans just all coincidentally imploded in 4 months."*

The relevant portion from the transcript exchange between Loverin and Amy Greenbaum (counsel's in-house investigator) reads quite differently:

| AMY GREENBAUM: | So it's your understanding that there's no way these loans just all coincidentally imploded in 4 months. |
|---|---|
| LOVERIN: | Um, no. And if they did, then you have total incompetence. Because I remember the CEO of |

---

[7] Had counsel notified the Court then that four of the six witnesses were in fact not employed by the Company at a time or in a position to know the facts attributed to them, and that all but one rejected the material allegations attributed to them, it would have required a judicial process that could have gone in a number of directions, the least likely of which was the continuation of the abusive discovery then ongoing.

[8] A copy of this purported transcript was attached as Exhibit C to the Appendix of Exhibits in Support of Defendants' Corrected Motion for Sanctions, dated June 4, 2010.  It is subsequently referred to herein as the "Appendix." Months after receiving this transcript, and after repeated requests to produce, Plaintiffs produced the raw audio data underlying the transcript.

-9-

> SunTrust saying, if the loan goes bad within the first
> 6 months, you didn't do your due diligence, And, you
> know, I mean, that's reality.

Transcript at 21.  Thus, not only does the allegation quote *the investigator's words* (not the witness's words), the context of the witness's quote is turned on its head.  Loverin was commenting on new loans going bad quickly, not seasoned loans going bad because of extraneous economic circumstances that crippled the home building industry across the board.

The transcript further confirms that Loverin should have never been a confidential witness in this lawsuit in the first place.  Although the FACC repeatedly introduces her as a member of the Credit Department during the class period — which, if true, would have given her at least some knowledge of matters relevant to this lawsuit — the transcript, *no less than eighteen times*, indicates that Loverin worked in the Small Business Lending Department — which has nothing to do with this lawsuit — from 2000 until she left BankAtlantic in January 2006.  *See, e.g.,* Transcript at 2, 3, 8, 9, 12, 14, 22, 23, 25, 26, 29, 30, 33, 37, 38 and 40.  The transcript also belies the loss reserve allegations attributed to Loverin, as she clearly is shown to have said: "I honestly don't know what they calculate it at, because I did not work over there." Transcript at 24.

It turns out Plaintiffs eventually went through the exercise of attempting to determine whether Loverin actually agreed with the allegations attributed to her, though long after those non-existent statements had already been filed with the Court.   In September 2009 — after Defendants served interrogatories seeking the confidential witness identities and when the specter of discovery into the veracity of those allegations became real — Plaintiffs' counsel (this time an actual lawyer, not an investigator) e-mailed Loverin commanding her to execute an affidavit affirming the correctness of the allegations attributed to her in the FACC.[9]  In making the e-mail command, Plaintiffs' counsel did not explain the motivation behind the request, did not explain the legal consequences of executing an affidavit (particularly one that contains false statements), and, most importantly, did not advise this still unrepresented individual that she might want to speak with a lawyer.  Notwithstanding those lapses, Loverin read the affidavit, saw that the statements attributed to her were false, told counsel not to contact her again, and then hired her own lawyer.

--------

[9] A copy of the e-mail, which was introduced as an exhibit during Loverin's deposition, is Exhibit D to the Appendix.  The actual draft unsigned affidavit has been withheld from production by the Plaintiffs pursuant to a claim of work product.

Stearns Weaver Miller Weissler Alhadeff & Sitterson, p.a.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

To say the least, once they learned that Loverin would not support the allegations attributed to her, and that they had a tape recording explaining why, Plaintiffs again had a duty of candor to this Court to withdraw the false allegations and inform the Court of the circumstances of their making. Counsel breached that duty again.

