**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 07-61542-CIV-UNGARO**

IN RE BANKATLANTIC BANCORP,
INC. SECURITIES LITIGATION

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

LABATON SUCHAROW, LLP
Mark S. Arisohn, admitted *pro hac vice*
Serena Hallowell, admitted *pro hac vice*
Mindy S. Dolgoff, admitted *pro hac vice*
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Co-Class Counsel for Class Representatives
and the Class and Lead Counsel for Lead-
Plaintiff State-Boston Retirement System*

FOWLER WHITE BARNETT P.A.
Ronald D. Shindler
Florida Bar No. 781703
Espirito Santo Plaza, 14th Floor
1395 Brickell Avenue
Miami, FL 33131-3302
Telephone: (305) 789-9222
Facsimile: (305) 789-9201
rshindler@fowler-white.com

*Liaison Counsel for Class Representatives and
the Class and for Lead Plaintiff State-Boston
Retirement System*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK LLP
Andrew L. Zivitz, admitted *pro hac vice*
Matthew L. Mustokoff, admitted *pro hac vice*
Mark S. Danek, admitted *pro hac vice*
Michelle M. Newcomer, admitted *pro hac vice*
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Class Counsel for Class Representatives
and the Class*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

I.      INTRODUCTION ..................................................................................................... 1

II.     RELEVANT FACTS ................................................................................................ 2

        A.      The Investigation – An Overview............................................................... 2

        B.      The Investigation Resulting in the Filing of the FACC ............................. 3

        C.      Plaintiffs' Rule 26 Disclosures .................................................................. 4

        D.      Plaintiffs' Attorneys Obtained Counsel for Four of the CWs.................... 5

        E.      The Depositions of the CWs ...................................................................... 6

III.    ARGUMENT ........................................................................................................... 7

        A.      Plaintiffs' Claims Are Meritorious ............................................................ 7

        B.      Recanted Witness Statements Do Not Support Rule 11 Sanctions........................ 8

        C.      Plaintiffs' Attorneys Did Not Violate Their Duty of Candor to the Court ........... 11

        D.      The Claims Were Not Frivolous ............................................................... 12

                1.      The CW allegations were made in good faith............................... 12

                        a.      The decision upholding the FACC relied primarily on
                                allegations from CW2/Halprin that she did not recant ................. 12

                        b.      The CW allegations were not "made up" ...................................... 12

                        c.      The other CW allegations are also based on information the
                                CWs provided to the investigators ................................................ 14

                2.      The Other Grounds Asserted For Sanctions Are Also Baseless ............... 16

                        a.      The insider trading claims............................................................ 16

                        b.      The loan loss reserves claim ........................................................ 17

                        c.      Loss causation and damages ........................................................ 17

                        d.      Alan Levan's July 25, 2007 statements ....................................... 19

                        e.      Defendants' claim for sanctions against the class
                                representatives................................................................................ 19

IV.     Defendants' Counsel's Improper and Sanctionable Conduct ........................................... 19

V.      CONCLUSION....................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Aetna Ins. Co. v. Meeker*,
  953 F.2d 1328 (11th Cir. 1992) ................................................................................7

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*,
  No. 08-11278, 2010 WL 1875728 (S.D.N.Y. May 11, 2010) .................................10

*Avirgan v. Hull*,
  932 F.2d 1572 (11th Cir. 1991) ..............................................................................11

*Baker v. Alderman*,
  158 F.3d 516 (11th Cir. 1998) ..................................................................................7

*Byrne v. Nezhat, M.D.*,
  261 F.3d 1075 (11th Cir. 2001) ..............................................................................19

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) .......................................................................................5

*Carson v. J. Curt Inc.*,
  No. 1:06-cv-00098-MP-AK, 2008 WL 4274502 (N.D. Fla., Sept. 11, 2008) ....................7, 17

*Christian v Mattel, Inc.*,
  286 F.3d 1118 (9th Cir. 2002) ...................................................................................9

*City of Livonia Employees' Ret. Sys. v. Boeing Co.*,
  No. 09 C 7143 2011 WL 824604 (N.D. Ill. Mar. 7, 2011) ......................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .................................................................................................18

*In re Dynex Capital, Inc. Sec. Litig.*, 05 Civ. 1897 (HB) .............................................9

*Edward J. Goodman Life Trust v. Jabil Circuit, Inc.*,
  560 F. Supp. 2d 1221 (M.D. Fla. 2008) .................................................................16

*Harding Univ. v. Consulting Serv. Group, L.P.*,
  48 F. Supp. 2d 765 (N.D. Ill. 1999) ..........................................................................8

*Healey v. Chelsea Res., Ltd.*,
  947 F.2d 611 (2d Cir. 1991) ....................................................................................12

*In re JDS Uniphase Corp. Sec. Litig*,
  No. 02-1486, 2008 WL 753758 (N.D. Cal. Mar. 19, 2008) .................................8, 9

*Ledford v. Peeples*,
    630 F.3d 1345 (11th Cir. 2011)............................................................................10

*Lee v. Mid-State Land & Timber Co., Inc.*,
    285 Fed. Appx. 601, 608 (11th Cir. 2008) ..........................................................7

*Mar Oil, S.A. v. Morrissey*,
    982 F.2d 830 (2d Cir. 1993)................................................................................12

*McGuire Oil Co. v. MAPCO, Inc.*,
    958 F.2d 1552 (11th Cir. 1992)............................................................................7

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...............................................................................10

*In re Oxford Health Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ......................................................................16

*People v. Lasher*,
    58 N.Y.2d 962 (1983) ........................................................................................13

*Riccard v. Prudential Ins. Co.*,
    307 F.3d 1277 (11th Cir. 2002)..........................................................................19

*Safe-Strap Co. v. Koala Corp*,
    270 F. Supp. 2d 407 (S.D.N.Y. 2003) ...............................................................19

*In re Star Gas Sec. Litig.*,
    745 F. Supp. 2d 26 (D. Conn. 2010) ...................................................................9

*Thompson v. RelationServe Media, Inc.*,
    610 F.3d 628 (11th Cir. 2010), ..........................................................................10

*United States v. Kamel*,
    965 F.2d 484 (7th Cir. 1992)..............................................................................10

*Watkins v. Miller*,
    92 F. Supp. 2d 824 (S.D. Ind. 2000) .................................................................10

*Williams v. General Motors Corp.*,
    158 F.R.D. 510 (M.D. Ga. 1993) .......................................................................19

*The Wu Group v. Synopsys, Inc.*,
    No. 04-3580, 2005 WL 1926626 (N.D. Cal. Aug. 10, 2005) ...........................8, 9

**STATUTES**

28 U.S.C. § 1927...................................................................................................................11

Fed. R. Civ. P. 11………………………………………………………………...*passim*

Fed. R. Civ. P. 26..................................................................................................................4

Fla. Stat. Ch. 934.03............................................................................................................13

N.J. Stat. Ann. § 2A:156A-4(d) (1993) .............................................................................13

N.Y. Penal Law § 250.00(1) ..............................................................................................13

N.Y. CPL § 700.05(3)………………………………………………………………13

## I.    INTRODUCTION

Defendants' attorneys persist in their baseless attack on Plaintiffs' attorneys[1] asserting that Plaintiffs' entire case was frivolous and plagued with attorney misconduct throughout.  The motion is remarkable for its meritless *ad hominem* attacks and its glaring omissions.  Notably, the motion ignores that after a five-week trial, a jury unanimously found that the Defendants knowingly made 11 material false statements that misled Bancorp's shareholders and awarded them damages.  Although the Court vacated the verdict, it is hard to imagine how Defendants' counsel can assert with candor that the entire case against Defendants was frivolous, given the jury's findings and this Court's prior rulings on summary judgment and at trial.