### H.   The Confidential Witnesses' Deposition Testimony

The contrast between what is attributed to the confidential witnesses in the FACC and their deposition testimony (and, for Loverin, the transcripts of her conversations as well) is striking. Charts juxtaposing the pertinent false allegations with the sworn deposition testimony are attached as Composite Exhibit E to the Appendix.  Full and complete copies of the deposition transcripts for each of the confidential witness are attached as Exhibits F through L to the Appendix.[10]

Loverin, for example, testified, unambiguously, that each of the dozen or so allegations attributed to her are factually incorrect.  More importantly, according to her testimony, the information she did provide expressly contradicts that which is alleged.  For example, echoing the transcripts of her secretly recorded conversations, Loverin testified, unequivocally, that she left the Credit Department in 2000 — *five years before the beginning of the class period* — and worked exclusively in the Small Business Lending Department, which has nothing to do with this lawsuit, from 2000 until she left BankAtlantic in January 2006.  Even without the recordings and transcripts, though, any sort of reasonable inquiry by counsel would have made this critical fact abundantly clear, as Loverin testified that she would have informed counsel that the allegations attributed to her were not true, had they bothered to show her the allegations prior to filing them with the Court.

In addition to Loverin, the sworn testimony of Johnny Irizarry (CW#1), Warren Toole (CW#4), Michael Blevins (CW#5), and Mark Meek (#6) also reveals the need for sanctions:

- Mark Meek (CW#6), who the FACC expressly alleges to have been employed at BankAtlantic during the class period, testified that his *last date of employment at BankAtlantic was in December 2004, almost a year before the beginning of the original class period*.  Meek Transcript at 29-31.

---

[10] All but one of the confidential witnesses deny ever making the key statements attributed to them in the FACC.  The one witness who stood by the allegations — Barbara Halprin — testified that she was angry about her termination, told Plaintiffs' investigator how angry she was, and demonstrated in her deposition testimony that she lacked the means to know any of the material allegations upon which the Court relied in denying the motion to dismiss.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

- Johnny Irizarry (CW#1), testified that *neither he nor anyone else in the Credit Department reported to the Lending Department*, although the FACC expressly alleges the opposite. He also testified, unequivocally, that he *never observed any conversations between Marcia Snyder and Linda Kilgo, much less arguments between the two over loan disbursements*, again despite those express allegations being attributed to him in the FACC. Moreover, Irizarry — who it is alleged offered "personal observations" about the BLB, LAD and LADC loan portfolios — *testified that he never had any discussions about those loan portfolios and never even heard of those portfolios in the first place*. Irizarry Transcript at 46, 85, 88-89, 95, 98-99.

- Warren Toole (CW#4) *denies even being a confidential witness*, having testified that he never had any contact of any type with the lawyers in this case. He testified that he was contacted by someone claiming to work for the Justice Department, but he became quickly suspicious at the types of questions being asked and ended the conversation abruptly. Toole Transcript at 10-12, 28, 33, 50-51.

- Michael Blevins (CW#5) testified that the principal allegation attributed to him — that most commercial real estate loans received "rubber-stamp approval from the Major Loan Committee" — is inaccurate in numerous respects, not the least of which is that *he did not know anything about any commercial real estate loans other than his own few loans*. Blevins Transcript at 32, 54-56.

These and other false statements — statements that counsel knew or should have known to be false — permeate the FACC to a degree that renders it unfit to have been filed. Thus, not only did counsel fail in its responsibilities to the Court and to opposing counsel by asserting these allegations without a factual basis, but once lawyers learned that the allegations were untrue, their duty of candor to the Court required prompt notice to the Court and opposing counsel and a withdrawal of the false allegations rather than the stonewalling undertaken.