Defendants' counsel's lack of good faith and false accusatory rhetoric permeate the motion.  *First*, in repeatedly asserting that the CW allegations "were all simply made up" (*e.g.*, DMS at 7),[2] they disregard the previously submitted and unrefuted evidence establishing that the CW allegations in the CAC and FACC were made in good faith and based on investigators' memoranda prepared from notes taken contemporaneously with their interviews of the CWs.  *Second*, they claim that sanctions should be imposed on the class representatives (DMS at 1), yet they do not and cannot include a single word supporting that claim.  *Third*, they ask for sanctions based on Plaintiffs' motion for partial summary judgment relating to the falsity of four statements by Alan Levan (DMS at 19 – 20) ***despite this Court's order granting the motion*** and repeated refusals to reverse itself on the issue.  *Fourth,* they seek sanctions based on Plaintiffs' loss causation and damages theory (DMS at 3, 18-19) ***despite this Court's numerous rulings that the evidence was sufficient for those issues to be decided by the jury***.  *Fifth*, they claim that the assertion by Plaintiffs of BLB fraud after the April 2007 disclosures is sanctionable (DMS at 20), ***despite this Court's multiple rulings that the evidence supporting the claim adduced at trial was legally sufficient***.  *Sixth*, arguments previously made by Defendants but rejected by the jury, relating to Bancorp's risk disclosures, loan loss reserves and the impact of the economy on

---

[1] Lead Counsel, Labaton Sucharow LLP, and Barroway, Topaz, Kessler, Meltzer & Check LLP were appointed Co-Class Counsel on October 20, 2009.

[2] "DMS" refers to Defendants' Motion for Sanctions.  "CAC" refers to the Consolidated Amended Complaint.  "FACC" refers to the First Amended Consolidated Complaint. "SACC" refers to the proposed Second Amended Consolidated Complaint. "CW" refers to Confidential Witness.  "Tr." refers to pages of the trial transcript unless otherwise indicated.

BankAtlantic's loan portfolio (DMS at 17–19) are asserted yet again in support of their sanctions motion.

As set forth below and in the accompanying declarations, affidavits and exhibits, Plaintiffs' attorneys presented factual contentions in the complaints that had extensive evidentiary support.[3] They presented theories of liability that were well-grounded in the law based on the facts as they were then reasonably and honestly understood.

The PSLRA sets a high pleading threshold for plaintiffs to meet without the benefit of discovery.  But the public policy that encourages private enforcement of the securities laws to root out fraud (as found by the jury in this case) depends on confidential witnesses willing to provide information to plaintiffs' attorneys.  This public policy should not be defeated by chilling plaintiffs' attorneys' reliance on confidential witnesses due to fear of sanctions being imposed if the witnesses later recant or their memories fade.  Nor should defendants' attorneys be encouraged to bully such witnesses into recanting by threatening them with breach of overly-broad severance agreements containing non-disparagement clauses, a tactic that was used repeatedly in this case.

For the reasons stated herein, Defendants' motion should be denied in all respects.

## II.    RELEVANT FACTS

### A.    The Investigation – An Overview

On February 5, 2008, the Court appointed Labaton as Lead Counsel and directed that a consolidated complaint be filed.  Shortly thereafter, Labaton contacted Barroway to assist with the litigation. Zivitz Decl. ¶2. Amy Greenbaum, an investigator employed by Labaton since February 2005 and former FBI Agent Janet Nyhart,[4] an investigator formerly employed by Barroway, commenced the process of identifying and interviewing former BankAtlantic employees.  Greenbaum Aff. ¶¶1,2; Evans Aff. ¶¶2,3.  The Barroway investigators were supervised by David Rabbiner, a former FBI agent and two Barroway attorneys and Ms. Greenbaum was supervised by four Labaton attorneys.  Greenbaum Aff. ¶2; Evans Aff. ¶4.

---

[3] Exh. A to the Greenbaum Aff. is a chart linking the CW allegations from the FACC with excerpts from the investigator memoranda.  The investigator affidavits attest that the chart contains true and accurate excerpts from the investigator memoranda.

[4] Ms. Nyhart left Barroway in June 2008.  After the CAC was dismissed, John Evans and Jason Bochet, members of the Barroway investigation team, were assigned to the BankAtlantic matter.  Zivitz Decl. ¶¶5,6; Newcomer Decl. ¶5; Evans Aff. ¶¶2,3.

These experienced investigators regularly reported the results of their interviews to their supervising attorneys.  Greenbaum Aff. ¶6; Hallowell Decl. ¶5; Scarlato Decl. ¶7.  Barbara Halprin, CW2, emerged as one of the most important witnesses because of the extent of her personal knowledge about highly relevant matters and her willingness to participate in multiple interviews despite her fear of retaliation from Defendants.  Scarlato Decl. ¶¶5,11.  Serena Hallowell, one of several Labaton attorneys involved in drafting the complaints, monitored Ms. Greenbaum's interviews of Halprin and was present during two of them.  Hallowell Decl. ¶¶12,13.

The investigators at both firms took notes contemporaneously with their witness interviews and prepared detailed memoranda of the interviews on the same day as (or shortly following) the interviews.  Evans Aff. ¶5; Greenbaum Aff. ¶6.  These memoranda were distributed to the attorneys working on the BankAtlantic case for review and the memoranda were utilized in drafting the CAC and FACC.  *Id.*  Prior to filing both complaints, Plaintiffs' counsel and the investigators compared the allegations attributed to the CWs to the investigator memoranda for accuracy.  Stocker Decl. ¶9; Hallowell Decl. ¶18; Scarlato Decl. ¶15.  In the case of CW Donna Loverin, Ms. Greenbaum recorded her interviews, and the transcript was utilized in preparing the pleadings.  Greenbaum Aff. ¶7.

Declarations  and affidavits from the attorneys and investigators who worked on this case leading up to the filing of the CAC and FACC are submitted in opposition to the DMS.  Those statements evidence that the complaints were the product of a lot of hard work and due diligence. The investigators' memoranda were carefully reviewed and follow-up inquiries of the CWs were directed.  Although an error was made by attributing to CW3/Loverin a statement made by the investigator that Loverin agreed with, Defendants' counsel's claim that the CW allegations were just made up is false.