## I.      The Proposed Second Amended Consolidated Complaint

On April 22, 2010, Plaintiffs moved for leave to file a Second Amended Consolidated Complaint, which, had it been permitted, would amount to a wholesale rewrite of the bulk of the confidential witness allegations, and omits many of the witnesses, including the allegations from the secretly tape recorded witness, Donna Loverin.  *See* DE 206 and 210.  The proposed pleading sought to cloak the withdrawal of the allegations that had enabled Plaintiffs to survive a motion to dismiss in a sea of snippets of quotations from documents produced during discovery.   A redline of the proposed Second Amended Consolidated Complaint showing the differences between it and the FACC is attached as Exhibit M to the Appendix.   The proposed pleading, which the Court properly

Stearns Weaver Miller Weissler Alhadeff & Sitterson, p.a.
Museum Tower  ▪  150 West Flagler Street, Suite 2200  ▪  Miami, FL 33130  ▪  (305) 789-3200

denied leave to file, is a concession of the indisputable fact that the confidential witnesses repudiated most of the allegations attributed to them.

### J.      Trial and Post-Trial Motions

This Court's April 25, 2011 Order contains an extensive recitation of events at trial and post-trial. *See* DE 695. Many of Plaintiffs' arguments at trial rested upon arguing that there was BLB fraud despite having pled the opposite, having failed to identify any such evidence at summary judgment, and failing to elicit any such proof at trial. Other arguments shared the common characteristic of ignoring the plain language of Bancorp's public filings, which language was obviously available to Plaintiffs prior to even the initial filing of the lawsuit in October 2007. As explained in greater detail below, all of these arguments are sanctionable.

## III.   LEGAL ARGUMENT

### A.      The Rule 11 Standard

Rule 11 imposes on an attorney who signs a pleading "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." *Business Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991); *Mike Ousley Prods., Inc. v. WJBF-TV*, 952 F.2d 380, 382 (11th Cir. 1992) ("Rule 11 stresses the need for some prefiling inquiry"). The Rule, in this regard, seeks to prompt attorneys "to validate the truth and legal reasonableness of the papers filed." *Business Guides,* 498 U.S. at 547 (quoting *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 126 (1989)). The central purpose of Rule 11 is to "deter baseless filings in district court." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).

By having one's name affixed as counsel to a pleading filed with the court, an attorney is certifying, to the best of his or her knowledge and belief "formed after an inquiry reasonable under the circumstances," that the factual contentions contained in that pleading are well-founded and have evidentiary support. Fed. R. Civ. P. 11(b)(3). "Rule 11 sanctions are proper (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) when the party files a pleading in bad faith or for an improper purpose." *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 694 (11th Cir. 1995).

In the Eleventh Circuit, the Rule 11 analysis is two-fold. *See Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996). First, a court must determine whether the claims are

objectively frivolous in view of the facts or law. *See id.* Then, if they are, a court must determine whether the person who signed the pleading should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry. *See id.* ("an attorney must make a reasonable inquiry into both the legal and factual basis of a claim prior to filing suit"). If the attorney failed to make a reasonable inquiry, then the court must impose sanctions, even despite an attorney's good faith belief that the claims were sound. *See id.*; *Hashemi v. Campaigner Publ'ns, Inc.*, 784 F.2d 1581, 1583 (11th Cir. 1986) (finding that the Rule 11 objective standard is more stringent than the original good-faith formulation).

In the confidential witness context, courts in the Eleventh Circuit have imposed sanctions on far less egregious facts. In *Avirgan v. Hull*, for example, the Eleventh Circuit affirmed the imposition of sanctions after plaintiffs refused to identify the names of seventy-nine confidential witnesses:

> After all the appeals were exhausted and plaintiffs complied with the order to reveal the names of their witnesses, the reason for the plaintiffs' adamant refusal became apparent. Specifically, the names and identities of approximately twenty of the seventy-nine witnesses were totally unknown to [plaintiffs' counsel] or the plaintiffs. Several of the disclosed witnesses later stated under oath that they did not know [plaintiffs' counsel], had never spoken to him, or flatly denied the statements he had attributed to them in his affidavit.