### B.      The Investigation Resulting in the Filing of the FACC

After the Order dismissing the CAC was issued, the supervising attorneys directed the investigators to re-interview the CWs with pointed inquiries designed to elicit additional information about their employment duties, the relevant time periods for their statements to the extent Plaintiffs' attorneys did not already have that information, additional details as to prior statements, and the basis for their knowledge.  Hallowell Decl. ¶11; Scarlato Decl. ¶10.  For example, at the supervising attorneys' direction, the investigator conducted two additional

interviews of CW2/Halprin wherein she provided more details regarding the basis of her knowledge for her prior statements, as well as additional Class Period detail regarding loan quality, the content, dissemination and preparation of exception reports, the composition of the MLC, deficiencies with respect to land loans, corroborating that CW1/Irizarry took the MLC minutes during parts of the Class Period, additional details concerning Steeplechase, and the understatement of BankAtlantic's loan loss reserves, *all of which confirmed her reliability*. Greenbaum Aff., Ex. A, pp. 7-24.

The main thrust of Defendants' motion is their assertion that the key CW allegations in the FACC that cured the deficiencies of the CAC, especially the allegations relating to time of employment and position, "were all simply made up."  DMS at 7.  This claim is made in the utmost of bad faith and is false.  *See* Greenbaum Aff. at ¶¶8-13.  Excerpts from the investigator reports and the Loverin transcript, provided to defense counsel almost a year ago (DE 319, Ex. I), *establish that there was a good faith basis for every one of the CW allegations in the FACC*.

### C.    Plaintiffs' Rule 26 Disclosures

Defendants note that Plaintiffs' Rule 26 disclosures did not include the CW names and charge that "[t]he decision not to identify the confidential witnesses was, of course, purely tactical, reflecting a purposeful attempt to keep those individuals forever hidden from the discovery process."  DMS at 8 n. 6.  However, the CWs were not included in Plaintiffs' Rule 26 disclosures because Plaintiffs did not intend to call or use any CW at trial.  The notes to the 2000 Amendments to Rule 26 provide, in pertinent part:

> A party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use … Because the disclosure obligation is limited to material that the party may use, it is no longer tied to particularized allegations in the pleadings.

Fed. R. Civ. P. 26 Advisory Committee's note (2000).  Magistrate Judge Simonton agreed that since Plaintiffs did not intend to call the CWs, disclosure of their identities in the Rule 26 initial disclosures was not required.  *See* DE 167 at 5.

Defendants' suggestion that Plaintiffs' counsel disclosed the CW identities only when ordered to do so by this Court (DMS at 8), although true, falsely implies something sinister.  As found by Magistrate Judge Simonton in her decision ordering disclosure, Plaintiffs told at least some of the CWs that their identities would not be disclosed absent a court order.  DE 167 at 9. Moreover, Plaintiffs' motivation in refusing to reveal the CW identities absent a court order was

to encourage disclosure.  As the First Circuit explained, "Employees or others in possession of important information about corporate malfeasance may be discouraged from stepping forward if they must be identified at the earliest stage of a lawsuit."  *In re Cabletron Sys., Inc.* 311 F.3d 11, 30 (1st Cir. 2002).  Indeed, Magistrate Judge Simonton found that the CWs exhibited an "understandable desire for privacy" (although outweighed by the need for disclosure).  DE 167 at 10.[5]

Some of the CWs expressed concern over the litigious nature of Alan Levan.  For example, CW2/Halprin attested that "I am also personally fearful of Alan Levan finding out of my identity as he is known to me to be a very litigious individual.  Specifically, I am aware of him suing multiple former employees.  I am fearful that if my identity became known to him that he would find some way to bring a case against me and that given my modest financial situation that I would be unable to protect myself from such wrongful litigation."  *See* DE 163, Ex. A.

In addition, Donna Loverin voiced a similar concern to the investigator:

> Make sure that they put in writing they're going to defend me, because I will tell you, Alan does solve his problems by litigation…. He is known for that.  He will not think twice before he will slap you with a lawsuit, and his attitude is, I've got a lot more resources than you do…. [H]e will sue his employees, in a heartbeat.

*See* Loverin Tr., DE 416, Ex. C at 43.

**D.      Plaintiffs' Attorneys Obtained Counsel for Four of the CWs**

When the CWs were served with deposition subpoenas and document demands by Defendants, those CWs who requested counsel were referred by Plaintiffs' Counsel to Jorge Mestre, Esq., of Rivero Mestre & Castro for possible representation.  Even that neutral event is painted by Defendants as improper because Lead Counsel paid for the representation of the CWs.  DMS at 8.  Defendants' argument is absurd, especially in light of the fact that other than the CWs and Perry Alexander, all the present and former BankAtlantic employees were

---

[5] Thus, far from the sinister motive suggested by Defendants, Plaintiffs' counsel opposed disclosure of CW identities because they were following through on the promises they had made to the CWs.  In fact, Magistrate Judge Simonton recognized Plaintiffs' counsel's good faith motivation at oral argument on the motion by thanking both sides for their presentations and expressing appreciation for the "fine lawyering in this case."  DE 169 at 39 – 40.

represented by counsel for the Defendants at their depositions and at the trial, and ***BankAtlantic paid for Alexander's counsel***. Tr. 1389.

  **E.**  **The Depositions of the CWs**

  Defendants' only substantive depositions taken in this case were of the CWs.  During aggressive and hostile examinations, Defendants' counsel confronted several of the CWs with their severance agreements promising not to disparage BankAtlantic, to keep confidential information they obtained during their employment, and acknowledging that they would be responsible for any damages resulting from breaching their agreement.  Eugene E. Stearns asked CW2/Halprin the particularly intimidating questions that are set out in the footnote below.[6]

  The questioning of CW1/Irizarry and CW5/Blevins was similarly threatening and designed to encourage these witnesses to deny that they had made disparaging statements about BankAtlantic to the investigators.[7]

---

 [6] Q. Did you discuss the fact that you had an agreement that if you made disparaging comments about the company, that you would have to pay the company $80,000?

  Q. I take it you disclosed to Ms. Greenbaum the fact that you had a contract with BankAtlantic Bancorp or BankAtlantic, correct?

  Q. And you disclosed to her in that contract that you agreed not to make any disparaging comments?

  Q. Was there ever any discussion about whether the Plaintiff's lawyers would be responsible if you had to pay BankAtlantic back the money?

  Q. Did you ask them to provide you money to cover it in the event you would have to pay the $79,000 back?

  Q. You know that you're one of the reasons they're defending this lawsuit, don't you?

  Q. You don't know that?  Did you read the order of District Court Judge denying the motion to dismiss?

  Q. Did you see that she relied on your testimony to deny the motion to dismiss?

  Q. Do you know how much Bancorp has had to spend to defend this litigation based on your testimony, based on the information you gave to these Plaintiff's lawyers?

  Q. Do you know how many millions of dollars …

Halprin Dep. Tr., DE 319, Ex. B at 61-63 and 80.