932 F.2d 1572, 1581 (11th Cir. 1991) (citation omitted). Based on those facts, the Court found that plaintiff's counsel "could not have reasonably believed at the time of the filing of the complaint and the signing of the affidavit that the complaint was well-grounded in fact . . . It is obvious that if the appellants knew (must have known) prior to filing this lawsuit that they had no competent evidence, then, this complaint was not well-grounded." *Id.* at 1582 (internal citations omitted). The Court then concluded: "When it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest." *Id.* at 1582 (citations omitted). *See also Pelletier v. Zweifel*, 921 F.2d 1465, 1514-15 (11th Cir. 1991) (affirming sanctions).

In the Reform Act context, the case law is compelling. In *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 636 (11th Cir. 2010), the Eleventh Circuit reversed a district court for its failure to provide a reasoned opinion refusing to sanction plaintiffs' lawyers in a failed securities class action, emphasizing that sanctions are mandatory for Rule 11 violations in such cases. Judge Tjoflat concurred, concluding that as to several of the securities law claims "the [Rule 11] violations are so clear that no matter what rationale the district court might have had, it abused its discretion when it

-14-

denied sanctions." *Id.* at 671.  More recently, the Eleventh Circuit granted a rehearing *en banc* to address Rule 11 sanctions under the Reform Act.  *See Ledford v. Peeples*, 630 F.3d 1345 (11th Cir. 2011).  Specifically, the Court will address, *inter alia*, whether the Court of Appeals has a duty under the Reform Act to determine, *sua sponte*, whether sanctions should have been imposed. Needless to say, the mere raising of this *en banc* issue does not bode well for Rule 11 violators.

District courts have also recognized and punished tactics that are patently intended to undermine the public policies embodied in the Reform Act.  In *Smith v. Smith*, 184 F.R.D. 420, 421-22 (S.D. Fla. 1998), Judge Moore granted a motion for sanctions under Rule 11 and noted that "[t]he main purpose behind the Reform Act is to curtail the abusive actions of plaintiffs in securities litigation who bring meritless claims hoping to initiate discovery and uncover evidence that was not alleged in the complaint."  He further explained: "The Reform Act seeks to dispose of these types of claims before a defendant is forced to engage in expensive and protracted discovery." *Id.*   Judge Denise Cote, in accordance with the Reform Act, also imposed sanctions against several plaintiffs' lawyers and law firms for violating Rule 11, and awarded Defendants their full attorneys' fees and costs as provided for by the Reform Act.  *See In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08cv11278, 2010 WL 1875728 (S.D.N.Y. May 11, 2010).  The Rule 11 violations recounted in *Australia* are far less egregious than those committed in this case.

And, as noted earlier, on September 30, 2010, Labaton and Barroway were sanctioned in yet another case involving Mark Arisohn for filing a complaint unsupported by confidential witness allegations.  *See In re Star Gas Sec. Litig.*, 745 F. Supp. 2d 26, 37 (D. Conn. 2010).  There, Judge Arterton found there was "no evidence" that the statements or testimony of two confidential witnesses supported the allegations included in the complaint. "[T]here remains no relationship between what the Plaintiffs' 'credible witnesses' said and the fraud claims Plaintiffs advanced." *Id.*

**B.    Plaintiffs' Counsel Did Not Make A Reasonable Inquiry**

The Eleventh Circuit has squarely held that "an attorney must make a reasonable inquiry into both the legal and factual basis of a claim prior to filing suit." *Worldwide Primates,* 87 F.3d at 1255. The reasonableness of the inquiry "may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for the facts underlying the violative document; or whether he depended on forwarding counsel or another member of the bar." *Id.* at 1254 (citations omitted).  With regard to the reasonableness of a pleading's legal basis, a court may

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

consider the time available to prepare the pleading; the complexity of the legal issues; the plausibility of the argument; and whether the party is proceeding *pro se*.  *See Pelletier*, 921 F.2d at 1514 n. 88.