 [7] Irizarry was shown a copy of his severance agreement and asked whether, when he spoke to Plaintiffs' investigator, he was conscious of the provision where he agreed to "never … make any disparaging, potentially damaging or otherwise uncomplimentary statements [about BankAtlantic] to any person."  DE 319, Ex. C at 101. Blevins was shown his severance agreement, read the provision barring disparaging statements about BankAtlantic  and providing for liquidated damages in the event of a breach, and asked whether he "breached that provision"

## III.    ARGUMENT

The Eleventh Circuit uses a two-step inquiry for Rule 11 sanctions that assesses: (1) whether the claims are objectively frivolous and (2) whether the person who signed the pleadings should have been aware that the claims were frivolous.  *Lee v. Mid-State Land & Timber Co., Inc.*, 285 Fed. Appx. 601, 608 (11th Cir. 2008); *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998).   Contrary to the foundation of Defendants' motion, the only proper inquiry when assessing counsel's conduct is "what could reasonably have been believed *at the time*" the representations to the Court were made.  *Aetna Ins. Co. v. Meeker*, 953 F.2d 1328, 1331 (11th Cir. 1992) (emphasis added).  "The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted."  *Carson v. J. Curt Inc.*, No. 1:06-cv-00098-MP-AK, 2008 WL 4274502, *2-3 (N.D. Fla., Sept. 11, 2008).  Moreover, Rule 11 was designed to discourage frivolous conduct driven by bad faith, not to chill or silence advocacy in support of meritorious claims – like those in the present case.  *Baker*, 158 F.3d at 524.

### A.    Plaintiffs' Claims Are Meritorious

In analyzing Rule 11 motions, the Eleventh Circuit directs district courts to determine whether the asserted claims are frivolous before analyzing whether "the person who signed the pleadings should have been aware that they were frivolous."  *McGuire Oil Co. v. MAPCO, Inc.*, 958 F.2d 1552, 1563 (11th Cir. 1992) (affirming denial of Rule 11 sanctions where a party's claims were not frivolous given the complexity of the issues involved).

It is beyond debate that Plaintiffs' claims here were not objectively frivolous at the time that Plaintiffs filed the CAC and FACC.  The foundation of Plaintiffs' claim is that Defendants fraudulently issued materially false and misleading statements to the public.  At the time of the drafting, independent of CWs' statements, several analysts believed that the Company had issued false statements during the Class Period regarding the credit quality of the BLB and non-BLB portions of the Bank's land loan portfolio.

For example, Morningstar issued a report on October 29, 2007 questioning the Company's truthfulness and observing that its lax underwriting may have contributed to its third quarter 2007 earnings miss:

---

and whether he recalled making any "disparaging, potentially damaging or uncomplimentary statements about BankAtlantic."  DE 319, Ex. D at 26 – 27.

> Our faith in management's underwriting, risk management ability, and forthrightness has eroded.  We believe management took a large concentrated risk, putting the bank in harm's way, and an investment in BankAtlantic is now speculative at best.
>
> * * *
>
> ***Furthermore, our confidence in management has eroded, given its unwillingness to be forthright about the risk in the bank's loan book.***

*See* DX392 [not admitted into evidence] (emphasis added).

Likewise, JPMorgan also called into question the veracity of the Company's prior statements regarding its land loan portfolio and the quality of the underwriting:

> Management attributed much of the deterioration within the CRE acquisition and development portfolio to market specific challenges and does not believe it is a function of lax underwriting standards.  ***However, in light of the magnitude of the jump in NPAs and size of the reserve charge, we do not believe this is the case***.

*See* PX638 [admitted into evidence] (emphasis added).  *See also* Tr. 4006.

Significantly, the jury determined that each of the Defendants knowingly made at least one materially false statement and that Bancorp's shareholders were damaged by statements made in the April 26, 2007 investor conference call.

Thus, Defendants cannot show that the essential claims were frivolous, either at the beginning of the case or at its conclusion.

## B.    Recanted Witness Statements Do Not Support Rule 11 Sanctions

Defendants contend that the CWs did not state to Plaintiffs' investigators what is attributed to them in the FACC because some of the CWs disavowed making some of those statements at their depositions.[8]  However, sanctions are not properly imposed because a subsequent deposition of a confidential witness is at odds with what was previously stated by the witness and relied on by counsel in drafting a pleading.  *See The Wu Group v. Synopsys, Inc.*, No. 04-3580, 2005 WL 1926626, at *12-13 (N.D. Cal. Aug. 10, 2005); *In re JDS Uniphase Corp. Sec. Litig*,  No. 02-1486, 2008 WL 753758, at *3-4 (N.D. Cal. Mar. 19, 2008); *Harding*

---

[8] The CW depositions support much of what is attributed to the CWs in the FACC.  *See* Hallowell Decl., Ex. A, which sets out in chart form the CW allegations in the FACC and the relevant portions of the CW depositions and a deposition taken of CW1/Irizarry by the SEC.

8

*Univ. v. Consulting Serv. Group, L.P.*, 48 F. Supp. 2d 765, 768-70 (N.D. Ill. 1999) (holding Rule 11 sanctions are inappropriate where complaint alleged facts based on interviews with percipient witnesses who later contradicted statements attributed to them in the complaint); *In re Dynex Capital, Inc. Sec. Litig.*, 05 Civ. 1897 (HB)(DF), DE 107 (S.D.N.Y. April 29, 2011).

In *JDS Uniphase*, *supra*, the court summarily rejected a motion for sanctions based on the allegation that certain confidential witnesses disavowed statements attributed to them in the pleading.[9]  The *JDS Uniphase* complaint was drafted based in part on interviews of certain confidential witnesses by investigators for Labaton who created contemporaneous memoranda reflecting the results of the interviews.  The sanctions motion was denied because it was demonstrated that the allegations in the complaint attributed to confidential witnesses were supported by the investigator memoranda.  The court wrote as follows:

> Plaintiffs counter that the depositions were not taken and the declarations were not signed until years after the witnesses originally spoke to Plaintiffs' investigators and attorneys.  In many cases the confidential witnesses testified or declared that they did not recall making the specific statements attributed to them in the SACC but did remember talking to Plaintiffs about the topics at issue.  Moreover, Plaintiffs maintain in their opposition and supporting declaration that over ninety-five percent of the statements included in the SACC are corroborated by the notes they were able to locate.  (footnote omitted)  Therefore, as in *The Wu Group v. Synopsys, Inc.*, the question of "whether the statements were made is essentially a credibility question."  Like the *The Wu Group* court, the Court here finds that Rule 11 sanctions are not appropriate in this context.  *Id.*  (Internal citations omitted.)

*In re JDS Uniphase Corp. Sec. Litig.*, *supra,* at *3.