Based upon the confidential witnesses' sworn testimony, it appears that not a single one of the actual lawyers in this case — of which there are many —  made any sort of meaningful effort to confirm that the critical allegations being attributed to these confidential witnesses were in fact accurately and properly attributed to those witnesses — at least not until well after the damage had been done.  The very lawyers that signed the complaints in this action and then stood behind the allegations as providing the bases for prosecuting these most serious of claims, did not even attempt to speak to the very people that supposedly provided the evidentiary support for the allegations, as is required by Rule 11.   As the deposition testimony further makes clear, had counsel done so, the confidential witnesses could have and would have informed them that the most critical allegations were not true.  Even more troubling, it appears counsel knew they were false yet used them anyway, and, when discovery was compelled, took no steps to voluntarily correct those falsehoods.

Plaintiffs cannot escape sanctions by asserting reasonable reliance on the work of non-lawyer investigators. "Rule 11 imposes a non-delegable duty upon the signing attorney to conduct his own independent analysis of the facts and law which form the basis of a pleading or motion." *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1277 (3d Cir. 1994) (citing *Pavelic*, 493 U.S. at 125-27). *See also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (attorney's "non-delegable" Rule 11 obligations cannot be delegated to another member of the firm) (citations omitted).  It is the lawyer's obligation to ensure that the factual allegations in a pleading are well founded.  This is particularly true where the delegated task relates to the core allegations offered in support of a claim for securities fraud. Indeed, had counsel taken those minimal steps to actually supervise the work of its investigator — for example, actually speak to the confidential witnesses — many of the factual inaccuracies would have become immediately apparent.  Moreover, counsel need not have acted in bad faith to be subject to sanctions under Rule 11.   *See Zaldivar v. City of Los Angeles*, 780 F.2d 823, 829 (9th Cir. 1986).

Finally, as to the legal claims and allegations established to have been objectively frivolous when filed, counsel's own actions confirm the lack of a reasonable inquiry.  By turning an initial blind eye to the obvious fundamental shortcomings of it insider trading claims, financial reporting claims and other allegations, Plaintiffs succeeded in forcing the Court and Defendants to waste vast sums of money and time litigating claims and facts that never should have been brought.  The Reform Act's

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

pleading burden was intended to prevent such a circumstance.  Because Plaintiffs subverted that statutory purpose through fraud and deceit, this Court is left with no choice but to turn elsewhere in the Reform Act's express provisions to address the issues that have now arisen in this case.  Rule 11 provides this Court with the means to do so.

### C.   The Claims Were And Are Objectively Frivolous

#### 1.   The Claims Asserted in the First Amended Consolidated Complaint

This Court found that the FACC sufficiently pled the elements of securities law violations based almost entirely on false confidential witness allegations that were objectively frivolous at the time they were asserted.  Any reasonably inquiry by Plaintiffs would have revealed the frivolity of the claims and stopped this lawsuit before an enormously cumbersome, burdensome, and expensive discovery and trial process was launched.  Although Labaton is responsible for the original pleading, the Barroway lawyers have pressed those claims for almost two years now, which certainly counts as "later advocating" them under Rule 11(b).  This Court should impose sanctions based on the confidential witness allegations standing alone.

#### 2.   Insider Trading Claims against Alan Levan and John Abdo

The insider trading claims against Alan Levan and Abdo are objectively frivolous as a matter of fact and law, and counsel should have known of their frivolity from the outset. In dismissing the Amended Complaint, this Court expressly rejected the claim on factual grounds: "the shares sold during this period represent only a fraction of A. Levan and Abdo's holdings.  In fact, A. Levan and Abdo exercised options that resulted in a substantial *net increase* in their holdings during the Class Period." DE 70 at 29 (emphasis in original).  With this factual finding in hand, easily confirmed by a simple review of the relevant SEC filings, Plaintiffs should have known that the insider trading claims against Levan and Abdo would collapse of their own weight.  Plaintiffs, nonetheless, included the exact same claim in the FACC.   Re-asserting the claim, particularly when the underlying stock ownership information was publicly available and showed the claim to be unfounded, warrants sanctions.   Much like the damage done from using the confidential witness, so too is the reputation damage to Levan and Abdo for being accused of insider trading irreparable.