The fact that a confidential witness later recants does not mean that reliance on the witness' prior statement was unfounded or unreasonable.  In light of the aggressive and

---

[9] Defendants' counsel repeatedly quotes from the papers submitted by defendant JDS Uniphase (DMS at 4, 5), but notes only as an afterthought that ***the motion was denied***.  DMS at 5.  Defendants also cite *In re Star Gas Sec. Litig.*, 745 F. Supp. 2d 26 (D. Conn. 2010), not for any precedential value, but for the fact that Plaintiffs' attorneys were found to have engaged in conduct ruled sanctionable.  Plaintiffs' attorneys have been lead counsel in hundreds of securities cases.  A single court finding sanctions is not relevant in any way to the proceedings here.  Indeed, it is impermissible to consider conduct in some other case as any support for sanctions in this case.  *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129-1131 (9th Cir. 2002).

threatening examination of several CWs by Defendants' lawyers and the fact that the depositions took place several years after the CWs made their statements to Plaintiffs' investigators resulting in faded memories (*see, e.g.* CW5/Blevins Dep. Tr., DE 416, Ex. J at 8), inconsistencies between the witnesses' statements and their deposition testimony is not surprising.  Indeed, cases in which "witnesses later recant for a host of possible reasons are not uncommon."  *See, e.g., Watkins v. Miller*, 92 F. Supp. 2d 824, 854 (S.D. Ind. 2000);  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (observing that witnesses may be influenced by fear of "retaliation against them"); *United States v. Kamel*, 965 F.2d 484, 494 n.25 (7th Cir. 1992) ("Recanting … witnesses are viewed with extreme suspicion.")  Accordingly, the fact that certain CWs recanted some of their statements to Plaintiffs' investigators does not support a Rule 11 motion.  The only proper inquiry is what was reasonable to believe at the time of the filing.

In *Dynex Capital*, *supra*,[10] the defendants moved for imposition of sanctions against the plaintiffs' attorneys on grounds similar to those raised by Defendants here.  Relying on sworn statements from class counsel that the confidential witnesses had indeed made the statements attributed to them in the complaint, the court denied the sanctions motion, accepting "that it is entirely possible that the witnesses, when their identities were no longer shielded by confidentiality, may have sought to disavow having made incriminating statements against Dynex."  *Id.*, DE 107 at 9.[11]

---

[10] In the *Dynex* decision, Magistrate Judge Freeman distinguishes *City of Livonia Employees' Ret. Sys. v. Boeing Co.*, No. 09 C 7143, 2011 WL 824604 (N.D. Ill. Mar. 7, 2011), a case submitted by Defendants as subsequent authority (DE 681) but not cited in support of their present motion.  In *Boeing*, the court granted a motion to dismiss (not a motion for sanctions) because the complaint was based entirely on a single confidential witness who had not worked at the defendant company and had no knowledge of the statements attributed to him.

[11] Defendants cite several cases that have no application here.  *See* DMS at 14-15.  *Ledford v. Peeples*, 630 F.3d 1345 (11th Cir. 2011), grants an application for rehearing *en banc* and vacates the previous panel's decision.  *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628 (11th Cir. 2010), reversed an order denying a sanctions motion because the record was insufficiently detailed to permit an adequate appellate review for abuse of discretion.

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08-11278, 2010 WL 1875728 (S.D.N.Y. May 11, 2010), is materially different from the present case.  There, the court dismissed an amended complaint **for failure to state a claim** because the false statements alleged were insufficient to form the basis of a Rule 10b-5 claim.  The original complaint based its assertion of falsity entirely on supposed internal emails of the defendant.  However, the court found that there was no support for the allegations as no emails had been reviewed by counsel.

### C.        Plaintiffs' Attorneys Did Not Violate Their Duty of Candor to the Court

Aside from falsely accusing Plaintiffs' attorneys that the CW allegations "were all simply made up" (DMS at 7), Defendants baselessly attack Plaintiffs' attorneys for violating their duty of candor to the Court on the factually wrong premise that, at the CW depositions, certain of the CWs recanted some of their prior statements and "Plaintiffs remained silent."  DMS at 9, and *see also*, DMS at 11, 12, 16.  Defendants twist the factual record.

Defendants' attorneys completed their depositions of the CWs who were cited in the FACC on April 6, 2010 (*see* DE 416, Ex. I).  On April 22, 2010, Plaintiffs filed their motion for leave to file the SACC (DE  206-208) and attached the proposed new pleading that, among other things, removed all of the allegations the CWs had "recanted" at their depositions or were inconsistent with what they previously told the investigators.[12]  Despite the good faith with which the CW allegations were made in the FACC (and CAC), the allegations were removed from the proposed SACC because some of the CWs recanted.  However, other discovery fully supported Plaintiffs' remaining claims.  On May 12, 2010 – weeks after receiving the proposed SACC that removed the recanted CW allegations – Defendants' counsel served a Rule 11 safe harbor notice enclosing a draft of the sanctions motion they ultimately filed on June 3, 2010.  *See* DE 319, Ex. I.  The present motion largely repeats what Defendants filed last year.

---

The falsity allegations concerning the emails were, according to the court, "the crux of the entire complaint" (*id*. at *6), and when they evaporated, so did plaintiff's claim.

*Avirgan v. Hull*, 932 F.2d 1572 (11th Cir. 1991), is completely inapposite.  The plaintiffs in *Avirgan* asserted civil RICO claims against CIA operatives, military intelligence personnel, arms merchants, mercenaries, Colombian drug lords and others arising out of a bombing resulting in physical injuries to the plaintiffs.  Fees and costs were awarded pursuant to 28 U.S.C. § 1927 because the complaint (dismissed on summary judgment) was supported by an affidavit outlining the testimony of 79 supposed witnesses, found by the court to include "unknown, nonexistent, deceased sources."  932 F.2d at 1582.  Indeed, in *Avirgan*, the sanctioned attorneys did not even have the identities of 20 of the 79 purported sources.  Completely unlike the present case, there were no investigator notes or memoranda in *Avirgan* supporting what was attributed to the witnesses.

[12] The proposed SACC also dropped claims relating to loan loss reserves and insider trading and shortened the Class Period, focusing the upcoming trial on Plaintiffs' strongest claims.

**D.    The Claims Were Not Frivolous**

      **1.    The CW allegations were made in good faith**

            **a.    The decision upholding the FACC relied primarily on allegations from CW2/Halprin that she did not recant**

Defendants' motion is based primarily on their claim that the motion to dismiss the FACC was denied "based on the false confidential witness allegations that were objectively frivolous at the time they were asserted." DMS at 17.  The opinion denying the motion to dismiss cites the following FACC paragraphs that allege information from CWs:  ¶¶ 61, 65, 67, 69, 70, 71, 72, 84, 85, 86, 87, 103, 105, 119, 120, 121.  Twelve of these sixteen paragraphs are attributed solely to CW2/Halprin – the one witness Defendants do not even claim recanted the statements attributed to her in the FACC.  DMS at 11, n.10.[13]  The investigator memoranda supporting these 12 CW2/Halprin allegations are referenced on the pages of the chart attached as Exhibit A to the Greenbaum Aff. as follows:  FACC ¶61 is supported at p. 7 of the chart; FACC ¶69 at pp. 10-12; FACC ¶70 at p. 12; FACC ¶71 at pp. 12-13; FACC ¶72 at pp. 13-14; FACC ¶84 at p. 17; FACC ¶85 at pp. 17-18; FACC ¶87 at pp. 18-19; FACC ¶105 at pp. 20-21; FACC ¶119 at pp. 22-23; FACC ¶120 at pp. 23-24; and FACC ¶121 at p. 24.