#### 3.   Accounting Fraud and Loan Loss Reserves

Not a single confidential witness was in a position to know anything about loan loss reserves and therefore Plaintiffs could not have had any basis for the allegations of accounting fraud and the

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200

understatement of loan loss reserves included in the FACC.  And, predictably enough, even after years of exhaustive discovery, Plaintiffs were forced to concede the adequacy of the loan loss reserves in the briefing on summary judgment, and this Court entered judgment on this issue.

At trial, however, Plaintiffs pressed forward with an even more frivolous iteration of the original claim, arguing that they should be able to reverse course and argue that the loan loss reserves were inadequate, which the Court properly rejected out of hand.  *See* Tr. 3767-3778. Indeed, while attempting to argue to the jury the existence of accounting fraud, counsel conceded the absence of evidence to support the claim:

> Well, Your Honor, we chose to withdraw that claim because at the time, and based on the evidence in the record, we didn't feel that we could meet the burden of proof as to the accounting.

Tr. 3767.  A reasonable inquiry would not have led to such a claim, making sanctions mandatory. Pressing such an argument at trial while admitting the absence of proof drives home that point.

4.      All Remaining Claims Should Never Have Been Brought

Any reasonable inquiry into a potential securities class action should begin with the public disclosure that caused the stock price to decline.  Here, the Company's earnings release said that there was a catastrophic collapse of the Florida housing market in the third quarter that caused substantial losses and increases in loan loss reserves to a portfolio of "builder land bank" loans, a very substantial increase in unallocated loan loss reserves, an increased loss to property previously acquired in foreclosure, and other losses in non-BLB acquisition and development loans.  In addition, the Company said that the Florida housing market had deteriorated to such a serious degree that the entire land loan portfolio of approximately $550 million was now regarded as likely to compel still greater loan losses in the future.

The next reasonable inquiry should have been to determine whether what the Company said about the suddenly collapsing housing market was true.  Had that inquiry been made, it would have led to an obvious answer: it was; the housing market meltdown was sudden, catastrophic and would have been expected to substantially adversely impact any bank with Florida real estate loans.  That inquiry and answer should immediately have set off alarms as to the cause of the stock price decline.

The next reasonable inquiry should have been to determine if the Company had previously disclosed that it had loans that were particularly susceptible to a collapse in the Florida housing market.  Had that inquiry been made, it would have led to another obvious answer: yes; the very land

-18-

acquisition and development loans identified in the earnings release as suffering losses had been previously identified as likely to result in substantial losses if the economy declined further.

The next reasonable inquiry should have been to compare the reported losses and additional reserves caused by the third quarter housing market collapse to the Company's previous disclosure of its exposure. Had that inquiry been made, it would have led to the obvious conclusion that the Company emphatically disclosed its significant exposure to Florida real estate in general, its particular focus on approximately $550 million of commercial real estate loans to homebuilders and its serious concern that approximately $140 million of that portfolio (the BLB loans) were particularly susceptible to further market declines (with the remainder having a "relatively lower risk"). Since the loan losses that occurred were to those very loans, a reasonable inquiry would have revealed that the Company's reported losses were caused by the impact of the housing market collapse on the very loans where the risk was plainly identified. And, once discovery commenced, it became pellucidly clear that the lion's share of the losses were caused by the BLB loans.

Lawyers purportedly skilled enough to warrant appointment to manage a case such as this would be expected to know that, to prove damages, the non-fraud causes of the loss would have to be eliminated and proved. Performing that analysis from readily available information, reasonable attorneys acting within the constraints of Rule 11 would have to have concluded that the very risks the Company identified were the risks that materialized. Thus, were one to disaggregate the causes of the stock price decline correctly, there would be no fraud factors relevant to the price decline.