The four remaining FACC paragraphs referenced in the decision denying the motion to dismiss (three of which are in part attributed to Halprin) are also fully supported by the investigator memoranda.  This support is referenced on the pages of the chart attached as Exhibit A to the Greenbaum Aff. as follows: FACC ¶67 (CW1/Irizarry) is supported at pp. 3-4 of the chart; FACC ¶65 (CW2/Halprin and CW1/Irizarry) at pp. 2 and 9-10; FACC ¶86 (CW2/Halprin and CW4/Toole) at pp. 18 and 34; and FACC ¶103 (CW2/Halprin and CW3/Loverin) at pp. 20 and 32-33.

            **b.    The CW allegations were not "made up"**

Defendants' counsel baselessly asserts that the following allegations "were all simply made up:" CW2/Halprin participated in MLC meetings; CW2/Loverin worked in the Credit

---

[13] Defendants' claim as to CW2/Halprin appears to be that she lacked credibility because she was angry that BankAtlantic had terminated her employment.  Courts do not impose sanctions based on a challenge to the credibility of a witness.  *See, e.g., Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 844 (2d Cir. 1993) ("An unfavorable credibility assessment is rarely a sufficient basis for [a Rule 11] award.");  *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 625 (2d Cir. 1991) (testimony would have to be incredible as a matter of law).

Department during the Class Period; and CW6/Meek was a loan officer during the Class Period. DMS at 7.   But each of these allegations is appropriately supported by the investigator memoranda and/or the Loverin transcript.

CW2/Halprin confirmed that the Steeplechase loan was discussed at Major Loan Committee meetings attended by Alan Levan, Jack Abdo and Jarett Levan.   She knows this because she often attended these meetings as a non-voting participant.  Greenbaum Aff., Ex. A at 7-8.  *See also*, Greenbaum Aff., Ex. A at 8 ("In preparation for every meeting, there was an agenda circulated to all invitees.   Halprin confirmed that throughout the Class Period, problematic loans appeared on the agenda.  She knew this because she was frequently invited to the meetings."); *id.* ("In addition, this would have been discussed at the Major Loan Committee meetings.  She knows this because she often attended the meetings.").

CW3/Loverin [14] told the investigator that she worked in the credit department. Specifically, she told Greenbaum that she was an analyst and an underwriter.  Greenbaum Aff., Ex. A at 25.  When asked if she worked in a specific division, Loverin said that she "***worked in the credit department*** and we serviced both corporate banking and small business."   *Id.* Immediately following that exchange, Loverin told the investigator that she left BankAtlantic in January 2006.  *Id.*   Although Loverin also says she worked in small business lending, the interviews establish that she had knowledge about the commercial real estate matters that were under investigation.  *See* Greenbaum Aff., Ex. A at 25-33.

Likewise, CW6/Meek told Greenbaum that he was a loan officer during a time that included the Class Period.   Although he testified at his deposition that he left BankAtlantic in

---

[14] Defendants attack Plaintiffs' attorneys for the "secretly recorded conversations with Donna Loverin."  DMS at 9.  Both New Jersey, where Loverin was located, and New York, where Greenbaum was located, are one-party consent states.  Greenbaum Aff. ¶7.  *See* N.J. Stat. Ann. § 2A:156A-4(d) (1993) (It is lawful to intercept a wire, electronic or oral communication, where one such person is a party to the communication or one of the parties to the communication has given prior consent to such interception); N.Y. CPL § 700.05(3); N.Y. Penal Law § 250.00(1); *People v. Lasher*, 58 N.Y.2d 962, (1983).  Interviews of the other CWs, who were located in Florida, were not recorded because Florida is not a one-party consent state.  Fla. Stat. Ch. 934.03.

December 2004, Greenbaum's contemporaneous notes reflect that "Meek was with BankAtlantic from December 2002 through December 2005."  Greenbaum Aff., Ex. A at 37.[15]

> **c.     The other CW allegations are also based on information the CWs provided to the investigators**

Defendants assert that several other CW allegations in the FACC – none of which was relied on by the Court in denying the motion to dismiss – are false and justify imposition of sanctions.  DMS at 9-12.  They are wrong.  The following allegations in the FACC (in bold print below) are supported by the referenced excerpts from the investigator memoranda and the Loverin transcript:

**CW3/Loverin added that, with respect to the unusually large amount of loan defaults that were disclosed at the end of the Class Period, "there's no way these loans just all coincidentally imploded in 4 months"** (FACC ¶101)**:**    As the transcript of the interview confirms, Loverin agreed with and adopted the point asserted in the FACC that there was no way all the loans just all coincidentally imploded in 4 months.  Greenbaum Aff., Ex. A at 31.  Seizing on a double negative in the transcript, Defendants disingenuously maintain that "the context of the witness's quote is turned on its head."  DMS at 10.  That the operative statement was incorrectly attributed to the witness as a quotation, as opposed to the witness agreeing with the operative statement, is an unfortunate error.  However, Loverin agreed with the statement, and it cannot, in fairness, be used to argue that the allegation was "fabricated" and deserving of sanctions.[16]

**CW1/Irizarry said the Credit Department reported to the Lending Department** (FACC ¶58)**:**  Nyhart's investigator memorandum for Irizarry states that "CCD [commercial credit department] should remain separate from Loan Operations.  By reporting to Loan Operations, the CCD reported to the lenders who received commissions based on loan approvals."  Greenbaum Aff., Ex. A at 1.

---

[15] While the Class Period claims in the FACC are supported by the investigator memoranda, Defendants' insinuation that CW information pre-dating the Class Period would have been irrelevant is false.  Many of the loans at issue in the case were underwritten prior to the start of the Class Period making pre-Class Period underwriting practices extremely relevant.

[16] Defendants also attempt to make much of the fact that Loverin did not sign an affidavit that was prepared for her signature.  Contrary to Defendants' suggestion (DMS at 10), at the time of her refusal to sign, Loverin did not advise Plaintiffs' counsel that she believed the allegations attributed to her were false.  *See* Dolgoff Decl. ¶5.

**CW1/Irizarry said Snyder would often get in quarrels with Linda Kilgo … because Snyder would direct Kilgo to make loan disbursements before appraisals were complete, which violated company policy** (FACC ¶68)**:**  Nyhart's investigator memorandum as to Irizarry states "Kilgo had serious quarrels with Snyder, because as part of Loan Operations, Kilgo was responsible to put the loan documents together before closing.  Money was not supposed to be disbursed before appraisal.  Kilgo, however, was directed by Snyder to make loan disbursements before appraisals were complete.  This was not proper procedure."  Greenbaum Aff., Ex. A at 4.  And, contrary to Defendants' claim that Irizarry never heard of the BLB, LAD and LADC portfolios (DMS at 12), at his deposition he clearly understood that acquisition and development and acquisition, development and construction loans were part of the commercial real estate portfolio.  DE 416, Ex. J at 116-17.

**Most of these loans received rubber stamp approval from the Major Loan Committee – a fact confirmed by CW5/Blevins** (FACC ¶106)**:**  FACC ¶106 does not attribute any "rubber stamp approval" quote to Blevins or to anyone else.  The allegation is made without attribution, noting only that rubber stamp approval by Major Loan Committee was "confirmed" by Blevins.  Greenbaum Aff., Ex. A at 36.  Indeed, in his deposition Blevins acknowledged that he told the investigator that his loans at Major Loan Committee "were pretty much slam dunks."  DE 416, Ex. J at 33.[17]  And, whether MLC's approval of his loans was a "rubber stamp" or a "slam dunk," Blevins testified "to me they're kind of the same thing."  *Id.* at 54.