But, of course, these attorneys did not undertake the reasonable inquiry that would have led to that conclusion. Indeed, it is quite clear that Plaintiffs understood the absence of any fraud caused losses, as they declined the Court's invitation at trial to allow additional evidence so that the jury could do a calculation itself. They plainly knew that the actual loss was caused by the very risks properly disclosed by the Company.

5.   Alan Levan's July 25, 2007 Statements

Plaintiffs' claim that Alan Levan's July 25, 2007 statements were false as a matter of law is sanctionable because it ignores his actual words as well as the massive volume of other, contemporaneous public disclosure by Bancorp and Alan Levan. Defendants' prior briefs set forth at greater length how Plaintiffs' argument distorts the language actually used by Alan Levan during the call and was completely unsupported by record evidence. *See* DE 330, 471, 666, 669, 677, 679.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Those briefs are hereby incorporated by reference.  The claim that Alan Levan's July 25 statements were false as a matter of law plainly warrants sanctions.

6.   <u>Plaintiffs' Claim of Partial Disclosure of a Fraud in April 2007</u>

A reasonable inquiry into the claim of damages from an alleged  partial disclosure of a fraud from the earnings release in April 2007 would have immediately focused on the historical stock price decline that began in January 2007 following the Company's expressed concern of the declining Florida real estate market and the Company's exposure to it.   From that moment, the stock price steadily declined both in absolute terms and as compared to an average of banks throughout the country. The reason was and is obvious, as Bancorp's fortune was inextricably tied to the Florida economy.

A reasonable inquiry by reasonable counsel contemplating a securities class action would have revealed that the market decline on the day of the April earnings release was little different than the rate of price decline on many days that both preceded and followed it, all precipitated by the perceived decline of the Florida economy and Bancorp's exposure to it.  A claim that a one day price decline that appears like so many others was fraud driven while the rest were not is simply ridiculous and was treated as such by the jury.

## IV.   CONCLUSION

For the foregoing reasons and on the foregoing authorities, Defendants' motion for sanctions should be granted.

-20-

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3200
Facsimile:  (305) 789-3395

s/ Eugene E. Stearns
EUGENE E. STEARNS
Florida Bar No. 149335
estearns@stearnsweaver.com
RICHARD B. JACKSON
Florida Bar No. 898910
rjackson@stearnsweaver.com
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@stearnsweaver.com
CECILIA DURAN SIMMONS
Florida Bar No. 469726
csimmons@stearnsweaver.com
GORDON M. MEAD, JR.
Florida Bar No. 49896
gmead@stearnsweaver.com
ANDREA N. NATHAN
Florida Bar No. 016816
anathan@stearnsweaver.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 5, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF or through other approved means.

       s/ Adam M. Schachter         
       ADAM M. SCHACHTER

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street, Suite 2200 ▪ Miami, FL 33130 ▪ (305) 789-3200

## SERVICE LIST

*In re BankAtlantic Bancorp, Inc. Securities Litigation*
Case No. 07-61542-CIV-UNGARO
United States District Court, Southern District of Florida

Mark Arisohn
marisohn@labaton.com
Serena Hallowell
shallowell@labaton.com
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
Telephone: 212-907-0877
Facsimile:  212-818-0477
*Lead Counsel for Lead Plaintiff State Boston*
*Retirement System*

Ronald D. Shindler
rshindler@fowler-white.com
Fowler White Burnett P.A.
1395 Brickell Avenue
14th Floor
Miami, FL 33131
Telephone: 305-789-9222
Facsimile: 305-789-9201
*Liaison Counsel for Lead Plaintiff State Boston*
*Retirement System*

Andrew Zivitz
azivitz@btkmc.com
Barroway Topaz Kessler Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
Facsimile:  610-667-7056
*Attorney for Plaintiff*

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street, Suite 2200 ■ Miami, FL 33130 ■ (305) 789-3200