Defendants' cite CW4/Toole's deposition testimony where he denied that he was a CW, claiming he never had contact with the Plaintiffs' attorneys.  Toole is clearly mistaken, as the investigator memorandum reveals he was interviewed on March 14, 2008 and the investigator told him of her identity and the purpose of the call.  Greenbaum Aff., Ex. A at 34.

---

[17] After showing Blevins his severance agreement containing the non-disparagement clause, Defense counsel asked him the following question at his deposition to encourage Blevins to deny having told Plaintiffs' investigator anything about rubber stamp approvals (DE 416, Ex. J at 58):
    Q: If you had told plaintiffs' counsel or the individual who called you in the spring of '08 that major loan committee gave rubber-stamp  approval to all commercial real estate loans, would that have been a disparaging comment about BankAtlantic?

2.       **The Other Grounds Asserted For Sanctions Are Also Baseless**

a.       **The insider trading claims**

Defendants disingenuously assert that in dismissing the CAC, this Court "expressly rejected" Plaintiffs' §20A claims on "factual grounds" - that A. Levan and Abdo exercised options that resulted in a net increase in their holdings during the Class Period.  DMS at 17. Based upon this flawed foundation, Defendants attack Plaintiffs' inclusion of the same §20A claims in the FACC arguing that Plaintiffs should have known from the Court's "factual finding" that these claims would  "collapse of their own weight." *Id.*

Defendants, however, fundamentally misrepresent this Court's decision.  The referenced "factual grounds" related to whether insider trading provided an inference of scienter for §10(b) liability, not whether Plaintiffs had stated a §20A claim.  DE 70 at 29.  Since the Court found a failure to plead a §10(b) claim, the derivative §20A claim was also dismissed.  DE 70 at 38.

Indeed, a defendant's other class period trading is wholly irrelevant to the analysis of a §20A claim; the elements of which are simply (i) a predicate violation of the securities law, and (ii) that the defendant, while in possession of material non public information, purchased or sold a security contemporaneously with plaintiff's purchase or sale of a security.  *See Edward J. Goodman Life Trust v. Jabil Circuit, Inc*. 560 F. Supp 2d 1221, 1245 (M.D. Fla. 2008). Plaintiffs' §20A insider trading claims are based on Defendants' sales while in possession of material non-public information; whether the Defendants also purchased or exercised options resulting in a "net increase" in their holdings is irrelevant to whether a §20A claim is stated.  *See In re Oxford Health Sec. Litig*., 187 F.R.D. 133, 144 (S.D.N.Y. 1999) (upholding §20A claim noting that "retaining substantial holdings and purchasing or otherwise obtaining shares during the class period do not vitiate insider trading liability.").[18]  Thus, there was nothing in the Court's Opinion (or in Defendants' stock ownership records) inhibiting Plaintiffs from reasserting a §20A claim in the FACC.

---

[18] Tellingly, the only argument raised in Defendants' Motion to Dismiss the FACC with respect to Plaintiffs' §20A claims was Plaintiffs' purported  failure to state a primary violation; Defendants did not argue at the time that A. Levan's or Abdo's other Class Period transactions in Bancorp's stock undermined Plaintiffs' §20A claims  *See* DE 85, at n. 22.

**b.      The loan loss reserves claim**

Prior to filing the CAC, Plaintiffs retained Sharon Fierstein to analyze BankAtlantic's loan performance during the relevant period based on public documents.  *See* Stocker Decl. ¶¶5-6.  Fierstein provided Plaintiffs' attorneys with data regarding the Company's non-accruing loans and loan loss reserves.  This data was included in the chart incorporated at ¶128 of the FACC and shows that while the riskiness of the land loans was increasing, the loan loss reserves declined dramatically as a percentage of the bank's non-accrual loans.  The allegation was based, in part, on this information provided by the expert showing that there should have been an increase in the reserves to reflect the dramatic rise in non-accrual loans.  Moreover, CW2/Halprin told the investigator that BankAtlantic would "reallocate, move and redefine many of the commercial real estate loans … as a mechanism to reserve less and tinker with the reserves."  Greenbaum Aff., Ex. A at 23-24.  Thus, contrary to Defendants' contention, Plaintiffs had a reasonable basis for making the loan loss reserves claim.

Plaintiffs' decision not to pursue the claim at trial surely does not support sanctions.  The only proper inquiry is what was reasonable at the time of the pleading.  *Carson v. J. Curt Inc.*, *supra*, 2008 WL 4274502, at *2-3.[19]

**c.      Loss causation and damages**

There is nothing sanctionable about Plaintiffs' loss causation and damages theory or the way it was pursued during this case.  Defendants claim that because the April 26 and October 26, 2007 declines in Bancorp's stock price occurred during the economic downturn in Florida there was necessarily no basis to allege loss causation or damages in connection with Defendants' multiple false and misleading statements about the state of BankAtlantic's land loan portfolio. DMS at 18-20.  This rhetoric is refuted by Plaintiffs' initial loss causation analysis (*see* Stocker Decl.  ¶¶ 2-4), by Plaintiffs' *and Defendants'* damages experts, and by the observations of this Court.

---

[19] Nor was Plaintiffs' argument at trial about the slow downgrading of loans an attempt to argue the existence of accounting fraud as Defendants' incorrectly assert.  DMS at 18.  In any event, the discussion relied on by Defendants' counsel for this point (Tr. 3767 -78) came the day before the Court's ruling that the adequacy of the loan loss reserves was an issue precluded by the summary judgment ruling (Tr. 3888).  Moreover, since the colloquy referenced by Defendants did not occur in a "pleading, written motion, or other paper" (Rule 11(b), Fed. R. Civ. P.), imposition of sanctions is not permitted.

Preston's event study established that the April and October 2007 stock price declines were statistically significant and therefore caused by forces independent from general market or industry factors. *See* DE 695 at 47-48 (citing trial record). ***Moreover, Defendants' damages expert, Michael Keable, agreed that the declines were not caused by market or industry factors.*** *See* DE 302, Ex. E at 67-68 ("Q: So would you agree then that it was company-specific information as opposed to industry-wide or market-wide information that caused the stock to drop in April and October 2007?  A:  Oh, yes.").

Finally, the Court recognized that there was a complete *lack* of any quantitative evidence in the trial record demonstrating that the risk of the BLB portfolio followed or corresponded to the Florida real estate market.  As the Court noted:

> I'm not saying you have the burden.  But I'm just asking you, is there any evidence in the record that the risk inherent in the BLB portfolio tracked the Florida real estate market?  ***And the answer is no.***

Tr. 3062-63 (emphasis added).  Stated simply, the evidence fully supported the claim that the April and October 2007 stock price declines in Bancorp's stock price were caused by the materialization of previously concealed risks about Bancorp's land loan portfolio.

Defendants' counsel next launch an ethical assault on Plaintiffs' attorneys for advocating a damages theory based on the argument that the full extent of risk to the BLB land loans was not disclosed and did not fully materialize until October 2007.  DMS at 19.  But this line of attack ignores this Court's rulings that recognized the sufficient basis in the record from which the jury could infer BLB fraud past April 26, 2007.  In denying Defendants' motion to exclude Preston's expert testimony under *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579 (1993), this Court held that her testimony regarding the causes of the decline in Bancorp's stock price on October 26, 2007 was "reliable."  DE 411 at 34.[20]  The Court also ruled at the close of Plaintiffs' case that there was sufficient evidence from which the jury could infer post-April 26, 2007 BLB fraud.  Tr. 3044–3045.  *See also* DE 695 at 53.  Thus, there is clearly no basis for the assertion that Plaintiffs' damages theory is a Rule 11 violation.

---

[20] Defendants argued that Preston's opinion was unreliable because she attributed 100% of the company-specific residual decline to negative information about the land loan portfolio.  The Court found this argument was no basis to disqualify Preston.  *See* DE 411 at 33.

18

### d.       Alan Levan's July 25, 2007 statements

Plaintiffs' motion for partial summary judgment was made based on the existing record. Defendants failed to cite any evidence creating an issue of fact, and the Court granted the motion.  The decision was sustained over and over again at trial despite countless attempts by Defendants' counsel to reargue.  And, the Court recently denied Defendants' motion for a new trial based on this decision.  DE 695 at 94-102.  The notion that Plaintiffs' attorneys engaged in sanctionable conduct in connection with this motion is ludicrous.

### e.       Defendants' claim for sanctions against the class representatives

Defendants move for sanctions against the class representatives, but not a word in the motion addresses any of their conduct much less sanctionable conduct.  Like the rest of the motion, this baseless claim must be denied.  *See Byrne v. Nezhat, M.D.*, 261 F.3d 1075, 1118 (11th Cir. 2001).

## IV.   Defendants' Counsel's Improper and Sanctionable Conduct

The Defendants' motion is without merit and objectively frivolous and known to be so by Defense counsel.  The CW allegations in the pleadings were based on, and consistent with, contemporaneously drafted interview memoranda and an interview transcript, thereby demonstrating Plaintiffs' attorneys' good faith basis for the allegations.  Defense counsel knew this last May (DE 319, Ex. I) but willfully turned a blind eye to that evidence and to the case law that rejects sanctions based on CW recantations.  They persisted in filing two sanctions motions falsely asserting that all the CW allegations were "made up." Moreover, the present sanctions motion (i) makes completely unsupported claims against the class representatives, (ii) distorts the record with respect to the prior proceedings relating to Plaintiffs' §20A claim, and (iii) baselessly asserts that sanctions are warranted for Plaintiffs' loan loss reserve claim, loss causation and damages theories that were upheld by the Court and motion for partial summary judgment as to Levan's four false statements that was granted by the Court.  Imposition of sanctions for a frivolous sanctions motion is firmly supported by Rule 11.  *See Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1293-94 (11th Cir. 2002); *Safe-Strap Co. v. Koala Corp*, 270 F. Supp. 2d 407, 421 (S.D.N.Y. 2003) ("where a party's Motion for Rule 11 sanctions is not well grounded in fact or law, or is filed for any improper purpose" that party should be sanctioned under Rule 11); *Williams v. General Motors Corp.*, 158 F.R.D. 510 (M.D. Ga. 1993).

Defense counsel also falsely, repeatedly and disingenuously represented in signed documents and in open court during trial that no bank disclosed substandard and special mention loans.[21]  In fact, as Plaintiffs advised the Court, 117 banks on the NASDAQ Bank Stocks Index alone had disclosed such loans in their SEC filings prior to October 26, 2007.  Tr. 2647-56.  Any argument that Defense counsel innocently made the foregoing misrepresentations is specious.  Indeed, consciously avoiding a simple computer search of the terms "substandard" and "special mention" that would have informed defense counsel of the many banks that disclosed what BankAtlantic had not, Defense counsel searched for the word "watch" – a search designed to achieve a false result.

Defendants' counsel's conduct is sanctionable.  In contrast, Plaintiffs' counsel's conduct in bringing this action in good faith based on a diligent investigation, analysis of expert opinion, and information in the public domain and prosecuting the case to a jury verdict in Plaintiffs' favor is not.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Sanctions should be denied in all respects and the Court should sanction Defendants' counsel.

---

[21] *See*, *e.g.*, DE 261 at 22 ("no other company made such disclosure during this period"); DE 350 (SMJ Reply) at 9; DE  330 (Partial SMJ Opposition) at 10 ("[t]he undisputed evidence in fact showed that financial institutions do not report the number of internally risk-rated special mention (10) and substandard (11) loans for many reasons"); DE 524, Pre-Trial Hearing Tr. at 129–34 ("527 [banks] didn't [disclose watch list loans].  This one bank did … [and] …BankAtlantic became the second bank to disclose watch lists in October of '07 … [Court:] [n]ow you're telling me there's only one other bank that did [disclose watch list loans]. Mr. Stearns: Yes"); Tr. 2645-2656.

Dated: May 16, 2011

Respectfully submitted,

LABATON SUCHAROW LLP

/s/Mark S. Arisohn

Mark S. Arisohn, admitted *pro hac vice*
Serena Hallowell, admitted *pro hac vice*
Mindy Dolgoff, admitted *pro hac vice*
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Co-Class Counsel for Class Representatives and the Class and Lead Counsel for Lead Plaintiff State-Boston Retirement System*

BARROWAY TOPAZ KESSLER
MELTZER & CHECK LLP
Andrew L. Zivitz, admitted *pro hac vice*
Matthew Mustokoff, admitted *pro hac vice*
Mark S. Danek, admitted *pro hac vice*
Michelle M.Newcomer, admitted *pro hac vice*
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Co-Class Counsel for Class Representatives and the Class*

FOWLER WHITE BURNETT P.A.
RONALD D. SHINDLER # 781703
Espirito Santo Plaza, 14th Floor
1395 Brickell Avenue
Miami, FL 33131-3302
Telephone: (305) 789-9200
Facsimile: (305) 789-9201
rshindler@fowler-white.com

*Liaison Counsel for Class Representatives and the Class and for Lead Plaintiff State-Boston Retirement System*

21

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 16, 2011, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document

is being served this day on all counsel of record or pro se parties identified on the attached

Service List in the manner specified, either via transmission of Notices of Electronic Filing

generated by CM/ECF or in some other authorized manner for those counsel or parties who are

not authorized to receive electronically Notices of Electronic Filing.


/s/ Ronald D. Shindler
RONALD D. SHINDLER

## SERVICE LIST

Adam M. Schachter
Eugene E. Stearns
Gordon M. Mead, Jr.
Stearns Weaver Miller
Weissler Alhadeff & Sitterson, P.A.
150 W. Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305)789-3400
Facsimile: (305) 789-3395
aschachter@stearnsweaver.com
estearns@stearnsweaver.com
gmead@sternsweaver.com